JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff  Rock Island County<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  Cuyahoga<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Lewis Brisbois Bisgaard & Smith, LLP<br>1375 East 9th Street, Suite 1600<br>Cleveland, Ohio 44114 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place<br>of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☒ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br> & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br> Student Loans<br> (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br> of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br> Liability<br>☐ 320 Assault, Libel &<br> Slander<br>☐ 330 Federal Employers'<br> Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br> Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br> Product Liability<br>☐ 360 Other Personal<br> Injury<br>☐ 362 Personal Injury -<br> Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br> Product Liability<br>☐ 367 Health Care/<br> Pharmaceutical<br> Personal Injury<br> Product Liability<br>☐ 368 Asbestos Personal<br> Injury Product<br> Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br> Property Damage<br>☐ 385 Property Damage<br> Product Liability | ☐ 625 Drug Related Seizure<br> of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br> Act<br>☐ 720 Labor/Management<br> Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br> Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br> Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br> 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br> 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br> Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br> Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | Act<br>☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br> Accommodations<br>☐ 445 Amer. w/Disabilities -<br> Employment<br>☐ 446 Amer. w/Disabilities -<br> Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br> Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br> Conditions of<br> Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br> Actions | ☐ 870 Taxes (U.S. Plaintiff<br> or Defendant)<br>☐ 871 IRS—Third Party<br> 26 USC 7609 | ☐ 899 Administrative Procedure<br> Act/Review or Appeal of<br> Agency Decision<br>☐ 950 Constitutionality of<br> State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE  11/7/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**     Civil Categories: (Please check one category only).

1. [✔] General Civil
2. [ ] Administrative Review/Social Security
3. [ ] Habeas Corpus Death Penalty

*If under Title 28, §2255, name the SENTENCING JUDGE: _____

CASE NUMBER: _____

**II.**   **RELATED OR REFILED CASES.** See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled. Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action is [ ] **RELATED** to another **PENDING** civil case. This action is [ ] **REFILED** pursuant to **LR 3.1**.

If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.

**III.**  In accordance with Local Civil Rule 3.8, actions involving counties in the Eastern Division shall be filed at any of the divisional offices therein. Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER. UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)     **Resident defendant.** If the defendant resides in a county within this district, please set forth the name of such county
**COUNTY:**
Corporation For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.

(2)     **Non-Resident defendant.** If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred,
**COUNTY:**

(3)     **Other Cases.** If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
**COUNTY:**

**IV.**   The Counties in the Northern District of Ohio are divided into divisions as shown below. After the county is determined in Section III, please check the appropriate division.

**EASTERN DIVISION**

[ ] AKRON          (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
[✔] CLEVELAND      (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake,
                              Lorain, Medina and Richland)
[ ] YOUNGSTOWN     (Counties: Columbiana, Mahoning and Trumbull)

**WESTERN DIVISION**

[ ] TOLEDO         (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,
                              Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca
                              VanWert, Williams, Wood and Wyandot)

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

CMB Infrastructure Investment Group X,L.P.

_____
*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____
*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Maple Street Inestors, LLC, an Ohio Limited Liabilitiy Company
c/o Hurtuk & Daroff Co., LLP
6120 Parkland Boulevard, Suite 100
Cleveland, Ohio  44124

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

GERI M. SMITH, CLERK OF COURT

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                         _____
                                           *Printed name and title*


                                         _____
                                             *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

CMB Infrastructure Investment Group X,L.P.

_____
*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____
*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Stuart Lichter
c/o Indsutrial Realty Group, LLC
12214 Lakewood Boulevard
Downey, CA  90242

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*GERI M. SMITH, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

□ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

□ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

□ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

□ I returned the summons unexecuted because _____ ; or

□ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*

                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

CMB Infrastructure Investment Group X,L.P.

_____

*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____

*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Christopher S. Semarjian
c/o Alan R. Daus & Associates
3401 Enterprise Parkway, Suite 105
Cleveland, Ohio 44142

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*GERI M. SMITH, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

CMB Infrastructure Investment Group X, L.P.

_____
*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____
*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Maple Street Commerce, LLC
c/o Hurtuk & Daroff Co., L.P.A. (Registered Agent)
6120 Parkland Boulevard, Suite 100
Cleveland, Ohio 44124

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*GERI M. SMITH, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## for the

CMB Infrastructure Investment Group X,L.P.

_____
*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____
*Defendant*

)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Industrial Realty Group, LLC.
3773 Howard Hughes Parkway
Suite 500S
Las Vegas, NV  89169

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*GERI M. SMITH, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

    ☐ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

    ☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ☐ I returned the summons unexecuted because _____ ; or

    ☐ Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

                                _____
                                              *Server's signature*

                                _____
                                        *Printed name and title*

                                _____
                                           *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

CMB Infrastructure Investment Group X,L.P.

_____

*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____

*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  IRG RC market Buildings, LLC
1300 East Ninth Street
Cleveland, Ohio  44114

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

GERI M. SMITH, CLERK OF COURT

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❏ I returned the summons unexecuted because _____ ; or

    ❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

                                     _____
                                     *Server's signature*

                                     _____
                                     *Printed name and title*

                                     _____
                                     *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

CMB Infrastructure Investment Group X,L.P.

_____

*Plaintiff*

v.

Maple Street Investors, LLC, et al.

_____

*Defendant*

)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  IRG Rubber City, LLC
c/o Corporate Service Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*GERI M. SMITH, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## for the

CMB Infrastructure Investment Group X, L.P.

|  |  |
|---|---|
| _____ | ) ) ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Maple Street Investors, LLC, et al. | ) |
| _____ | ) ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    S.L. Properties, Inc.
c/o Corporate Service Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

GERI M. SMITH, CLERK OF COURT

Date: _____          _____
                                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

# PROOF OF SERVICE
## *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

.

| | |
|---|---|
| **CMB Infrastructure Investment Group X, L.P.,**<br>an Illinois Limited Partnership<br>7819 42nd Street, West<br>Rock Island, Illinois 61201 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| **Maple Street Investors LLC**, an Ohio Limited<br>Liability Company, and **Stuart Lichter**, individually)<br>c/o Hurtuk & Daroff Co., LLP<br>6120 Parkland Boulevard, #100<br>Cleveland, Ohio  44124 | )<br>)<br>)<br>)<br>) |
| And | )<br>) |
| Stuart Lichter<br>c/o Industrial Realty Group, LLC<br>12214 Lakewood Boulevard<br>Downey, CA 90242 | )<br>)<br>)<br>) |
| And | )<br>) |
| Christopher S. Semarjian<br>c/o Alan R. Daus & Associates<br>3401 Enterprise Parkway, Suite 105<br>Cleveland, Ohio 44142 | )<br>)<br>)<br>) |
| And | )<br>) |
| Maple Street Commerce, LLC<br>c/o Hurtuk & Daroff Co., LLP (Registered Agent)<br>6120 Parkland Blvd, #100<br>Cleveland, OH 44124 | )<br>)<br>)<br>) |
| And | )<br>) |
| Industrial Realty Group, LLC<br>3773 Howard Hughes Pkway<br>Suite 500S<br>Las Vegas, NV 89169 | )<br>)<br>)<br>) |

**CASE NO.:**

JUDGE:

**COMPLAINT**

4852-5626-2971.3

And                                          )
                                             )
IRG RC Market Buildings LLC                  )
1300 East Ninth Street                       )
Cleveland, OH 44114                          )
                                             )
        and                                  )
                                             )
IRG Rubber City LLC                          )
c/o Corporate Service Company                )
2711 Centerville Road Suite 400              )
Wilmington, DE 19808                         )
                                             )
        and                                  )
                                             )
S.L. Properties, Inc.                        )
c/o Corporate Service Company                )
2711 Centerville Road Suite 400              )
Wilmington, DE 19808                         )
                                             )
                                             )
        Defendants.                          )

Now comes Plaintiff, CMB Infrastructure Investment Group X, L.P., by and through undersigned counsel hereby sues Defendants, Maple Street Investors LLC, and Stuart Lichter, seeking money damages, equitable, and other relief, and alleges as follows:

## **Nature of the Case**

1.      This is an action for breach of contract, specific performance, and injunctive relief, arising from a borrower's misrepresentations and deliberate concealment of its failure to comply with the terms of a loan agreement and a guarantor's failure to honor a guaranty.

2

2.      On May 7, 2012, Plaintiff as "Lender" and Defendant, Maple Street Investors LLC, ("MSI") as "Borrower" entered into a loan agreement (the "Loan Agreement"),[1] a copy of which is attached hereto as Exhibit "A".  Pursuant to the Loan Agreement, MSI borrowed $36,000,000 from Plaintiff (the "Loan") for development of a construction project consisting of the renovation, repurposing and improvement of the former Hoover Vacuum Company campus located on real property in North Canton, Ohio ("Hoover Project").  The Hoover Project is being constructed on real property owned by Maple Street Commerce LLC, an entity owned by MSI.

3.      The principal amount of the Loan bears interest at a fixed rate of six percent (6%).  Interest is payable quarterly and the Loan is to mature seventy-two (72) months from the initial funding date.  The initial funding date was <u>October 16, 2013.</u>

4.      Under the Loan Agreement, Plaintiff agreed to lend MSI $36,000,000 in authorized EB-5 investment funds to facilitate the development of the Hoover Project pursuant to the provisions of the EB-5 foreign investor program as authorized by the United States Citizenship and Immigration Services (defined in ¶ 28, *infra*).[2]

5.      In the Loan Agreement, MSI delivered covenants to Plaintiff promising to use the Loan proceeds solely for the purpose of funding the construction costs of the Hoover Project.  However, Plaintiff has since learned that, in direct contravention of the Loan Agreement, and a mere two (2) days after MSI received the Loan proceeds from Plaintiff, MSI diverted at least

---

[1] The Loan Agreement, Ex. "A", incorrectly names "CMB Investment Group X, L.P." as "Lender" (instead of Plaintiff/Lender's correct name, CMB Infrastructure Investment Group X, L.P.).  In the First Amendment to Loan Agreement dated October 16, 2013 (*see* Ex. "C", *infra*, at para. 6), the parties acknowledged the scrivener's error and agreed that all references to the incorrect name or to "Lender" in the Loan Agreement and in any other Loan Document shall mean and refer to CMB Infrastructure Investment Group X, L.P.

[2] The EB-5 investment program provides foreign investors the opportunity to earn permanent residence in the United States through investing in U.S. projects that create a certain number of jobs. *See, infra.*

$25,000,000 of the Loan proceeds.  The transfer of Loan funds was made without Plaintiff's knowledge or consent and in violation of the Loan Agreement.  Since first learning of the diverted funds, Plaintiff has been attempting to determine the use of the funds and scope of the misreporting.

6.     MSI deliberately concealed from Plaintiff the unauthorized transfer of Loan proceeds by intentional omissions in financial reports and documentation it prepared and delivered to Plaintiff, and in meetings and discussions between MSI's officers and agents and Plaintiff's representatives.

7.     In accordance with the terms of the Loan Agreement, Plaintiff has undertaken repeated and continuing efforts to obtain information and documentation from MSI to ensure that the $36,000,000 loaned to MSI is being used solely for construction of the Hoover Project. In violation of the Loan Agreement, MSI continues to refuse to supply necessary records and reports required by the Loan Agreement, prohibited CMB's access to MSI's offices at the Hoover Project and denied Plaintiff's attempts to inspect MSI's books and records.

8.     Prior to funding the Loan, to induce Plaintiff to commence the raising of funds from foreign investors under the EB-5 Program, MSI delivered to Plaintiff an authorization letter.  The authorization letter projected that the Hoover Project construction would be completed by the fourth quarter of 2015 and  anticipated the expenditure by MSI of approximately $70,000,000, including private and public funds from sources other than the Plaintiff.

9.     Despite MSI's representations, the Hoover Project is still not complete and $25,000,000 of the projected $70,000,000 of funds required for completion of the Hoover Project have been diverted without authorization, for unknown purposes and uses.

4

10.    As a result of MSI's repeated failure to fully and properly address Plaintiff's requests for information regarding the status of the Hoover Project and the Loan proceeds, Plaintiff, through its counsel, provided notice to MSI of the Events of Default under the Loan Agreement. The notice requested that MSI cure those Events of Default as required pursuant to the Loan Agreement.  To date, MSI has failed to cure the Events of Default.

11.    By virtue of the unauthorized transfer of the Loan proceeds, inaccurate financial information provided by the MSI and MSI's refusal to meet its reporting requirements, Plaintiff's security is compromised and it has incurred damages, including costs associated with attempts to obtain MSI's compliance with its obligations under the Loan Agreement.

12.    Plaintiff seeks damages for the repeated and continuing breach of the Loan Agreement by MSI as well as the accelerated return of all unpaid principal and accrued interest on the loan.  Plaintiff further demands specific performance of certain provisions of the Loan Agreement which require the production of audited financial statements, operating budgets, records reflecting MSI's financial and operational condition and a forensic examination of the MSI's records.  Plaintiff further seeks injunctive relief enjoining MSI from continuing to violate the terms of the Loan Agreement.

13.    Plaintiff also seeks damages from Defendant, Stuart Lichter ("Lichter"), a fifty-percent (50%) owner of MSI, pursuant to a written Guaranty for his failure to fulfill his obligations under the Guaranty of MSI's obligations of the Loan Agreement.

### Parties

### Plaintiff

14.    Plaintiff, CMB Infrastructure Investment Group X, L.P. ("CMB") is an Illinois Limited Partnership, with its principal place of business in Rock Island, Illinois.  CMB's Co-

5

General Partners are CMB Summit, LLC ("CMB Summit"), a Texas limited liability company with its principal place of business in Austin, Texas, and NK Immigration Services, LLC, a Texas limited liability company.

15.     CMB, as limited partner of CMB Summit, and at the request of Defendant, originated the Loan and raised capital through EB-5 investors to invest in the Hoover Project. *See* Ex. "A", p. 1.

### Defendants and Affiliated Entities

16.     Defendant, Maple Street Investors LLC ("MSI"), is an Ohio Limited Liability Company with its principal place of business in Summit County, Ohio. The members of MSI are Stuart Lichter, a resident of California, and Christopher S. Semarjian, a resident of Ohio.

17.     Defendant, Stuart Lichter ("Lichter") is the 50% owner of MSI.

18.     MSI was formed on April 30, 2012, as a "Single Purpose Entity" organized solely for the purpose of acquiring and holding membership interest in Maple Street Commerce LLC ("MSC"), an Ohio limited liability company with its principal place of business in Summit County, Ohio. *See* Ex. "A", pp. 5-6. MSC holds fee title to the real property and improvements comprising the Hoover Project.

19.     MSI entered into the Loan Agreement with CMB on May 7, 2012, for the funding of the redevelopment of real property and improvements at the Hoover Project.

20.     IRG RC Market Buildings, LLC ("IRG"), is an Ohio limited liability company with its principal place of business in Akron, Ohio. IRG was formed on June 10, 2011. IRG entered into a loan agreement with CMB on May 7, 2012, for the funding of the redevelopment of certain property located in Akron, Ohio and which property was formerly owned and operated by Goodyear Tire & Rubber Company in Akron, Ohio (the "Goodyear Project").

6

21.     IRG Rubber City, LLC ("IRG RC"), is a Delaware limited liability company. IRG RC is the sole Member of IRG RC Market Buildings, LLC.

22.     S.L. Properties, Inc. is a Delaware corporation and is a Manager of MSI, IRG, and IRG RC. The President of S.L. Properties, Inc. is Lichter.

23.     Industrial Realty Group, LLC is a Nevada limited liability company with its principal place of business in Henderson, Nevada, and is the parent company of MSI and IRG. The President and Manager of Industrial Realty Group LLC is Lichter. MSI and IRG are affiliates by virtue of their common ownership.

## Jurisdiction and Venue

24.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interest and costs and arises between citizens of different states.

25.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2202 (Injunctions).  CMB seeks specific performance and an injunction enjoining MSI from continuing to violate the terms of the Loan Agreement, as further set out below.

26.     This Court has personal jurisdiction over MSI because MSI regularly conducts business in the State of Ohio and has sufficient contacts with the State of Ohio such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. Specifically, the Hoover Project is located in Summit County, Ohio.  The Parties further consented to jurisdiction in this Court. *See* Loan Agreement, Ex. "A", at § 10.14; and Guaranty (Exhibit B to Exhibit "C"), at § 5.8.

27.     Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this District.

7

### The EB-5 Program

28.     In 1990, Congress created the EB-5 Visa Program to provide prospective immigrants with the opportunity to become lawful U.S. permanent residents by investing in the U.S. economy. The EB-5 Visa Program is overseen by the U.S. Citizenship and Immigration Services ("USCIS"). *See* USCIS Policy Memorandum PM-602-0083, dated May 30, 2013, available at www.uscis.gov/laws/policy-memoranda.

29.     To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (see *infra*) in a commercial enterprise approved by the USCIS ("EB-5 Investor"). Once the investment is effected, the foreign applicant may apply for a 2-year conditional green card. If the investment creates or preserves at least ten (10) U.S. jobs during those two years, the EB-5 Investor may apply to have the conditions removed from the green card.  Once the conditions are removed, the foreign applicant is allowed to live and work in the U.S. permanently.

30.     In 1992, a program was launched that set aside a certain number of EB-5 visas for investments that were affiliated with an economic unit known as a "Regional Center."

31.     A Regional Center is defined as any economic entity, public or private, which is involved with the promotion of economic growth, improved regional productivity, job creation, and increased domestic capital investment. EB-5 Regional Centers are designated by the USCIS to administer EB-5 investment projects based on proposals for promoting economic growth.

### CMB's Regional Centers

32.     CMB is a subsidiary entity of CMB Summit, a federally-designated Regional Center with a geographic scope that encompasses Ohio.  CMB is authorized to raise capital under the EB-5 Program.  Funds raised by CMB Summit through CMB from EB-5 Investors

may be combined with additional public and private funds to finance the construction of a specific project or projects within the geographic region covered by the Regional Center.

33.     Through its Regional Center partnerships, CMB Summit seeks to assist needy U.S. communities by channeling foreign national investment capital into larger infrastructure construction projects such as roads, sewers, water, electricity generation, transportation, communication upgrades, and public and private building structures.

34.     As an approved Regional Center, CMB Summit is governed by the rules and regulations promulgated under the EB-5 Program. CMB must comply with USCIS rules in order to protect CMB Summit's designation as a Regional Center as well as the immigration pursuits of the various limited partners in its Regional Center sponsored EB-5 partnerships.

## Factual Background

## CMB and MSI Loan Agreement

35.     On March 7, 2012, Lichter, on behalf of MSI, sent a letter to Patrick F. Hogan ("Hogan"), President of CMB Summit ("MSI Authorization Letter"), authorizing CMB Summit to raise $36,000,000 in loan financing (referred to in the MSI Authorization Letter as the "CMB Maple Street Loan") for the Hoover Project. *See* MSI Authorization Letter, attached hereto as Exhibit "B".

36.     In the MSI Authorization Letter, Lichter expressly represented that "[t]he CMB Maple Street Loan will be used by MSC to fund a portion of the needed equity commitment to the former Hoover Company projects and shall provide significant assistance to the further development of the former Hoover Company properties listed in the table above." *Id.*

37.     Lichter further represented to CMB that the total capital expenditures on the Hoover Project "are expected to exceed $70 million", of which $36,000,000 would be funded

9

through the CMB Maple Street Loan and an additional $34,800,000 would be raised from a combination of public and private funds. The Hoover Project was projected to be completed by the fourth quarter of 2015. *Id.*

38.     In reliance on the MSI Authorization Letter and the terms, conditions, and covenants of the Loan Agreement, on May 7, 2012, CMB entered into the Loan Agreement with MSI, agreeing to loan $36,000,000 to MSI "solely for the purpose of funding the construction costs of the [Hoover] Project." *See* Ex. "A", at § 2.1(d).

39.     MSI violated Section 2.1(d) (as well as Section 6.1(f)) of the Loan Agreement when it misappropriated Loan proceeds. Instead of using the Loan proceeds as specifically required in the Loan Agreement, MSI claims that, within days of the funding of the Loan, and without notice to or consent of CMB, it transferred $25,000,000 of the Loan proceeds to intermediaries which then loaned those funds to an affiliate, IRG, for use in the Goodyear Project.

40.     The Loan Agreement also requires MSI to provide CMB with audited financial statements and accounting reports as well as EB-5 documentation and other information within specified time periods, including Sections: 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management Letters"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); and 5.1(h) ("EB-5 Documentation").

41.     Section 5.1(a) of the Loan Agreement (titled "Operating Statements and Operating Results") requires MSI, as Borrower, to deliver or cause to be delivered to CMB, as Lender:

> As soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, (i) monthly operating statements, which operating

10

statements shall include actual monthly and year-to-date net operating income and net cash flow results and comparison to the prior calendar year, and variance to budget reporting, detailed rent rolls, cash flow projections, lease status reports and occupancy summaries in the form customarily generated by Borrower for the Property, dated as of the last day of such calendar month, in form and substance satisfactory to Lender, certified to Borrower as being true, correct, and complete in all material respects (each, an "**Operating Statement**").

42.     Section 5.1(b) of the Loan Agreement (titled "Annual Financial Statements; Accountant's Report and Management Letters") requires Borrower, to deliver or cause to be delivered to Lender:

> Within one hundred twenty (120) days after the close of each calendar year, annual audited financial statements of Borrower, prepared on a consolidated basis, consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, together with related schedules and supporting reports, when applicable. Such financial statements shall be prepared on the basis of GAAP or another accounting method approved by Lender and shall be accompanied by a certificate executed by Borrower or a certified public accountant acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects. Such financial statements are collectively referred to herein as the "**Annual Financial Statements**". Together with the delivery of such Annual Financial Statements pursuant to this Section 5.1(b), Borrower shall deliver to Lender a copy of the accountant's reports and management letters with respect to such calendar year.

43.     Section 5.1(f) of the Loan Agreement (titled "Other Information") requires Borrower to deliver or cause to be delivered to Lender:

> Such other information, reports, contracts, schedules, lists, documents, agreements and instruments in the possession or under the control of Borrower with respect to (i) the Property[3], (ii) any material change in Borrower's investment, finance or operating policies, or (iii) Borrower's business, condition (financial or otherwise), operations, performance, properties or prospects as

---

[3] The Loan Agreement defines the term "Property" as "the project known as the former Hoover Plant located in North Canton, Ohio" which "generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan" and "together with related site improvements, appurtenances, fixtures and tenant improvements, if any, now or hereafter on the Real Property". *See* Ex. "A", p. 1.

Lender may from time to time reasonably request, including, without limitation, annual information with respect to cash flow projections, budgets, operating statements (current year and immediately preceding year), rent rolls, lease expiration reports and leasing status reports...

44.    Section 5.1(g) of the Loan Agreement (titled "Accountant Reports") requires

Borrower to deliver or cause to be delivered to Lender:

> (i) In connection with the audited Annual Financial Statements described in Section 5.1(b) and if at any other time Borrower causes audited financial statements to be prepared with respect to any Fiscal Year, then, within ten (10) Business Days after receipt thereof from the Accountants: copies of such audited financial statements, together with all reports prepared by the Accountants and submitted to Borrower in connection therewith, including the comment letter submitted by the Accountants in connection with such audit, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower.

45.    Section 5.1(h) of the Loan Agreement (titled "EB-5 Documentation") requires

Borrower to deliver or cause to be delivered to Lender:

> At any time during the term of this [Loan] Agreement, upon thirty (30) days written request therefor by Lender, EB-5 documentation reports in form and content acceptable to Lender relating to the construction expenditures made by or on behalf of Borrower with respect to the [Hoover] Project, including a description of each such construction expenditure and the date of each such construction expenditure in such detail as reasonably requested by Lender (the "**EB-5 Documentation**"). Borrower shall state in the EB-5 Documentation that total expenditures on the [Hoover] Project at the time of the delivery of the EB-5 Documentation to Lender, which [Hoover] Project expenditures, including the use of additional private and public funds, are estimated as of the date of this [Loan] Agreement to be approximately $70,000,000.00. Borrower agrees to produce the EB-5 Documentation at its sole cost and expense.

46.    In addition to regular reporting requirements, the Loan Agreement affords CMB

the right to visit and inspect the Property, and to inspect and make copies of financial and

accounting records and leases "as often as Lender may reasonably request." *See* Ex. "A", Section

6.1(d) of the Loan Agreement, which states:

12

6.1(d) <u>Inspection of Property; Books and Records; Discussions</u>. Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request. Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

47.    As more fully stated below, MSI failed to comply with its aforesaid reporting requirements under the Loan Agreement and has repeatedly disregarded and denied CMB's repeated requests to inspect MSI's books and records.

48.    On October 16, 2013, CMB and MSI entered into a First Amendment to Loan Agreement ("First Amendment") which included additional terms requiring MSI to execute a Pledge Agreement and a Guaranty. *See* First Amendment, attached hereto as Exhibit "C".

49.    Pursuant to the terms of the First Amendment, MSI, on October 16, 2013, executed and delivered a promissory note evidencing CMB's funding of the Loan to MSI under the Loan Agreement, in the original principal amount of $36,000,000. A copy of the Maple Street Investors LLC Promissory Note is attached hereto as Exhibit "D", (the "Note"). The Note states "[t]his Note shall not be assigned by either party without the written permission of the other party, which permission shall not be unreasonably withheld." *Id*.

50.    Although projected to be completed in the fourth quarter of 2015, to date, the Hoover Project remains unfinished and the Loan proceeds are not accounted for.

**MSI Deliberately Conceals the Unauthorized Diversion of Loan Proceeds**

51.    On March 7, 2012, Lichter sent a separate Authorization Letter on behalf of IRG ("IRG Authorization Letter"), to Hogan authorizing CMB Summit to raise an additional $35,000,000 in loan financing for funding improvements to properties formerly owned and

operated by Goodyear Tire & Rubber Company and located in Akron, Ohio ("CMB Goodyear Project Loan"). See IRG Authorization Letter, attached hereto as Exhibit "E".

52.     In the IRG Authorization Letter, Lichter represented that the Goodyear Project would exceed $252 million in total funding, including the $35,000,000 to be funded by CMB. *Id.*

53.     As was the case in the MSI Authorization Letter, the IRG Authorization Letter identified the use of loan proceeds, specifically for use in development of the Goodyear Project: "to fund a portion of the needed equity commitment to the existing Goodyear Headquarters Buildings projects and shall provide significant assistance to the further development of IRG RC properties." *Id.*

54.     Contemporaneous with the execution of the Loan Agreement, on May 7, 2012, CMB also entered into an agreement with IRG for a loan for the financing of the Goodyear Project in the amount of $35,000,000.

55.     On August 7, 2013, IRG executed a $35,000,000 promissory note in accordance with its loan agreement with CMB.

56.     Pursuant to the loan documents, both MSI and IRG were to provide regular reporting to the CMB regarding their finances and status of the projects.

57.     In the fall of 2015, CMB was attempting to gather from MSI missing information and noted some discrepancies with the financial information on the Hoover Project and where the Loan proceeds were spent.

58.     After CMB's repeated requests for an explanation of the discrepancies in financial information provided to CMB by IRG, MSI ceased delivery to CMB of the monthly Operating Statements required under Section 5.1(a) of the Loan Agreement. *See* Ex. "A".   MSI discontinued any meaningful communication with CMB.

59.     In September 2015, representatives of CMB sent a written request to MSI for the production of documents pursuant to Section 5.1(h) of the Loan Agreement. CMB's requests were ignored by MSI.

60.     On October 21, 2015, CMB's representatives sent another written request to MSI notifying MSI that CMB's representatives would be traveling to the Property for inspection and to make copies of financial and accounting records and leases, pursuant to Section 6.1(d) of the Loan Agreement.

61.     On October 26, 2015, CMB's representatives visited the Property in North Canton, Ohio.  Upon their arrival, they were intercepted by Tracy Green, President of IRG Realty Advisors, who denied the CMB's representatives access to MSI's offices and records. Green stated to the CMB's representatives that he was under direction from MSI not to provide them access to the documentation.

62.     In November 2015, after weeks of unsuccessful attempts by CMB's representatives to elicit responses to various requests for information from MSI regarding its use of the Loan proceeds and status of the Hoover Project, CMB was advised by MSI that days following the October 16, 2013 funding of the $36,000,000 Loan, MSI diverted $25,000,000 of the Loan proceeds to intermediaries who allegedly then loaned those funds to IRG for use in the Goodyear Project.

63.     According to Lichter and Richard Klein (purportedly the Chief Financial Officer of MSI's parent entity, Industrial Realty Group), and unbeknownst to CMB, on October 18, 2013 (a day after the $36 million Loan from Plaintiff cleared Defendant's bank account), MSI loaned $14,300,000 to S.L. Properties, Inc., the Manager of IRG.  On the same date, S.L. Properties, Inc. loaned the entire $14,300,000 to IRG.  An additional $10,700,000 was loaned

15

from MSI to Industrial Commerce, Ltd, which in turn then supposedly loaned the $10,700,000 to IRG. To substantiate the alleged loans, MSI produced copies of the four (4) purported promissory notes. *See* Promissory Notes, attached hereto as Composite Exhibit "F". MSI has refused to provide any records by which the funds can be traced. Due to MSI's failure to comply with regular reporting requirements or provide any meaningful information, CMB has been unable to verify the unauthorized loans or track the funds.

64.    MSI - without the knowledge, permission, or consent of CMB and in direct contravention of the representations in the MSI Authorization Letter, the Loan Agreement, and the CMB-MSI Promissory Note - diverted $25,000,000 in Loan proceeds intended for the Hoover Project.

65.    Not only did MSI misappropriate the Loan proceeds but it knowingly and deliberately concealed the transfer of the $25,000,000 in financial statements and other reports and failed to disclose the transfer to CMB until December 2015 and then only after CMB had discovered discrepancies in MSI's and IRG's financial reporting.

66.    MSI's actions are in breach of Sections 2.1(d) and 6.1(f) of the Loan Agreement, which provides:

> 2.1(d) <u>Requirements of EB-5 Program for Borrower</u>. Borrower shall use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h). Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure periods set forth in Section 9.1). Borrower further represents that that the total funds anticipated to be expended on the Project, including the use of additional private and public funds, are approximately $70,000,000.00.

> 6.1(f) <u>Use of Funds</u>. The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Agreement for the purpose of funding costs

16

for the Project. Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project.

67.     MSI had knowledge that it was in breach of the Loan Agreement, yet failed to provide any notice to CMB in violation of Section 5.1(d) of the Loan Agreement, which provides as follows:

> 5.1(d) Knowledge of Event of Default.  Promptly after Borrower (i) obtains knowledge of any condition or event which constitutes an Event of Default or Unmatured Event of Default, or becomes aware that Lender has given notice or taken any action with respect to a claimed Event of Default or Unmatured Event of Default or (ii) obtains knowledge of any condition or event which has a Material Adverse Effect, a notice specifying the nature and period of existence of such condition or event, or specifying the notice given or action taken by Lender and the nature of such claimed Event of Default, Unmatured Event of Default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto.

68.     Moreover, IRG – the purported ultimate beneficiary of the $25,000,000 unauthorized transfers – never reported the aggregate $25,000,000 in loans it supposedly received from S.L. Properties, Inc. and Industrial Commerce, Ltd in any financial statements or reports provided to CMB, nor did it disclose the alleged $25,000,000 in unauthorized transfers until December 2015.

69.     Additionally, MSI has failed to deliver to CMB the EB-5 Documentation for the Hoover Project, in direct violation of Section 5.1(h) of the Loan Agreement.

70.     CMB remains in doubt as to what happened to the Loan proceeds, where the proceeds are now, whether sufficient funds are available to complete the Hoover Project, and the true condition of MSI and the Hoover Project.

## COUNT I
**Breach of Loan Agreement and Acceleration of Repayment Against MSI**

71.     CMB re-alleges and incorporates herein paragraphs 1 through 70, herein.

72.     CMB and MSI are parties to a May 27, 2012 written Loan Agreement.

73.     CMB performed its contractual obligations under the Loan Agreement by, *inter alia*, disbursing to MSI the amount of $36,000,000. CMB provided proper notice to MSI pursuant to Section 9.1(b) (Event(s) of Default) and 9.2(a) (acceleration of the loan) of the Loan Agreement.

74.     MSI has breached the Loan Agreement by failing to comply with its obligations under the Loan Agreement. Specifically:

    a.   Section 2.1(d) – Failing to use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project;

    b.   Section 5.1(a) – Failing to provide CMB with monthly Operating Statements;

    c.   Section 5.1(b) – Failing to provide CMB with "Annual Financial Statements" (as defined in Section 5.1(b), *see supra*, p. 9, for 2013, 2014, and 2015;

    d.   Section 5.1(d) – Failing to disclose to CMB until December 2015 (and then only after repeated requests by CMB for information regarding Defendant's use of Loan proceeds) MSI's diversion in October 2013 of $25,000,000 of Loan proceeds to third parties;

    e.   Section 5.1(f) – Failing to properly account for, and respond directly and in good faith to repeated requests by CMB for information regarding MSI's use of Loan proceeds;

    f.   Section 5.1(g) – Failing to deliver to CMB any annual audited financial statements or any reports prepared by MSI's accountants in connection with the Audited Financial Statements or any accountant reports in connection with

18

any other annual, interim, or special audits or review over the financial statements or practices of MSI;

g.  Section 5.1(h) – Failing to provide CMB with all requested EB-5 Documentation regarding the Hoover Project;

h.  Section 6.1(d) – Refusing to allow CMB or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Defendant's offices at the Property or otherwise;

i.  Section 6.1(f) – Diverting and failing to account for $25,000,000 of the proceeds of the loan; and

j.  Section 6.1(g) – Engaging in impermissible transactions with S.L. Properties, Inc., and Industrial Commerce, Ltd, in connection with Defendant's diversion of loan proceeds.

75.     MSI's breaches of the aforementioned Sections are material and have resulted in Events of Defaults under Section 9.1 of the Loan Agreement, which states, in part:

> 9.1 EVENTS OF DEFAULT:   Each of the following occurrences shall constitute an "**Event of Default**" under this [Loan] Agreement:
>
> (b) Other Defaults.  Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this Agreement which could lead to a Material Adverse Effect[4] (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law)[5].

---

[4] The Loan Agreement defines "Material Adverse Effect" to mean, with respect to Borrower, a material adverse effect upon the condition (financial or otherwise) of Borrower. *See* Ex. "A", p. 4.

[5] *See* Letter dated March 7, 2016, from CMB to MSI, demanding compliance with the Loan Agreement, attached hereto as Exhibit "G". *See also* para. 80, *infra*.

(h) <u>Transfer of Assets</u>. The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this Agreement, or as otherwise permitted by the Loan Documents."

76. The diversion of $25,000,000 in Loan proceeds is a Material Adverse Effect.

77. Upon the occurrence of an Event[s] of Default by MSI, the Loan Agreement expressly authorizes CMB to "institute any proceeding at law or in equity to enforce the obligations of Borrower under this Agreement and/or any covenants and obligations of Lender contained in this Agreement." *See* Ex. "A", at § 9.2(d).

78. Further, upon the occurrence of an Event of Default, Section 9.2(a) of the Loan Agreement provides:

9.2(a) Acceleration, Etc. Upon the occurrence and during the continuance of any Event of Default, at the option of Lender, the unpaid principal amount of and any and all accrued interest on the Loan shall become immediately due and payable, with all additional interest from time to time accrued thereon and without presentment, demand or protest or other requirements of any kind (including, without limitation, valuation and appraisement, diligence, presentment, notice of intent to demand or accelerate or notice of acceleration), all of which are hereby expressly waived by Borrower, and the obligations of Lender to make any further disbursement under the Loan shall thereupon terminate. On or after the Maturity Date, subject to the provisions of this Agreement and the other Loan Documents, Lender may exercise any or all rights and remedies under the Loan Documents or applicable law.

79. As a result of MSI's breaches, CMB has suffered damages and has opted to accelerate the repayment of the loan pursuant to Section 9.2(a).

80. By letter dated March 7, 2016, CMB, through counsel, notified MSI of its failures to comply with the Loan Agreement and demanding cure. *See* Exhibit "G". MSI has failed to cure the defaults.

81.     By letter dated September 30, 2016, CMB provided MSI with a demand for the acceleration of the repayment of the unpaid principal on the loan and including any and all unpaid interest. *See* Exhibit "H", attached hereto.

82.     CMB is entitled to recover from MSI all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

WHEREFORE, CMB demands judgment against MSI for the following:

a.  The immediate repayment of the unpaid principal amount of the Loan of $36,000,000 plus all accrued interest;

b.  Monetary damages;

c.  Interest;

d.  All reasonable out-of-pocket costs and expenses, including attorney fees.

e.  Injunctive relief enjoining MSI from further violations of the Loan Agreement; and

f.  All such other and further relief as the Court deems just and proper.

## COUNT II
### Specific Performance Against MSI

83.     CMB re-alleges and incorporates herein paragraphs 1 through 70 and 74, herein.

84.     MSI is in default for failure to comply with its obligations under the Loan Agreement.

85.     CMB seeks relief from the Court in the form of an judgment requiring MSI to specifically perform its obligations under the Loan Agreement as provided in the following sections:

6.1(d) Inspection of Property; Books and Records; Discussions. Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial

and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request. Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this [Loan] Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

86.     Section 6.1(f) of the Loan Agreement provides:

6.1(f) Use of Funds. The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this [Loan] Agreement for the purpose of funding costs for the [Hoover] Project. Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, [MSI] shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the [Hoover] Project.

87.     An "Event of Default" is defined in Section 9.1 of the Loan Agreement, and

includes, in part:

9.1 EVENTS OF DEFAULT: Each of the following occurrences shall constitute an "**Event of Default**" under this [Loan] Agreement:

(b) Other Defaults. Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this [Loan] Agreement which could lead to a Material Adverse Effect (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law).

(h) Transfer of Assets. The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this [Loan] Agreement, or as otherwise permitted by the Loan Documents.

An Event of Default shall be deemed "continuing" until cured or waived in writing in accordance with Section 9.3 or 10.3.

88.     Upon the occurrence of an Event of Default, Section 9.2(b) of the Loan Agreement provides:

9.2(b) <u>Access to Information</u>.  If an Event of Default then exists, Lender shall have, in addition to and not by way of a limitation of any other rights and remedies contained in this [Loan] Agreement or in the other Loan Documents[6], the right within forty-eight (48) hours after notice to Borrower to obtain access to Borrower's records (including computerized information, files and supporting software) and its accounting information, and to use all of the foregoing and the information contained therein in any manner Lender deems appropriate. Borrower hereby authorizes any accountant or manager employed by Borrower to deliver such items and information to Lender.  Notwithstanding anything to the contrary contained in the Loan Documents, upon the occurrence of and during the continuance of an Event of Default, Lender shall be entitled to request and receive, by or through [MSI] or appropriate legal process, any and all information concerning Borrower or any of its property which is reasonably available to or obtainable by Lender.

89.     In an Event of Default, Section 9.2(d) of the Loan Agreement affords CMB the right to institute any proceeding at law or in equity to enforce the obligations of MSI under this Agreement and/or any covenants and Obligations of MSI contained in this Agreement.

90.     By letter dated March 7, 2016, CMB, through counsel, requested pursuant to above-referenced Sections  of the Loan Agreement, that MSI, *inter alia*, deliver to CMB certain information and documents regarding the accounting, finances, and EB-5 Documentation of the Property and the Project within thirty (30) days. *See* Ex. "G".

91.     In that same letter, CMB requested, pursuant to Section 6.1(d) of the Loan Agreement, that MSI allow CMB's representatives to inspect and make copies of the financial and accounting records and leases of the Property and the Project within 30 days.

---

[6] The Loan Agreement defines "Loan Documents" as "those agreements, instruments and documents (together with any amendments and supplements thereto and replacements thereof, and in recordable form, if necessary) listed on <u>Exhibit C</u> [of the Loan Agreement] as Loan Documents and any other agreements, instruments or documents previously or hereafter executed by Borrower which evidence or secure the Obligations. *See* Ex "A", p. 4.

92.     MSI should further be required to provide all of the information and documents demanded by CMB and to which CMB is entitled under Sections 5.1(a), 5.1(b), 5.1(g), and 5.1(h) of the Loan Agreement, including audited financial statements.

93.     Given MSI's pattern of misrepresentation and concealing the $25 million unauthorized transfer of funds, Plaintiff has reasonable justification to question the true use of the loaned funds, MSI'S compliance with the Loan Agreement, as well as the terms of the Promissory Note, and whether MSI has the financial wherewithal and ability to complete the Hoover Project and repay the Loan. CMB must be able to review and verify information associated with the EB-5 Program.

94.     Specific performance is appropriate and necessary to determine MSI's compliance with its covenants under the Loan Agreement. Only through inspection of the records and reports can CMB determine the nature and extent of the use of Loan proceeds, violations of compliance with the covenants contained in the Loan Agreement, or the extent to which the pledged collateral is compromised.

95.     Moreover, CMB lacks an adequate remedy at law if MSI continues to violate the Loan Agreement by failing to provide required documents and information and permit an inspection of the records.  MSI's continued disregard of its obligations under the Loan Agreement jeopardizes CMB's own compliance with USCIS requirements.

96.     CMB has complied with all of its obligations under the Loan Agreement by providing proper written notice pursuant to Section 9.1(b) in the form of the March 7, 2016 letter. *See* Ex. "G".

97.     CMB is entitled to recover from Defendant all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

24

WHEREFORE, CMB requests that the Court enter judgment in its favor, ordering MSI to provide all records and reports required under the Loan Agreement including Sections 5.1(a), 5.1(b), including audited financial statements, 5.1(g), and 5.1(h), and permit CMB to inspect all of MSI's records including its computerized information, files and supporting software and its accounting information pursuant to Section 9.2(b) through a forensic examination, all reasonable costs and expenses, including attorney fees incurred, together with such all such other relief as it deems just and proper.

## COUNT III
### Breach of Guaranty Against Lichter

98.     CMB re-alleges and incorporates herein paragraphs 1 through 70 and 74 through 81, herein.

99.     On October 16, 2013, Lichter, as holder of a 50% membership interest in MSI, entered into a Guaranty of the terms of the Loan Agreement and the $36,000,000 promissory note executed by MSI for the benefit of CMB (referred to in the Guaranty as the "Guaranty Obligations", *see* Section 2.1, *infra*). *See* Guaranty, attached as Exhibit I (the Guaranty is also attached to the First Amendment to Loan Agreement, Ex. "C").

100.     Section 2.1 of the Guaranty provides that Lichter, as Guarantor:

hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitation set forth in Section 2.7, the "Guaranteed Obligations"). Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligator, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

25

101.    Section 2.7 of the Guaranty provides that Lichter's obligations as Guarantor are limited to 10% of the $36,000,000 funded under the Loan Agreement:

> (a) The total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amount paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap"). Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

102.    On September 30, 2016, CMB provided written notice to Lichter detailing MSI's breaches of its obligations that constitute Guaranteed Obligations as provided in Section 2.1 and 2.6 of the Guaranty.  CMB invoked the Guaranty and demanded prompt payment of the $3,600,000 owed thereunder. *See* Sept. 30, 2016 Correspondence to Lichter, attached hereto as Exhibit "J".

103.    Pursuant to Section 2.6 of the Guaranty, Lichter has failed to provide payment to CMB within twenty (20) business days after receipt of the September 30, 2016 letter.

104.    Lichter has breached his obligations under the Guaranty.

105.    CMB has been damaged by Lichter's breach of the Guaranty.

106.    Pursuant to Section 4.1 of the Guaranty, in the event of a failure by Lichter to pay any amounts due, CMB , as Lender "shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7."

107.    CMB is entitled to recover from Lichter all reasonable costs and expenses including attorney fees incurred by Plaintiff pursuant to the Guaranty at Section 5.2.

WHEREFORE, CMB demands judgment against MSI for the following:

26

g.  The immediate payment of the Guaranteed amount of $3,600,000 plus all accrued interest;

h.  Monetary damages;

i.  Interest;

j.  All reasonable out-of-pocket costs and expenses, including attorney fees; and

k.  All such other and further relief as the Court deems just and proper.

LEWIS BRISBOIS BISGAARD & SMITH, LLP
*Attorneys for Plaintiff*

BY:

JOHN R. CHRISTIE (0067570)
TODD GRAY (0071568)
1375 East 9th Street, Suite 1600
Cleveland, Ohio 44114
Phone: 216.344.9422
Fax: 216.344.9421
John.christie@lewisbrisbois.com
Todd.gray@lewisbrisbois.com

Kenneth J. Joyce, (Florida Bar #986488)
Stacy M. Schwartz, (Florida Bar #:520411)
Andrew B. Zelmanowitz, (Florida Bar #74202)
Michael Platner (Florida Bar # 366331)
Jeffrey Weinstock (Ohio Bar # 0066784)
110 S.E. 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Phone: 954.728.1280
Fax: 954.728.1282
Kenneth.Joyce@lewisbrisbois.com
Stacy.Schwartz@lewisbrisbois.com
Andrew.Zelman@lewisbrisbois.com
Michael.Platner@lewisbrisbois.com
Jeffrey.Weinstock@lewisbrisbois.com

27

# LOAN AGREEMENT

## MAPLE STREET INVESTORS LLC,
### AN OHIO LIMITED LIABILITY COMPANY,

### AS BORROWER,

## CMB INVESTMENT GROUP X, LP,
### AN ILLINOIS LIMITED PARTNERSHIP

### AS LENDER,

### DATED AS OF MAY 7, 2012



**PLAINTIFF'S EXHIBIT**

A

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**") is dated as of May 7, 2012, and is by and between Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**"), and CMB Investment Group X, LP, an Illinois limited partnership ("**Lender**").

## RECITALS

A.      Borrower was formed on April 30, 2012, as a Single Purpose Entity (as hereinafter defined), and is governed by that certain Operating Agreement of Maple Street Investors LLC, dated as of April 30, 2012, as amended (the "**Borrower Operating Agreement**").  The membership interests in Borrower held by the members of Borrower are collectively referred to as the "**Membership Interests in Borrower**" and the members of Borrower are collectively referred to as the "**Members**" and each individually as a "**Member**."

B.      Each Member shall execute and deliver to Lender a certain Membership Pledge and Security Agreement (the "**Pledge Agreement**"), concurrent with delivery of the Authorization Notice (as hereinafter defined) by Borrower, to collaterally secure the obligations of Borrower as incurred pursuant to this Agreement and the corresponding Note (as hereinafter defined).  The form of the Pledge Agreement is attached hereto as Exhibit A.

C.      Borrower is the holder of a 100% membership interest (the "**MSC LLC Membership Interest**") in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**").  MSC LLC is governed by that certain Amended and Restated Operating Agreement of Maple Street Commerce LLC, dated as of May 1, 2012, as amended (the "**MSC LLC Operating Agreement**").

D.      MSC LLC holds fee title in certain real property described in Exhibit B attached hereto (the "**Real Property**"), which consists of the project known as the former Hoover Plant located in North Canton, Ohio.  The Real Property generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan.  Such buildings and improvements, together with related site improvements, appurtenances, fixtures and tenant improvements, if any, now or hereafter located on the Real Property, are collectively referred to as the "**Improvements**".  The Real Property and Improvements are collectively referred to as the "**Property**".

E.      Borrower intends to use and apply the proceeds of the Loan (as hereinafter defined) as set forth in detail in this Agreement for the purposes of causing the renovation and improvement of certain existing buildings on the Real Property and the construction of various tenant improvements for use by industrial and commercial tenants in their business operations.

F.      Lender is a subsidiary entity of CMB Summit, LLC ("**CMB Summit**").  Borrower has requested that CMB Summit, through Lender, originate a loan to Borrower in the principal amount of $36,000,000.00 (the "**Loan**") to facilitate the development of the Property pursuant to the provisions of the EB-5 foreign investor program as authorized by the United States Citizenship and Immigration Services ("**USCIS**").  The Loan will facilitate capital contributions by Borrower to MSC LLC to further certain capital improvement projects upon the Hoover facility, in conformity with the Regional Center, as established by CMB Summit with the approval of the USCIS, for originating foreign investor loans to create jobs within targeted employment areas identified by the USCIS.

1

G.      The Loan is to be secured by the Pledge Agreement and perfected by a Uniform Commercial Code filing against up to 100% of each Member's individual Membership Interest in Borrower (as further described in the definition of "Collateral" in Section 1.1 of this Agreement), providing a public record of lien.

H.      Based upon (i) the structural requirements necessary to comply with the rules and regulations promulgated under the EB-5 Program (as hereinafter defined) as determined by Lender, and (ii) the materials and submissions developed and made by Lender as described in Section 2.1(c)(ii) of this Agreement, the Loan has been structured to provide direct construction financing for costs applicable to the reuse and redevelopment of the Hoover facility, and shall facilitate capital contributions by Borrower to MSC LLC to further the construction of certain new improvements and related infrastructure with respect to the Property, including, but not limited to, certain (a) environmental remediation, (b) sewer construction, (c) construction of tenant improvements, and (d) other infrastructure projects, and, subject to the limitations set forth herein, other purposes, all as more particularly described below.

I.      The parties now desire to enter into this Agreement and to proceed with the funding of the loan proceeds intended by this Agreement.

NOW, THEREFORE, Borrower and Lender agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     CERTAIN DEFINED TERMS.  In addition to the defined terms set forth throughout this Agreement, the following defined terms used in this Agreement shall have the following meanings (such meanings to be applicable, except to the extent otherwise indicated in a definition of a particular term, both to the singular and the plural forms of the terms defined):

"**Accountants**" means a firm of certified public accountants of national standing, selected by Borrower and acceptable to Lender.

"**Affiliate**" as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means (a) the possession, directly or indirectly, of the power to vote ten percent (10%) or more of all interests having voting power for the election of directors of such Person or otherwise to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting interests or by contract or otherwise, or (b) the ownership of a general partnership interest, a limited partnership interest or a membership interest (or other ownership interest) representing ten percent (10%) or more of the outstanding limited partnership interests, membership interests or other ownership interests of such Person. The Affiliates of a Person shall include any officer, director, trustee or employee of, or partner in, such Person.  In no event shall Lender be deemed to be an Affiliate of Borrower.

"**Authorization Notice**" means that certain notice as shall be delivered by Borrower to Lender stating that Borrower has obtained all approvals and complied with all other conditions pursuant to this Agreement for the funding of the Loan.

"**Business Day**" means a day of the week (but not a Saturday or Sunday) on which the offices of the national banking institutions are open to the public for carrying on substantially all business functions.

2

Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"**Collateral**" means 100% of each Member's individual Membership Interest in Borrower; provided, however, that if for any reason Lender does not fund the full amount of the Loan, then "Collateral" shall mean a fraction of each Member's individual Membership Interest in Borrower, which fraction shall be equal to the quotient, expressed as a percentage, arrived at by dividing (i) the portion of the Loan actually funded by (ii) $36,000,000.00. For example, if Lender only funds $30,000,000.00 of the stated $36,000,000.00 Loan, the Collateral would be 83.333% of each Member's individual Membership Interest in Borrower ($30,000,000.00/$36,000,000.00 = 83.333%).

"**Contractual Obligation**," as applied to any Person, means any provision of any securities issued by that Person or any indenture, mortgage, deed of trust, lease, contract, undertaking, document or instrument to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject (including, without limitation, any restrictive covenant affecting such Person or any of its properties).

"**Court Order**" means any judgment, writ, injunction, decree, rule or regulation of any court or Governmental Authority binding upon or applicable the Person in question.

"**Dollars**" and the symbol "**$**" means the lawful money of the United States of America.

"**Event of Default**" means any of the occurrences set forth in Section 9.1 of this Agreement, after the expiration of any applicable grace period expressly provided therein.

"**Fiscal Year**" means the fiscal year of Borrower, which shall be the twelve (12) month period ending on the last day of December in each year.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means any nation or government, any federal, state, local, municipal or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indebtedness**," as applied to any Person (and without duplication), means (a) the principal amount of all indebtedness of such Person for borrowed money, whether or not subordinated and whether with or without recourse beyond any collateral security, (b) the principal amount of all indebtedness of such Person evidenced by securities or other similar instruments, (c) all reimbursement obligations and other liabilities of such Person with respect to letters of credit or banker's acceptances issued for such Person's account, (d) all obligations of such Person to pay the deferred purchase price of property or services, (e) all obligations of such Person in respect of capital leases, (f) all accommodation obligations of such Person, (g) all indebtedness, obligations or other liabilities of such Person or others secured by a Lien on any asset of such Person, whether or not such indebtedness, obligations or liabilities are assumed by, or are a personal liability of, such Person (including, without limitation, the principal amount of any assessment or similar indebtedness encumbering any property), (h) all indebtedness, obligations or other liabilities (other than interest expense liability) in respect of interest rate swap, collar, cap or similar agreements providing interest rate protection and foreign currency exchange agreements, and (i) without

3

duplication or limitation, all liabilities and other obligations included in the financial statements (or notes thereto) of such Person as prepared in accordance with GAAP.

"**Laws**" means, collectively, all federal, state and local laws, statutes, rules, regulations, policies, ordinances and codes.

"**Lender**" means CMB Investment Group X, LP, an Illinois limited partnership, organized in accordance with the requirements for regional centers as set forth under the Immigration Act of 1990, as amended, and for the purpose of promoting economic growth through, among other things, increased export sales, improved regional productivity, job creation and increased domestic capital investment, and to generate jobs through the immigrant investor visa program of the USCIS.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance (including, but not limited to, easements, rights-of-way, zoning restrictions and the like), lien (statutory or other), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including without limitation any conditional sale or other title retention agreement, the interest of a lessor under any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement or document having similar effect (other than a financing statement filed by a "true" lessor pursuant to the Uniform Commercial Code) naming the owner of the asset to which such Lien relates as secured party, under the Uniform Commercial Code or other comparable law of any jurisdiction.

"**Loan Documents**" means those agreements, instruments and documents (together with any amendments and supplements thereto and replacements thereof, and in recordable form, if necessary) listed on Exhibit C attached hereto as Loan Documents and any other agreements, instruments or documents previously or hereafter executed by Borrower which evidence or secure the Obligations.

"**Material Adverse Effect**" means with, respect to Borrower, a material adverse effect upon the condition (financial or otherwise) of Borrower. The phrase "has a Material Adverse Effect" or "will result in a Material Adverse Effect" or words substantially similar thereto shall in all cases be intended to mean "has resulted, or could reasonably be anticipated to result, in a Material Adverse Effect", and the phrase "has no (or does not have a) Material Adverse Effect" or "will not result in a Material Adverse Effect" or words substantially similar thereto shall in all cases be intended to mean "does not or could not reasonably be anticipated to result in a Material Adverse Effect".

"**Note**" means the Promissory Note, in the original principal amount of $36,000,000.00, to be executed by Borrower in favor of Lender, as hereafter amended, supplemented, replaced or modified from time to time. Borrower shall execute the Note and deliver it to Lender concurrent with the delivery of the Authorization Notice. The form of the Note is attached hereto as Exhibit D.

"**Obligations**" means, from time to time, all Indebtedness of Borrower owing to Lender, or to any Person entitled to indemnification, or to any of their respective successors, transferees or assigns, of every type and description, whether or not evidenced by any note, guaranty or other instrument, arising under or in connection with this Agreement or any other Loan Document, whether or not for the payment of money, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. The term includes, without limitation, all interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, reasonable fees and disbursements of expert witnesses and other consultants, and any other sum now or hereinafter chargeable to Borrower under or in connection with this Agreement or any other Loan Document.

4

"**Permit**" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

"**Person**" means any natural person, corporation, limited partnership, general partnership, joint stock company, limited liability company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, or any other non-governmental entity, or any Governmental Authority.

"**Proceedings**" means, collectively, all actions, suits, arbitrations and proceedings, at law, in equity or otherwise, before, and investigations commenced or threatened by or before, any court or Governmental Authority with respect to a Person.

"**Project**" means the ownership, leasing and/or management, reuse (as to existing building improvements), development (as to new improvements and all necessary on-site infrastructure), operation and sale of portions of the Property. Based upon (i) the structural requirements necessary to comply with the rules and regulations promulgated under the EB-5 Program (as hereinafter defined) as determined by Lender, and (ii) the materials and submissions developed and made by Lender as described in Section 2.1(c)(ii) of this Agreement, the Loan has been structured to provide construction financing for the renovation of certain improvements to the existing buildings comprising the Hoover facility and to further all or some of the following additional construction of certain new improvements, tenant improvements and related infrastructure with respect to the Property:

1. Construction of tenant improvements;
2. Construction financing for infrastructure and other vertical construction projects; and
3. Additional construction financing for (i) industrial developments and infrastructure improvements, (ii) retail improvements and infrastructure, (iii) residential improvements and infrastructure, (iv) parking, landscaping and other similar site improvements, and (v) other tenant improvements to various buildings and roadway improvements.

"**Requirements of Law**" mean, as to any Person, the charter and by-laws, partnership agreement, operating agreement or other organizational or governing documents of such Person, and any law, rule or regulation, Permit, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including without limitation, applicable securities laws, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement or Permit or occupational safety or health law, rule or regulation.

"**Single Purpose Entity**" means a limited liability company which, at all times since its formation and thereafter: (a) was and will be organized solely for the purpose of acquiring and holding the MSC LLC Membership Interest, (b) shall exercise its rights and perform its obligations set forth under the MSC LLC Operating Agreement, (c) has not and will not have any assets other than the MSC LLC Membership Interest and assets incidental thereto, (d) has maintained and will maintain its accounts, books and records separate from any other Person, (e) has not commingled and will not commingle its funds or assets with those of any other Person, (f) has held and will hold its assets only in its own name, (g) has conducted and will conduct its business only in its own name, (h) has maintained and will maintain its financial statements, accounting records and other entity documents separate from those of any other Person, (i) has paid and will pay its own liabilities only out of its own funds and assets, (j) has observed and will observe all limited liability company formalities, (k) has maintained and will maintain an arms'-length relationship with its Affiliates and any Subsidiaries, (l) has and will have no Indebtedness

5

other than in favor of Lender, except as expressly permitted by Lender or as expressly permitted by the Loan Documents, (m) has not and will not assume or guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of any other entity, except as expressly permitted by Lender or as expressly permitted by the Loan Documents, (n) has not acquired and will not acquire obligations or securities of its members, (o) has allocated and will allocate fairly and reasonably shared expenses, including, without limitation, shared office space, and has used and will use separate stationery, invoices and checks, (p) except as expressly permitted by Lender or by the Loan Documents, has not and will not pledge its assets for the benefit of any other Person, (q) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other person or entity, (r) except as expressly permitted by Lender or by the Loan Documents, or as otherwise provided in the Borrower Operating Agreement, has not made and will not make loans to any Person, (s) has not and will not identify its members, or any Affiliates of any of them as a division or part of it, (t) has paid and will pay the salaries of its own employees only from its own funds, and (u) has maintained and will maintain adequate capital in light of its contemplated business operations.

"**Solvent**" means, as to any Person at the time of determination, that such Person (a) owns property the value of which (both at fair valuation and at present fair salable value and taking into account (i) the value of such Person's rights of reimbursement, contribution, subrogation and indemnity against any other Person, and (ii) the value of any property, owned by another Person, that secures any liabilities of the Person whose solvency is being determined) is equal to or greater than the amount required to pay all of such Person's liabilities (including contingent liabilities and debts); (b) is able to pay all of its debts as such debts mature; and (c) has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage.

"**Subsidiary**" means any Person that is wholly-owned by Borrower and/or by any other Subsidiary of Borrower, as applicable.

"**Tranche**" has the meaning provided in Section 2.1(a) of this Agreement.

"**Uniform Commercial Code**" means the Uniform Commercial Code as in effect on the date hereof in the State of Ohio; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of any security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

"**Unmatured Event of Default**" means an event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

1.2     COMPUTATION OF TIME PERIODS.   In this Agreement, in the computation of periods of time from a specified date to a later specified date, unless otherwise specified, the word "from" means "from and including" and the words "to" and "until" each mean "to and including". Periods of days referenced to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed.

1.3     TERMS.

(a)     Any accounting terms used in this Agreement which are not specifically defined shall have the meanings customarily given them in accordance with GAAP.

6

(b)     Any time the word "or" is used herein, unless the context otherwise clearly requires, it has the inclusive meaning represented by the phrase "and/or". The words "hereof," "herein," "hereby," "hereunder" and similar terms refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, exhibit and schedule references are to this Agreement unless otherwise specified. Any reference in this Agreement to this Agreement or to any other Loan Document includes any and all amendments, modifications, supplements, renewals or restatements thereto or thereof, as applicable. Each defined term shall be applicable, except to the extent otherwise indicated in the definition thereof, to both the singular and the plural forms thereof.

(c)     In each case where the consent or approval of Lender is required, or its non-obligatory action is requested by Borrower, such consent, approval or action shall be in the sole discretion of Lender, unless otherwise specifically indicated.

## ARTICLE II
## THE LOAN

2.1     TERMS.

(a)     Disbursements of the Loan.  Lender agrees to loan to Borrower the principal amount of $36,000,000.00 (the "**Loan Commitment**"). In consideration therefor, Borrower agrees to pay to Lender amounts equal to the principal and interest coming due on the Loan as and when due as provided herein. The Loan shall be designated the "$36,000,000.00 CMB Investment Group X Loan" and shall be dated as of the date set forth in the introductory paragraph of this Agreement. The determination of all subsequent dates, such as the Maturity Date (as hereinafter defined) and the Prepayment Date (as hereinafter defined), shall be based upon the date of the first disbursement of the initial Tranche by Lender to Borrower pursuant to this Agreement (the date of such initial disbursement shall be referred to herein as the "**Initial Funding Date**"). The aggregate amount of the funding on the Initial Funding Date shall not be less than $10,000,000.00. Each subsequent disbursement of loan proceeds by Lender to Borrower pursuant to this Agreement (each such disbursement, a "**Tranche**") shall be made in the principal amount of $500,000.00 or any multiple thereof. Each Tranche shall be disbursed by Lender directly to Borrower or to an account designated by Borrower.

(b)     Interest; Maturity Date. The outstanding principal balance of the Loan shall bear interest at the rate of six percent (6.0%) per annum (the "**Fixed Rate**"), calculated from the date of disbursement of the applicable Tranche by Lender to Borrower, until repaid as set forth in this Agreement and the other Loan Documents. Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable, in arrears, quarterly on each January 1, April 1, July 1, and October 1 following the Initial Funding Date (each such date is defined herein as an "**Interest Payment Date**"), with the final interest payment being due and payable on the Maturity Date. The Loan shall mature seventy-two (72) months from the Initial Funding Date (the "**Maturity Date**"). (e.g., if the Initial Funding Date of the Loan were to occur on December 1, 2012, then the Maturity Date would be November 30, 2018).

(c)     Requirements of EB-5 Program for Lender.

(i)     Lender hereby covenants that it is an approved and federally-designated "regional center," and is authorized and intends to raise capital from foreign investors ("**EB-5 Investors**") who seek to obtain permanent residency in the United States in accordance with the EB-5 investor visa program of the Immigration and Nationality Act

7

(the "**EB-5 Program**"). It is anticipated that each EB-5 Investor will make an investment with Lender of Five Hundred Thousand Dollars ($500,000.00). Such funds shall initially be held by Lender in an interest bearing trust account for the benefit of each EB-5 Investor until such time as each such EB-5 Investor has been initially approved by the USCIS for temporary residency in the United States. Each Tranche shall be released to Borrower as soon as commercially practicable after such approval by the USCIS.

(ii) Lender further covenants that, based on its own evaluation of all relevant matters requested by Lender and submitted by Borrower, Lender has (a) prepared and submitted the requisite business plan and financial information necessary to obtain the requisite approvals from the USCIS for funding of the Loan through the EB-5 Program, (b) reviewed and analyzed all materials, including financial information, requested by Lender and submitted by Borrower to enable Lender to proceed with the underwriting of the Loan upon receiving the requisite approvals from the USCIS, and (c) structured this Agreement, the Loan, and other Loan Documents to comply with the requirements of the EB-5 Program and the USCIS. During the term of the Loan, Lender shall make all required submissions and take all necessary actions to cause the Loan to remain in compliance with the requirements of the EB-5 Program and any other applicable requirements in effect or later imposed by the USCIS or other applicable Governmental Authority concerning the Loan and this Agreement. Lender shall also be solely responsible for monitoring the required submissions to be made by EB-5 Investors and/or their counsel for purposes of obtaining the necessary approvals from the USCIS for temporary residency in the United States in accordance with the requirements of the EB-5 Program.

(iii) Borrower acknowledges that, to maintain compliance with the rules and regulations promulgated under the EB-5 Program, Lender is required to invest its funds with third parties located within the geographic area that constitutes Lender's "regional center," and that Lender, based upon its sole and absolute discretion and the development of the materials set forth in Section 2.1(c)(ii) above, has determined to allocate the Loan to Borrower as a qualified third party in compliance with the rules and regulations promulgated under the EB-5 Program.

(d) Requirements of EB-5 Program for Borrower. Borrower shall use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h). Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure periods set forth in Section 9.1). Borrower further represents that the total funds anticipated to be expended on the Project, including the use of additional private and public funds, are approximately $70,000,000.00.

2.2    REPAYMENT OF THE LOAN. Borrower hereby agrees to pay, directly to Lender, interest and/or principal equal to the amount thereof coming due on each Interest Payment Date or Maturity Date under this Agreement, less amounts already on deposit with Lender for such payment. The Loan shall be repaid in the amounts and at the times as provided in this Agreement.

(a) Principal. The outstanding principal balance of the Loan shall be due and payable on the Maturity Date, and such amount shall be paid in immediately available funds,

8

Except as provided in Section 2.2(b), Borrower shall not prepay the Loan, or any portion thereof, at any time prior to the expiration of forty-two (42) months following the Initial Funding Date (the "**Prepayment Date**"), without first obtaining the written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion. Borrower acknowledges that the EB-5 Program requires, among other things, that the Loan remain outstanding, except for EB-5 Investors whose I-829 petitions have been submitted to the USCIS and which EB-5 Investors have been approved for permanent residency in the United States by the USCIS (the "**Cleared Investors**"), at least until the Prepayment Date. It is recognized and agreed that if Borrower were to prepay the Loan, or any portion thereof (other than the portion attributable to Cleared Investors), prior to the Prepayment Date, such prepayment would jeopardize Lender's investment program with respect to the EB-5 Investors who are not Cleared Investors and the ability of the EB-5 Investors who are not Cleared Investors to obtain the benefits under the EB-5 Program, thus causing Lender and its Affiliates to suffer irreparable harm and damages.

(b)     Prepayment.  Borrower may prepay all or any portion of the Loan (any such prepayment, a "**Prepayment of Principal**") solely in accordance with the provisions of this Section 2.2(b).

(i)     After the Prepayment Date, Borrower may make a Prepayment of Principal, without penalty or premium, and/or may remit periodic payments of principal, upon at least thirty (30) days prior written notice to Lender, subject to the provisions of Section 2.2(b)(iii).

(ii)     On the first day of each calendar month after the Initial Funding Date, Lender shall provide to Borrower a report (the "**Cleared Investor Report**") setting forth the number of Cleared Investors as of the Cleared Investor Report date. Subject to the provisions of Section 2.2(b)(iii), Borrower may, concurrently with making its interest payment on any Interest Payment Date, make a Prepayment of Principal, without penalty or premium, in a maximum amount of (A) the number of Cleared Investors on such Cleared Investor Report (less any Cleared Investors with respect to which Borrower has previously remitted a Prepayment of Principal), multiplied by (B) $500,000.00.

(iii)     Any Prepayment of Principal pursuant to Section 2.2(b)(i) or 2.2(b)(ii) shall be in an amount equal to not less than five percent (5%) of the then outstanding principal amount of the Loan and in increments of $500,000.00, and shall be accompanied by any interest due on the amount of principal prepaid.

(iv)     In the event that Borrower elects to make any Prepayment of Principal, concurrent with such payment by Borrower to Lender, Lender shall execute all necessary documents to release the Pay-Down Percentage (as hereinafter defined) of Lender's security interest in the Collateral established by the Pledge Agreement (the portions of Collateral released by Lender in accordance with this Section 2.2(b)(iv) are referred to as the "**Released Collateral**"). Each such release shall be applied, as directed by Borrower, either (A) to each Member's individual Membership Interest in Borrower, pro rata in accordance with their respective Membership Interests in Borrower (as such are adjusted from time to time), or (B) to selected Members' individual Membership Interests in Borrower, in accordance with an allocation provided by Borrower. Concurrent with any Prepayment of Principal, Borrower shall deliver to Lender a schedule which identifies the appropriate percentages of each Member's individual Membership Interests in Borrower to be released. The "**Pay-Down Percentage**" means the quotient, expressed as a

9

percentage, arrived at by dividing the amount of the subject Prepayment of Principal by the then outstanding principal balance of the Loan.

(c)     Interest.  Interest shall be payable quarterly as set forth in Section 2.1(b) of this Agreement.  Lender shall submit invoices to Borrower on a quarterly basis, at least ten (10) days prior to each Interest Payment Date.  All payments shall be first applied to interest and then to principal.

(d)     Late Charges; Default Interest Rate.  In lieu of the imposition of any late charges for payments not made by Borrower to Lender as of any Interest Payment Date (**"Delinquent Interest"**) or the Maturity Date (**"Delinquent Principal"**), as applicable, a three percent (3%) per annum interest charge shall be added to the Fixed Rate (the **"Default Interest Rate"**) and shall be applied for the number of days any payment remains unpaid as to (i) any interest payment not made on or before the ninth (9th) calendar day subsequent to each Interest Payment Date (i.e., January 10, April 10, July 10 and October 10), and (ii) as of the Maturity Date for the payment in whole of the outstanding principal balance of the Loan and the accrued and unpaid interest due and payable as of the Maturity Date.  Each amount of Delinquent Interest and Delinquent Principal (collectively, a **"Delinquent Payment"**) shall bear interest at the Default Interest Rate until such payment is made in full to Lender.  Borrower and Lender agree that this Default Interest Rate represents a reasonable sum considering all of the circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment.  Borrower and Lender further agree that proof of actual damages would be costly and inconvenient.  Acceptance of any payments of the Default Interest Rate shall not constitute a waiver of a default with respect to an overdue installment, and shall not prevent Lender from exercising any of the other rights available hereunder or any other Loan Document.  Such Default Interest Rate shall be paid without prejudice to any rights of Lender.

(e)     Acceleration of Certain Interest Payments.  In the event Borrower fails to make two (2) consecutive interest payments to Lender or two (2) interest payments in any twelve-month period, Lender may accelerate payment of the amount of interest coming due on the next two (2) succeeding Interest Payment Dates after notice from Lender to Borrower, so that all such interest for the next two (2) Interest Payment Dates, together with all Delinquent Payments, shall be due and payable on (i) the tenth (10th) calendar day of the month following the month in which the second (2nd) interest payment was not made.  Such amounts of interest that are subject to acceleration shall only be payable on invoice from Lender delivered to Borrower at least ten (10) days prior to the due date thereof.  Thereafter, Borrower shall continue to remit quarterly interest payments in accordance with the Note and this Agreement.

2.3     FUNDING OF LOAN.

(a)     Amount Outstanding.  The outstanding principal balance of all Tranches that shall be made pursuant to this Agreement shall not exceed the Loan Commitment.

(b)     Lender Agreement.  Subject to the terms and conditions set forth in this Agreement, (i) Lender hereby agrees to advance Tranches of the Loan to Borrower from time to time during the period after receipt of the Authorization Notice until the Loan has been fully funded, in an aggregate principal amount which shall not exceed the Loan Commitment at any time, and (ii) Lender shall disburse Loan proceeds, as described in Sections 2.1(a) and 2.1(c)(i), as the EB-5 Investors are cleared by the USCIS.

10

2.4     AUTHORIZED REPRESENTATIVES.

(a)     Generally.  Borrower hereby designates Stuart Lichter (the "**Authorized Representative**") as the person authorized to sign any required notices on behalf of Borrower under the Loan Documents.  Borrower agrees to be bound by any request (i) authorized or transmitted by the Authorized Representative on behalf of Borrower, or (ii) made in Borrower's name by the Authorized Representative and accepted by Lender in good faith and in compliance with these instructions, even if not properly authorized by Borrower.  Borrower further agrees and acknowledges that Lender may rely solely on any bank routing number or identifying bank account number or name provided by the Authorized Representative to effect a wire transfer of funds even if the information provided by the Authorized Representative identifies a different bank or account holder than those named by Borrower.  Lender is not obligated or required in any way to take any actions to detect errors in information provided by the Authorized Representative.  If Lender takes any actions in an attempt to detect errors in the transmission or content of transfer requests or takes any actions in an attempt to detect unauthorized funds transfer requests, Borrower agrees that no matter how many times Lender takes these actions Lender will not in any situation be liable for failing to take or correctly perform these actions in the future, and such actions shall not become any part of the transfer disbursement procedures authorized under this Agreement, the other Loan Documents, or any agreement between Lender and Borrower.  Borrower agrees to notify Lender of any errors in the transfer of any funds or of any unauthorized or improperly authorized transfer requests within fourteen (14) days after Lender's confirmation to Borrower of such transfer.

(b)     Transfer Methods.  Lender will, in its sole discretion, determine the funds transfer system and the means by which each transfer of funds to Borrower will be made.  Lender may delay or refuse to accept a funds transfer request if the transfer would: (i) violate the terms of this Section 2.4, (ii) require use of a bank unacceptable to Lender or prohibited by any Governmental Authority, (iii) cause Lender to violate any Federal Reserve or other regulatory risk control program or guideline, or (iv) otherwise cause Lender to violate any Laws or regulations.

(c)     Limitation of Liability.  Lender shall not be liable to Borrower or any other parties for (i) errors, acts or failures to act of others, including other entities, banks, communications carriers or clearinghouses, through which Borrower's transfers may be made or information received or transmitted, and no such entity shall be deemed an agent of Lender, (ii) any loss, liability or delay caused by fires, earthquakes, wars, civil disturbances, power surges or failures, acts of government, labor disputes, failures in communications networks, legal constraints or other events beyond Lender's control, or (iii) any special, consequential, indirect or punitive damages, whether or not any claim for these damages is based on tort or contract, or Lender or Borrower knew or should have known the likelihood of these damages in any situation.  Lender makes no representations or warranties other than those expressly made in this Agreement.

2.5     FEES.

(a)     Facility Fee.  Borrower has previously paid to Lender a document preparation fee of $50,000.00.  Borrower shall also pay to Lender a facility fee (the "**Facility Fee**") upon Lender's funding of the last Tranche pursuant to this Agreement, with such Facility Fee being remitted by Borrower to Lender from other legally available funds.  The Facility Fee shall be equal to 0.75% of the principal amount of the Loan that is actually funded in one or more

Tranches (e.g., if the entire $36,000,000.00 Loan Commitment is funded, then the Facility Fee shall be $270,000.00).

(b) Payment of Fees. The fees described in this Section 2.5 represent compensation for services rendered and to be rendered separate and apart from the lending of money or the provision of credit and do not constitute compensation for the use, detention or forbearance of money, and the obligation of Borrower to pay such fees shall be in addition to, and not in lieu of, the obligation of Borrower to pay interest, other fees and expenses otherwise described in any Loan Document. All fees shall be payable when due in immediately available funds and in Dollars, and shall be non-refundable when paid.

## 2.6 PAYMENTS.

(a) Principal Prepayments. Borrower may prepay all or any portion of the Loan in accordance with Sections 2.2(a) and 2.2(b) of this Agreement. Any notice of prepayment given to Lender under this Agreement shall specify the approximate date of prepayment and the principal amount of the prepayment.

(b) Manner and Time of Payment. All payments of principal, interest and fees hereunder payable to Lender shall be made, without condition or reservation of right and free of set-off or counterclaim, in Dollars, either by authorized debit or by wire transfer (pursuant to Lender's written wire transfer instructions) of immediately available funds, not later than 11:00 A.M. (Pacific time) on the date due; and funds received by Lender after that time and date shall be deemed to have been paid on the next succeeding Business Day.

(c) Payments on Non-Business Days. Whenever any payment to be made by Borrower hereunder or under any other Loan Document is stated to be due on a day which is not a Business Day, payment shall be made on the next succeeding Business Day, and such extension of time shall be included in the computation of the payment of interest under Section 2.1(b).

2.7 LENDER'S ACCOUNTING. Lender shall maintain a loan account (the "Loan Account") on its books, in which shall be recorded (a) the principal amount of the Loan owing from time to time, and (b) all advances and repayments of principal and payments of accrued interest as provided in this Agreement, separately identifying Tranches advanced to Borrower and Prepayments of Principal. All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time. Monthly or at such other interval as is customary with Lender's practice, Lender will render a statement of the Loan Account to Borrower. Each such statement shall be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein (absent manifest error), unless Borrower, within sixty (60) days after the date such statement is mailed or otherwise delivered to Borrower, delivers to Lender written notice of any objections (with adequate specificity to describe the basis for such objections) which Borrower may have to any such statement. Notwithstanding the foregoing, Lender's entries in the Loan Account evidencing the status of the Loan and other financial accommodations made from time to time shall be final, binding and conclusive upon Borrower (absent manifest error) as to the existence and amount of the Obligations recorded in the Loan Account.

## ARTICLE III
## CONDITIONS TO DISBURSEMENTS

3.1    CONDITIONS TO TRANCHES. The obligation of Lender to fund any Tranches to Borrower shall be subject to satisfaction of (i) the applicable conditions set forth in Article II, and (ii) the following conditions:

       (a)    Solvency. Borrower shall be Solvent.

       (b)    Litigation Proceedings. There shall not have been instituted or threatened any litigation or Proceeding in any court or Governmental Authority affecting or threatening to affect Borrower or the Property, which would have a Material Adverse Effect.

       (c)    No Event of Default. After giving effect to each Tranche, no Event of Default or Unmatured Event of Default shall exist.

       (d)    Fees and Expenses. Borrower shall have paid all expenses of Lender that are then due and owing under this Agreement or the other Loan Documents.

       (e)    Other Loan Documents. Each Member shall have executed and delivered the Pledge Agreement, and Borrower shall have executed and delivered the Note, the Authorization Notice and all required Uniform Commercial Code financing documents and security instruments, all effective as of the Initial Funding Date, and such Loan Documents shall be in full force and effect and there shall be no defaults or events of default under such Loan Documents.

       (f)    Representations and Warranties. Borrower shall have delivered a certificate to Lender, effective as of the Initial Funding Date, stating that, except as set forth in such certificate, all of Borrower's representations and warranties set forth in Section 4.1 are true and correct in all material respects. If any exceptions set forth in such certificate give rise to a Material Adverse Effect, Lender may elect not to fund such Tranche.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

4.1    REPRESENTATIONS AND WARRANTIES. Borrower hereby represents and warrants to Lender as follows:

       (a)    Organization; Limited Liability Company Powers. (i) Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio, and (ii) Borrower has all requisite limited liability company power to conduct its business as proposed to be conducted in accordance with the Loan Documents.

       (b)    Authority. Borrower has the requisite limited liability company power and authority to execute, deliver and perform each of the Loan Documents to which Borrower is a party. The execution, delivery and performance thereof, and the consummation of the transactions contemplated thereby, have been duly approved by the Members of Borrower, and no other proceedings or authorizations on the part of Borrower or its Members are necessary to consummate such transactions, except for such as have been obtained or effected (and true and correct copies of which have been delivered to Lender). Each of the Loan Documents to which Borrower is a party has been duly executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its

13

terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and general principles of equity.

(c)  No Conflict.  The execution, delivery and performance by Borrower of the Loan Documents to which Borrower is a party, and each of the transactions contemplated thereby, do not and will not (i) conflict with or violate Borrower's operating agreement, articles of organization or other organizational documents, or (ii) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Requirement of Law or Court Order binding upon Borrower or any of its Members, or (iii) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under, or require termination of any Contractual Obligation of Borrower, or (iv) result in or require the creation or imposition of any Lien whatsoever upon any assets of Borrower, except those Liens created by or permitted by the Loan Documents.

(d)  Consents and Authorizations.  Upon Borrower's delivery of the Authorization Notice, Borrower shall have obtained all consents and authorizations required pursuant to its Contractual Obligations with any other Person, and shall have obtained all consents and authorizations of, and effected all notices to and filings with, any Governmental Authority, as may be necessary to allow Borrower to lawfully execute, deliver and perform its obligations under the Loan Documents to which Borrower is a party.

(e)  Governmental Regulation.  Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, the Investment Company Act of 1940 or any other federal or state statute or regulation such that Borrower's ability to incur indebtedness is limited or its ability to consummate the transactions contemplated by the Loan Documents is materially impaired.

(f)  Litigation; Compliance.

(i)  There is no Proceeding pending or, to the best of Borrower's knowledge, threatened against Borrower which may have a Material Adverse Effect.

(ii)  Borrower is neither (A) in violation of any applicable Law, or (B) subject to or in default with respect to any Court Order.

(g)  No Material Adverse Effect.  With respect to any and all information contained in those materials delivered to Lender by Borrower prior to the Initial Funding Date, there has occurred no event concerning Borrower which may have a Material Adverse Effect.

(h)  Payment of Taxes.  All tax returns and reports to be filed by Borrower have been timely filed, and all taxes, assessments, fees and other governmental charges shown on such returns or otherwise payable by Borrower have been paid when due and payable, except such taxes, if any, as are reserved against in accordance with GAAP and are being contested in good faith by appropriate proceedings and subject to such extensions of the filing and/or due date thereof as Borrower shall have obtained.  Borrower has no knowledge of any proposed tax assessment that may have a Material Adverse Effect.

(i)  Material Adverse Agreements.  Except as disclosed to Lender prior to entering into this Agreement, Borrower is not a party to or subject to any Contractual Obligation or other restriction contained in its operating agreement, articles of organization, or similar governing documents which may have a Material Adverse Effect.

14

(j)     Solvency.  Borrower will be Solvent after giving effect to each Tranche and the payment and accrual of all fees then payable.

(k)     Single Purpose Entity.  Borrower, at all times since its formation, (i) has been a Single Purpose Entity, (ii) has complied with the provisions of its organizational documents and the laws of the State of Ohio relating to limited liability companies, and (iii) has never owned nor now owns any asset or property other than the MSC LLC Membership Interest.

## ARTICLE V
## REPORTING COVENANTS

Borrower covenants and agrees that, on and after the date hereof, until payment in full of all of the Obligations, and termination of this Agreement:

5.1     FINANCIAL STATEMENTS AND OTHER FINANCIAL AND OPERATING INFORMATION.  Borrower shall maintain or cause to be maintained a system of accounting established and administered in accordance with sound business practices and consistent with past practice to permit preparation of quarterly and, to the extent applicable, annual financial statements, each in conformity with GAAP, and each of the financial statements described below shall be prepared on a consolidated basis for Borrower from such system and records.  Borrower shall deliver or cause to be delivered to Lender:

(a)     Operating Statements and Operating Results.  As soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, (i) monthly operating statements, which operating statements shall include actual monthly and year-to-date net operating income and net cash flow results and comparison to the prior calendar year, and variance to budget reporting, detailed rent rolls, cash flow projections, lease status reports and occupancy summaries in the form customarily generated by Borrower for the Property, dated as of the last day of such calendar month, in form and substance satisfactory to Lender, certified by Borrower as being true, correct, and complete in all material respects (each, an "**Operating Statement**").

(b)     Annual Financial Statements; Accountant's Report and Management Letters.  Within one hundred twenty (120) days after the close of each calendar year, annual audited financial statements of Borrower, prepared on a consolidated basis, consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, together with related schedules and supporting reports, when applicable.  Such financial statements shall be prepared on the basis of GAAP or another accounting method approved by Lender and shall be accompanied by a certificate executed by Borrower or a certified public accountant acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects.  Such financial statements are collectively referred to herein as the "**Annual Financial Statements**".  Together with the delivery of such Annual Financial Statements pursuant to this Section 5.1(b), Borrower shall deliver to Lender a copy of the accountant's reports and management letters with respect to such calendar year.

(c)     Annual Budget For the Property.  Not later than January 31 of each Fiscal Year, an annual operating budget for the Property for such Fiscal Year, detailing expected sources and uses of funds and projected operating income and capital expenditures and expected net cash flow for the Property for such Fiscal Year (the "**Operating Budget**"), in such form as may be approved by Lender from time to time, together with all supporting details reasonably requested by Lender, and certified as being based upon Borrower's reasonable good faith estimates, upon information and assumptions at the time.

15

(d)  Knowledge of Event of Default.  Promptly after Borrower (i) obtains knowledge of any condition or event which constitutes an Event of Default or Unmatured Event of Default, or becomes aware that Lender has given notice or taken any other action with respect to a claimed Event of Default or Unmatured Event of Default or (ii) obtains knowledge of any condition or event which has a Material Adverse Effect, a notice specifying the nature and period of existence of such condition or event, or specifying the notice given or action taken by Lender and the nature of such claimed Event of Default, Unmatured Event of Default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto.

(e)  Litigation, Arbitration or Government Investigation.  Promptly upon Borrower obtaining knowledge of (i) the institution of, or threat of, any material Proceeding against or affecting Borrower or the Property, not previously disclosed in writing by Borrower to Lender, including any eminent domain or other condemnation Proceedings affecting the Property, or (ii) any material development in any Proceeding already disclosed, which, in either case, has a Material Adverse Effect, a notice thereof to Lender and such other material information as may be reasonably available to Borrower to enable Lender and its counsel to evaluate such matters.

(f)  Other Information.  Such other information, reports, contracts, schedules, lists, documents, agreements and instruments in the possession or under the control of Borrower with respect to (i) the Property, (ii) any material change in Borrower's investment, finance or operating policies, or (iii) Borrower's business, condition (financial or otherwise), operations, performance, properties or prospects as Lender may from time to time reasonably request, including, without limitation, annual information with respect to cash flow projections, budgets, operating statements (current year and immediately preceding year), rent rolls, lease expiration reports and leasing status reports.  Borrower hereby authorizes Lender to communicate with the Accountants and authorizes the Accountants to disclose to Lender any and all financial statements and other information of any kind, including copies of any management letter or the substance of any oral information, that such Accountants may have with respect to Borrower's condition (financial or otherwise), operations, properties, performance and prospects.  Concurrently therewith, Lender will notify Borrower of any such communication.  At Lender's request, Borrower shall deliver a letter addressed to the Accountants instructing them to disclose such information in compliance with this Section 5.1(f).

(g)  Accountant Reports.  (i) In connection with the audited Annual Financial Statements described in Section 5.1(b) and if at any other time Borrower causes audited financial statements to be prepared with respect to any Fiscal Year, then, within ten (10) Business Days after receipt thereof from the Accountants: copies of such audited financial statements, together with all reports prepared by the Accountants and submitted to Borrower in connection therewith, including the comment letter submitted by the Accountants in connection with such audit, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower.

(h)  EB-5 Documentation.  At any time during the term of this Agreement, upon thirty (30) days' written request therefor by Lender, EB-5 documentation reports in form and content acceptable to Lender relating to the construction expenditures made by or on behalf of Borrower with respect to the Project, including a description of each such construction expenditure and the date of each such construction expenditure in such detail as reasonably requested by Lender (the "**EB-5 Documentation**").  Borrower shall state in the EB-5 Documentation the total expenditures on the Project at the time of the delivery of the EB-5 Documentation to Lender, which Project expenditures, including the use of additional private and

16

public funds, are estimated as of the date of this Agreement to be approximately $70,000,000.00. Borrower agrees to produce the EB-5 Documentation at its sole cost and expense.

5.2    CONFIDENTIALITY.  Confidential information obtained by Lender pursuant to this Agreement or in connection with the Loan shall not be disseminated by Lender and shall not be disclosed to third parties except (a) to regulators, taxing authorities and other Governmental Authorities having jurisdiction over Lender or otherwise in response to Requirements of Law, (b) to Lender's auditors and legal counsel and in connection with regulatory, administrative and judicial proceedings as necessary or relevant including enforcement proceedings relating to the Loan Documents, and (c) to any prospective assignee of or participant in Lender's interest under this Agreement or any prospective purchaser of the assets or a controlling interest in Lender; provided that such prospective assignee, participant or purchaser first agrees to be bound by the provisions of this Section 5.2.  In connection with disclosures of confidential information to any non-governmental third-party, Lender shall, to the extent feasible and permitted, give prior notice of such request to Borrower; however, Lender shall not incur any liability to Borrower for failure to do so.  For purposes hereof, **"confidential information"** shall mean all nonpublic information obtained by Lender, unless and until such information becomes publicly known, other than as a result of unauthorized disclosure by Lender of such information.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

6.1    AFFIRMATIVE COVENANTS.  Borrower covenants and agrees that, on and after the date hereof, until payment in full of all of the Obligations and termination of this Agreement:

(a)    Existence.  Borrower shall at all times maintain its existence as a limited liability company and preserve and keep in full force and effect its rights to do business in, and shall remain in good standing in, each jurisdiction in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary.

(b)    Qualification; Name.  Borrower shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified.  Borrower will transact business solely in its own name.

(c)    Compliance with Laws, Etc.  Borrower shall (i) comply with all Requirements of Law applicable to the operations of Borrower, and (ii) obtain as needed all Permits necessary for its operations and maintain such in good standing.

(d)    Inspection of Property; Books and Records; Discussions.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request.  Borrower will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

(e)    Maintenance of Permits, Etc.  Borrower will maintain in full force and effect all Permits, franchises, patents, trademarks, trade names, copyrights, governmental approvals, authorizations or other rights necessary for the operation of its business and notify Lender in writing, promptly after learning thereof, of the suspension, cancellation, revocation or discontinuance of or of any pending or threatened action or proceeding seeking to suspend,

cancel, revoke or discontinue any material Permit, franchise, patent, trademark, trade name, copyright, governmental approval, authorization or right.

(f)   Use of Funds.  The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Agreement for the purpose of funding costs for the Project. Within the later of (i) two (2) years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project

(g)   Single Purpose Entity.  Borrower will be, and at all times will hold itself out to the public as, a Single Purpose Entity and will continue to comply with the provisions of its organizational documents and the Laws of the State of its formation.

(h)   Distributions to Members.  To the extent that the management of Borrower, in accordance with the terms and conditions of the Borrower Operating Agreement, determines to make Distributions of Available Cash Flow (as hereinafter defined) to the Members, fifty percent (50.00%) of each such Distribution of Available Cash Flow shall be retained and used by Borrower ("**Retained Distributions**") as set forth in this Section 6.1(h).  Each Retained Distribution shall be paid to Lender as a Prepayment of Principal of the Loan until the Loan has been paid in full.  Any Prepayment of Principal pursuant to this Section 6.1(h) shall be paid by Borrower to Lender within thirty (30) days following the funding date of the Distribution of Available Cash Flow and shall be credited against the outstanding principal balance of the Loan as set forth in Section 2.2(b) of this Agreement; provided, however, that if the Prepayment Date has not yet occurred at such time, Borrower shall hold the Retained Distributions in its accounts until the Prepayment Date and shall make the Prepayment of Principal to Lender on the Prepayment Date in accordance with this Section 6.1(h).  For purposes of this Section 6.1(h), "**Distributions of Available Cash Flow**" shall mean the amount of cash which the management of Borrower deems available for distribution to the Members, taking into account, among other factors, (i) all of Borrower's obligations then due and payable, including, but not limited to, required payments under loan documents, (ii) anticipated Borrower expenditures, and (iii) those amounts which the management of Borrower deems reasonably necessary to place into reserves to satisfy customary and usual claims with respect to Borrower's business.

(i)   Priority of Security.  Borrower shall, within thirty (30) days after receipt of written request from Lender therefor, execute and deliver all further instruments and documents, and take all further action, that Lender may reasonably request to (i) grant to Lender the rights, powers and privileges purported to be created by this Agreement and the other Loan Documents, (ii) grant to Lender the security interests and Liens on the Collateral purported to be created by this Agreement and the other Loan Documents.  Lender shall, together with such notice to Borrower, include any such requested instruments or documents for Borrower's review.

## ARTICLE VII
## NEGATIVE COVENANTS

Borrower covenants and agrees that, on and after the date hereof, until payment in full of all of the Obligations, and termination of this Agreement:

7.1    OPERATING RESTRICTIONS.

(a)    Contracts.  Borrower shall not enter into any contract or agreement with any Subsidiary or Affiliate of Borrower without the prior written consent of Lender; provided, however, that Borrower may enter into contracts or agreements with Subsidiaries or Affiliates without Lender's prior written consent so long as such contracts or agreements provide for payments at prevailing market rates.

(b)    Restrictions on Fundamental Changes.  Borrower shall not:

(i)    enter into any merger or consolidation or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution);

(ii)    engage in any line of business other than as expressly permitted by the Borrower Operating Agreement;

(iii)    except upon prior written notice to Lender, move its chief executive office from the State of California;

(iv)    seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, or the sale of any material assets of Borrower;

(v)    without the unanimous consent of all of the Members, file a petition for relief under the United States Bankruptcy Code, or under any other present or future state of federal law regarding bankruptcy, reorganization or other debtor relief law; or

(vi)    cease to be a Single Purpose Entity.

7.2    AMENDMENT OF CONSTITUENT DOCUMENTS.  Borrower shall not amend or modify the Borrower Operating Agreement or the MSC LLC Operating Agreement without Lender's prior written consent.  If Lender fails to send written notice to Borrower disapproving a proposed modification to the Borrower Operating Agreement or the MSC LLC Operating Agreement within fifteen (15) days following Lender's receipt of written notice from Borrower describing such proposed modification, Lender shall be deemed to have approved such modification.

7.3    TRANSFERS.  Except as permitted by (a) the Borrower Operating Agreement, or (b) the Loan Documents, Borrower shall not (i) cause or permit any change in the Members of Borrower or in the relative ownership interests of such Members without the prior written consent of Lender (which consent may be granted or withheld at the sole discretion of Lender), or (ii) cause or permit any Member or any other equity interest holder in Borrower to, directly or indirectly, transfer, convey, assign, mortgage, pledge, hypothecate, alienate or lease its Membership Interest in Borrower without Lender's prior written consent (which consent may be granted or withheld at the sole discretion of Lender).

## ARTICLE VIII
## FINANCIAL COVENANTS

8.1     DISTRIBUTIONS.  Borrower shall not permit any distributions to or for the account of any Member (or any other equity interest holder in Borrower) during the continuance of any Event of Default. For purposes of this Section 8.1, "distribution" shall be understood to include any payment of funds, whether a return of capital or any accrual thereon, a payment of available cash, a repayment of any loan or other advance or interest accrual thereon, or any other payment of any nature or kind.

## ARTICLE IX
## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

9.1     EVENTS OF DEFAULT.  Each of the following occurrences shall constitute an **"Event of Default"** under this Agreement:

(a)     Failure to Make Payments When Due.  Borrower's failure to pay (i) any amount due on the Maturity Date, (ii) any other principal payment within ten (10) days after the date upon which it first became due, (iii) any interest on the Loan (or any Tranche thereof) within ten (10) days after the applicable Interest Payment Date, or (iv) any fee or other amount payable under any Loan Document within ten (10) days after the date upon which it first became due.

(b)     Other Defaults.  Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this Agreement which could lead to a Material Adverse Effect (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver to EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of time as is mandated by applicable Requirements of Law).

(c)     Breach of Representation or Warranty.  Should any representation or warranty made or deemed made by Borrower to Lender herein or in any of the other Loan Documents be false or misleading in any material respect on the date as of which made, which could lead to a Material Adverse Effect, and which is not remedied to the reasonable satisfaction of Lender within ninety (90) days following Borrower's receipt of written notice of such inaccuracy.

(d)     Involuntary Bankruptcy; Appointment of Receiver, Etc.

(i)     An involuntary case shall be commenced against Borrower and the petition shall not be dismissed within sixty (60) days after commencement of the case, or a court having jurisdiction shall enter a decree or order for relief in respect of any such Person in an involuntary case, under any applicable bankruptcy, insolvency or other similar law now or hereinafter in effect; or any other similar relief shall be granted under any applicable federal, state or foreign law; or

(ii)     A decree or order of a court (or courts) having jurisdiction for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower, or over all or a substantial part of the property of Borrower, shall be entered; or an interim receiver, trustee or other custodian of Borrower, or of all or a substantial part of the property of Borrower, shall be appointed; or a warrant of attachment, execution or similar process against any substantial part of the property of

Borrower shall be issued; and any such event shall not be stayed, vacated, dismissed, bonded or discharged within sixty (60) days after entry, appointment or issuance.

(e)     <u>Voluntary Bankruptcy; Appointment of Receiver, Etc.</u>  Should Borrower have an order for relief entered with respect to it or commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or should Borrower consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law; or should Borrower consent to the appointment of or taking of possession by a receiver, trustee or other custodian for all or a substantial part of its property; or should Borrower make any assignment for the benefit of creditors; or should Borrower be unable or fail, or admit in writing its inability, to pay its debts as such debts become due; or should Borrower's managers and/or Members adopt any resolution or otherwise authorize any action to approve any of the foregoing.

(f)     <u>Dissolution.</u>  Any order, judgment or decree shall be entered against Borrower decreeing its involuntary dissolution or split up, and such order shall remain undischarged and unstayed for a period in excess of thirty (30) days; or Borrower shall otherwise dissolve or cease to exist.

(g)     <u>Solvency; Material Adverse Change.</u>  Borrower ceases to be Solvent, or there shall have occurred any event or circumstance having a Material Adverse Effect which is not remedied to the satisfaction of Lender within ninety (90) days after the occurrence of such event.

(h)     <u>Transfer of Assets.</u>  The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this Agreement, or as otherwise permitted by the Loan Documents.

An Event of Default shall be deemed "continuing" until cured or waived in writing in accordance with Section 9.3 or 10.3.

9.2    <u>RIGHTS AND REMEDIES.</u>

(a)     <u>Acceleration, Etc.</u>  Upon the occurrence and during the continuance of any Event of Default, at the option of Lender, the unpaid principal amount of and any and all accrued interest on the Loan shall become immediately due and payable, with all additional interest from time to time accrued thereon and without presentment, demand or protest or other requirements of any kind (including, without limitation, valuation and appraisement, diligence, presentment, notice of intent to demand or accelerate or notice of acceleration), all of which are hereby expressly waived by Borrower, and the obligations of Lender to make any further disbursement under the Loan shall thereupon terminate.  On or after the Maturity Date, subject to the provisions of this Agreement and the other Loan Documents, Lender may exercise any or all rights and remedies under the Loan Documents or applicable law.

(b)     <u>Access to Information.</u>  If an Event of Default then exists, Lender shall have, in addition to and not by way of a limitation of any other rights and remedies contained in this Agreement or in the other Loan Documents, the right within forty-eight (48) hours after notice to Borrower to obtain access to Borrower's records (including computerized information, files and supporting software) and its accounting information, and to use all of the foregoing and the information contained therein in any manner Lender deems appropriate.  Borrower hereby authorizes any accountant or manager employed by Borrower to deliver such items and

21

information to Lender. Notwithstanding anything to the contrary contained in the Loan Documents, upon the occurrence of and during the continuance of an Event of Default, Lender shall be entitled to request and receive, by or through Borrower or appropriate legal process, any and all information concerning Borrower or any of its property which is reasonably available to or obtainable by Lender.

(c)     Waiver of Demand. Demand, presentment, protest and notice of nonpayment are hereby waived by Borrower. Borrower also waives, to the extent permitted by law, the benefit of all valuation, appraisal and exemption laws.

(d)     Rights of Lender. During the existence of an Event of Default, Lender may (i) institute any proceeding at law or in equity to enforce the obligations of Borrower under this Agreement and/or any covenants and Obligations of Borrower contained in this Agreement or (ii) acquire ownership of the Collateral (excluding the Released Collateral) and exercise any of its rights and remedies accruing as a result of Lender's ownership of the Collateral (excluding the Released Collateral).

(e)     Waivers, Amendments and Remedies. No delay or omission of Lender to exercise any right under any Loan Document shall impair such right or be construed to be a waiver of any Event of Default or an acquiescence therein, and any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right, and no waiver, amendment or other variation of the terms, conditions or provisions of the Loan Documents whatsoever shall be valid unless in a writing signed by Lender, and then only to the extent in such writing specifically set forth. All remedies contained in the Loan Documents or by law afforded shall be cumulative and all shall be available to Lender until the Obligations have been paid in full and this Agreement has been terminated.

9.3     RESCISSION. If at any time after acceleration of the maturity of the Loan, Borrower shall pay all arrears of interest and all payments on account of principal of the Loan which shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified in this Agreement) and all Events of Default and Unmatured Events of Default (other than nonpayment of principal of and accrued interest on any portion of the Loan due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 10.3, then by written notice to Borrower, Lender may elect, in its sole discretion, to rescind and annul the acceleration and its consequences; but such action shall not affect any subsequent Event of Default or Unmatured Event of Default or impair any right or remedy consequent thereon. The provisions of the preceding sentence are intended merely to bind Lender to a decision; they are not intended to benefit Borrower and do not give Borrower the right to require Lender to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

9.4     TRANSFER OF COLLATERAL (EXCLUDING RELEASED COLLATERAL). If an Event of Default occurs under Section 9.1(a), and such Event of Default is not cured within ninety (90) days thereafter by Borrower, provided that no other Event of Default exists at such time, then notwithstanding any other provision of this Agreement to the contrary, Borrower may elect to transfer to Lender the Collateral (excluding Released Collateral), as limited by and subject to the provisions of Section 19 of the Pledge Agreement (such transferred interest is referred to as the "**Lender Transferred Interest**"), in full satisfaction of the outstanding principal balance and any other amounts outstanding under the Loan. Following such transfer, the Lender Transferred Interest shall be held by Lender in accordance with the terms and conditions of the Borrower Operating Agreement as limited by and subject to the provisions of Section 19 of the Pledge Agreement. Borrower acknowledges that Lender, (i) if Borrower fails to thereafter comply with the provisions of Borrower Operating Agreement, shall be

entitled to pursue all available legal and equitable remedies provided thereunder, and (ii) due to being the then holder of the Lender Transferred Interest, may receive fundings of Distributions of Available Cash Flow (as defined in Section 6.1(h) of this Agreement) in excess of the outstanding principal balance and any other amounts outstanding under the Loan in effect immediately prior to such conversion, and Borrower agrees that Lender shall be entitled to retain all such distributions notwithstanding the full satisfaction of the Loan.

## ARTICLE X
## MISCELLANEOUS

10.1   EXPENSES AFTER EVENT OF DEFAULT.  Borrower agrees to pay, or reimburse Lender for, all reasonable out-of-pocket costs and expenses, including without limitation reasonable attorneys' fees and disbursements, incurred by Lender after the occurrence of an Event of Default (i) in enforcing any Obligation or exercising or enforcing any other right or remedy available by reason of such Event of Default; (ii) in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or in any insolvency or bankruptcy Proceeding; (iii) in commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal Proceeding relating to Borrower and related to or arising out of the transactions contemplated hereby; and (iv) in taking any other action in or with respect to any suit or Proceeding (whether in bankruptcy or otherwise).

10.2   CHANGE IN ACCOUNTING PRINCIPLES.  Except as otherwise provided herein, if any changes in accounting principles from those used in the preparation of the most recent financial statements delivered to Lender pursuant to the terms hereof are hereinafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or successors thereto or agencies with similar functions) and are adopted by Borrower with the agreement of its independent certified public accountants, and such changes result in a change in the method of calculation of any of the financial covenants, standards or terms found herein, the parties hereto agree to enter into negotiations in order to amend such provisions so as to equitably reflect such changes with the desired result that the criteria for evaluating the financial condition of Borrower shall be the same after such changes as if such changes had not been made; provided, however, that no change in GAAP that would affect the method of calculation of any of the financial covenants, standards or terms shall be given effect in such calculations until such provisions are amended, in a manner satisfactory to Lender, to so reflect such change in accounting principles.

10.3   AMENDMENTS AND WAIVERS.  No amendment or modification of any provision of this Agreement shall be effective without the written agreement of Lender and Borrower, and no termination or waiver of any provision of this Agreement, or consent to any departure by Borrower therefrom, shall in any event be effective without the written concurrence of Lender, which Lender shall have the right to grant or withhold at its sole discretion.

10.4   INDEPENDENCE OF COVENANTS.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default or Unmatured Event of Default if such action is taken or condition exists, and if a particular action or condition is expressly permitted under any covenant, unless expressly limited to such covenant, the fact that it would not be permitted under the general provisions of another covenant shall not constitute an Event of Default or Unmatured Event of Default if such action is taken or condition exists.

10.5   NOTICES AND DELIVERY.  Unless otherwise specifically provided herein, any consent, notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied or sent by courier service or United States mail, and shall be deemed to have been given (a) when delivered in person or by courier service, (b) upon receipt of a telecopy (or on the next Business Day if such telecopy is received on a non-Business Day or after 5:00 p.m. (at the office of the recipient) on a Business Day), or (c) four (4) Business Days after deposit in the United States mail (registered or certified, with postage prepaid and properly addressed).  Any party delivering a communication by telecopy shall also send a copy thereof by one of the other means provided in this Section 10.5.  Notices to Lender shall not be effective until received by Lender.  For the purposes hereof the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section 10.5) shall be as set forth below each party's name on the signature pages hereof, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

10.6   SURVIVAL OF WARRANTIES, INDEMNITIES AND AGREEMENTS.  All agreements, representations, warranties and indemnities made or given herein shall survive the execution and delivery of this Agreement and the other Loan Documents and the making and repayment of the Loan, and such indemnities shall survive termination hereof.

10.7   FAILURE OR INDULGENCE NOT WAIVER; REMEDIES CUMULATIVE.  No failure or delay on the part of Lender in the exercise of any power, right or privilege under any of the Loan Documents shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing under the Loan Documents are cumulative to and not exclusive of any rights or remedies otherwise available.

10.8   MARSHALLING; PAYMENTS SET ASIDE.  Lender shall not be under any obligation to marshal any assets in favor of Borrower or any other Person (except Lender) or against or in payment of any or all of the Obligations.  To the extent that Borrower makes a payment or payments to Lender, or Lender enforces any Liens or Lender exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

10.9   SEVERABILITY.  In case any provision in or obligation under this Agreement or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby; provided, however, that if the rates of interest or any other amount payable hereunder, or the collectability thereof, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to advance the Tranches shall not be enforceable.

10.10   HEADINGS.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

10.11   GOVERNING LAW; WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OHIO.

10.12   LIMITATION OF LIABILITY.  To the extent permitted by applicable law, no claim may be made by Borrower or any other Person against Lender, or the affiliates, directors, officers, employees, attorneys of or agents of Lender, for any special or punitive damages (as opposed to direct, indirect or consequential damages) in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and Borrower and Lender hereby waive, release and agree not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

10.13   SUCCESSORS AND ASSIGNS.  This Agreement and the other Loan Documents shall be binding upon the parties hereto and their respective successors and assigns.  The terms and provisions of this Agreement shall inure to the benefit of any assignee or transferee of the Loan or any portion thereof, and in the event of any permitted such transfer or assignment, the rights and privileges herein conferred upon Lender shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.  Borrower's rights or any interest therein hereunder, and Borrower's duties and Obligations hereunder, shall not be assigned without the written consent of Lender.

10.14   CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL.  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST BORROWER WITH RESPECT TO THIS AGREEMENT MAY BE AND ALL JUDICIAL PROCEEDINGS BROUGHT BY BORROWER WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION HAVING SITUS IN SUMMIT COUNTY, OHIO, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, BORROWER ACCEPTS, FOR ITSELF AND IN CONNECTION WITH THE PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY FINAL JUDGMENT RENDERED THEREBY FROM WHICH NO APPEAL HAS BEEN TAKEN OR IS AVAILABLE.  BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS NOTICE ADDRESS SPECIFIED ON THE SIGNATURE PAGES HEREOF.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER IRREVOCABLY WAIVE (A) TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND (B) ANY OBJECTION (INCLUDING, WITHOUT LIMITATION, ANY OBJECTION OF THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS) WHICH ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY JURISDICTION SET FORTH ABOVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF LENDER TO BRING PROCEEDINGS AGAINST BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.

10.15   COUNTERPARTS; EFFECTIVENESS; INCONSISTENCIES.  This Agreement and any amendments, waivers, consents or supplements may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all such together shall constitute but one and the same instrument.  This Agreement shall become effective when Borrower and Lender have duly executed and delivered signature pages of this Agreement to each other.  This Agreement and each of the other

Loan Documents shall be construed to the extent reasonable to be consistent one with the other, but to the extent that the terms and conditions of this Agreement are actually and directly inconsistent with the terms and conditions of any other Loan Document, this Agreement shall govern.

10.16  PERFORMANCE OF OBLIGATIONS.  Borrower agrees that Lender may, but shall have no obligation to, make any payment or perform any act required of Borrower under any Loan Document or take any other action which Lender in its discretion deems necessary or desirable to protect or preserve the Collateral, including without limitation, any action to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against any Collateral.

10.17  CONSTRUCTION.  The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

10.18  ENTIRE AGREEMENT.  This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embodies the entire agreement and supersede all prior agreements, written and oral, relating to the subject matter hereof.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, this Agreement has been duly executed on the date set forth above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:   **S.L. Properties, Inc.,**
      a Delaware corporation,
      its Manager

     By: _____
          Stuart Lichter, President

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California  90242
Attn:  Stuart Lichter
Tel:  (562) 803-4761
Fax:  (562) 803-4796

with a required copy to:

Fainsbert Mase & Snyder, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California  90064
Attn:  John A. Mase, Esq.
Tel:  (310) 473-6400
Fax:  (310) 473-8702

**Lender:**

**CMB INVESTMENT GROUP X, LP,**
an Illinois limited partnership

By: _____

Name: Patrick F. Hogan
Title: General Partner

**ADDRESS FOR NOTICE AND DELIVERY TO LENDER:**

CMB Summit, LLC
7819 42nd Street West
Rock Island, Illinois 61201
Attn: Patrick F. Hogan, General Partner
Tel: (309) 797-1500
Fax: (309) 797-1655

with a required copy to:

Lewis, Brisbois, Bisgaard & Smith, LLP
Attn: Timothy J. Sabo
650 Hospitality Lane, Third Floor
San Bernardino, California 92408
Tel: (909) 387-1130
Fax: (909) 387-1138

## EXHIBIT A

## Form of Pledge Agreement

[See attached]

## MEMBERSHIP PLEDGE AND SECURITY AGREEMENT

This Membership Pledge and Security Agreement (this "**Agreement**") is made as of _____, 2012 by the undersigned members (each a "**Pledgor**" and collectively, the "**Pledgor Group**") of Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**"), in favor of CMB Investment Group X, LP, an Illinois limited partnership ("**Lender**").

### RECITALS

A.    In accordance with the terms and conditions of that certain Loan Agreement, dated as of May 7, 2012 (the "**Loan Agreement**"), between Lender and Borrower, Lender is making a loan to Borrower in the total principal amount of up to $36,000,000.00 (the "**Loan**"). The Loan is evidenced by the Promissory Note, dated as of the date hereof (the "**Note**"), executed in accordance with the Loan Agreement.

B.    As consideration for Lender's agreement to make the Loan, and as security therefor, each Pledgor has agreed to pledge a portion of the Collateral (as defined below). All capitalized terms used (and not defined) herein shall have the meanings given to them in the Loan Agreement.

NOW, THEREFORE, in consideration for the Loan, and for other good and valuable consideration, each Pledgor agrees as follows:

1.    Definitions.

   1.1.    Certain Defined Terms.    The following additional terms shall have the following meanings:

      "**Collateral**" has the meaning given to it in Section 2.

      "**Controlling Management Interest**" means the management and control over any and all decisions and elections of Borrower, which includes, but is not limited to, all organizational, operational and business affairs of Borrower as set forth in the LLC Agreement, subject to the covenants of Borrower set forth in the Loan Agreement.

      "**Default**" shall have the meaning given to it in Section 17.

      "**Economic Interest**" means all of the economic benefit accrued or accruing, including, without limitation, all proceeds from sale or assignment, rights to dividends and distributions of any type (regular or special, and whether pertaining to profits, return of capital or otherwise) with respect to the Pledged Interest of each Pledgor.

      "**LLC Agreement**" means the Operating Agreement of Borrower, dated as of April 30, 2012, as it may be amended, supplemented or restated from time to time.

      "**Membership Interest**" means each Pledgor's membership interest in Borrower (see Attachment 10.10), and includes any and all benefits to which the holder of such a membership interest may be entitled as provided in the LLC Agreement, including, but not limited to, all profits, distributions and payments now or hereafter due or paid to a Pledgor by or from Borrower on account of such membership interest, all rights of a Pledgor to receive net proceeds of any sale or financing (or refinancing) of the assets of Borrower on account of such membership interest, and all rights to receive cash or any

1

other distributions of property on account of such membership interest, together with all obligations of a Pledgor to comply with the terms and provisions of the LLC Agreement, and all rights with respect to the management of Borrower's activities, subject to the provisions of this Agreement.

"**Person**" means any natural person, corporation, limited partnership, general partnership, joint stock company, limited liability company, limited liability partnership, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, or any other nongovernmental or governmental entity.

"**Pledged Interest**" means one hundred percent (100%) of each Pledgor's individual Membership Interest in Borrower (see Attachment 10.10); provided, however, that as described in the Loan Agreement, if for any reason Lender does not fund the full amount of the Loan, then "Pledged Interest" shall mean a fraction of each Pledgor's individual Membership Interest in Borrower, which fraction shall be equal to the quotient, expressed as a percentage, arrived at by dividing (i) the portion of the Loan actually funded by (ii) $36,000,000.00. For example, if Lender only funds $30,000,000.00 of the stated $36,000,000.00 Loan, the Pledged Interest would be 83.333% of each Member's individual Membership Interest in Borrower (($30,000,000.00/$36,000,000.00 = 83.333%) (and in such event Lender shall execute all documentation reasonably requested by any Pledgor to evidence such reduction and applicable release of a portion of the Pledged Interest). In addition, the Pledged Interest shall be partially released (and shall therefore decrease) in connection with any Prepayment of Principal by Borrower, as set forth in Section 2.2(b)(iv) of the Loan Agreement.

"**Secured Obligations**" has the meaning given to it in Section 3.

1.2.    Construction. Unless the context otherwise requires: (i) references in this Agreement to any other agreement shall mean such agreement as from time to time amended, supplemented or restated; (ii) references in this Agreement to a particular section of the LLC Agreement or any other document shall include any successor provision; and (iii) references to the plural include the singular and to the singular include the plural. The terms "include" and "including" are not limiting. Except where otherwise indicated, the term "or" has the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby" and "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision. Except where otherwise indicated, references to paragraphs, subparagraphs, sections, subsections, clauses, exhibits and schedules are to this Agreement.

2.    Grant of Security Interest. As security for the full and prompt performance of all of the Secured Obligations, each Pledgor hereby assigns, transfers to, grants a security interest in and pledges to Lender (i) such Pledgor's Pledged Interest, together with all rights (whether now owned or hereafter acquired) in, to and under whatever is receivable or received when such Pledged Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions on such Pledgor's Pledged Interest, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Pledged Interest, whether as a result of merger, consolidation, dissolution,

reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise; and all proceeds, products, additions, accessions, rents, issues, royalties of or to any of the foregoing, in whatever form; and (ii) without limiting the foregoing clause (i), such Pledgor's Economic Interest, together with all rights of such Pledgor, whether now owned or hereafter acquired, in, to and under whatever is receivable or received when such Economic Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions thereon, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Economic Interest or other property subject to this Agreement, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise (all of the foregoing, the "**Collateral**").

3.  <u>Secured Obligations</u>. The pledge of the Collateral is made by each Pledgor to secure repayment or performance, as the case may be, of each of the following described obligations to Lender (the "**Secured Obligations**"): (i) the Loan and all other indebtedness, obligations, liabilities, conditions and covenants of Borrower, now existing or hereafter arising, under or in respect of the Note, the Loan Agreement or the other Loan Documents to which Borrower is a party, including all principal, interest (including interest accruing, or that would accrue but for the provisions of applicable law, after the commencement of any bankruptcy or other debtor-relief proceeding in respect of Borrower), premiums, fees, charges, expenses, penalties and other amounts arising under or relating to any of the foregoing, and the performance of each and every condition, covenant and obligation of Borrower thereunder; and (ii) the payment and performance by each Pledgor of each and every obligation, liability, condition, covenant and obligation of such Pledgor created hereby or otherwise arising hereunder.

4.  <u>Rights with Respect to Distributions</u>. At Lender's election, following the occurrence and during the continuance of a Default, all rights of the Pledgor Group to receive dividends, cash, securities, instruments, withdrawals or other distributions or transfers of property in respect of their respective Pledged Interests or other Collateral (collectively, "**Distributions**") shall be vested in Lender, and unless Lender elects otherwise, Lender have the sole right to receive such Distributions and apply them to the Secured Obligations in such order as it may elect in its sole discretion. In all other circumstances, each Pledgor shall have the right to receive Distributions and may apply such Distributions in any manner that it may elect. Without limiting the foregoing, any Distributions received by a Pledgor following the occurrence and during the continuance of a Default shall be received by such Pledgor in trust for the benefit of Lender, shall be segregated from other property or funds of such Pledgor and shall be forthwith delivered to Lender in the same form as so received (with any necessary endorsement).

5.  <u>Voting and Other Rights</u>. Subject to the limitations contained in <u>Sections 11.3</u> and <u>19</u>, so long as no Default shall have occurred and be continuing and subject to any other applicable provisions of this Agreement, each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not prohibited by the terms of this Agreement or the Loan Agreement. Lender shall execute and deliver (or cause to be executed and delivered) to each Pledgor such proxies and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and other

3

rights that such Pledgor is entitled to exercise pursuant to the foregoing authorization. At Lender's election, upon the occurrence and during the continuance of any Default, and subject to the limitations set forth in Section 19, all rights of the Pledgor Group to exercise the voting and other consensual rights that the Pledgor Group would otherwise be entitled to exercise hereunder shall cease, and (unless otherwise agreed by Lender) all such rights (and any other rights the Pledgor Group may have in respect of the Pledged Interests) shall thereupon become vested in Lender, which shall thereupon have the sole right to exercise such rights.

6.     <u>Obligations Under Other Agreements</u>. The obligations of each Pledgor hereunder shall be in addition to any obligations of such Pledgor or any other Person under any other pledges of security or guaranties or indemnities for the Secured Obligations heretofore, now or hereafter given to Lender.

7.     <u>Separate Actions; Waiver of Statute of Limitations; Reinstatement of Liability</u>. The obligations of each Pledgor under this Agreement are independent of the Secured Obligations, and a separate action or actions may be brought and prosecuted against each Pledgor, whether or not action is brought against any other Person or whether any other Person is joined in any such action or actions. Each Pledgor acknowledges that there are no conditions precedent to the effectiveness of this Agreement and that this Agreement is in full force and effect and is binding on such Pledgor as of the date hereof, regardless of whether Lender obtains additional collateral or guaranties from others or takes any other action contemplated by the Loan Documents. To the extent permitted under applicable law, each Pledgor waives the benefit of any statute of limitations affecting such Pledgor's liability hereunder or the enforcement thereof, and agrees that any payment made on account of the Secured Obligations or other act that tolls any statute of limitations applicable thereto shall also operate to toll such statute of limitations applicable to such Pledgor with respect to its obligations hereunder. The liability of a Pledgor hereunder shall be reinstated and revived, and the rights of Lender shall continue, with respect to any amount paid on account of the Secured Obligations that is required thereafter to be restored or returned by Lender upon the bankruptcy, insolvency or reorganization of Borrower or any other Person or for any other reason, all as though such amount had not been paid.

8.     <u>Financing Statement; Further Assurances; Power of Attorney</u>. Each Pledgor hereby consents to Lender filing a financing statement describing the Collateral being provided by the Pledgor Group, and such financing statement, when filed of record (a) for any Pledgor who is an individual, with the Secretary of State of the State in which such Pledgor has his principal residence, or (b) for any Pledgor that is an entity, with the Secretary of State of the State in which such Pledgor is organized or incorporated, will perfect the security interest in all of the Collateral in which such Pledgor currently has rights. The form of such financing statement (the "UCC-1") is attached hereto as Attachment 8. Each Pledgor agrees that at any time and from time to time, at the expense of such Pledgor, such Pledgor shall promptly execute and deliver all further instruments and documents, and take all further action, that Lender may reasonably request to perfect and protect the security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Each Pledgor hereby irrevocably makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as such Pledgor's true and lawful attorney-in-fact to sign the name of such Pledgor on any financing statement or other writing necessary or reasonably requested by Lender to perfect and maintain a perfected lien on, and security interest in, any Collateral. Without limiting the generality of the foregoing, if at any time after the date hereof all or any portion of the Collateral shall be represented or evidenced by certificates or instruments, all such certificates or instruments representing or evidencing the Collateral shall be delivered to and held by Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall

4

be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Lender. In the event that certificates or instruments evidencing the Collateral are delivered to Lender pursuant to this paragraph, Lender shall have the right, at any time in its discretion and without notice to any Pledgor, to transfer to or to register in the name of Lender or any of its nominees any or all of the Pledgor Group's interest in the Collateral (without affecting the nature of such property as Collateral), subject only to the revocable rights specified in Section 5. In addition, Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

9.   Release of Pledge. Upon repayment in full of all of the Secured Obligations, the obligations of Pledgors under this Agreement shall terminate. The parties acknowledge that, pursuant to Section 2.2(b)(iv) of the Loan Agreement, partial releases of Lender's security interest in the Collateral are permitted and, upon the satisfaction of the criteria for such partial releases pursuant to Section 2.2(b)(iv) of the Loan Agreement, Lender shall execute all documents necessary or reasonably requested by any Pledgor to release the applicable Released Collateral. Any such Released Collateral shall thereafter not be subject to the terms and conditions of this Agreement.

10.  Representations and Warranties. Each Pledgor, as to itself only, represents and warrants to Lender as follows:

   10.1.   Due Formation and Existence. With respect to any Pledgor that is an entity, such Pledgor is duly organized or incorporated, validly existing and in good standing under the laws of the State of its organization or incorporation, is duly qualified to conduct its business as now conducted and proposed to be conducted, and is in good standing in all jurisdictions where the failure to do so would have a material adverse effect on its business or financial condition.

   10.2.   Requisite Power. Such Pledgor has all requisite limited liability company, corporate, or other power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its properties (including owning such Pledgor's Membership Interest) and to carry on its business as now conducted and proposed to be conducted. Such Pledgor has all requisite limited liability company, corporate, or other power to execute, deliver and perform this Agreement and each other agreement, document or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby. With respect to any Pledgor that is an entity, the execution, delivery and performance of this Agreement have been duly authorized by all necessary action by the members, managers, directors, and/or shareholders (as applicable) of such Pledgor.

   10.3.   Governmental Consents. No authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the grant by such Pledgor of the security interest created hereunder or the exercise by Lender of the voting or other rights, remedies or powers provided for in this Agreement.

   10.4.   Enforceability. This Agreement has been duly and validly executed and delivered by such Pledgor and constitutes the valid and legally binding obligation of such Pledgor, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by principles of equity.

10.5.   No Conflicts.  Subject to Borrower's delivery to Lender of the Authorization Notice, neither the execution and delivery by such Pledgor of this Agreement or of any other document or instrument or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby, the consummation of the transactions contemplated hereby, nor compliance by such Pledgor or Borrower with the provisions hereof or thereof (i) requires the consent of any third party or (ii) will conflict with or result in a breach of any of the terms, conditions or provisions of any indenture, agreement, lease or instrument to which such Pledgor or Borrower is a party or by which such Pledgor or Borrower is bound or to which such Pledgor or Borrower, or any material part of the property of such Pledgor or Borrower, may be subject (including the LLC Agreement), or constitute a breach thereof or a default thereunder, or permit the acceleration of any obligation thereunder, or result in the creation or imposition of any lien of any nature whatsoever (other than the lien created hereby and the other liens permitted by the Loan Documents) upon any of the property of such Pledgor.

10.6.   Governing Documents.  A true and complete copy of the LLC Agreement, including all amendments and supplements thereto, has been previously delivered to Lender. The LLC Agreement remains in full force and effect as of the date of this Agreement, and is the valid and legally binding obligation of each party thereto, enforceable in accordance with its terms.  Borrower has all requisite legal power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its property and any other assets of Borrower and to carry on its business as now conducted and proposed to be conducted. The execution, delivery and performance of such agreements, documents and instruments has been duly authorized by all necessary action by such Pledgor and by Borrower.

10.7.   No Other Agreements.  Except for the LLC Agreement (as provided to and approved by Lender) and as otherwise previously disclosed to Lender, there are no other agreements or commitments between or among Pledgors relating to the management, voting rights, operations or ownership of Borrower or relating to such Pledgor's Membership Interest or any of Borrower's or such Pledgor's obligations with respect thereto.

10.8.   Absence of Liens; Absence of Certificates.  Such Pledgor's Membership Interest is owned by such Pledgor free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character, other than the security interest created hereunder. Except as contemplated by or permitted by the Loan Agreement or related to the issuance of the Authorization Notice, the property owned by Borrower is free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character. The Collateral is not, and will not be, evidenced by any certificate.

10.9.   Address.  Such Pledgor's address for notices is set forth on the signature page hereof.

10.10.  Membership Interests in Borrower.  Attachment 10.10 accurately reflects the ownership structure of Borrower, including each Pledgor's percentage ownership interest in Borrower.

11.    Certain Covenants of Pledgor.  Until all Secured Obligations are paid or performed in full, each Pledgor covenants and agrees as follows:

11.1.   No Liens or Transfers.  Without Lender's consent, such Pledgor shall not grant, permit or suffer to exist any lien on all or any portion of the Collateral, or agree to do so, except in

favor of Lender, nor shall such Pledgor sell or otherwise dispose or transfer of all or any portion of its Pledged Interest.

11.2.   Name and Organization.  Such Pledgor shall not change its name, the place or structure of its organization (for any Pledgor that is an entity), or the place of his principal residence (for any Pledgor who is an individual), without first giving Lender at least thirty (30) days' written notice of such change and executing such additional documentation as Lender may reasonably require pursuant to Section 8 of this Agreement.

11.3.   Exercise of Voting Rights; Other Changes to Documents.  Without Lender's consent (not to be unreasonably withheld), such Pledgor shall not vote or give consent (i) to amend in any material respect the LLC Agreement, (ii) to sell or otherwise dispose of or transfer, or grant any lien on, all or any portion of the assets of Borrower in violation of this Agreement or the other Loan Documents, (iii) to terminate or dissolve Borrower, (iv) except as permitted by the LLC Agreement, to permit any change in the ownership of Borrower, or (v) except as permitted by the LLC Agreement, to admit any additional member to Borrower.

11.4.   Copies of Notices.  Such Pledgor shall promptly deliver to Lender copies of all material reports and financial statements, and all other material notices, issued by or delivered to such Pledgor under the LLC Agreement, and such Pledgor shall provide to Lender:

    (a)     a copy of each amendment to or restatement of Borrower's articles of organization filed by Borrower promptly (but in any event within ten (10) Business Days) after effecting such filing;

    (b)     a copy of each amendment to or restatement of the LLC Agreement promptly after effecting such amendment or restatement; and

    (c)     within ten (10) Business Days after its receipt of the written request of Lender therefor, copies of any or all of the business records of Borrower to which such Pledgor is entitled access under the LLC Agreement or applicable law.

12.   Powers of Lender.  Each Pledgor appoints Lender (and any Persons designated by Lender for such purpose) as such Pledgor's true and lawful attorney-in-fact to take any action and to execute any instrument that Lender may reasonably deem necessary or desirable to accomplish the purposes of this Agreement.  Such power is coupled with an interest, is irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, in their discretion.

13.   Waivers.

13.1.   Waivers of Rights.  Each Pledgor waives any right to require Lender:

    (a)     to proceed against any Person, including Borrower or any other pledgor of security for, or guarantor of, the Secured Obligations or any part thereof;

    (b)     to proceed against or exhaust any Collateral;

    (c)     to proceed against or exhaust any collateral held from any other Person;

(d)     to give notice of the terms, time and place of any public or private sale of personal property security held from such Pledgor or any other Person, except as expressly required under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities);

(e)     to pursue any other remedy in Lender's power; or

(f)     to make any presentment, demands for performance, or give any notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any obligations or evidences of the Secured Obligations, or in connection with the creation of new or additional obligations, whether or not constituting Secured Obligations.

Further, each Pledgor waives all rights and benefits of such Pledgor under California Civil Code Sections 2787 to 2855 inclusive, under California Civil Code Sections 2899 and 3433, and under Chapter 1341 of the Ohio Revised Code (as applicable), each as amended and superseded from time to time.

13.2.    Waivers of Defenses. Each Pledgor waives any defense arising by reason of:

(a)     any disability or other defense to the Secured Obligations of Borrower or any other Person;

(b)     the cessation, from any cause whatsoever (other than payment in full of all Secured Obligations), of any obligation of Borrower or any other Person;

(c)     the application by Borrower or any other Person of the proceeds of any Secured Obligation for purposes other than the purposes represented by Borrower or any other Person to Lender or intended or understood by Lender or such Pledgor;

(d)     any act or omission by Lender which directly or indirectly results in or aids the discharge of Borrower or any other Person or any of the Secured Obligations, or which provides a defense to Borrower or any other Person, by operation of law or otherwise;

(e)     any modification of the Secured Obligations, in any form whatsoever and including the renewal, extension, acceleration or other change in time for payment of the Secured Obligations, or other change in the terms of the Secured Obligations, or any part thereof, including any increase or decrease of the rate of interest thereon;

(f)     any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(g)     Lender's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the United States Bankruptcy Code or any successor statute;

(h)     any borrowing or any grant of a security interest under Section 364 of the United States Bankruptcy Code;

(i)     any statute of limitations affecting the liability of such Pledgor hereunder or the enforcement hereof, and each Pledgor agrees that the payment of all sums payable under the Note or other act which tolls any statute of limitations applicable to the Note shall similarly operate to toll the statute of limitations applicable to such Pledgor's liability hereunder;

(j)     any defense based upon an election of remedies by Lender, including any election to proceed by judicial or nonjudicial foreclosure of any security, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies (including remedies relating to real property or personal property security) which destroys or otherwise impairs the subrogation rights of such Pledgor or the rights of such Pledgor to proceed against Borrower, any other Pledgor or any guarantor for reimbursement, or both (including, if applicable, California Code of Civil Procedure Sections 580a, 580b, 580d, and 726 or Ohio Revised Code Sections 2329.08 and 5721.192); or

(k)     any defense or right of subrogation, reimbursement, exoneration, contribution or indemnity, or any right to enforce any remedy which Lender now has or may hereafter have against Borrower, any other Pledgor, or any other Person or any benefit of, or any right to participate in, any security now or hereafter held by Lender pursuant to the Note, the Loan Agreement, the other Loan Documents and/or this Agreement.

13.3    Waiver of Subrogation and Related Rights.    Each Pledgor hereby waives, until all Secured Obligations have been paid in full, any right of subrogation, any right of contribution, any right of reimbursement and any right to enforce any remedy that Lender may have against Borrower or any other Person and any right to participate in, or benefit from, any security for the Note or the other Loan Documents now or hereafter held by Lender. Each Pledgor waives any defense it may have based upon an election of remedies by Lender that destroys such Pledgor's subrogation rights or its rights to proceed against Borrower or any other Person for reimbursement or contribution, including any loss of rights such Pledgor may suffer by reason of any rights, powers or remedies of Borrower or any other Person in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging all or any part of the Secured Obligations (including, if applicable, Sections 726, 580b and 580d of the California Code of Civil Procedure or Sections 2329.08 and 5721.92 of the Ohio Revised Code, each as from time to time amended). Without limiting the generality of the foregoing or any other provision hereof (but subject to the first sentence of this Section 13.3), each Pledgor expressly waives any and all benefits which might otherwise be available to such Pledgor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433, under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, and under Chapter 1341 and Sections 2329.08 and 5721.192 of the Ohio Revised Code (as applicable). Furthermore, each Pledgor waives as a defense to its obligations hereunder the application of any "one action" or "anti-deficiency" statute or law or other similar statute or law, now or hereafter in effect, in any state in which all or any real property security for either Borrower's, or any other Person's, obligations under the Loan Documents (if any) may be located.

14. <u>Authorizations to Lender</u>. Each Pledgor authorizes Lender, without notice or demand and without affecting such Pledgor's other liability hereunder, from time to time and at any time:

    14.1. <u>Alterations of Secured Obligations</u>. To alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Secured Obligations or any part thereof, including any increase or decrease of the rate of interest thereon.

    14.2. <u>Dealings with Security</u>. To take and hold security other than the Collateral for payment of the Secured Obligations or any part thereof, or for all or any portion of the obligations of any guarantor of the Secured Obligations, and to exchange, enforce, waive, release or perfect or fail to perfect its security interests in the Collateral or any part thereof or any such other security.

    14.3. <u>Application of Collateral</u>. During the existence of a Default, to apply the Collateral or any other security and direct the order or manner of sale thereof, including a non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine.

    14.4. <u>Dealings with Pledgor, Guarantors and other Persons</u>. To release or substitute any other pledgor of security for the Secured Obligations or any part thereof, or any other Person.

15. <u>Payment of Taxes, Charges, Liens and Assessments</u>. Each Pledgor agrees to pay, prior to delinquency, all taxes, charges, liens and assessments against such Pledgor's interest in the Collateral. Upon the failure of any Pledgor to do so, Lender at its option may pay any of such taxes, charges, liens or assessments and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge them. Any such payments made by Lender shall be obligations of such Pledgor to Lender, due and payable immediately without demand, together with interest at a rate determined in accordance with the provisions of <u>Section 22</u>, and shall be secured by the Collateral, subject to all of the terms and conditions of this Agreement.

16. <u>Continuing Obligations of Pledgor</u>. Lender shall not, by reason of this Agreement, the creation of the security interest in the Collateral provided for herein, the exercise of any remedies as provided hereunder or for any other reason, be responsible or liable in any manner or to any extent for the obligations and liabilities of Borrower or of any Pledgor with respect thereto, whether now existing or hereafter incurred, and all such obligations and liabilities shall at all times and in all events be the responsibilities and liabilities of Borrower and the Pledgor Group only. Without limiting the generality of the foregoing, each Pledgor shall remain liable to observe and perform and shall observe and perform all the conditions and obligations to be observed and performed by it under each agreement, document or other instrument relating to the Collateral granted hereunder, all in accordance with the terms and conditions thereof.

17. <u>Default</u>. The occurrence of any of the following shall constitute a "<u>Default</u>" under this Agreement:

    17.1. <u>Default under Loan Agreement</u>. Any "<u>Event of Default</u>" as defined in the Loan Agreement.

    17.2. <u>LLC Agreement</u>. Any material breach by any Pledgor of any of its obligations under the LLC Agreement or any agreements, instruments or documents related to the LLC Agreement beyond any applicable notice and cure periods thereunder.

17.3. <u>Default under this Agreement</u>.  Any material breach by any Pledgor of, or failure by any Pledgor to comply with or perform, any provision hereof, or any failure by any Pledgor to pay any amount due hereunder when due; <u>provided</u>, however, that, except for any Pledgor's failure to comply with the provisions of Sections 11.1, 11.2, and 11.3 (which shall be immediate Defaults, with no required notice or cure period), any such breach or failure shall constitute a "Default" only if such failure is not cured within thirty (30) days after Lender delivers written notice to each Pledgor advising each Pledgor of such breach or failure and demanding that such breach or failure be cured.

17.4. <u>Insolvency Events</u>.

(a)    The institution of a proceeding in a court having jurisdiction seeking a decree or order for relief in respect of Borrower, Stuart Lichter, or Christopher S. Semarjian under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of any such Person for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs, if such proceeding remains undismissed or unstayed and in effect for a period of sixty (60) consecutive days, or such court enters a decree or order granting the relief sought in such proceeding.

(b)    The institution by Borrower, Stuart Lichter, or Christopher S. Semarjian of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; the consent by Borrower, Stuart Lichter, or Christopher S. Semarjian to the entry of an order for relief in any involuntary proceeding described in Section 17.4(a) or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs; the making by Borrower, Stuart Lichter, or Christopher S. Semarjian of a general assignment for the benefit of creditors; or the general failure by Borrower, Stuart Lichter, or Christopher S. Semarjian to pay its/his debts as they become due.

18.    <u>Remedies</u>.  Upon the occurrence of a Default, subject to the limitations set forth in Section 19, Lender shall thereupon and thereafter during the continuance thereof have any or all of the rights, remedies and powers to which a secured party is entitled after a default under the provisions of the Uniform Commercial Code as in effect (a) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (b) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), including, without limitation, the right to foreclose on the Collateral, or any portion thereof (including, without limitation, the Pledged Interest or any portion thereof or the Economic Interest or any portion thereof, or both), or any combination of the foregoing; provided that Lender's election to foreclose on less than all of the Collateral shall not limit Lender's right to foreclose on any other portion of the Collateral at any time in the future (and such future foreclosure shall in no event require the consent from any other party).  In addition to those rights, remedies and powers and in addition to any and all other rights, remedies and powers that Lender may have under any other agreement, document or instrument or under applicable law, and subject to the limitations set forth in Section 19, each Pledgor agrees that Lender may in its sole discretion do or cause to be done any one or more of the following:

18.1.    Realize Upon Collateral.  Sell, assign and deliver, or otherwise realize upon, all or any part of the Collateral in any manner permitted by law, at any time and from time to time, at public or private sale, with or without demand and with or without notice or advertisement, for cash, upon credit or for future delivery, as Lender shall deem appropriate.  Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay or appraisal that such Pledgor now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.  In addition:

(a)    If notice of sale is required to be given to any Pledgor under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), written notice to such Pledgor ten (10) days prior to the date of any public sale or private sale of the Collateral shall be the notice required to be given under the applicable provision of the Uniform Commercial Code.

(b)    In connection with any private sale or other disposition of any part of the Collateral (if the Collateral or relative portion thereof is of a type customarily sold on a recognized market), and upon each public sale of any of the Collateral, Lender may purchase all or any part of the Collateral being sold and may credit bid any portion or all of the Secured Obligations.  Lender shall hold any such Collateral in its own right, free from any claims of Pledgor or rights of redemption.

(c)    Lender shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  If sale of all or any part of the Collateral is made on credit or for future delivery: (i) the Collateral so sold may be retained by Lender until the sale price is paid by the purchaser or purchasers thereof, (ii) the Secured Obligations shall be reduced only to the extent that payment is actually received by Lender in respect of such sale, and (iii) Lender shall not incur any liability in the event that any purchaser or purchasers for future delivery shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.

(d)    As an alternative to exercising the power of sale herein conferred upon it, Lender may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts of competent jurisdiction.

Any proceeds of any disposition of the Collateral or any part thereof may be applied by Lender to the payment of reasonable expenses incurred by Lender in connection with the foregoing, including reasonable attorneys' fees and expenses, and the balance of such proceeds may be applied by Lender toward the payment of the Secured Obligations, in such order of application as Lender may from time to time elect.

12

18.2.   Pledgor's Acknowledgments.  Each Pledgor recognizes that Lender may be unable to effect a public sale of all or part of the Collateral by reason of certain prohibitions contained in the Securities Act of 1933, in applicable securities laws of the State of California or the State of Ohio, or in applicable securities laws of another jurisdiction, but may instead resort to one or more private sales to a single purchaser or a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Pledged Interests for their own account, for investment and not with a view to the distribution or resale thereof.  Each Pledgor understands that Lender's exercise of its election to hold private sales may be at prices and other terms less favorable to such Pledgor than if such Collateral were sold at public sale and that Lender has no obligation to delay the sale of any portion of the Collateral for the period of time necessary to permit any Person to register any portion of the Collateral constituting securities, even if such Person is required to, or would, agree to register such securities for public sale under applicable securities laws.  Each Pledgor agrees that private sales made under the foregoing circumstances shall each be deemed to have been actions taken or transactions made in a "commercially reasonable" manner.

18.3.   No Liability.  Without limiting in any manner any other limitation on Lender's liability to any Pledgor set forth herein or in any other agreement, document or instrument executed in connection herewith or otherwise available to Lender under applicable law, Lender shall not have any liability whatsoever to any Pledgor under any circumstances as a result of any income tax liability incurred by such Pledgor as a result of any action (or inaction) by Lender pursuant to its rights, remedies and powers under this Agreement.

18.4.   Rights Cumulative.  The rights, remedies and powers of Lender shall be cumulative, and no single or partial exercise of any of them shall preclude the further or other exercise of any of them, in any sequence or combination, and in one or more iterations.  Any waiver, permit, consent or approval of any kind by Lender in respect of any Default, or any waiver of any provision or condition hereof, must be in writing and shall be effective only to the extent set forth in such writing.

19.   Controlling Management Interest.  Notwithstanding any other provision of this Agreement to the contrary, with the exception of (i) a Default under Sections 17.1, 17.2 or 17.3 resulting from a final determination of fraud or intentional misrepresentation by Borrower, any Pledgor or any officer, director, partner, member or employee of Borrower in connection with the application for or creation of the Loan or any request for any action or consent of Lender, or (ii) a Default under Section 17.4, the Pledgor Group shall retain the Controlling Management Interest in accordance with the LLC Agreement, and Lender, upon gaining control of the Collateral in accordance with Section 18, shall be limited to ownership of the Economic Interest; provided, however, if Lender, upon gaining control of the Collateral in accordance with Section 18, holds more than forty percent (40.00%) of the Membership Interests in Borrower, thereafter any Major Decision (as defined below) shall require the prior written approval of Lender (not to be unreasonably withheld).  The failure of Lender to disapprove in writing of any proposed Major Decision within thirty (30) days following Lender's receipt of written notice describing the Major Decision in question shall be deemed Lender's approval of such Major Decision.  Upon Lender's transfer, sale or other conveyance of the Collateral to any third party, Lender shall notify such third party of the reservation of the Controlling Management Interest set forth in this Section 19.  A "Major Decision" shall mean (i) approval of the annual business and operations plan for MSC LLC (the "MSC LLC Annual Business Plan") in accordance with the provisions of the MSC LLC Operating Agreement, (ii) an election to sell, dispose or transfer fee title to any material portion of the Real Property below the values established in or not contemplated by the MSC LLC

13

Annual Business Plan, or (iii) an action not contemplated in the MSC LLC Annual Business Plan which could result in a Material Adverse Effect with respect to Borrower.

20.    <u>Disposition of Collateral and Proceeds.</u> Upon the transfer of all or any part of the Secured Obligations, Lender may transfer all or any part of the Collateral, and thereafter Lender shall be fully discharged from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all the rights, remedies and powers and assume all the obligations of Lender hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral not so transferred, Lender shall retain all rights, remedies and powers herein given.

21.    <u>Notices.</u> Unless otherwise specifically provided herein, any consent, notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied or sent by courier service or United States mail, and shall be deemed to have been given (a) when delivered in person or by courier service, (b) upon receipt of a telecopy (or on the next Business Day if such telecopy is received on a non-Business Day or after 5:00 p.m. (at the office of the recipient) on a Business Day), or (c) four (4) Business Days after deposit in the United States mail (registered or certified, with postage prepaid and properly addressed). Any party delivering a communication by telecopy shall also send a copy thereof by one of the other means provided in this <u>Section 21</u>. Notices to Lender shall not be effective until received by Lender. For the purposes hereof (i) the address of each Pledgor shall be its address set forth on the signature pages hereof and (ii) the address of Lender shall be its address set forth in the Loan Agreement (until notice of a change of address is delivered as provided in this <u>Section 21</u>), or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

22.    <u>Costs, Expenses and Attorneys' Fees.</u> All reasonable out-of-pocket payments, advances, charges, costs and expenses, including reasonable attorneys' fees and expenses and fees and expenses of expert witnesses, made or incurred by Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof (including those arising in connection with (i) the custody of, the registration of, the sale of, or other redemption upon, any of the Collateral, or (ii) the failure by any Pledgor to perform or observe any of the provisions hereof), shall be paid to Lender by the Pledgor Group immediately and without demand, together with interest at a rate per annum equal to the rate of interest specified in the Note for amounts remaining unpaid thereunder after the due date thereof (or, if less, the maximum rate permitted by law).

23.    <u>Governing Law; Successors, Assigns.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, and shall be binding on and inure to the benefit of the legal representatives, successors and assigns of each Pledgor and Lender.

24.    <u>Severability.</u> If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

25.    <u>**WAIVER OF RIGHT TO TRIAL BY JURY.**</u> **TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE**

14

DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND, TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

26.  Choice of Forum; Venue.  Except with respect to foreclosure proceedings against any Collateral which by requirement of law must be brought in the jurisdiction where such Collateral is located, all judicial proceedings brought against any Pledgor with respect to this Agreement may be, and all judicial proceedings brought by any Pledgor with respect to this Agreement shall be, brought in any state or federal court of competent jurisdiction having situs in Summit County, Ohio, and by execution and delivery of this Agreement, each Pledgor accepts, for itself and in connection with the Collateral, generally and unconditionally, the jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby from which no appeal has been taken or is available. Each Pledgor irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its notice address specified on the signature page hereof.

27.  Miscellaneous.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute a single instrument.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, each Pledgor has executed this Agreement as of the day and year first written above.

**Pledgor Group:**

Address:

_____
**STUART LICHTER**

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase & Snyder, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: John A. Mase, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

_____
**CHRISTOPHER S. SEMARJIAN**

Address:

c/o Alan R. Daus & Associates
3401 Enterprise Parkway, Suite 105
Cleveland, Ohio 44142
Tel: _____
Fax: _____

_____
**ERIC KAPLAN, as Trustee of the
KAPLAN FAMILY TRUST**

Address:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Tel: (562) 803-4761
Fax: (562) 803-4796

*[Signatures continue on next page]*

*[Signatures continued from previous page]*

---

**BRUCE HAAS, as Trustee of the
HAAS FAMILY TRUST**

Address:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California  90242
Tel:  (562) 803-4761
Fax:  (562) 803-4796

**DEHOFF DEVELOPMENT COMPANY,**
an Ohio corporation

Address:

821 South Main Street
North Canton, Ohio  44720
Attn:  Robert DeHoff
Tel: _____
Fax: _____

By: _____
　　　　Name:
　　　　Title:

**Attachment 8**

UCC-1

### Attachment 10.10

## PLEDGED MEMBERSHIP INTERESTS IN BORROWER

| Member | Percentage Membership Interest in Borrower | Percentage Interest Being Pledged Pursuant to this Agreement ("Pledged Interest") |
|---|---|---|
| Stuart Lichter | 40.18% | 40.18% |
| Christopher S. Semarjian | 40.18% | 40.18% |
| Kaplan Family Trust | 4.02% | 4.02% |
| Haas Family Trust | 5.62% | 5.62% |
| DeHoff Development Company | 10.00% | 10.00% |

**EXHIBIT B**

## Property

[See attached]

## EXHIBIT C

## Loan Documents

1.    This Agreement
2.    The Note (as defined in this Agreement)
3.    The Pledge Agreement (as defined in this Agreement)

Exhibit C

**EXHIBIT D**

**Form of Note**

[See attached]

## MAPLE STREET INVESTORS LLC
## PROMISSORY NOTE
### (CMB Investment Group X, LP)

| RATE OF INTEREST: | TERM: | DATE: |
|---|---|---|
| 6.0% | 6 Years | _____, 2012 |

**REGISTERED OWNER: CMB Investment Group X, LP**

**PRINCIPAL AMOUNT: $36,000,000.00**

MAPLE STREET INVESTORS LLC ("**Borrower**") is an Ohio limited liability company, formed on April 30, 2012 as a Single Purpose Entity (as defined in the Loan Agreement, dated as of May 7, 2012 (the "**Loan Agreement**"), between Borrower and CMB Investment Group X, LP, an Illinois limited partnership ("**Lender**")). Borrower is the holder of a 100% membership interest (the "**MSC LLC Membership Interest**") in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**").

The members of Borrower have executed and delivered a certain Membership Pledge and Security Agreement, dated as of the date hereof (the "**Pledge Agreement**"), granting to Lender a security interest in their respective membership interests in Borrower (the "**Collateral**") as security for the obligations of Borrower as incurred pursuant to the Loan Agreement.

MSC LLC holds fee title in certain real property (the "**Real Property**"; see Exhibit B to the Loan Agreement), which consists of the project known as the former Hoover Plant located in North Canton, Ohio. The Real Property generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan (as hereinafter defined). Such buildings and improvements, together with related site improvements, appurtenances, fixtures and tenant improvements, if any, now or hereafter located on the Real Property, are collectively referred to as the "**Improvements**". The Real Property and Improvements are collectively referred to as the "**Property**".

Borrower hereby promises to pay to Lender the principal sum of Thirty-Six Million Dollars ($36,000,000.00) (the "**Loan**"), or so much thereof as has been advanced by Lender to Borrower pursuant to the Loan Agreement, plus interest at a rate of 6.0% per annum, in accordance with and subject to the terms and provisions of the Loan Agreement. Reference is hereby made to the Loan Agreement for a more complete statement of the terms and conditions under which the Loan evidenced by this Promissory Note (this "**Note**") is made and is to be repaid. Subject to the terms of the Loan Agreement, this Note shall be paid in full on the Maturity Date (as defined in the Loan Agreement), which is six(6) years after the Initial Funding Date (as defined in the Loan Agreement), unless payment in full is made sooner pursuant to Section 2.2(b) of the Loan Agreement.

Borrower agrees to pay the aforesaid principal plus interest in accordance with the terms hereinafter set forth:

1.    This Note shall be payable as follows:

    (a)    On the Maturity Date, Borrower shall pay, in lawful money of the United States of America, the outstanding principal balance of this Note to Lender at 7819 42nd Street West, Rock Island, IL 61201 or to such other address or to such account and in such manner as Lender shall direct. Except as provided in Section 2.2(b) of the Loan Agreement, Borrower may not prepay any of the outstanding principal balance of this Note at any time prior to the expiration of forty-two (42) months following the Initial Funding Date. Any prepayment of the outstanding principal balance of this Note shall be subject to the provisions of Section 2.2(b) of the Loan Agreement. Upon any prepayment of a portion of the outstanding principal balance of this Note, Lender shall concurrently release a portion of its interest in the Collateral in accordance with the process and formula set forth in Section 2.2(b)(iv) of the Loan Agreement.

    (b)    The outstanding principal balance of the Loan shall bear interest at the rate of six percent (6.0%) per annum (the **"Fixed Rate"**), calculated from the date of disbursement of the applicable Tranche (as defined in the Loan Agreement) by Lender to Borrower, until repaid as set forth in this Agreement and the other Loan Documents (as defined in the Loan Agreement). Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable, in arrears, quarterly on each January 1, April 1, July 1, and October 1 following the Initial Funding Date (each such date, an **"Interest Payment Date"**), with the final interest payment being due and payable on the Maturity Date. Lender shall provide invoices for all payments as set forth in the Loan Agreement.

2.    In lieu of the imposition of any late charges for payments not made by Borrower to Lender as of any Interest Payment Date (**"Delinquent Interest"**) or the Maturity Date (**"Delinquent Principal"**), as applicable, a three percent (3%) per annum interest charge shall be added to the Fixed Rate (the **"Default Interest Rate"**) and shall be applied for the number of days any payment remains unpaid as to (i) any interest payment not made on or before the ninth (9th) calendar day subsequent to each Interest Payment Date (i.e., January 10, April 10, July 10 and October 10), and (ii) as of the Maturity Date for the payment in whole or the outstanding principal balance of the Loan and the accrued and unpaid interest due and payable as of the Maturity Date. Each amount of Delinquent Interest and Delinquent Principal (collectively, a **"Delinquent Payment"**) shall bear interest at the Default Interest Rate until such payment is made in full to Lender. Borrower and Lender agree that this Default Interest Rate represents a reasonable sum considering all of the circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower and Lender further agree that proof of actual damages would be costly and inconvenient. Acceptance of any payments of the Default Interest Rate shall not constitute a waiver of a default with respect to an overdue installment, and shall not prevent Lender from exercising any of the other rights available hereunder or any other Loan Document. Such Default Interest Rate shall be paid without prejudice to any rights of Lender.

3.    In the event Borrower fails to make two (2) consecutive interest payments to Lender or two (2) interest payments in any twelve-month period, Lender may accelerate payment of the amount of interest coming due on the next two (2) succeeding Interest Payment Dates after notice from Lender to Borrower, so that all such interest for the next two (2) Interest Payment Dates, together with all Delinquent Payments, shall be due and payable on (i) the tenth (10th) calendar day of the month following the month in which the second (2nd) interest payment was not made. Such amounts of interest that are subject to acceleration shall only be payable on invoice from Lender delivered to Borrower at least ten (10) days prior to the due date thereof. Thereafter, Borrower shall continue to remit quarterly interest payments in accordance with this Note and the Loan Agreement.

4.     This Note is secured by the Pledge Agreement, and the security interests created by the Pledge Agreement are perfected by one or more Uniform Commercial Code filings against the Collateral, providing a public record of lien.

5.     This Note shall not be assigned by either party, without the written permission of the other party, which permission shall not be unreasonably withheld.

6.     Borrower covenants and warrants that the execution, delivery and performance of this Note have been duly authorized by all necessary actions of Borrower, do not require the consent or approval of any other person, regulatory authority or governmental body, and do not conflict with, result in a violation of, or constitute a default of: (a) any provision of any agreement or other instrument binding upon Borrower, or (b) any law, regulation, court decree or order applicable to Borrower.

7.     This Note, when delivered, shall constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and general principles of equity.

8.     It is hereby recited, certified and declared that any and all acts, conditions and things required to exist, to happen and to be performed precedent to and in the issuance of this Note exist, have happened and have been performed in due time, form and manner as required by the Ohio Constitution and the laws of the State of Ohio.

9.     This Note, the Loan Agreement, and the Pledge Agreement constitute the entire understanding and agreement of the parties as to the matters set forth herein and therein. No alteration of or amendment to this Note shall be effective unless given in writing and signed by Lender and Borrower.

10.     Payment of the principal amount of this Note may not be accelerated by Lender, unless otherwise provided herein or in the Loan Agreement.

11.     This Note has been delivered to Lender and accepted by Lender in the State of Ohio. In the event of a lawsuit, Lender and Borrower agree to submit to the jurisdiction of the courts of Summit County, Ohio. This Note shall be governed by the laws of the State of Ohio as to the interpretation of any matter contained herein.

12.     If a court of competent jurisdiction finds any provision of this Note invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; provided, however, in the event the offending provision cannot be so modified, it shall be stricken and all other provisions of this Note in all respects shall remain valid and enforceable.

13.     Time shall be of the essence in the performance of this Note.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first written above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:     **S.L. Properties, Inc.,**
           a Delaware corporation,
           its Manager


            By: _____
                   Stuart Lichter, President



ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group                    with a required copy to:
12214 Lakewood Boulevard
Downey, California  90242                    Fainsbert Mase & Snyder, LLP
Attn:  Stuart Lichter                               11835 West Olympic Blvd., Suite 1100
Tel:  (562) 803-4761                             Los Angeles, California  90064
Fax:  (562) 803-4796                            Attn:  John A. Mase, Esq.
                                                            Tel:  (310) 473-6400
                                                            Fax:  (310) 473-8702

**Maple Street Investors, LLC**
**12214 Lakewood Boulevard**
**90242 Downey, CA**

March 7, 2012

Patrick F. Hogan
President
CMB Summit, LLC
7819 42nd Street West
Rock Island, IL 61201

RE: <u>CMB Infrastructure Group X</u>

Dear Mr. Hogan:

As founder, President and Managing Partner of Industrial Realty Group ("IRG"), I appreciate the continuing efforts and commitment that your California Regional Center, CMB Export, LLC ("CMB Export"), has demonstrated in the ongoing redevelopment of McClellan Business Park, LLC ("MBP"), in which entities I control are co-owners. Discussions with MBP (dating back to 2006) have resulted in CMB EB-5 financings to MBP totaling $138 million of loan proceeds from CMB Investment Groups I, II, IV, VI-A, VI-B and VI-C. Those loan proceeds have provided significant assistance to the financing plan for various phases of the McClellan AFB reuse and redevelopment efforts. The McClellan project has become the leading job-generating engine for Sacramento County and the investments made by CMB Export have been critical to that success.

Those early efforts are what lead to the seeking of your assistance in 2008 for a variety of Stuart Lichter controlled projects in Ohio which would ultimately include projects in Akron, North Canton, Moraine and other parts of the state. There is no doubt that the "Goodyear Headquarters Project" was the most notable of the projects at that time and support for your company to establish the CMB Ohio Regional Center, CMB Summit, LLC ("CMB Summit"), came not only from IRG but also from the City of Akron, Summit County and the Summit County Port Authority. All of these public agencies were instrumental in the development effort of the Goodyear projects and the retention of Goodyear in Ohio. As you recall, our past discussions have covered a number of projects throughout Ohio. CMB's continued commitment to Ohio and visits to the Ohio Stuart Lichter controlled properties have highlighted many job generation opportunities that we believe will parallel the job generation opportunities in California. CMB has met IRG's geographical Ohio needs by expanding your scope of operations to include the entire state of Ohio, allowing the use of EB-5 loan proceeds to assist in the transformation of the former Hoover Company Headquarters in North Canton, Ohio.

I am proud of the role the number of Stuart Lichter controlled projects in Ohio have been able to play in you development of CMB Summit, when our initial focus was based primarily upon the Goodyear projects. As you know, the downturn in the economy delayed the commencement of construction on the Goodyear projects and for a period of time our respective attentions were turned elsewhere. I am also proud to report that not only are the Goodyear projects moving forward but a different Stuart Lichter controlled



PLAINTIFF'S EXHIBIT
B
tabbies

Patrick F. Hogan
RE: CMB Infrastructure Group X
March 7, 2012
Page 2 of 2

entity affiliated entity's efforts in North Canton, Ohio, are prepared to move forward as well.

Based upon CMB Export's success as an EB-5 lender in California, subject to loan documents to be approved and entered into by the parties, a Stuart Lichter controlled entity, Maple Street Investors, LLC ("MSI"), is authorizing CMB Summit to raise $36 million in loan financing ("CMB Maple Street Loan") from an investment group partnership of which CMB Summit or a subsidiary will be the general partner.  MSI is the single and only member of Maple Street Commerce, LLC ("MSC"), which is the owner of the former Hoover properties.  MSI, in such capacity as the sole member of MSC, is expected to be the "borrower" under the loan transaction.  These properties would include the former Hoover Headquarters building, Manufacturing Plant, and the remaining vacant land that comprises the 88 acre redevelopment project.  The CMB Maple Street Loan, which shall provide funds to MSC, will be combined with public and private funds totaling over $34 million.  Renovation of a portion of the former Hoover facilities has already begun by MSC and total build out is projected to be completed in 2015.  The specific start dates on some portions will be based on future tenant needs; however, current projections are identified as follows:

| Project: | Start Date: | Completion Date: |
|---|---|---|
| Parking and Infrastructure Improvements | Third quarter of 2012 | Fourth quarter of 2014 |
| Office 1 | Third quarter of 2012 | Fourth quarter of 2013 |
| Office 2 | First quarter of 2013 | Fourth quarter of 2014 |
| Office 3 | First quarter of 2014 | Fourth quarter of 2015 |
| Retail Improvements | First quarter of 2013 | Fourth quarter of 2013 |
| Residential Improvements | First quarter of 2013 | First quarter of 2014 |
| Industrial Development and Improvements | Third quarter of 2012 | Fourth quarter of 2013 |
| Roadway and Infrastructure | Second quarter of 2012 | Fourth quarter of 2015 |

The total capital expenditures on the various Maple Street projects involving the former Hoover Company facilities are expected to exceed $70 million.  The funding for these projects comes from:

- $5,000,000 from Ohio Department of Development
- $36,000,000 CMB Maple Street Loan
- $29,800,000 from Maple Street Commerce, LLC by a combination of debt and equity investment.

The CMB Maple Street Loan will be used by MSC to fund a portion of the needed equity commitment to the former Hoover Company projects and shall provide significant assistance to the further development of the former Hoover Company properties listed in the table above.  The timelines, as outlined above, demonstrate anticipated construction and the related construction spending will be completed no later than 2015.

Patrick F. Hogan
RE: CMB Infrastructure Group X
March 7, 2012
Page 3 of 3

The repayment of the CMB Maple Street Loan is expected to be generated from the operations of MSC, including sales, leasing and refinancing. Credit support for the CMB Maple Street Loan is anticipated to be provided by the members of MSI pledging an agreed upon portion of their respective membership interest in MSI as collateral. The MSI loan agreement is anticipated to (i) contain restrictions on certain cash distributions to the members of MSI, (ii) require certain financial reporting by MSI and MSC, and (iii) require submission of annual budget and business plan updates by MSI and MSC.

In addition to the foregoing, the summary terms of the CMB Maple Street Loan are as follows and will be fully detailed in the actual loan agreements, and related loan documents, when finalized and approved:

- $36 million in loan proceeds at 6% per annum. The loan term is for 72 months from the date of the initial funding with interest only quarterly payments during the term of the investment.
- There will be a $50,000 documentation fee to be paid when loan agreements are executed and a .75% facility fee that is to be paid when full funding has occurred.

MSI, as the single and only member of MSC, looks forward to working with CMB Summit not only on the former Hoover Company projects in North Canton, Ohio, but also on the projects at the Goodyear Rubber and Tire Company Headquarters in Akron, Ohio, through a Stuart Lichter controlled entity, IRG RC Market Buildings, LLC. We appreciate CMB Summit's ongoing commitment to MSC's project in Ohio.

Sincerely,

Stuart Lichter, Manager

# FIRST AMENDMENT TO LOAN AGREEMENT

This First Amendment to Loan Agreement (this "**Amendment**") is made effective as of October 16, 2013 by and between Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**") and CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("**Lender**").

A.    Borrower and Lender entered into a certain Loan Agreement dated as of May 7, 2012 (the "**Loan Agreement**"), providing for a loan of up to $36,000,000 from Lender to Borrower for the Project, subject to the terms contained therein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.    Borrower and Lender wish to make certain amendments to the Loan Agreement and to correct a scriveners' error in the Loan Agreement, as set forth in this Amendment.

NOW, THEREFORE, in reliance on the foregoing facts and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree to amend the Loan Agreement, as follows:

1.    Ownership Structure of Borrower.  Recital C of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"C.    Borrower is currently the holder of a 90% membership interest (the "**MSC LLC Membership Interest**") in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**").  MSC LLC is governed by that certain Operating Agreement of Maple Street Commerce LLC, dated as of November 16, 2007 (as amended from time to time, the "**MSC LLC Operating Agreement**")."

2.    Pledge Agreement.  It shall be a condition precedent to the first disbursement by Lender of the initial Tranche of the Loan on the Initial Funding Date for all of the Members of Borrower to have executed and delivered to Lender the Pledge Agreement. The form of Pledge Agreement attached to the Loan Agreement as Exhibit A is hereby deleted in its entirety and replaced with Exhibit A attached to this Amendment (and the definition of "**Pledge Agreement**" in Recital B of the Loan Agreement is hereby revised to reflect such substitution).

3.    Guaranty.  It shall be a condition precedent to the first disbursement by Lender of the initial Tranche of the Loan on the Initial Funding Date for Stuart Lichter to have executed and delivered to Lender a Guaranty (the "**Guaranty**"), guaranteeing a portion of the obligations of Borrower as incurred pursuant to the Loan Agreement.  The form of the Guaranty is attached to this Amendment as Exhibit B.  The Guaranty shall be released and terminated (a) automatically, without further action by any Person, if and when Borrower acquires the remaining 10% of the MSC LLC Membership Interest (i.e. above the 90% of the MSC LLC Membership Interest currently owned by Borrower), and furnishes Lender with reasonably satisfactory evidence of such acquisition, (b) automatically, on the date on which the Guaranteed Obligations (as defined in the Guaranty) are paid in full or extinguished, (c) if Borrower or Guarantor furnishes substitute collateral or security for the Loan, which substitute collateral or security is acceptable to Lender in its sole and reasonable discretion, or (d) when otherwise released or terminated by Lender in writing.

4.    Promissory Note.  The form of Promissory Note attached to the Loan Agreement as Exhibit D is hereby deleted in its entirety and replaced with Exhibit D attached to this Amendment (and

1



PLAINTIFF'S EXHIBIT

C

tabbies

the definition of "Note" in Section 1.1 of the Loan Agreement is hereby revised to reflect such substitution).

5. **Certain Definitions.** The following defined terms in the Loan Agreement are hereby deleted in their entirety and replaced with the following:

(a) In the introductory paragraph of the Loan Agreement and in Section 1.1 of the Loan Agreement: "**Lender**" means CMB Infrastructure Investment Group X, LP, an Illinois limited partnership, organized in accordance with the requirements for regional centers as set forth under the Immigration Act of 1990, as amended, and for the purpose of promoting economic growth through, among other things, increased export sales, improved regional productivity, job creation and increased domestic capital investment, and to generate jobs through the immigrant investor visa program of the USCIS.

(b) In Recital A of the Loan Agreement: "**Borrower Operating Agreement**" means that certain Operating Agreement of Maple Street Investors LLC, dated as of October __1__, 2013, as amended from time to time.

6. **Correction of Scriveners' Error.** Due to a scriveners' error, the Loan Agreement and certain other Loan Documents incorrectly referred to Lender as "CMB Investment Group X, LP, an Illinois limited partnership" (instead of its correct name, CMB Infrastructure Investment Group X, LP, an Illinois limited partnership). The parties acknowledge and agree that all references to "Lender" or to "CMB Investment Group X, LP" in the Loan Agreement and in any other Loan Document shall mean and refer to CMB Infrastructure Investment Group X, LP, an Illinois limited partnership. The parties further acknowledge and agree that all references in the Loan Agreement and in any other Loan Document to the "$36,000,000 CMB Investment Group X Loan" shall mean and refer to the "$36,000,000 CMB Infrastructure Investment Group X Loan."

7. **Notice Address for Borrower's Counsel.** The notice address for Borrower counsel on the signature page of the Loan Agreement (and in any other Loan Document) is hereby amended to read as follows:

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

8. **Ratification; Conflict.** Except as amended hereby, the Loan Agreement remains in full force and effect. In the event of any conflict between the terms and provisions of the Loan Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Amendment has been duly executed on the date set forth above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:     **S.L. Properties, Inc.,**
        a Delaware corporation,
        its Manager

        By:     _____
                Stuart Lichter, President


**Lender:**

**CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,**
an Illinois limited partnership

By:     _____
        Name: Patrick F. Hogan
        Title: General Partner

IN WITNESS WHEREOF, this Amendment has been duly executed on the date set forth above.

Borrower:

MAPLE STREET INVESTORS LLC,
an Ohio limited liability company

By:    S.L. Properties, Inc.,
       a Delaware corporation,
       its Manager

       By: _____
           Stuart Lichter, President

Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,
an Illinois limited partnership

By: _____
    Name:  Patrick F. Hogan
    Title:  General Partner

3

## MEMBERSHIP PLEDGE AND SECURITY AGREEMENT

This Membership Pledge and Security Agreement (this "**Agreement**") is made as of October 16, 2013 by the undersigned members (each a "**Pledgor**" and collectively, the "**Pledgor Group**") of Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**"), in favor of CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("**Lender**").

## RECITALS

A.    In accordance with the terms and conditions of that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of October 16, 2013 (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "**Loan Agreement**"), between Lender and Borrower, Lender is making a loan to Borrower in the total principal amount of up to $36,000,000.00 (the "**Loan**"). The Loan is evidenced by the Promissory Note, dated as of the date hereof (the "**Note**"), executed in accordance with the Loan Agreement.

B.    As consideration for Lender's agreement to make the Loan, and as security therefor, each Pledgor has agreed to pledge a portion of the Collateral (as defined below). All capitalized terms used (and not defined) herein shall have the meanings given to them in the Loan Agreement.

NOW, THEREFORE, in consideration for the Loan, and for other good and valuable consideration, each Pledgor agrees as follows:

1.    Definitions.

    1.1.    Certain Defined Terms.    The following additional terms shall have the following meanings:

"**Collateral**" has the meaning given to it in Section 2.

"**Controlling Management Interest**" means the management and control over any and all decisions and elections of Borrower, which includes, but is not limited to, all organizational, operational and business affairs of Borrower as set forth in the LLC Agreement, subject to the covenants of Borrower set forth in the Loan Agreement.

"**Default**" shall have the meaning given to it in Section 17.

"**Economic Interest**" means all of the economic benefit accrued or accruing, including, without limitation, all proceeds from sale or assignment, rights to dividends and distributions of any type (regular or special, and whether pertaining to profits, return of capital or otherwise) with respect to the Pledged Interest of each Pledgor.

"**LLC Agreement**" means the Operating Agreement of Borrower, dated as of October 1, 2013, as it may be amended, supplemented or restated from time to time.

"**Membership Interest**" means each Pledgor's membership interest in Borrower (see Attachment 10.10), and includes any and all benefits to which the holder of such a membership interest may be entitled as provided in the LLC Agreement, including, but not limited to, all profits, distributions and payments now or hereafter due or paid to a Pledgor by or from Borrower on account of such membership interest, all rights of a Pledgor to receive net proceeds of any sale or financing (or refinancing) of the assets of

1

Borrower on account of such membership interest, and all rights to receive cash or any other distributions of property on account of such membership interest, together with all obligations of a Pledgor to comply with the terms and provisions of the LLC Agreement, and all rights with respect to the management of Borrower's activities, subject to the provisions of this Agreement.

"**Person**" means any natural person, corporation, limited partnership, general partnership, joint stock company, limited liability company, limited liability partnership, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, or any other nongovernmental or governmental entity.

"**Pledged Interest**" means one hundred percent (100%) of each Pledgor's individual Membership Interest in Borrower (see Attachment 10.10). The Pledged Interest(s) shall be partially released (and shall therefore decrease) in connection with any Prepayment of Principal by Borrower, as set forth in Section 2.2(b)(iv) of the Loan Agreement.

"**Secured Obligations**" has the meaning given to it in Section 3.

1.2. <u>Construction</u>. Unless the context otherwise requires: (i) references in this Agreement to any other agreement shall mean such agreement as from time to time amended, supplemented or restated; (ii) references in this Agreement to a particular section of the LLC Agreement or any other document shall include any successor provision; and (iii) references to the plural include the singular and to the singular include the plural. The terms "include" and "including" are not limiting. Except where otherwise indicated, the term "or" has the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby" and "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision. Except where otherwise indicated, references to paragraphs, subparagraphs, sections, subsections, clauses, exhibits and schedules are to this Agreement.

2. <u>Grant of Security Interest</u>. As security for the full and prompt performance of all of the Secured Obligations, each Pledgor hereby assigns, transfers to, grants a security interest in and pledges to Lender (i) such Pledgor's Pledged Interest, together with all rights (whether now owned or hereafter acquired) in, to and under whatever is receivable or received when such Pledged Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions on such Pledgor's Pledged Interest, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Pledged Interest, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise; and all proceeds, products, additions, accessions, rents, issues, royalties of or to any of the foregoing, in whatever form; and (ii) without limiting the foregoing clause (i), such Pledgor's Economic Interest, together with all rights of such Pledgor, whether now owned or hereafter acquired, in, to and under whatever is receivable or received when such Economic Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary

2

or involuntary; all dividends and distributions thereon, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Economic Interest or other property subject to this Agreement, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise (all of the foregoing, the "**Collateral**").

3.    Secured Obligations.  The pledge of the Collateral is made by each Pledgor to secure repayment or performance, as the case may be, of each of the following described obligations to Lender (the "**Secured Obligations**"):   (i) the Loan and all other indebtedness, obligations, liabilities, conditions and covenants of Borrower, now existing or hereafter arising, under or in respect of the Note, the Loan Agreement or the other Loan Documents to which Borrower is a party, including all principal, interest (including interest accruing, or that would accrue but for the provisions of applicable law, after the commencement of any bankruptcy or other debtor-relief proceeding in respect of Borrower), premiums, fees, charges, expenses, penalties and other amounts arising under or relating to any of the foregoing, and the performance of each and every condition, covenant and obligation of Borrower thereunder; and (ii) the payment and performance by each Pledgor of each and every obligation, liability, condition, covenant and obligation of such Pledgor created hereby or otherwise arising hereunder.

4.    Rights with Respect to Distributions.  At Lender's election, following the occurrence and during the continuance of a Default, all rights of the Pledgor Group to receive dividends, cash, securities, instruments, withdrawals or other distributions or transfers of property in respect of their respective Pledged Interests or other Collateral (collectively, "**Distributions**") shall be vested in Lender, and unless Lender elects otherwise, Lender have the sole right to receive such Distributions and apply them to the Secured Obligations in such order as it may elect in its sole discretion.  In all other circumstances, each Pledgor shall have the right to receive Distributions and may apply such Distributions in any manner that it may elect.  Without limiting the foregoing, any Distributions received by a Pledgor following the occurrence and during the continuance of a Default shall be received by such Pledgor in trust for the benefit of Lender, shall be segregated from other property or funds of such Pledgor and shall be forthwith delivered to Lender in the same form as so received (with any necessary endorsement).

5.    Voting and Other Rights.  Subject to the limitations contained in Sections 11.3 and 19, so long as no Default shall have occurred and be continuing and subject to any other applicable provisions of this Agreement, each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not prohibited by the terms of this Agreement or the Loan Agreement.  Lender shall execute and deliver (or cause to be executed and delivered) to each Pledgor such proxies and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and other rights that such Pledgor is entitled to exercise pursuant to the foregoing authorization.  At Lender's election, upon the occurrence and during the continuance of any Default, and subject to the limitations set forth in Section 19, all rights of the Pledgor Group to exercise the voting and other consensual rights that the Pledgor Group would otherwise be entitled to exercise hereunder shall cease, and (unless otherwise agreed by Lender) all such rights (and any other rights the Pledgor Group may have in respect of the Pledged Interests) shall thereupon become vested in Lender, which shall thereupon have the sole right to exercise such rights.

6.   **Obligations Under Other Agreements.**   The obligations of each Pledgor hereunder shall be in addition to any obligations of such Pledgor or any other Person under any other pledges of security or guaranties or indemnities for the Secured Obligations heretofore, now or hereafter given to Lender.

7.   **Separate Actions; Waiver of Statute of Limitations; Reinstatement of Liability.**   The obligations of each Pledgor under this Agreement are independent of the Secured Obligations, and a separate action or actions may be brought and prosecuted against each Pledgor, whether or not action is brought against any other Person or whether any other Person is joined in any such action or actions. Each Pledgor acknowledges that there are no conditions precedent to the effectiveness of this Agreement and that this Agreement is in full force and effect and is binding on such Pledgor as of the date hereof, regardless of whether Lender obtains additional collateral or guaranties from others or takes any other action contemplated by the Loan Documents. To the extent permitted under applicable law, each Pledgor waives the benefit of any statute of limitations affecting such Pledgor's liability hereunder or the enforcement thereof, and agrees that any payment made on account of the Secured Obligations or other act that tolls any statute of limitations applicable thereto shall also operate to toll such statute of limitations applicable to such Pledgor with respect to its obligations hereunder. The liability of a Pledgor hereunder shall be reinstated and revived, and the rights of Lender shall continue, with respect to any amount paid on account of the Secured Obligations that is required thereafter to be restored or returned by Lender upon the bankruptcy, insolvency or reorganization of Borrower or any other Person or for any other reason, all as though such amount had not been paid.

8.   **Financing Statement; Further Assurances; Power of Attorney.**   Each Pledgor hereby consents to Lender filing a financing statement describing the Collateral being provided by the Pledgor Group, and such financing statement, when filed of record (a) for any Pledgor who is an individual, with the Secretary of State of the State in which such Pledgor has his principal residence, or (b) for any Pledgor that is an entity, with the Secretary of State of the State in which such Pledgor is organized or incorporated, will perfect the security interest in all of the Collateral in which such Pledgor currently has rights. The form of such financing statement (the "UCC-1") is attached hereto as Attachment 8. Each Pledgor agrees that at any time and from time to time, at the expense of such Pledgor, such Pledgor shall promptly execute and deliver all further instruments and documents, and take all further action, that Lender may reasonably request to perfect and protect the security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Each Pledgor hereby irrevocably makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as such Pledgor's true and lawful attorney-in-fact to sign the name of such Pledgor on any financing statement or other writing necessary or reasonably requested by Lender to perfect and maintain a perfected lien on, and security interest in, any Collateral. Without limiting the generality of the foregoing, if at any time after the date hereof all or any portion of the Collateral shall be represented or evidenced by certificates or instruments, all such certificates or instruments representing or evidencing the Collateral shall be delivered to and held by Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Lender.   In the event that certificates or instruments evidencing the Collateral are delivered to Lender pursuant to this paragraph, Lender shall have the right, at any time in its discretion and without notice to any Pledgor, to transfer to or to register in the name of Lender or any of its nominees any or all of the Pledgor Group's interest in the Collateral (without affecting the nature of such property as Collateral), subject only to the revocable rights specified in Section 5. In addition, Lender shall have the right at any time to

4

exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

9.     Release of Pledge.  Upon repayment in full of all of the Secured Obligations, the obligations of Pledgors under this Agreement shall terminate.  The parties acknowledge that, pursuant to Section 2.2(b)(iv) of the Loan Agreement, partial releases of Lender's security interest in the Collateral are permitted and, upon the satisfaction of the criteria for such partial releases pursuant to Section 2.2(b)(iv) of the Loan Agreement, Lender shall execute all documents necessary or reasonably requested by any Pledgor to release the applicable Released Collateral.  Any such Released Collateral shall thereafter not be subject to the terms and conditions of this Agreement.

10.    Representations and Warranties.  Each Pledgor, as to itself only, represents and warrants to Lender as follows:

   10.1.    Due Formation and Existence.  With respect to any Pledgor that is an entity, such Pledgor is duly organized or incorporated, validly existing and in good standing under the laws of the State of its organization or incorporation, is duly qualified to conduct its business as now conducted and proposed to be conducted, and is in good standing in all jurisdictions where the failure to do so would have a material adverse effect on its business or financial condition.

   10.2.    Requisite Power.  Such Pledgor has all requisite limited liability company, corporate, or other power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its properties (including owning such Pledgor's Membership Interest) and to carry on its business as now conducted and proposed to be conducted.  Such Pledgor has all requisite limited liability company, corporate, or other power to execute, deliver and perform this Agreement and each other agreement, document or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby.  With respect to any Pledgor that is an entity, the execution, delivery and performance of this Agreement have been duly authorized by all necessary action by the members, managers, directors, and/or shareholders (as applicable) of such Pledgor.

   10.3.    Governmental Consents.  No authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the grant by such Pledgor of the security interest created hereunder or the exercise by Lender of the voting or other rights, remedies or powers provided for in this Agreement.

   10.4.    Enforceability.  This Agreement has been duly and validly executed and delivered by such Pledgor and constitutes the valid and legally binding obligation of such Pledgor, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by principles of equity.

   10.5.    No Conflicts.  Subject to Borrower's delivery to Lender of the Authorization Notice, neither the execution and delivery by such Pledgor of this Agreement or of any other document or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby, the consummation of the transactions contemplated hereby, nor compliance by such Pledgor or Borrower with the provisions hereof or thereof (i) requires the consent of any third party or (ii) will conflict with or result in a breach of any of the terms, conditions or provisions of any indenture, agreement, lease or

instrument to which such Pledgor or Borrower is a party or by which such Pledgor or Borrower is bound or to which such Pledgor or Borrower, or any material part of the property of such Pledgor or Borrower, may be subject (including the LLC Agreement), or constitute a breach thereof or a default thereunder, or permit the acceleration of any obligation thereunder, or result in the creation or imposition of any lien of any nature whatsoever (other than the lien created hereby and the other liens permitted by the Loan Documents) upon any of the property of such Pledgor.

10.6.   Governing Documents.  A true and complete copy of the LLC Agreement, including all amendments and supplements thereto, has been previously delivered to Lender. The LLC Agreement remains in full force and effect as of the date of this Agreement, and is the valid and legally binding obligation of each party thereto, enforceable in accordance with its terms.  Borrower has all requisite legal power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its property and any other assets of Borrower and to carry on its business as now conducted and proposed to be conducted.  The execution, delivery and performance of such agreements, documents and instruments has been duly authorized by all necessary action by such Pledgor and by Borrower.

10.7.   No Other Agreements.  Except for the LLC Agreement (as provided to and approved by Lender) and as otherwise previously disclosed to Lender, there are no other agreements or commitments between or among Pledgors relating to the management, voting rights, operations or ownership of Borrower or relating to such Pledgor's Membership Interest or any of Borrower's or such Pledgor's obligations with respect thereto.

10.8.   Absence of Liens; Absence of Certificates.  Such Pledgor's Membership Interest is owned by such Pledgor free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character, other than the security interest created hereunder.  Except as contemplated by or permitted by the Loan Agreement or related to the issuance of the Authorization Notice, the property owned by Borrower is free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character.  The Collateral is not, and will not be, evidenced by any certificate.

10.9.   Address.  Such Pledgor's address for notices is set forth on the signature page hereof.

10.10.  Membership Interests in Borrower.  Attachment 10.10 accurately reflects the ownership structure of Borrower, including each Pledgor's percentage ownership interest in Borrower.

11.   Certain Covenants of Pledgor.  Until all Secured Obligations are paid or performed in full, each Pledgor covenants and agrees as follows:

11.1.   No Liens or Transfers.  Without Lender's consent, such Pledgor shall not grant, permit or suffer to exist any lien on all or any portion of the Collateral, or agree to do so, except in favor of Lender, nor shall such Pledgor sell or otherwise dispose or transfer of all or any portion of its Pledged Interest.

11.2.   Name and Organization.  Such Pledgor shall not change its name, the place or structure of its organization (for any Pledgor that is an entity), or the place of his principal residence (for any Pledgor who is an individual), without first giving Lender at least thirty (30) days' written notice of such change and executing such additional

6

documentation as Lender may reasonably require pursuant to Section 8 of this Agreement.

11.3. **Exercise of Voting Rights; Other Changes to Documents.** Without Lender's consent (not to be unreasonably withheld), such Pledgor shall not vote or give consent (i) to amend in any material respect the LLC Agreement, (ii) to sell or otherwise dispose of or transfer, or grant any lien on, all or any portion of the assets of Borrower in violation of this Agreement or the other Loan Documents, (iii) to terminate or dissolve Borrower, (iv) except as permitted by the LLC Agreement, to permit any change in the ownership of Borrower, or (v) except as permitted by the LLC Agreement, to admit any additional member to Borrower.

11.4. **Copies of Notices.** Such Pledgor shall promptly deliver to Lender copies of all material reports and financial statements, and all other material notices, issued by or delivered to such Pledgor under the LLC Agreement, and such Pledgor shall provide to Lender:

(a) a copy of each amendment to or restatement of Borrower's articles of organization filed by Borrower promptly (but in any event within ten (10) Business Days) after effecting such filing;

(b) a copy of each amendment to or restatement of the LLC Agreement promptly after effecting such amendment or restatement; and

(c) within ten (10) Business Days after its receipt of the written request of Lender therefor, copies of any or all of the business records of Borrower to which such Pledgor is entitled access under the LLC Agreement or applicable law.

12. **Powers of Lender.** Each Pledgor appoints Lender (and any Persons designated by Lender for such purpose) as such Pledgor's true and lawful attorney-in-fact to take any action and to execute any instrument that Lender may reasonably deem necessary or desirable to accomplish the purposes of this Agreement. Such power is coupled with an interest, is irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, in their discretion.

13. **Waivers.**

13.1. **Waivers of Rights.** Each Pledgor waives any right to require Lender:

(a) to proceed against any Person, including Borrower or any other pledgor of security for, or guarantor of, the Secured Obligations or any part thereof;

(b) to proceed against or exhaust any Collateral;

(c) to proceed against or exhaust any collateral held from any other Person;

(d) to give notice of the terms, time and place of any public or private sale of personal property security held from such Pledgor or any other Person, except as expressly required under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities);

7

(e)     to pursue any other remedy in Lender's power; or

(f)     to make any presentment, demands for performance, or give any notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any obligations or evidences of the Secured Obligations, or in connection with the creation of new or additional obligations, whether or not constituting Secured Obligations.

Further, each Pledgor waives all rights and benefits of such Pledgor under California Civil Code Sections 2787 to 2855 inclusive, under California Civil Code Sections 2899 and 3433, and under Chapter 1341 of the Ohio Revised Code (as applicable), each as amended and superseded from time to time.

13.2.    **Waivers of Defenses.** Each Pledgor waives any defense arising by reason of:

(a)     any disability or other defense to the Secured Obligations of Borrower or any other Person;

(b)     the cessation, from any cause whatsoever (other than payment in full of all Secured Obligations), of any obligation of Borrower or any other Person;

(c)     the application by Borrower or any other Person of the proceeds of any Secured Obligation for purposes other than the purposes represented by Borrower or any other Person to Lender or intended or understood by Lender or such Pledgor;

(d)     any act or omission by Lender which directly or indirectly results in or aids the discharge of Borrower or any other Person or any of the Secured Obligations, or which provides a defense to Borrower or any other Person, by operation of law or otherwise;

(e)     any modification of the Secured Obligations, in any form whatsoever and including the renewal, extension, acceleration or other change in time for payment of the Secured Obligations, or other change in the terms of the Secured Obligations, or any part thereof, including any increase or decrease of the rate of interest thereon;

(f)     any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(g)     Lender's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the United States Bankruptcy Code or any successor statute;

(h)     any borrowing or any grant of a security interest under Section 364 of the United States Bankruptcy Code;

(i)     any statute of limitations affecting the liability of such Pledgor hereunder or the enforcement hereof, and each Pledgor agrees that the payment of all sums payable under the Note or other act which tolls any statute of limitations

8

applicable to the Note shall similarly operate to toll the statute of limitations applicable to such Pledgor's liability hereunder;

(j) any defense based upon an election of remedies by Lender, including any election to proceed by judicial or nonjudicial foreclosure of any security, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies (including remedies relating to real property or personal property security) which destroys or otherwise impairs the subrogation rights of such Pledgor or the rights of such Pledgor to proceed against Borrower, any other Pledgor or any guarantor for reimbursement, or both (including, if applicable, California Code of Civil Procedure Sections 580a, 580b, 580d, and 726 or Ohio Revised Code Sections 2329.08 and 5721.192); or

(k) any defense or right of subrogation, reimbursement, exoneration, contribution or indemnity, or any right to enforce any remedy which Lender now has or may hereafter have against Borrower, any other Pledgor, or any other Person or any benefit of, or any right to participate in, any security now or hereafter held by Lender pursuant to the Note, the Loan Agreement, the other Loan Documents and/or this Agreement.

13.3 Waiver of Subrogation and Related Rights. Each Pledgor hereby waives, until all Secured Obligations have been paid in full, any right of subrogation, any right of contribution, any right of reimbursement and any right to enforce any remedy that Lender may have against Borrower or any other Person and any right to participate in, or benefit from, any security for the Note or the other Loan Documents now or hereafter held by Lender. Each Pledgor waives any defense it may have based upon an election of remedies by Lender that destroys such Pledgor's subrogation rights or its rights to proceed against Borrower or any other Person for reimbursement or contribution, including any loss of rights such Pledgor may suffer by reason of any rights, powers or remedies of Borrower or any other Person in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging all or any part of the Secured Obligations (including, if applicable, Sections 726, 580b and 580d of the California Code of Civil Procedure or Sections 2329.08 and 5721.92 of the Ohio Revised Code, each as from time to time amended). Without limiting the generality of the foregoing or any other provision hereof (but subject to the first sentence of this Section 13.3), each Pledgor expressly waives any and all benefits which might otherwise be available to such Pledgor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433, under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, and under Chapter 1341 and Sections 2329.08 and 5721.192 of the Ohio Revised Code (as applicable). Furthermore, each Pledgor waives as a defense to its obligations hereunder the application of any "one action" or "anti-deficiency" statute or law or other similar statute or law, now or hereafter in effect, in any state in which all or any real property security for either Borrower's, or any other Person's, obligations under the Loan Documents (if any) may be located.

14. Authorizations to Lender. Each Pledgor authorizes Lender, without notice or demand and without affecting such Pledgor's other liability hereunder, from time to time and at any time:

14.1. Alterations of Secured Obligations. To alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Secured Obligations or any part thereof, including any increase or decrease of the rate of interest thereon.

9

14.2.  **Dealings with Security.** To take and hold security other than the Collateral for payment of the Secured Obligations or any part thereof, or for all or any portion of the obligations of any guarantor of the Secured Obligations, and to exchange, enforce, waive, release or perfect or fail to perfect its security interests in the Collateral or any part thereof or any such other security.

14.3.  **Application of Collateral.** During the existence of a Default, to apply the Collateral or any other security and direct the order or manner of sale thereof, including a non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine.

14.4.  **Dealings with Pledgor, Guarantors and other Persons.** To release or substitute any other pledgor of security for the Secured Obligations or any part thereof, or any other Person.

15.  **Payment of Taxes, Charges, Liens and Assessments.** Each Pledgor agrees to pay, prior to delinquency, all taxes, charges, liens and assessments against such Pledgor's interest in the Collateral. Upon the failure of any Pledgor to do so, Lender at its option may pay any of such taxes, charges, liens or assessments and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge them. Any such payments made by Lender shall be obligations of such Pledgor to Lender, due and payable immediately without demand, together with interest at a rate determined in accordance with the provisions of Section 22, and shall be secured by the Collateral, subject to all of the terms and conditions of this Agreement.

16.  **Continuing Obligations of Pledgor.** Lender shall not, by reason of this Agreement, the creation of the security interest in the Collateral provided for herein, the exercise of any remedies as provided hereunder or for any other reason, be responsible or liable in any manner or to any extent for the obligations and liabilities of Borrower or of any Pledgor with respect thereto, whether now existing or hereafter incurred, and all such obligations and liabilities shall at all times and in all events be the responsibilities and liabilities of Borrower and the Pledgor Group only. Without limiting the generality of the foregoing, each Pledgor shall remain liable to observe and perform and shall observe and perform all the conditions and obligations to be observed and performed by it under each agreement, document or other instrument relating to the Collateral granted hereunder, all in accordance with the terms and conditions thereof.

17.  **Default.** The occurrence of any of the following shall constitute a **"Default"** under this Agreement:

17.1.  **Default under Loan Agreement.** Any "Event of Default" as defined in the Loan Agreement.

17.2.  **LLC Agreement.** Any material breach by any Pledgor of any of its obligations under the LLC Agreement or any agreements, instruments or documents related to the LLC Agreement beyond any applicable notice and cure periods thereunder.

17.3.  **Default under this Agreement.** Any material breach by any Pledgor of, or failure by any Pledgor to comply with or perform, any provision hereof, or any failure by any Pledgor to pay any amount due hereunder when due; provided, however, that, except for any Pledgor's failure to comply with the provisions of Sections 11.1, 11.2, and 11.3 (which shall be immediate Defaults, with no required notice or cure period), any such breach or failure shall constitute a "Default" only if such failure is not cured within thirty (30) days

10

after Lender delivers written notice to each Pledgor advising each Pledgor of such breach or failure and demanding that such breach or failure be cured.

17.4.  Insolvency Events.

(a)    The institution of a proceeding in a court having jurisdiction seeking a decree or order for relief in respect of Borrower, Stuart Lichter, or Christopher S. Semarjian under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of any such Person for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs, if such proceeding remains undismissed or unstayed and in effect for a period of sixty (60) consecutive days, or such court enters a decree or order granting the relief sought in such proceeding.

(b)    The institution by Borrower, Stuart Lichter, or Christopher S. Semarjian of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; the consent by Borrower, Stuart Lichter, or Christopher S. Semarjian to the entry of an order for relief in any involuntary proceeding described in Section 17.4(a) or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs; the making by Borrower, Stuart Lichter, or Christopher S. Semarjian of a general assignment for the benefit of creditors; or the general failure by Borrower, Stuart Lichter, or Christopher S. Semarjian to pay its/his debts as they become due.

18.    Remedies.  Upon the occurrence of a Default, subject to the limitations set forth in Section 19, Lender shall thereupon and thereafter during the continuance thereof have any or all of the rights, remedies and powers to which a secured party is entitled after a default under the provisions of the Uniform Commercial Code as in effect (a) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (b) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), including, without limitation, the right to foreclose on the Collateral, or any portion thereof (including, without limitation, the Pledged Interest or any portion thereof or the Economic Interest or any portion thereof, or both), or any combination of the foregoing; provided that Lender's election to foreclose on less than all of the Collateral shall not limit Lender's right to foreclose on any other portion of the Collateral at any time in the future (and such future foreclosure shall in no event require the consent from any other party).  In addition to those rights, remedies and powers and in addition to any and all other rights, remedies and powers that Lender may have under any other agreement, document or instrument or under applicable law, and subject to the limitations set forth in Section 19, each Pledgor agrees that Lender may in its sole discretion do or cause to be done any one or more of the following:

18.1.    Realize Upon Collateral.  Sell, assign and deliver, or otherwise realize upon, all or any part of the Collateral in any manner permitted by law, at any time and from time to time, at public or private sale, with or without demand and with or without notice or advertisement, for cash, upon credit or for future delivery, as Lender shall deem appropriate.  Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay or appraisal that such Pledgor

11

now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. In addition:

(a)    If notice of sale is required to be given to any Pledgor under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), written notice to such Pledgor ten (10) days prior to the date of any public sale or private sale of the Collateral shall be the notice required to be given under the applicable provision of the Uniform Commercial Code.

(b)    In connection with any private sale or other disposition of any part of the Collateral (if the Collateral or relative portion thereof is of a type customarily sold on a recognized market), and upon each public sale of any of the Collateral, Lender may purchase all or any part of the Collateral being sold and may credit bid any portion or all of the Secured Obligations. Lender shall hold any such Collateral in its own right, free from any claims of Pledgor or rights of redemption.

(c)    Lender shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. If sale of all or any part of the Collateral is made on credit or for future delivery: (i) the Collateral so sold may be retained by Lender until the sale price is paid by the purchaser or purchasers thereof, (ii) the Secured Obligations shall be reduced only to the extent that payment is actually received by Lender in respect of such sale, and (iii) Lender shall not incur any liability in the event that any purchaser or purchasers for future delivery shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.

(d)    As an alternative to exercising the power of sale herein conferred upon it, Lender may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts of competent jurisdiction.

Any proceeds of any disposition of the Collateral or any part thereof may be applied by Lender to the payment of reasonable expenses incurred by Lender in connection with the foregoing, including reasonable attorneys' fees and expenses, and the balance of such proceeds may be applied by Lender toward the payment of the Secured Obligations, in such order of application as Lender may from time to time elect.

18.2.    Pledgor's Acknowledgments. Each Pledgor recognizes that Lender may be unable to effect a public sale of all or part of the Collateral by reason of certain prohibitions contained in the Securities Act of 1933, in applicable securities laws of the State of California or the State of Ohio, or in applicable securities laws of another jurisdiction, but may instead resort to one or more private sales to a single purchaser or a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Pledged Interests for their own account, for investment and not with a view to the distribution or

12

resale thereof. Each Pledgor understands that Lender's exercise of its election to hold private sales may be at prices and other terms less favorable to such Pledgor than if such Collateral were sold at public sale and that Lender has no obligation to delay the sale of any portion of the Collateral for the period of time necessary to permit any Person to register any portion of the Collateral constituting securities, even if such Person is required to, or would, agree to register such securities for public sale under applicable securities laws. Each Pledgor agrees that private sales made under the foregoing circumstances shall each be deemed to have been actions taken or transactions made in a "commercially reasonable" manner.

18.3.    No Liability. Without limiting in any manner any other limitation on Lender's liability to any Pledgor set forth herein or in any other agreement, document or instrument executed in connection herewith or otherwise available to Lender under applicable law, Lender shall not have any liability whatsoever to any Pledgor under any circumstances as a result of any income tax liability incurred by such Pledgor as a result of any action (or inaction) by Lender pursuant to its rights, remedies and powers under this Agreement.

18.4.    Rights Cumulative. The rights, remedies and powers of Lender shall be cumulative, and no single or partial exercise of any of them shall preclude the further or other exercise of any of them, in any sequence or combination, and in one or more iterations. Any waiver, permit, consent or approval of any kind by Lender in respect of any Default, or any waiver of any provision or condition hereof, must be in writing and shall be effective only to the extent set forth in such writing.

19.    Controlling Management Interest. Notwithstanding any other provision of this Agreement to the contrary, with the exception of (i) a Default under Sections 17.1, 17.2 or 17.3 resulting from a final determination of fraud or intentional misrepresentation by Borrower, any Pledgor or any officer, director, partner, member or employee of Borrower in connection with the application for or creation of the Loan or any request for any action or consent of Lender, or (ii) a Default under Section 17.4, the Pledgor Group shall retain the Controlling Management Interest in accordance with the LLC Agreement, and Lender, upon gaining control of the Collateral in accordance with Section 18, shall be limited to ownership of the Economic Interest; provided, however, if Lender, upon gaining control of the Collateral in accordance with Section 18, holds more than forty percent (40.00%) of the Membership Interests in Borrower, thereafter any Major Decision (as defined below) shall require the prior written approval of Lender (not to be unreasonably withheld). The failure of Lender to disapprove in writing of any proposed Major Decision within thirty (30) days following Lender's receipt of written notice describing the Major Decision in question shall be deemed Lender's approval of such Major Decision. Upon Lender's transfer, sale or other conveyance of the Collateral to any third party, Lender shall notify such third party of the reservation of the Controlling Management Interest set forth in this Section 19. A "**Major Decision**" shall mean (i) approval of the annual business and operations plan for MSC LLC (the "**MSC LLC Annual Business Plan**") in accordance with the provisions of the MSC LLC Operating Agreement, (ii) an election to sell, dispose or transfer fee title to any material portion of the Real Property below the values established in or not contemplated by the MSC LLC Annual Business Plan, or (iii) an action not contemplated in the MSC LLC Annual Business Plan which could result in a Material Adverse Effect with respect to Borrower.

20.    Disposition of Collateral and Proceeds. Upon the transfer of all or any part of the Secured Obligations, Lender may transfer all or any part of the Collateral, and thereafter Lender shall be fully discharged from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all the rights, remedies and powers and assume

13

all the obligations of Lender hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral not so transferred, Lender shall retain all rights, remedies and powers herein given.

21. **Notices.** Unless otherwise specifically provided herein, any consent, notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied or sent by courier service or United States mail, and shall be deemed to have been given (a) when delivered in person or by courier service, (b) upon receipt of a telecopy (or on the next Business Day if such telecopy is received on a non-Business Day or after 5:00 p.m. (at the office of the recipient) on a Business Day), or (c) four (4) Business Days after deposit in the United States mail (registered or certified, with postage prepaid and properly addressed). Any party delivering a communication by telecopy shall also send a copy thereof by one of the other means provided in this Section 21. Notices to Lender shall not be effective until received by Lender. For the purposes hereof (i) the address of each Pledgor shall be its address set forth on the signature pages hereof and (ii) the address of Lender shall be its address set forth in the Loan Agreement (until notice of a change of address is delivered as provided in this Section 21), or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

22. **Costs, Expenses and Attorneys' Fees.** All reasonable out-of-pocket payments, advances, charges, costs and expenses, including reasonable attorneys' fees and expenses and fees and expenses of expert witnesses, made or incurred by Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof (including those arising in connection with (i) the custody of, the registration of, the sale of, or other redemption upon, any of the Collateral, or (ii) the failure by any Pledgor to perform or observe any of the provisions hereof), shall be paid to Lender by the Pledgor Group immediately and without demand, together with interest at a rate per annum equal to the rate of interest specified in the Note for amounts remaining unpaid thereunder after the due date thereof (or, if less, the maximum rate permitted by law).

23. **Governing Law; Successors, Assigns.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, and shall be binding on and inure to the benefit of the legal representatives, successors and assigns of each Pledgor and Lender.

24. **Severability.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

25. **WAIVER OF RIGHT TO TRIAL BY JURY.** TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND, TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY HEREBY

14

AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

26. Choice of Forum Venue. Except with respect to foreclosure proceedings against any Collateral which by requirement of law must be brought in the jurisdiction where such Collateral is located, all judicial proceedings brought against any Pledgor with respect to this Agreement may be, and all judicial proceedings brought by any Pledgor with respect to this Agreement shall be, brought in any state or federal court of competent jurisdiction having situs in Summit County, Ohio, and by execution and delivery of this Agreement, each Pledgor accepts, for itself and in connection with the Collateral, generally and unconditionally, the jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby from which no appeal has been taken or is available. Each Pledgor irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its notice address specified on the signature page hereof.

27. Miscellaneous. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute a single instrument.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, each Pledgor has executed this Agreement as of the day and year first written above.

**Pledgor Group:**

_____
**STUART LICHTER**

Address:

631 Paseo de la Playa
Redondo Beach, California  90277
Tel:  (562) 803-4761
Fax:  (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California  90064
Attn:  Dean Sussman, Esq.
Tel:  (310) 473-6400
Fax:  (310) 473-8702

_____
**CHRISTOPHER S. SEMARJIAN**

Address:

c/o Industrial Commerce Ltd.
360 East Highland Road
Macedonia, Ohio  44056
Tel:  (216) 570-5584
Fax:  _____

IN WITNESS WHEREOF, each Pledgor has executed this Agreement as of the day and year first written above.

**Pledgor Group:**

_____

**STUART LICHTER**

Address:

631 Paseo de la Playa
Redondo Beach, California  90277
Tel:  (562) 803-4761
Fax:  (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California  90064
Attn:  Dean Sussman, Esq.
Tel:  (310) 473-6400
Fax:  (310) 473-8702

_____

**CHRISTOPHER S. SEMARJIAN**

Address:

c/o Industrial Commerce Ltd.
360 East Highland Road
Macedonia, Ohio  44056
Tel:  (216) 570-5584
Fax: (440) 205-6666

Attachment 8

UCC-1

[See attached]

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

CMB Export LLC
Attn: Patrick Hogan
7819 42nd Street West
Rock Island, IL 61201

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – Do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Lichter | Stuart | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 631 Paseo de la Playa | Redondo Beach | CA | 90277 | USA |
| ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – Do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CMB Infrastructure Investment Group X, LP | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7819 42nd Street West | Rock Island | IL | 61201 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's 50.00% membership interest in Maple Street Investors LLC, an Ohio limited liability company, pursuant to that certain Membership Pledge and Security Agreement executed by Debtor in favor of Secured Party, in connection with the transactions contemplated by that certain Loan Agreement, dated as of May 7, 2012 (as amended from time to time), by and between Maple Street Investors LLC and Secured Party.

| 5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING |
|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum (if applicable) | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] (optional) ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA |

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

> CMB Export LLC
> Attn: Patrick Hogan
> 7819 42nd Street West
> Rock Island, IL 61201

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

1a. ORGANIZATION'S NAME

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Semanian | Christopher | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 360 East Highland Road | Macedonia | OH | 44056 | USA |

1d. ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | □ NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

2d. ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | □ NONE

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
CMB Infrastructure Investment Group X, LP

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7819 42nd Street West | Rock Island | IL | 61201 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's 50.00% membership interest in Maple Street Investors LLC, an Ohio limited liability company, pursuant to that certain Membership Pledge and Security Agreement executed by Debtor in favor of Secured Party, in connection with the transactions contemplated by that certain Loan Agreement, dated as of May 7, 2012 (as amended from time to time), by and between Maple Street Investors LLC and Secured Party.

5. ALTERNATIVE DESIGNATION [if applicable]: □ LESSEE/LESSOR □ CONSIGNEE/CONSIGNOR □ BAILEE/BAILOR □ SELLER/BUYER □ AG. LIEN □ NON-UCC FILING

6. □ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] □ All Debtors □ Debtor 1 □ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

## Attachment 10.10

## PLEDGED MEMBERSHIP INTERESTS IN BORROWER

| Member | Percentage Membership Interest in Borrower | Percentage Interest Being Pledged Pursuant to this Agreement ("Pledged Interest") |
|---|---|---|
| Stuart Lichter | 50.00%[1] | 50.00% |
| Christopher S. Semarjian | 50.00%[1] | 50.00% |

[1] Subject to increase or decrease as set forth in the LLC Agreement.

## GUARANTY

This GUARANTY (this "Guaranty") is dated as of October 16 , 2013 and is made by Stuart Lichter, an individual ("Guarantor"), in favor of CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("Lender").

## RECITALS

A.     Guarantor owns a fifty percent (50%) membership interest in Maple Street Investors LLC, an Ohio limited liability company ("Borrower").

B.     Borrower and Lender have entered into that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "Loan Agreement"), pursuant to which Lender is making a loan (the "Loan") to Borrower in the total principal amount of up to $36,000,000.00.

C.     Guarantor will derive a material and substantial benefit from the making of the Loan to Borrower, and has therefore agreed to provide this Guaranty on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees, and is hereby bound for the benefit of Lender, as follows:

## SECTION 1
## DEFINITIONS

1.1     Loan Agreement Defined Terms.   Unless the context hereof shall otherwise require, capitalized terms used in this Guaranty, including those in the recitals, and not otherwise defined herein shall have the respective meanings specified in the Loan Agreement (including those set forth in Section 1.1 of the Loan Agreement).  The general interpretive provisions of Section 1.3 to the Loan Agreement shall apply to terms used in this Guaranty.

1.2     Definitions.  "Guarantor Material Adverse Effect" shall mean an event that has a material adverse effect on the ability of Guarantor to perform his obligations under this Guaranty; provided, however, that notwithstanding the foregoing, in no event shall any of the following, alone or in combination, be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or shall be a Guarantor Material Adverse Effect: (i) any effect that results from events, circumstances or situations affecting general economic, business or regulatory conditions worldwide, or in North America or any national or global financial or capital market; (ii) any effect of any proposed or actual institution of any new interpretation of any existing applicable laws affecting the business of Guarantor or his affiliates; or (iii) acts of war (whether or not declared), the commencement, continuation or escalation of a war, acts of armed hostility, sabotage or terrorism or other international or national calamity or any material worsening of any such conditions threatened or existing as of the date hereof.

1

## SECTION 2
## GUARANTY PROVISIONS

2.1  Guaranty.  Subject to the limitations set forth in Section 2.7, Guarantor hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitations set forth in Section 2.7, the "Guaranteed Obligations").  Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligor, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

2.2  Termination.  This Guaranty shall be released and terminated (a) automatically, without further action by any Person, if and when Borrower acquires the remaining 10% of the MSC LLC Membership Interest (i.e. above the 90% of the MSC LLC Membership Interest currently owned by Borrower), and furnishes Lender with reasonably satisfactory evidence of such acquisition, (b) automatically, on the date on which the Guaranteed Obligations are paid in full or extinguished, (c) if Borrower or Guarantor furnishes substitute collateral or security for the Loan, which substitute collateral or security is acceptable to Lender in its sole and reasonable discretion, or (d) when otherwise released or terminated by Lender in writing (the date of such release and termination being the "Termination Date").  Guarantor hereby acknowledges and agrees that this Guaranty constitutes a continuing guaranty and shall remain in full force until the Termination Date; provided, however, that with respect to any claim resulting from the acts of Guarantor or Borrower which occurred prior to the Termination Date:

(a)  if such claim is made upon Lender at any time for repayment or recovery of any amounts or any property received by Lender from any source on account of any of the Guaranteed Obligations, and Lender is required to repay or return any amounts or property so received (including interest thereon to the extent Lender is required to repay the same), or

(b)  if Lender becomes liable for any part of such claim (beyond any possible appeal) by reason of (1) any judgment or order of any court or administrative authority having competent jurisdiction, or (2) any settlement or compromise of any such claim, which settlement or compromise has been approved in writing by Guarantor,

then, subject to the limitations set forth in Section 2.7, Guarantor shall remain liable under this Guaranty for the amounts so repaid or property so returned or the amounts for which Lender becomes liable (such amounts being deemed part of the Guaranteed Obligations) to the same extent as if such amounts or property had never been received by Lender, notwithstanding any termination hereof or the cancellation of any instrument or agreement evidencing any of the Guaranteed Obligations.  Not later than ten (10) days after receipt of notice from Lender, Guarantor shall pay to Lender an amount equal to the amount which Lender has repaid or returned as provided in this Section 2.2, subject to the limitations set forth in Section 2.7.

2.3    Guaranty Absolute.

(a)    The obligations of Guarantor contained herein (i) are direct, independent and primary obligations of Guarantor, (ii) are absolute, unconditional and continuing obligations and are not conditioned in any way upon the institution of suit or the taking of any other action or any attempt to enforce performance of or compliance with the Obligations of Borrower (other than providing notice to Borrower as set forth in the Loan Documents), (iii) shall remain in full force and effect and irrevocable without regard to the authority of Borrower to enter into any of the Loan Documents or any substitution, release or exchange of any other guaranty or any other security for any of the Guaranteed Obligations or any other circumstance whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents) that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, and (iv) except as set forth herein, are in no way conditioned or contingent upon any attempt to collect from Borrower or any other entity or to perfect or enforce any security or upon any other condition or contingency or upon any other action, occurrence or circumstance whatsoever.

(b)    Without limiting the generality of the foregoing, Guarantor shall have no right to terminate this Guaranty, or, except as expressly set forth herein, to be released, relieved or discharged from its obligations hereunder, and such obligations shall be neither affected nor diminished for any reason whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents), including (i) any amendment or supplement to or modification of any Loan Document, any extension or renewal of Borrower's obligations under any Loan Document, or any assignment or transfer of Borrower's interest in any Loan Document, (ii) any bankruptcy, insolvency, readjustment, composition, liquidation or similar proceeding with respect to Borrower, (iii) any furnishing or acceptance of additional security or any exchange, substitution, surrender or release of any security, (iv) any waiver, consent or other action or inaction or any exercise or non-exercise of any right, remedy or power with respect to the Guaranteed Obligations or any Loan Document, (v) any merger or consolidation of Borrower into or with any other Person, any change in the structure of Borrower, or any sale, lease or transfer of any or all of the assets of Borrower to any other Person, or (vi) any default, misrepresentation, negligence, misconduct or other action or inaction of any kind by Lender under or in connection with any Loan Document or any other agreement relating to this Guaranty, except to the extent that any such default, misrepresentation, negligence, misconduct or other action or inaction would constitute a defense to or limit Borrower's payment or performance of the Guaranteed Obligations.

(c)    Except as otherwise expressly set forth herein, Guarantor hereby unconditionally waives to the extent permitted by law promptness, diligence and notice as to the Guaranteed Obligations and acceptance of this Guaranty, and agrees that, except as otherwise provided herein and in the Loan Documents, Guarantor shall not be required to consent to or receive any notice of any amendment or modification of, or waiver, consent or extension with respect to, any Loan Document. The rights, powers and remedies herein provided are cumulative. No failure or delay on the part of Lender in

3

exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise of any other right, remedy, power or privilege.

2.4    Guarantor's Waivers.    Except as expressly required by the Loan Documents, Guarantor waives, to the fullest extent permitted by the provisions of applicable law, all of the following (including all defenses, counterclaims and other rights of any nature based upon any of the following):

(a)    presentment, demand for payment and protest of nonpayment of any of the Guaranteed Obligations, and notice of protest, dishonor or nonperformance;

(b)    notice of acceptance of this Guaranty and notice that credit has been extended in reliance on Guarantor's guaranty of the Guaranteed Obligations;

(c)    notice of any default or of any inability to enforce performance of the obligations of Borrower with respect to any Loan Document or notice of any acceleration of maturity of any Guaranteed Obligations;

(d)    demand for performance or observance of, and any enforcement of, any provision of any Loan Document or the Guaranteed Obligations, or any pursuit or exhaustion of rights or remedies against Borrower in respect of the Guaranteed Obligations or any requirement of diligence or promptness on the part of Lender in connection with any of the foregoing;

(e)    any "single action" or "anti-deficiency" law which would otherwise prevent Lender from bringing any action, including any claim for a deficiency, against Guarantor before or after Lender's commencement or completion of any foreclosure action, whether judicially, by exercise of power of sale or otherwise, or any other law which would otherwise require any election of remedies by Lender;

(f)    all demands and notices of every kind with respect to the foregoing;

(g)    any defense based upon any legal disability or other defense of Borrower;

(h)    any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower; and

(i)    any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender.

Without limiting the generality of the foregoing or any other provision hereof, Guarantor further expressly subordinates to the Guaranteed Obligations, to the extent permitted by law, any and all rights and defenses, including without limitation any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to Guarantor under the law. Guarantor represents that he has obtained the advice of counsel as to

4

the extent to which suretyship and other defenses may be available to him with respect to his obligations hereunder in the absence of the waivers contained in this Section 2.4.

2.5     Loan Documents.  Guarantor does hereby acknowledge that it has received and reviewed a copy of the Loan Agreement.

2.6     Payment.  All payments to be made by Guarantor hereunder shall be made (a) within twenty (20) business days after receipt by Guarantor of written notice from Lender that reasonably identifies Borrower's breach of its obligations that constitute Guaranteed Obligations as provided herein, or (b) if later, when due and payable under the terms of the Loan Documents (subject to any applicable notice and grace periods under the Loan Documents). Such notice shall also include the amount of the Guaranteed Obligations for which Lender is seeking recourse against Guarantor which has not been paid as and when due and payable by Borrower (subject to any applicable notice and grace periods under the Loan Documents). All payments to be made by Guarantor hereunder shall be made in immediately available funds and in U.S. dollars to Lender as Lender may direct to Guarantor in writing.

2.7     Limitation of Liability.  Notwithstanding anything to the contrary contained herein, (a) the total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amounts paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder and the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap").  Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants to Lender as of the date hereof that:

3.1     Organization; Requisite Power and Authority; Qualification.  Guarantor is an individual with all requisite power and authority to own and operate his assets and has not had, and does not reasonably expect to have, a Guarantor Material Adverse Effect.

3.2     Due Authorization.  Guarantor has obtained any and all necessary consents, including, if applicable, spousal consents as are necessary to enter into this Guaranty.

3.3     No Conflict.  The execution, delivery and performance by Guarantor of this Guaranty and the transactions contemplated hereby do not and will not (i) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Requirement of Law or Court Order binding upon Guarantor, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation of Guarantor, the breach of which could reasonably be expected to have a Guarantor Material Adverse Effect, or (iii) result in or require the creation or imposition of any Lien whatsoever upon any assets of Guarantor (other than any Liens created under or permitted by any of the Loan Documents).

5

## SECTION 4
## REMEDIES; SUBROGATION

4.1     Remedies.  In the event Guarantor shall fail to pay when due any amounts due under this Guaranty, or to comply with any other term of this Guaranty, Lender shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7.

4.2     Subrogation.  Guarantor will not exercise any rights that he may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, until all of the Guaranteed Obligations shall have been paid in full.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, in accordance with the terms of the Loan Documents, when such Guaranteed Obligations are due and payable.

4.3     Survival of Remedies and Subrogation Rights.  The provisions of this Section 4 shall survive the termination of this Guaranty and the payment in full of the Guaranteed Obligations and the termination of the Loan Agreement.

4.4     Subordination.  Guarantor covenants and agrees that, after the occurrence and during the continuance of an Event of Default, all indebtedness, claims and liabilities then or thereafter owing by Borrower to Guarantor, whether arising under any Loan Document or otherwise, are subordinated to the prior payment in full of the Guaranteed Obligations and are so subordinated as a claim against Borrower or any of its assets, whether such claim be in the ordinary course of business or in the event of voluntary or involuntary liquidation, dissolution, insolvency or bankruptcy, so that no payment with respect to any such indebtedness, claim or liability will be made or received while any Event of Default exists.  Notwithstanding the foregoing, to the extent Guarantor receives any such payment, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender upon written request from Lender to be credited and applied against the Guaranteed Obligations then due and payable and reasonable expenses of collection, whether matured or unmatured, in accordance with the terms of the Loan Documents.

## SECTION 5
## MISCELLANEOUS

5.1     Defenses.  Without limiting Guarantor's own defenses and rights hereunder, but subject to the conditions herein, Guarantor reserves to himself all rights, counterclaims and other defenses which Borrower is or may be entitled to arising from or out of any Loan Document, except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Borrower, the power or authority of Borrower to enter into the Loan Documents and to perform its Guaranteed Obligations thereunder, and the lack of enforceability of Borrower's Obligations under any Loan Document or any transaction thereunder; provided that, for the avoidance of doubt, Guarantor hereby waives, with respect to any claims asserted by Lender, any defenses he

6

may have against Borrower under the Loan Documents with respect to the Guaranteed Obligations.

5.2     Expenses.  Guarantor agrees that in the event that Lender retains or engages an attorney or attorneys to enforce this Guaranty by reason of the failure of Guarantor to fulfill his obligations hereunder, then upon the successful enforcement of any such claim (beyond any applicable notice and cure period), promptly after request therefor, Guarantor will reimburse Lender for all reasonable out-of-pocket expenses incurred, including reasonable attorneys' fees, costs and disbursements.

5.3     Amendments and Waivers.  No term, covenant, agreement or condition of this Guaranty may be terminated, amended or compliance therewith waived (either generally or in a particular instance, retroactively or prospectively) except by an instrument or instruments in writing executed by Guarantor and Lender.

5.4     Possession.  Guarantor agrees and acknowledges that possession of this Guaranty by Lender shall be conclusive evidence of due execution and delivery of this Guaranty by Guarantor.

5.5     Notices.  All notices, requests, consents and other communications required or permitted under this Guaranty shall be in writing and shall be (as elected by the Person giving such notice) (a) hand delivered by messenger or courier service, (b) delivered by express courier service (e.g., Federal Express), (c) telefaxed, or (d) mailed by registered or certified mail (postage prepaid), return receipt requested, addressed as follows:

If to Guarantor:

Stuart Lichter
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

If to Lender:

CMB Export Infrastructure Investment Group X, LP
c/o CMB Export LLC
7819 42nd Street West
Rock Island, Illinois 61201
Attn: Patrick F. Hogan, General Partner
Tel: (309) 797-1550
Fax: (855) 852-5733

or to such other address as any party may designate by notice complying with the terms of this Section 5.5. Each such notice shall be deemed delivered (i) on the date actually delivered if by messenger or courier service or express courier service; (ii) on the date of confirmed answerback if by telefax so long as a duplicate copy is sent immediately by methods (a), (b), or (d) above; and (iii) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

5.6    Assignment and Assumption.  Except as permitted in the Loan Agreement, this Guaranty may not be assigned by Guarantor to, or assumed by, any successor to or assign of Guarantor without the prior written consent of Lender, which consent shall not be unreasonably withheld.

5.7    Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with the laws of the State of Illinois.

5.8    Waiver of Trial by Jury.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER, IRREVOCABLY WAIVE (A) TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT, AND (B) ANY OBJECTION (INCLUDING, WITHOUT LIMITATION, ANY OBJECTION OF THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS) WHICH ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT IN ANY JURISDICTION.

5.9    Severability.  If any provision of this Guaranty is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible. If any provision of this Guaranty may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

5.10    Headings.  The headings contained in this Guaranty are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect in any way the meaning or interpretation of this Guaranty.

5.11    Further Assurances.  Guarantor will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by Lender, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Guaranty; provided, however, that Guarantor shall not be required to execute or enter into any such further assurance that increases Guarantor's obligations or decreases Guarantor's rights under this Guaranty.

5.12    Effectiveness of Guaranty.  This Guaranty shall be effective as of the date hereof.

5.13    Successors and Assigns.  This Guaranty shall be binding upon Guarantor and Lender (by acceptance hereof) and their respective successors and permitted assigns and shall

8

inure to the benefit of, and shall be enforceable by Lender and Guarantor and their respective successors and permitted assigns.

5.14    Unsecured Obligation.    The obligations of Guarantor under this Guaranty are unsecured obligations of Guarantor.    Without limiting the generality of the immediately preceding sentence, the obligations of Guarantor under this Guaranty are not secured by, and Guarantor shall not be deemed to have granted or otherwise conveyed to Lender, any security interest in, lien on or pledge of any properties or assets (or interests therein) of Guarantor.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____
STUART LICHTER

Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,
an Illinois limited partnership

By: _____
    Name: Patrick F. Hogan
    Title: General Partner

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____

STUART LICHTER


Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP, an Illinois limited partnership

By: _____
Name:  Patrick F. Hogan
Title:  General Partner

**MAPLE STREET INVESTORS LLC**
**PROMISSORY NOTE**
**(CMB Infrastructure Investment Group X, LP)**

| RATE OF INTEREST: | TERM: | DATE: |
|---|---|---|
| 6.0% | 6 Years | October __, 2013 |

**REGISTERED OWNER:** CMB Infrastructure Investment Group X, LP

**PRINCIPAL AMOUNT: $36,000,000.00**

(All capitalized terms used, but not otherwise defined in this Promissory Note (this "**Note**") shall have the meanings ascribed to such terms in that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "**Loan Agreement**"), between MAPLE STREET INVESTORS LLC, an Ohio limited liability company ("**Borrower**") and CMB INFRASTRUCTURE INVESTMENT GROUP X, LP, an Illinois limited partnership ("**Lender**")).

Borrower is an Ohio limited liability company, formed on April 30, 2012, as a Single Purpose Entity. Borrower is the holder of 90% of the membership interests in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**"). Certain members of Borrower have executed and delivered a certain Membership Pledge and Security Agreement, dated as of the date hereof (the "**Pledge Agreement**"), granting to Lender a security interest in their respective membership interests in Borrower (the "**Collateral**") as security for the obligations of Borrower as incurred pursuant to the Loan Agreement. In addition, Stuart Lichter (who is one of the members of Borrower) has executed and delivered a certain Guaranty, dated as of the date hereof (the "**Guaranty**"), guarantying a portion of the obligations of Borrower as incurred pursuant to the Loan Agreement.

MSC LLC holds fee title in certain real property (the "**Real Property**", see Exhibit B to the Loan Agreement), which consists of the project known as the former Hoover Plant located in North Canton, Ohio. The Real Property generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan (as hereinafter defined).

Borrower hereby promises to pay to Lender the principal sum of Thirty-Six Million Dollars ($36,000,000.00) (the "**Loan**"), or so much thereof as has been advanced by Lender to Borrower pursuant to the Loan Agreement, plus interest as set forth in Section 1(b) of this Note, in accordance with and subject to the terms and provisions of the Loan Agreement. Reference is hereby made to the Loan Agreement for a more complete statement of the terms and conditions under which the Loan evidenced by this Note is made and is to be repaid. Subject to the terms of the Loan Agreement, this Note shall be paid in full on the Maturity Date, which is six (6) years after the Initial Funding Date, unless payment in full is made sooner pursuant to Section 2.2(b) of the Loan Agreement.

1

Borrower agrees to pay the aforesaid principal plus interest in accordance with the terms hereinafter set forth:

1. This Note shall be payable as follows:

    (a)    On the Maturity Date, Borrower shall pay, in lawful money of the United States of America, the outstanding principal balance of this Note to Lender at 7819 42nd Street West, Rock Island, IL 61201 or to such other address or to such account and in such manner as Lender shall direct. Except as provided in Section 2.2(b) of the Loan Agreement, Borrower may not prepay any of the outstanding principal balance of this Note at any time prior to the expiration of forty-two (42) months following the Initial Funding Date. Any prepayment of the outstanding principal balance of this Note shall be subject to the provisions of Section 2.2(b) of the Loan Agreement. Upon any prepayment of a portion of the outstanding principal balance of this Note, Lender shall concurrently release a portion of its interest in the Collateral in accordance with the process and formula set forth in Section 2.2(b)(iv) of the Loan Agreement.

    (b)    The outstanding principal balance of the Loan shall bear interest at the rate of six percent (6.0%) per annum (the "**Fixed Rate**"), calculated from the date of disbursement of the applicable Tranche (as defined in the Loan Agreement) by Lender to Borrower, until repaid as set forth in this Agreement and the other Loan Documents (as defined in the Loan Agreement).

    (c)    Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable, in arrears, quarterly on each January 1, April 1, July 1, and October 1 following the Initial Funding Date (each such date, an "**Interest Payment Date**"), with the final interest payment being due and payable on the Maturity Date. Lender shall provide invoices for all payments as set forth in the Loan Agreement.

2.    In lieu of the imposition of any late charges for payments not made by Borrower to Lender as of any Interest Payment Date ("**Delinquent Interest**") or the Maturity Date ("**Delinquent Principal**"), as applicable, a three percent (3%) per annum interest charge shall be added to the Fixed Rate (the "**Default Interest Rate**") and shall be applied for the number of days any payment remains unpaid as to (i) any interest payment not made on or before the ninth (9th) calendar day subsequent to each Interest Payment Date (i.e. January 10, April 10, July 10 and October 10), and (ii) as of the Maturity Date for the payment in whole of the outstanding principal balance of the Loan and the accrued and unpaid interest due and payable as of the Maturity Date. Each amount of Delinquent Interest and Delinquent Principal (collectively, a "**Delinquent Payment**") shall bear interest at the Default Interest Rate until such payment is made in full to Lender. Borrower and Lender agree that this Default Interest Rate represents a reasonable sum considering all of the circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower and Lender further agree that proof of actual damages would be costly and inconvenient. Acceptance of any payments of the Default Interest Rate shall not constitute a waiver of a default with respect to an overdue installment, and shall not prevent Lender from exercising any of the other rights available hereunder or under any other Loan Document. Such Default Interest Rate shall be paid without prejudice to any rights of Lender.

3.    In the event Borrower fails to make two (2) consecutive interest payments to Lender or two (2) interest payments in any twelve-month period, Lender may accelerate payment of the amount of interest coming due on the next two (2) succeeding Interest Payment Dates after notice from Lender to Borrower, so that all such interest for the next two (2) Interest Payment Dates, together with all Delinquent Payments, shall be due and payable on (i) the tenth (10th) calendar day of the month following the month in which the second (2nd) interest payment was not made. Such amounts of interest that are



subject to acceleration shall only be payable on invoice from Lender delivered to Borrower at least ten (10) days prior to the due date thereof. Thereafter, Borrower shall continue to remit quarterly interest payments in accordance with this Note and the Loan Agreement.

4. This Note is secured by the Pledge Agreement, and the security interests created by the Pledge Agreement are perfected by one or more Uniform Commercial Code filings against the Collateral, providing a public record of lien. In addition, a portion of Borrower's obligations under this Note is guarantied by Stuart Lichten pursuant to the Guaranty.

5. This Note shall not be assigned by either party without the written permission of the other party, which permission shall not be unreasonably withheld.

6. Borrower covenants and warrants that the execution, delivery and performance of this Note have been duly authorized by all necessary actions of Borrower, do not require the consent or approval of any other person, regulatory authority or governmental body, and do not conflict with, result in a violation of, or constitute a default or: (a) any provision of any agreement or other instrument binding upon Borrower, or (b) any law, regulation, court decree or order applicable to Borrower.

7. This Note, when delivered, shall constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and general principles of equity.

8. It is hereby recited, certified and declared that any and all acts, conditions and things required to exist, to happen and to be performed precedent to and in the issuance of this Note exist, have happened and have been performed in due time, form and manner as required by the Ohio Constitution and the laws of the State of Ohio.

9. This Note, the Loan Agreement, the Pledge Agreement, and the Guaranty constitute the entire understanding and agreement of the parties as to the matters set forth herein and therein. No alteration of or amendment to this Note shall be effective unless given in writing and signed by Lender and Borrower.

10. Payment of the principal amount of this Note may not be accelerated by Lender, unless otherwise provided herein or in the Loan Agreement.

11. This Note has been delivered to Lender and accepted by Lender in the State of Ohio. In the event of a lawsuit, Lender and Borrower agree to submit to the jurisdiction of the courts of Summit County, Ohio. This Note shall be governed by the laws of the State of Ohio as to the interpretation of any matter contained herein.

12. If a court of competent jurisdiction finds any provision of this Note invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; provided, however, in the event the offending provision cannot be so modified, it shall be stricken and all other provisions of this Note in all respects shall remain valid and enforceable.

13. Time shall be of the essence in the performance of this Note.

*[Remainder of page intentionally left blank]*



3

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first written above.

**Borrower**

**MAPLE STREET INVESTORS LLC**,
an Ohio limited liability company

By:     **S.L. Properties, Inc.**,
a Delaware corporation,
its Manager



By:
Stuart Lichter, President

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

4

## MAPLE STREET INVESTORS LLC
## PROMISSORY NOTE
### (CMB Infrastructure Investment Group X, LP)

| RATE OF INTEREST: | TERM: | DATE: |
|---|---|---|
| 6.0% | 6 Years | October ___, 2013 |

**REGISTERED OWNER:** CMB Infrastructure Investment Group X, LP

**PRINCIPAL AMOUNT: $36,000,000.00**

(All capitalized terms used, but not otherwise defined in this Promissory Note (this "**Note**") shall have the meanings ascribed to such terms in that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "**Loan Agreement**"), between MAPLE STREET INVESTORS LLC, an Ohio limited liability company ("**Borrower**") and CMB INFRASTRUCTURE INVESTMENT GROUP X, LP, an Illinois limited partnership ("**Lender**"))

Borrower is an Ohio limited liability company, formed on April 30, 2012, as a Single Purpose Entity. Borrower is the holder of 90% of the membership interests in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**"). Certain members of Borrower have executed and delivered a certain Membership Pledge and Security Agreement, dated as of the date hereof (the "**Pledge Agreement**"), granting to Lender a security interest in their respective membership interests in Borrower (the "**Collateral**") as security for the obligations of Borrower as incurred pursuant to the Loan Agreement. In addition, Stuart Lichter (who is one of the members of Borrower) has executed and delivered a certain Guaranty, dated as of the date hereof (the "**Guaranty**"), guarantying a portion of the obligations of Borrower as incurred pursuant to the Loan Agreement.

MSC LLC holds fee title in certain real property (the "**Real Property**", see Exhibit B to the Loan Agreement), which consists of the project known as the former Hoover Plant located in North Canton, Ohio. The Real Property generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan (as hereinafter defined).

Borrower hereby promises to pay to Lender the principal sum of Thirty-Six Million Dollars ($36,000,000.00) (the "**Loan**"), or so much thereof as has been advanced by Lender to Borrower pursuant to the Loan Agreement, plus interest as set forth in Section 1(b) of this Note, in accordance with and subject to the terms and provisions of the Loan Agreement. Reference is hereby made to the Loan Agreement for a more complete statement of the terms and conditions under which the Loan evidenced by this Note is made and is to be repaid. Subject to the terms of the Loan Agreement, this Note shall be paid in full on the Maturity Date, which is six (6) years after the Initial Funding Date, unless payment in full is made sooner pursuant to Section 2.2(b) of the Loan Agreement.



PLAINTIFF'S EXHIBIT
D

1

Borrower agrees to pay the aforesaid principal plus interest in accordance with the terms hereinafter set forth:

1. This Note shall be payable as follows:

    (a)    On the Maturity Date, Borrower shall pay, in lawful money of the United States of America, the outstanding principal balance of this Note to Lender at 7819 42nd Street West, Rock Island, IL 61201 or to such other address or to such account and in such manner as Lender shall direct.  Except as provided in Section 2.2(b) of the Loan Agreement, Borrower may not prepay any of the outstanding principal balance of this Note at any time prior to the expiration of forty-two (42) months following the Initial Funding Date.  Any prepayment of the outstanding principal balance of this Note shall be subject to the provisions of Section 2.2(b) of the Loan Agreement.  Upon any prepayment of a portion of the outstanding principal balance of this Note, Lender shall concurrently release a portion of its interest in the Collateral in accordance with the process and formula set forth in Section 2.2(b)(iv) of the Loan Agreement.

    (b)    The outstanding principal balance of the Loan shall bear interest at the rate of six percent (6.0%) per annum (the "**Fixed Rate**"), calculated from the date of disbursement of the applicable Tranche (as defined in the Loan Agreement) by Lender to Borrower, until repaid as set forth in this Agreement and the other Loan Documents (as defined in the Loan Agreement).

    (c)    Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable, in arrears, quarterly on each January 1, April 1, July 1, and October 1 following the Initial Funding Date (each such date, an "**Interest Payment Date**"), with the final interest payment being due and payable on the Maturity Date.  Lender shall provide invoices for all payments as set forth in the Loan Agreement.

2. In lieu of the imposition of any late charges for payments not made by Borrower to Lender as of any Interest Payment Date ("**Delinquent Interest**") or the Maturity Date ("**Delinquent Principal**"), as applicable, a three percent (3%) per annum interest charge shall be added to the Fixed Rate (the "**Default Interest Rate**") and shall be applied for the number of days any payment remains unpaid as to (i) any interest payment not made on or before the ninth (9th) calendar day subsequent to each Interest Payment Date (i.e., January 10, April 10, July 10 and October 10), and (ii) as of the Maturity Date for the payment in whole of the outstanding principal balance of the Loan and the accrued and unpaid interest due and payable as of the Maturity Date.  Each amount of Delinquent Interest and Delinquent Principal (collectively, a "**Delinquent Payment**") shall bear interest at the Default Interest Rate until such payment is made in full to Lender.  Borrower and Lender agree that this Default Interest Rate represents a reasonable sum considering all of the circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment.  Borrower and Lender further agree that proof of actual damages would be costly and inconvenient.  Acceptance of any payments of the Default Interest Rate shall not constitute a waiver of a default with respect to an overdue installment, and shall not prevent Lender from exercising any of the other rights available hereunder or under any other Loan Document.  Such Default Interest Rate shall be paid without prejudice to any rights of Lender.

3. In the event Borrower fails to make two (2) consecutive interest payments to Lender or two (2) interest payments in any twelve-month period, Lender may accelerate payment of the amount of interest coming due on the next two (2) succeeding Interest Payment Dates after notice from Lender to Borrower, so that all such interest for the next two (2) Interest Payment Dates, together with all Delinquent Payments, shall be due and payable on (i) the tenth (10th) calendar day of the month following the month in which the second (2nd) interest payment was not made.  Such amounts of interest that are



subject to acceleration shall only be payable on invoice from Lender delivered to Borrower at least ten (10) days prior to the due date thereof. Thereafter, Borrower shall continue to remit quarterly interest payments in accordance with this Note and the Loan Agreement.

4.      This Note is secured by the Pledge Agreement, and the security interests created by the Pledge Agreement are perfected by one or more Uniform Commercial Code filings against the Collateral, providing a public record of lien. In addition, a portion of Borrower's obligations under this Note is guarantied by Stuart Lichten pursuant to the Guaranty.

5.      This Note shall not be assigned by either party without the written permission of the other party, which permission shall not be unreasonably withheld.

6.      Borrower covenants and warrants that the execution, delivery and performance of this Note have been duly authorized by all necessary actions of Borrower, do not require the consent or approval of any other person, regulatory authority or governmental body, and do not conflict with, result in a violation of, or constitute a default of: (a) any provision of any agreement or other instrument binding upon Borrower, or (b) any law, regulation, court decree or order applicable to Borrower.

7.      This Note, when delivered, shall constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and general principles of equity.

8.      It is hereby recited, certified and declared that any and all acts, conditions and things required to exist, to happen and to be performed precedent to and in the issuance of this Note exist, have happened and have been performed in due time, form and manner as required by the Ohio Constitution and the laws of the State of Ohio.

9.      This Note, the Loan Agreement, the Pledge Agreement, and the Guaranty constitute the entire understanding and agreement of the parties as to the matters set forth herein and therein. No alteration of or amendment to this Note shall be effective unless given in writing and signed by Lender and Borrower.

10.     Payment of the principal amount of this Note may not be accelerated by Lender, unless otherwise provided herein or in the Loan Agreement.

11.     This Note has been delivered to Lender and accepted by Lender in the State of Ohio. In the event of a lawsuit, Lender and Borrower agree to submit to the jurisdiction of the courts of Summit County, Ohio. This Note shall be governed by the laws of the State of Ohio as to the interpretation of any matter contained herein.

12.     If a court of competent jurisdiction finds any provision of this Note invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; provided, however, in the event the offending provision cannot be so modified, it shall be stricken and all other provisions of this Note in all respects shall remain valid and enforceable.

13.     Time shall be of the essence in the performance of this Note.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first written above.

Borrower:

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:  **S.L. Properties, Inc.,**
a Delaware corporation,
its Manager

By: _____
Stuart Lichter, President

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California  90242
Attn:  Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California  90064
Attn:  Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

4

**IRG RC Market Buildings, LLC**
**12214 Lakewood Boulevard**
**90242 Downey, CA**

March 7, 2012

Patrick F. Hogan
President
CMB Summit, LLC
7819 42nd Street West
Rock Island, IL 61201

RE: CMB Infrastructure Group X

Dear Mr. Hogan:

I appreciate the continuing efforts and commitment demonstrated by your California Regional Center, CMB Export, LLC ("CMB Export"), in the ongoing redevelopment of McClellan Business Park, LLC ("MBP"), in which entities control by Stuart Lichter are co-owners. Discussions with MBP (dating back to 2006) have resulted in CMB EB-5 financings for the McClellan project totaling $138 million of loan proceeds from CMB Investment Groups I, II, IV, VI-A, VI-B and VI-C. Those loan proceeds have provided significant assistance to the financing plan for various phases of the McClellan AFB reuse and redevelopment efforts. The McClellan project has become the leading job-generating engine for Sacramento County and the investments made by CMB Export have been critical to that success.

Those early efforts are what lead to the seeking of your assistance in 2008 for a variety of Stuart Lichter controlled projects in Ohio, which would ultimately include projects in Akron, North Canton, Moraine and other regions of the state. There is no doubt that the "Goodyear Headquarters Project" was the most notable of the projects at that time and support for your company to establish the CMB Ohio Regional Center came not only from Industrial Realty Group (which is Stuart Lichter's operating company) but also from the City of Akron, Summit County and the Summit County Port Authority. All of these public agencies were instrumental in the development effort of the Goodyear projects and the retention of Goodyear in Ohio. As you recall, our past discussions have covered a number of projects throughout Ohio and your company has meet this geographical need by expanding the scope of operations of CMB Summit, LLC ("CMB Summit") to include the entire state of Ohio.

I am proud of the role the number of Stuart Lichter controlled projects in Ohio have been able to play in your development of CMB Summit even as our initial focus was based primarily upon the Goodyear projects. As you know, the downturn in the economy delayed the start of construction of the new Goodyear Headquarters and parking structure projects and for a period of time our respective attentions were turned elsewhere. I am also proud to report that not only are the existing and new Goodyear projects moving forward but a different Stuart Lichter controlled entity's efforts in North Canton, Ohio, is prepared to move forward at this time as well.



PLAINTIFF'S
EXHIBIT
E
tabbies

Patrick F. Hogan
RE: CMB Infrastructure Group X
March 7, 2012
Page 2 of 2

Based upon CMB Export's successes as an EB-5 lender in California, subject to loan
documents to be approved and entered into by the parties, the Stu Lichter controlled
entity, IRG RC Market Buildings, LLC ("IRGRC Market Buildings"), is authorizing CMB
Summit to raise $35 million in loan financing ("CMB Goodyear Project Loan") from an
investment group partnership of which CMB Summit or a subsidiary will be the general
partner. Such loan is intended to assist in funding improvements to properties controlled
by IRG Rubber City, LLC ("IRG Rubber City") which include the existing Goodyear
Headquarters Buildings, Goodyear Hall, Market Street Garage, Tech Centers A and B,
the Mix Center, the Research Center, Archwood North and South, the Tire Testing
Facility as well as the raw land formerly owned by Goodyear. IRGRC Market Buildings
is wholly owned and controlled by IRG Rubber City and IRGRC Market Buildings, in
such capacity, is expected to be the "borrower" under the loan transaction. Several
other wholly-owned subsidiaries of IRG Rubber City (collectively, "IRGRC Affiliates")
hold differing ownership interest in the Goodyear properties as a component of the
development agreement between IRGRC and the Goodyear Tire and Rubber Company.
The portion of the properties owned by IRGRC Market Buildings include the existing
Goodyear Headquarters building, Goodyear Hall, and the Market Street Garage. The
CMB Goodyear Project Loan, which shall provide funds to IRG Rubber City, will be
combined with public and private funds totaling over $217 million of additional funds.
Additional renovation of the existing Goodyear facilities is projected to begin by IRG
Rubber City and the IRGRC Affiliates in 2012 with a forecasted completion date in 2015.

As part of the original master acquisition and related funding of the Goodyear properties,
Industrial Realty Group arranged for an Angelo, Gordon & Company affiliate to receive
title to the parcel upon which the New Goodyear World Headquarters building and
parking structure are to be constructed subject to Industrial Realty Group's obligation to
design and construct the new Goodyear facilities. CMB investor funds will be playing a
significant role not only in the revitalization of the existing Goodyear facilities but also in
the development of the new Goodyear facilities. The total capital expenditures on the
various Goodyear related projects are expected to exceed $252 million. The funding for
the related projects comes from the following sources:

- $30,000,000 from the City of Akron
- $10,200,000 from Summit County
- $16,800,000 from the State of Ohio
- $2,500,000 from the Goodyear Tire and Rubber Company
- $157,500,000 from Angelo, Gordon & Co., L.P. by a combination equity and debt
- $35,000,000 CMB Goodyear Project Loan

The CMB Goodyear Project Loan will be used by IRG Rubber City to fund a portion of
the needed equity commitment to the existing Goodyear Headquarters Buildings projects
and shall provide significant assistance to the further development of the IRGRC
properties listed above. The timelines, as outlined above, demonstrate anticipated
construction and the related construction spending to be completed no later than 2015.

The repayment for the CMB Goodyear Project Loan is expected to be generated from a
combination of cash flows generated from IRGRC Market Buildings' share of operations
of IRG Rubber City, including sales, leasing and refinancing. Credit support for the CMB

Patrick F. Hogan
RE: CMB Infrastructure Group X
March 7, 2012
Page 3 of 3

Goodyear Project Loan is anticipated to be provided by the sole member of IRGRC Market Buildings (which is IRG Rubber City) pledging an agreed to portion of its membership interest in IRGRC Market Buildings as collateral. The IRGRC Market Buildings loan agreement is anticipated to (i) contain restrictions on certain cash distributions to the members of IRGRC Market Buildings, (ii) require certain financial reporting by IRGRC Market Buildings, IRG Rubber City and IRGRC Affiliates, and (iii) require submission of annual budget and business plan updates by IRGRC Market Buildings, IRG Rubber City and IRGRC Affiliates.

In addition to the foregoing, the summary terms of the CMB Goodyear Project Loan are as follows and will be fully detailed in the actual loan agreement, and related loan documents, when finalized and approved:

- $35 million in loan proceeds at 6% per annum. The loan term is for 72 months from the date of the initial funding with interest only quarterly payments during the term of the investment.
- There will be a $50,000 documentation fee to be paid when loan agreements are executed and a .75% facility fee that is to be paid when full funding has occurred.

IRGRC Market Buildings, as a wholly owned entity of IRG Rubber City, looks forward to working with CMB Summit not only on the Goodyear projects in Akron, Ohio, but also on the projects at the former Hoover Company Headquarters in North Canton, Ohio, through a Stu Lichter controlled entity, Maple Street Investors, LLC. We appreciate CMB Summit's ongoing commitment to IRGRC Market Buildings' project in Ohio.

Sincerely,

Stuart Lichter, Manager

# PROMISSORY NOTE

$14,300,000.00                                     Los Angeles, California
                                                  October 18, 2013

For value received, IRG RC MARKET BUILDINGS, LLC, an Ohio limited liability company ("Borrower"), hereby promises to pay to the order of S.L. PROPERTIES, INC., a Delaware corporation ("Lender"), at such location as Lender may from time to time designate, the principal sum of FOURTEEN MILLION AND THREE HUNDRED THOUSAND DOLLARS ($14,300,000.00), together with interest thereon as provided in this Note, in lawful money of the United States of America in immediately available funds.

1.    Interest.  The outstanding principal balance of this promissory note (the "Note") will bear interest, at a rate of six percent (6.0%) per annum, beginning on the date funds are advanced under this Note until paid in full.  If the Note is not paid in full on the Maturity Date, the interest rate shall thereafter increase to ten percent (10%) per annum until paid in full. Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable in full on the Maturity Date.

2.    Term.  The entire outstanding principal balance of this Note and all accrued and unpaid interest will be due and payable on May 31, 2019 (the "Maturity Date"), on which date all of the interest accrued hereunder and the outstanding principal balance hereof shall be due and payable.  Borrower may, at its option, prepay the principal amount of this Note at any time without premium or penalty.  Payments received will be applied first to accrued interest, and then to principal.

3.    Waiver, Presentment, Demand, Protest Provision.  Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived.

4.    Severance or Unenforceable Provisions.  Should any part, term or provision of this Note be declared invalid, void or unenforceable, such provision shall be severed from the remaining provisions hereof and/or thereof and shall not invalidate such remaining provisions, and all such remaining provisions shall remain in full force and effect, valid and enforceable.

5.    Attorney's Fees.  If action be instituted on this Note, Maker promises to pay Holder's attorney's fees and costs of collection.

6.    Governing Law.  This Note shall be governed by and construed and enforced according to the laws of the State of California.

1



PLAINTIFF'S EXHIBIT
F

7.    Waiver of Jury Trial.  Each of Borrower and Lender waives any right to trial by jury in any action or proceeding relating to this Note.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date set forth above.

**BORROWER:**

IRG RC MARKET BUILDINGS, LLC, an Ohio limited liability company

By:    S.L. Properties, Inc. a Delaware corporation

    By: _____
          Stuart Lichter, President

2

## PROMISSORY NOTE

$14,300,000.00

Los Angeles, California
October 18, 2013

For value received, S.L. PROPERTIES, INC., a Delaware corporation ("Borrower"), hereby promises to pay to the order of MAPLE STREET INVESTORS, LLC, an Ohio limited liability company ("Lender"), at such location as Lender may from time to time designate, the principal sum of FOURTEEN MILLION AND THREE HUNDRED THOUSAND DOLLARS ($14,300,000.00), together with interest thereon as provided in this Note, in lawful money of the United States of America in immediately available funds.

      1.    Interest. The outstanding principal balance of this promissory note (the "Note") will bear interest, at a rate of six percent (6.0%) per annum, beginning on the date funds are advanced under this Note until paid in full. If the Note is not paid in full on the Maturity Date, the interest rate shall thereafter increase to ten percent (10%) per annum until paid in full. Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable in full on the Maturity Date.

      2.    Term. The entire outstanding principal balance of this Note and all accrued and unpaid interest will be due and payable on May 31, 2019 (the "Maturity Date"), on which date all of the interest accrued hereunder and the outstanding principal balance hereof shall be due and payable. Borrower may, at its option, prepay the principal amount of this Note at any time without premium or penalty. Payments received will be applied first to accrued interest, and then to principal.

      3.    Waiver, Presentment, Demand, Protest Provision. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived.

      4.    Severance or Unenforceable Provisions. Should any part, term or provision of this Note be declared invalid, void or unenforceable, such provision shall be severed from the remaining provisions hereof and/or thereof and shall not invalidate such remaining provisions, and all such remaining provisions shall remain in full force and effect, valid and enforceable.

      5.    Attorney's Fees. If action be instituted on this Note, Maker promises to pay Holder's attorney's fees and costs of collection.

      6.    Governing Law. This Note shall be governed by and construed and enforced according to the laws of the State of California.

7.   <u>Waiver of Jury Trial</u>.  Each of Borrower and Lender waives any right to trial by jury in any action or proceeding relating to this Note.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date set forth above.

**BORROWER:**

**S.L. PROPERTIES, INC.,**
a Delaware corporation

By: _____
        Stuart Lichter, President

2

# PROMISSORY NOTE

$10,700,000.00

Los Angeles, California
October 18, 2013

For value received, IRG RC MARKET BUILDINGS, LLC, an Ohio limited liability company ("Borrower"), hereby promises to pay to the order of INDUSTRIAL COMMERCE, LTD., an Ohio limited liability company ("Lender"), at such location as Lender may from time to time designate, the principal sum of TEN MILLION AND SEVEN HUNDRED THOUSAND DOLLARS ($10,700,000.00), together with interest thereon as provided in this Note, in lawful money of the United States of America in immediately available funds.

1. **Interest.** The outstanding principal balance of this promissory note (the "**Note**") will bear interest, at a rate of six percent (6.0%) per annum, beginning on the date funds are advanced under this Note until paid in full. If the Note is not paid in full on the Maturity Date, the interest rate shall thereafter increase to ten percent (10%) per annum until paid in full. Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable in full on the Maturity Date.

2. **Term.** The entire outstanding principal balance of this Note and all accrued and unpaid interest will be due and payable on May 31, 2019 (the "**Maturity Date**"), on which date all of the interest accrued hereunder and the outstanding principal balance hereof shall be due and payable. Borrower may, at its option, prepay the principal amount of this Note at any time without premium or penalty. Payments received will be applied first to accrued interest, and then to principal.

3. **Waiver, Presentment, Demand, Protest Provision.** Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived.

4. **Severance or Unenforceable Provisions.** Should any part, term or provision of this Note be declared invalid, void or unenforceable, such provision shall be severed from the remaining provisions hereof and/or thereof and shall not invalidate such remaining provisions, and all such remaining provisions shall remain in full force and effect, valid and enforceable.

5. **Attorney's Fees.** If action be instituted on this Note, Maker promises to pay Holder's attorney's fees and costs of collection.

6. **Governing Law.** This Note shall be governed by and construed and enforced according to the laws of the State of California.

1

7.  Waiver of Jury Trial.  Each of Borrower and Lender waives any right to trial by jury in any action or proceeding relating to this Note.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date set forth above.

**BORROWER:**

INDUSTRIAL COMMERCE, LTD.,
an Ohio limited liability company

By: _____

Chris Semarjian, Manager

2

# PROMISSORY NOTE

$10,700,000.00

Los Angeles, California
October 18, 2013

For value received, INDUSTRIAL COMMERCE, LTD., an Ohio limited liability company ("**Borrower**"), hereby promises to pay to the order of **MAPLE STREET INVESTORS, LLC**, an Ohio limited liability company ("**Lender**"), at such location as Lender may from time to time designate, the principal sum of TEN MILLION AND SEVEN HUNDRED THOUSAND DOLLARS ($10,700,000.00), together with interest thereon as provided in this Note, in lawful money of the United States of America in immediately available funds.

1.     Interest. The outstanding principal balance of this promissory note (the "**Note**") will bear interest, at a rate of six percent (6.0%) per annum, beginning on the date funds are advanced under this Note until paid in full. If the Note is not paid in full on the Maturity Date, the interest rate shall thereafter increase to ten percent (10%) per annum until paid in full. Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable in full on the Maturity Date.

2.     Term. The entire outstanding principal balance of this Note and all accrued and unpaid interest will be due and payable on May 31, 2019 (the "**Maturity Date**"), on which date all of the interest accrued hereunder and the outstanding principal balance hereof shall be due and payable. Borrower may, at its option, prepay the principal amount of this Note at any time without premium or penalty. Payments received will be applied first to accrued interest, and then to principal.

3.     Waiver, Presentment, Demand, Protest Provision. Presentment, demand, protest, notices of protest, dishonor and nonpayment of this Note and all notices of every kind are hereby waived.

4.     Severance or Unenforceable Provisions. Should any part, term or provision of this Note be declared invalid, void or unenforceable, such provision shall be severed from the remaining provisions hereof and/or thereof and shall not invalidate such remaining provisions, and all such remaining provisions shall remain in full force and effect, valid and enforceable.

5.     Attorney's Fees. If action be instituted on this Note, Maker promises to pay Holder's attorney's fees and costs of collection.

6.     Governing Law. This Note shall be governed by and construed and enforced according to the laws of the State of California.

1

7.     Waiver of Jury Trial.  Each of Borrower and Lender waives any right to trial by jury in any action or proceeding relating to this Note.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the date set forth above.

BORROWER:

INDUSTRIAL COMMERCE, LTD.,
an Ohio limited liability company

By: _____
        Chris Semarjian, Manager

2

# LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

1375 East 9th Street, Suite 1600
Cleveland, OH 44114
Telephone: (216) 344-9422
Fax: (216) 344-9421
www.lewisbrisbois.com

JEFFREY D. WEINSTOCK
DIRECT DIAL: 216.344.9422
JEFF.WEINSTOCK@LEWISBRISBOIS.COM

March 7, 2016

Via Federal Express

Maple Street Investors LLC
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, CA 90242
Attention: Stuart Lichter

**Re:** **Loan Agreement dated May 7, 2012 by and between Maple Street Investors LLC, an Ohio Limited Liability Company, as Borrower, and CMB Investment Group X, LP, an Illinois limited partnership, as Lender, as amended by that certain First Amendment to Loan Agreement dated as of October 16, 2013 between said Borrower and Lender (collectively, the "Loan Agreement")**

**THIS LETTER CONSTITUTES A DEMAND FOR BORROWER TO CURE FAILURES TO COMPLY WITH VARIOUS COVENANTS UNDER THE LOAN AGREEMENT AND SETS FORTH PERIODS FOR SUCH CURE AS PERMITTED OR REQUIRED THEREUNDER.**

Gentlemen:

This Law Firm represents CMB Investment Group X LP, an Illinois limited partnership ("Lender"). Lender has requested that we contact you regarding certain actions taken, and representations made to Lender, by Maple Street Investors LLC ("Borrower") and its representatives and Borrower's repeated failure to comply with various covenants and obligations under the Loan Agreement. Please note that this letter arises primarily out of your diversion of $25,000,000.00 of Loan proceeds within barely three (3) days after the closing of the Loan Agreement funding, followed by your repeated failure to comply with the terms of the Loan Agreement requiring financial statement reporting and direct responses to questions as Lender has attempted to determine the true intentions and results of Borrower having taken this action.

Words or phrases used in this letter with their initial letters capitalized and not otherwise defined in this letter, shall have the meanings ascribed to those words or phrases in the Loan Agreement.

ALBUQUERQUE • ATLANTA • BOSTON • CHARLESTON • CHICAGO • CLEVELAND • DALLAS • DENVER • FORT LAUDERDALE • FT. WRIGHT • HOUSTON • INDIAN WELLS
LAFAYETTE • LAWRENCEBURG • LAS VEGAS • LOS ANGELES • MADISON COUNTY • NEW ORLEANS • NEW YORK • NEW... • PHOENIX • PITTSBURGH
PORTLAND • PROVIDENCE • RALEIGH • SACRAMENTO • SAN BERNARDINO • SAN DIEGO • SAN FRANCISCO • S... ...RTON • WICHITA
4814-3548-4718.8

PLAINTIFF'S
EXHIBIT
G

March 7, 2016
Page 2 of 10

I.     <u>Items of Borrower Default</u>

This letter constitutes Lender's demand that Borrower within 30 days from the date of your receipt of this letter, and in the manner hereinafter specified, cure Borrower's current failure to comply with certain covenants and obligations under Loan Agreement Sections 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management Letters"); 5.1(c) ("Annual Budget for the Property"); 5.1(d) ("Knowledge of Event of Default"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); 5.1(h) ("EB-5 Documentation"); 6.1(f) ("Use of Funds"); and 6.1(g) ("Single Purpose Entity").  Failure to do so will give rise to Events of Default.

It appears that Borrower has failed to comply with:

•     *Section 5.1(a) ("Operating Statements and Operating Results")* **by its failure to provide Lender with Operating Statements for December 2015 and January 2016 (an Operating Statement for February 2016, is due no later than March 25, 2016). See further discussion at II(A) below.**

•     *Section 5.1(b) ("Annual Financial Statements; Accountant's Reports and Management Letters")* **by its failure to provide any Annual Financial Statements, to wit:  Annual Financial Statements for 2013 and 2014 (the Annual Financial Statement for 2015 is due on or before April 30, 2016). See further discussion at II(B) below.**

•     *Section 5.1(c) ("Annual Budget for the Property")* **by its failure to deliver the Operating Budget for Fiscal Year 2016.  See further discussion at II(C) below.**

•     *Section 5.1(d) ("Knowledge of Event of Default")* **by: (i) its failure to disclose to Lender until late 2015 (and then only after repeated requests by Lender for information regarding Borrower's use of Loan proceeds and repeated delays and lack of candor by Borrower and its representatives) Borrower's diversion in October 2013 of $25,000,000 of Loan proceeds to third parties; (ii) its ongoing refusal to comply with Lender's various requests for information regarding Borrower's use of Loan proceeds; (iii) its failure to provide Lender with notice as to the steps Borrower has taken, is taking and proposes to take with respect to effecting return and the expenditure of those funds to and for the costs of the Project. See further discussion at II(D) below.**

•     *Section 5.1(f) ("Other Information")* **by its failure to: (i) respond directly in good faith to repeated requests by Lender for information regarding Borrower's use of Loan proceeds; (ii) provide comprehensive and coherent reconciliations of all expenditures on the various phases and components of the Project; and (iii) since December 2015 provide any meaningful responses to Lender's requests for information regarding status of the Project and use of Loan proceeds. See further discussion at II(E) below.**

March 7, 2016
Page 3 of 10

•    *Section 5.1(g) ("Accountant Reports")* by failing to deliver to Lender any reports prepared by the Accountants in connection with the Audited Financial Statements or any reports prepared by the Accountants in connection with any other annual, interim or special audits or review over the financial statements or practices of Borrower. See further discussion at II(F) below.

•    Borrower has failed to comply with *Section 5.1(h) ("EB-5 Documentation")* by its failure to provide Lender with all requested EB-5 Documentation regarding the Project, including without limitation, all spending records for incurred development and construction costs of the Project and draw requests submitted relating to the expenditure of funds (including without limitation expenditure of Loan proceeds) on the Project, notwithstanding repeated requests by Lender to Borrower for the EB-5 Documentation, including, (but not limited to) written requests made by correspondence dated September 14, 2015 and December 2, 2015, respectively, from Lender to Borrower. See further discussion at II(G) below.

•    *Section 6.1(d) ("Inspection of Property; Books and Records; Discussions")* by its refusal to allow Lender or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Borrower's offices at the Property or otherwise. See further discussion at II(H) below.

•    *Section 6.1(f) ("Use of Funds")* by diversion of $25,000,000 of the proceeds of the Loan. See further discussion at II(I) and III below.

•    *Section 6.1(g) ("Single Purpose Entity")* by engaging in impermissible transactions with Affiliates in connection with Borrower's diversion of Loan proceeds, which call into question its status as a Single Purpose Entity. See further discussion at II(J) below.

     II.    **Requirements for Cure**

     (A)    Borrower must within 30 days from the date Borrower receives this letter, deliver to Lender the Operating Statements for December 2015 and January 2016 respectively, and must on or before March 25, 2016 deliver to Lender the Operating Statement for February 2016. The form of the Operating Statements must be organized so as to clearly and consistently identify each building comprising the Project and the corresponding rent rolls for each such building, as well as the operating income net cash flow results, and comparisons to prior calendar year, and variance to budget reporting, cash flow projections, lease status reports and occupancy summaries for each of the buildings comprising of the Project, in each case broken out by each respective building and using the same designations for the respective buildings consistently applied so as to facilitate tracking across all Operating Statements.

     (B)    Borrower is obligated within 120 days after the close of each calendar year (but to date has failed) to provide Lender with annual audited financial statements of Borrower, prepared on a consolidated basis and consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, all in accordance with GAAP, together with

March 7, 2016
Page 4 of 10

related schedules and supporting reports. The financial statements must be accompanied by a certificate executed by Borrower or a CPA acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects (collectively referred to in the Loan Agreement as the "Annual Financial Statements"). Borrower is further obligated to deliver to Lender, together with the Annual Financial Statements, a copy of the accountant's reports and management letters with respect to the calendar year in question.

Borrower must within 30 days from the date it receives this letter, deliver to Lender the Annual Financial Statements for each of the respective years ended December 31, 2013 and December 31, 2014. With respect to the Annual Financial Statements for year ended December 31, 2015 Borrower must deliver that Annual Financial Statement to Lender no later than 120 days from December 31, 2015 as required under Section 5.5(b) of the Loan Agreement.

(C)     Borrower must within 30 days from the date it receives this letter, deliver to Lender the Operating Budget for Fiscal Year 2016.

(D)     Borrower representative, Stuart Lichter  must within 30 days from the date Borrower receives this letter, meet with Lender's representatives at Borrower's offices at the Project and engage in good faith and candid discussions with Lender and its representatives regarding the circumstances surrounding, and questions presented by the Diversion Notes and Borrower's diversion of Loan proceeds, the ramification thereof, delays in completion of the Project and such other relevant matters as may be presented by Lender.

(E)     Borrower must within 30 days from the date Borrower receives this letter deliver to Lender the information and documents and take the actions listed, and fully answer the questions set forth, in the attached Schedule A;

(F)     Borrower must within 30 days of the date of its receipt of this letter, provide Lender with copies of all audited Annual Financial Statements for 2013 and 2014, together with all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection therewith, including all comment letters submitted by the Accountants in connection with such audits, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower. All such materials for and with respect to 2015 must be provided to Lender within the periods specified in Sections 5.1(b) and 5.1(g) of the Loan Agreement.

To date Lender and its representatives have repeatedly made requests of Borrower and its representatives for EB-5 Documentation and on the few occasions when Borrower has responded, Borrower has provided incomplete, inconsistent and confusing responses and documentation.

Borrower must within 30 days of the date of its receipt to the letter, deliver full, complete and comprehensive EB-5 Documentation to Lender and fully comply with its obligations under Section 5.1(h) of the Loan Agreement.

(G)     Article VI of the Loan Agreement (titled "Affirmative Covenants") provides, inter alia, that Borrower must (under Section 6.1(d)) permit any authorized representative or representatives designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom,

March 7, 2016
Page 5 of 10

all at such times during normal business hours and as often as Lender may reasonably request. Borrower is obligated to keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by the Loan Agreement and applicable Requirements of Law, of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

Borrower must within 30 days of the date of its receipt of this letter, allow Lender's representatives to inspect the financial and accounting records and leases of and with regard to the Property and the Project, and to make copies and take extract therefrom during regular business hours at either Borrower's offices at the Property and Borrower's representatives must in connection therewith cooperate in good faith with Lender and its representatives with respect to the scheduling, facilitation and conduct of such inspections.

(H)  Section 6.1(f) of the Loan Agreement (titled "Use of Funds"), requires that the proceeds of the Loan be utilized solely for the purpose of funding costs of the Projects, and in part also requires that the Borrower within the later of (i) 2 years following the funding date of any Tranche or (ii) thirty days following Borrower's receipt of written request of such information from Lender, provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project. More than 2 years has passed since funding of the Loan, and Borrower has failed to deliver to Lender documentation and supporting accounting records and contract documents demonstrating that all Loan proceeds have been spent directly or indirectly on the Project.

Borrower must within 30 days of the date of its receipt of this letter: (i) deliver to Lender copies of all bank statements, wire transfer instructions, wire transfer confirmations and all other correspondence and emails relating to Borrower's transfer or lending of any Loan proceeds to any of its affiliates or other third parties, including without limitation to S.L. Properties Inc., a Delaware corporation, Industrial Commerce, Ltd., an Ohio limited liability company, and IRG RC Market Buildings LLC; and (ii) effect return of all such Loan proceeds to Borrower for the purposes of expending those funds solely for the uses permitted under the Loan Agreement, and Borrower must provide such proof thereof as Lender may reasonably require.

(I)  Borrower must within 30 days of the date of its receipt of this letter provide Lender with copies of all limited liability company agreements and/or operating agreements of Borrower as well as Borrower's subsidiary, Maple Street Commerce LLC, together with all amendments, schedules and exhibits thereto, including but not limited to all schedules of members, interest holders and their respective membership interests or other interest in and to or with respect of such entities.

III.  **Diversion of Loan Proceeds.**

As you know, on or about May 7, 2012, Borrower and Lender executed the Loan Agreement. Thereafter, pursuant to the Loan Agreement, on or about October 16, 2013, Borrower executed and delivered the $36,000,000 Note and Lender funded the $36,000,000 Loan.

In addition to the explanation of the purposes of the Loan set forth in the Recitals of the Loan Agreement, the Loan Agreement at Sections 2.1(d) ("Requirements of EB-5 Program for Borrower") and Section 6.1(f) ("Use of Funds") are clear as to the purposes of the Loan and the permitted uses of the Loan proceeds by Borrower. Section 2.1(d) provides that "Borrower shall use the proceeds of the

March 7, 2016
Page 6 of 10

Loan solely for the purpose of funding the construction and cost of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h). Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure period set forth in Section 9.1)."

Section 6.1(f) ("Use of Funds") sets forth Borrower's affirmative covenants that "the proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Loan Agreement for the purpose of funding costs for the Project. Within the later of (i) two (2) years following the funding date of any Tranche or (ii) thirty (30) days following Lender's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche where spent directly or indirectly on the Project".

After weeks of repeated and, for the most part, unsuccessful requests by Lender's representatives for information from Borrower regarding its use of the Loan proceeds and status of the Project, Lender was, in November 2015, advised by Messrs. Lichter and Richard Klein, (purportedly the Chief Financial Officer of Borrower's parent entity, Industrial Realty Group), that within the first 2 days following Lender's funding of the $36,000,000 Loan to Borrower, and unbeknownst to Lender and without Lender's permission or consent, Borrower diverted $25,000,000 of the Loan proceeds (which by the terms of the Loan Agreement were to have been deployed exclusively on the Project), indirectly to two third party entities controlled by Messrs. Lichter and Semarjian and then purportedly loaned by those third parties to IRG RC Market Buildings, LLC, an Ohio limited liability company ("IRG"), another Lichter affiliated entity and the borrower under a separate loan agreement dated May 7, 2012 by and between Lender and IRG (the "Group X/IRG Loan"). The Group X/IRG Loan was made by Lender for an entirely different development project.

The diversion of Loan proceeds from the Project to IRG was according to Messrs. Lichter and Klein evidenced by a series of promissory notes dated as of October 18, 2013, copies of which were after numerous requests by Lender, finally provided by Borrower via email to Lender in December, 2015 (said notes collectively, the "Diversion Notes"). The Diversion Notes purportedly show a flow of $25,000,000 of Loan proceeds from Borrower ultimately to IRG. No supporting or corroborating materials, such as bank statements, financial records or wire transfer instructions or confirmations showing actual transfer of funds have to date been provided to Lender.

Notwithstanding statements previously made by Borrower's representatives regarding the Diversion Notes and use by IRG of the as yet unaccounted for $25,000,000, the balance sheet for IRG for the period ending December 31, 2013 does not reflect the $25,000,000 in question (whether as "assets" or otherwise), nor does it reflect any of the Diversion Notes or any note payable to anyone, other than to Lender under the "EB-5 Note" for $35,000,000 which IRG executed and delivered to Lender in connection with the Group X/IRG Loan.

Similarly, the comparative balance sheets of Borrower as of December 31, 2012 and 2013 do not reflect a reduction of cash as of December 31, 2013 of $25,000,000, nor does it reflect any note receivable of $25,000,000 or otherwise. This raises serious questions concerning whether the copies of the Diversion Notes delivered by Messrs. Lichter and Klein purporting to evidence a loan from Borrower to third party intermediaries and ultimately to IRG, truly reflect the actual disposition of the

March 7, 2016
Page 7 of 10

$25,000,000 of Loan proceeds in question, and requires further accounting as to the disposition of those funds.

Diversion of Loan proceeds by Borrower for use for any purpose other than those permitted under the Loan Agreement undeniably violates Borrower's covenants under the Loan Agreement, including but not limited to Borrower's affirmative covenants at Section 6.1(f).

Upon learning of the apparent diversion of Loan proceeds, representatives of Lender repeatedly attempted to schedule meetings with Mr. Lichter and other Borrower representatives for the purposes of reviewing records and having further discussions to understand what exactly has happened to the Loan proceeds. Lender's requests have to date been met with what can only be described as dissembling, if not outright stonewalling. This is not a matter that can be allowed to remain unresolved, and thus this letter.

## IV.  Litigation Hold/Warning against Spoliation of Evidence

It is difficult for Lender to believe that Borrower or Mr. Lichter and his affiliates would actually misappropriate $25,000,000 of Loan proceeds. Lender wants to give Borrower and Messrs. Lichter, Semarjian and their affiliates the benefit of the doubt as to their intentions, and the opportunity to explain their actions and rectify the current situation, in the hope that declaration of Events of Default and subsequent resort to Lender's various remedies can be avoided. However, the apparent refusal by Borrower, Mr. Lichter and their respective affiliates to engage in forthright discussions with Lender regarding the issues at hand only serves to aggravate matters.

We hope these issues can be resolved amicably, however, Borrower needs to fully comply with the various requests set forth above, in good faith and in a timely manner. We invite a call, or face to face meeting with all concerned parties within 10 days of your receipt of this letter to discuss these issues and various potential paths forward. Borrower's failure to respond in a satisfactory manner, and to in good faith and in a timely fashion comply with Lender's requests as set forth above, may leave Lender with little choice but to pursue appropriate legal action.

Regardless of whether litigation is in state or federal court, similar rules require that Borrower and its attorneys preserve information that may be relevant to any such lawsuit, and such lawsuit would obligate Borrower and its attorneys to impose a "litigation hold" to preserve all of Borrower's documents and electronically stored information (ESI) which may be relevant in this matter. ESI includes data on all computers, networks, storage devices including back up tapes and USB drives, voicemail, and even cell phones and pdas.

"ESI" also includes but is not necessarily limited to, all text files (including word processing documents), Microsoft excel files and all other spreadsheets and charts, emails files and information concerning emails (including logs of email history and usage, header information and "deleted" files), Microsoft outlook and/or other similar files, internet history files and preferences, graphically image files, including but not limited to files with .gif, .tiff, .bmp and .jpg extensions, Portable Document Format (pdf) files and all other read only and/or limited access files, data bases, calendar and scheduling information, computer system activity logs, telephone logs, voicemails and all files fragments and backup files. This list is illustrative, not exhaustive.

March 7, 2016
Page 8 of 10

We believe that discoverable evidence in the form of "hard copy" documents and ESI may exist in your computer systems, including computers used by your employees and agents, and third parties acting on behalf of or in concert with Borrower and/or its affiliates. Accordingly, this letter shall also serve as notice and demand that such evidence, and all such hard copy, and other discoverable documents, be immediately preserved and retained. Additionally, the continued operation of your computer systems will likely result in the destruction of potentially discoverable evidence due to the fact that electronic evidence can be easily altered, deleted or otherwise modified. The failure to preserve and retain ESI constitutes spoliation of evidence and may subject you and your affiliates to significant adverse consequences, including legal claims for damages and/or evidentiary and monetary sanctions. Please advise all appropriate third parties to preserve and retain all ESI generated or received, including but not limited to the ESI, relating to the issues that are subject to the matters described above.

You and any third parties acting on your behalf must refrain from removing or altering internal or external drives and media attached thereto from any stand alone personal computers, network workstations, notebook and/or laptop, computers, and all wireless devices, including but not limited to personal digital assistance, blackberry, mobile telephones and paging devices. This includes emails sent or received by any employees or other "active information stored" on your services or those of persons acting for or on your behalf. You and your affiliates are obligated to take affirmative steps to prevent anyone with access to its data, systems and archives from seeking to modify, destroy, delete, overwrite or hide electronic evidence on network or local drives, including backup tapes or other storage media, whether online or offline, even if the information was deleted at some prior time.

Please govern yourselves accordingly.

Very truly yours,

Jeffrey D. Weinstock of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc:   Via Federal Express
      Fainsbert Mase & Snyder, LLP
      11835 West Olympic Boulevard, Suite 1100
      Los Angeles, CA 90064
      Attention: John A. Mase, Esq.

      Via Federal Express
      Fainsbert Mase Brown & Sussman, LLP
      1110 Santa Monica Boulevard, Suite 870
      Los Angeles, CA 90025
      Attention: Dean Sussman

      Via Federal Express
      Christopher S. Semarjian
      c/o Alan R. Daus & Associates
      3401 Enterprise Park Place, Suite 105
      Cleveland, OH 44142

Via Email:
CMB Infrastructure Investment
 Group X, L.P.
Attn: CMB Summit, LLC /
      Patrick F. Hogan,
      Managing Member

4814-3548-4718.8

March 7, 2016
Page 9 of 10

## Schedule A

1.    Identify, and provide the address, telephone number, email address and other contact information of and with respect to the Accountants (including all contact persons within any accounting firm so identified and with whom Lender may communicate with regard to and who has knowledge of the matters referred to in Section 5.1(f) of the Loan Agreement;

2.    Deliver to the Accountants the letter called for under Section 5.1(f), instructing the Accountants to disclose the aforesaid information to Lender in compliance with Section 5.1(f); and simultaneously therewith furnish Lender with an executed copy of that letter.

3.    Deliver to Lender:

(a)    cash flow projections for the Project, broken out by each building comprising, and each phase of, the Project; budgets, operating statements (for year to date 2016 and for 2015), complete rent rolls identifying each building comprising the Project (using consistent nomenclature and designations for the respective buildings and phases of the Project) and for each suite, office or other premises within or comprising the Project; lease expiration reports and leasing status reports;

(b)    comprehensive and detailed general ledgers of all expenditures to date for and with respect to each component of the Project, together with all invoices for same, organized in accordance with the order in which they are presented in the aforesaid general ledger;

(c)    general ledgers and/or detailed spending records for and with respect to any other related costs, expenses or expenditures for or with respect to the Project - (whether in connection with municipal county, state, federal or other governmental authorities, tenants or otherwise) together with all corresponding invoices; and

(d)    all reports of, and all correspondence from or to environmental consultants with respect to the Property, the Project or any part thereof, and copies of all correspondence to or from any government agency or authority regarding any environmental condition, environmental law or regulation, or any environmental remediation effected or required to be effected on, below or with respect to the Property, Project or any part thereof, including without limitation all reports prepared by Hull and Associates for or in connection with the Property or Project.

4.    Advise with specificity, as to each element of environmental remediation of or with respect to the Property or Project or any part thereof, which as of the date of this letter: (i) has been completed; (ii) has been identified as being required but has not been completed (with respect to each such item, provide description of the progress made towards completion of such item and all expenditures in connection therewith, all actions remaining together with estimated cost of completion);

5.    Provide true and complete copies of all studies, reports and analyses, including Phase 1 and Phase 2 environmental audits, prepared by or for Borrower or any of its subsidiaries or affiliates with regard to the Property or Project, together with all correspondence between Borrower or any of its subsidiaries, affiliates or their respective representatives, on the one hand, and any state or federal government, official, agency or authority on the other, regarding environmental condition, or remediation of the Property or Project or any part thereof, or any actual or potential requirement for

March 7, 2016
Page 10 of 10

environmental remediation of or with respect to the Property or Project or any part thereof, together with budgets for all such remaining remediation.

6.  Identify all outstanding mortgages, liens and other encumbrances filed of record against, or otherwise encumbering, the Property or any part thereof, including without limitation all liens filed by any persons or entities for or with respect to labor, services or materials provided to or for the benefit of the Property or Project and with respect to each such mortgage, lien or encumbrance, the principal amount thereof, and interest accruing thereon.

7.  With respect to each part of the Project (e.g. demolition/renovation, site preparation, permitting, architectural/engineering, environmental, remediation, residential, commercial office, retail, industrial, warehouse, public facilities and common areas, etc.), provide percentage completion to date and projected costs of completion and completion dates.

8.  With respect to each part of the Project, provide a table of expenditures to date, together with status and/or completion date for each item listed and indicating with respect to each such expenditure, the amount or percentage allocated to direct investment by Borrower, financing from Lender, and financing provided by third parties.

9.  Provide the following information with regard to all distributions received by Borrower from Maple Street Commerce LLC – amount and nature of distribution, (whether cash or other property and if other than cash, provide description of property distributed); and the dates thereof.

10.  List and describe (and identify all parties and claimants under or with respect to) all currently pending and threatened claims or litigation against Borrower or its subsidiary, Maple Street Commerce LLC or any of their respective parents, subsidiaries or affiliates, which in any respect relates to the Property or Project or any labor, services or materials provided by any person or entity for or in connection with the Property or Project.

11.  Please advise whether Borrower or its subsidiary, Maple Street Commerce LLC engages the services of an architect, engineer, Project manager or any other person charged with primary responsibility for overseeing progress of the Project and/or or facilitating payment of invoices for labor, services or materials relating to the Property or Project; identify and provide contact information for each such person.

CMB INFRASTRUCTURE INVESTMENT GROUP X, L.P.
7819 42nd Street West
Rock Island, IL 61201

September 30, 2016

Via Federal Express and Facsimile

Maple Street Investors, LLC
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, CA 90242
Attn: Stuart Lichter
Facsimile: 562-803-4796

Re:     Loan Agreement dated May 7, 2012 by and between Maple Street Investors, LLC, an Ohio
Limited Liability Company, as Borrower (hereinafter "Borrower") and CMB Infrastructure
Investment Group X, L.P., an Illinois Limited Partnership, as Lender, (hereinafter "Lender") as
amended by that certain First Amendment to Loan Agreement dated as of October 16, 2013
between said Borrower and Lender (collectively, the "Loan Agreement") and Maple Street
Investors LLC Promissory Note dated October 16, 2013 payable to CMB Infrastructure
Investment Group X, L.P., in the original principal amount of $36,000,000 (the "Note").

Dear Mr. Lichter:

    As you know, by correspondence dated March 7, 2016 from the Law Firm of Lewis Brisbois Bisgaard & Smith,
acting as legal counsel to Lender, notice was provided to Borrower of numerous items of default under the referenced Loan
Agreement which, if not timely cured, would constitute Events of Default under the Loan Agreement.  Lender hereby
exercises its rights without limitation under Section 9.2 of the Loan Agreement to accelerate the Note and repayment of the
Loan.  Demand is hereby made upon Borrower for payment of the $36,000,000 principal amount of the Loan and Note,
together with accrued interest thereon, and together with such other collection costs as are accrued and owing, at this point
estimated to be not less than $100,000.

    In the event Borrower fails to remit full and complete payment of the aforesaid $36,000,000 principal balance
together with all accrued but unpaid interest thereon on or before October 11, 2016, Lender intends to file suit against
Borrower to enforce Lender's rights under the Loan Agreement, Note and other Loan Documents.

                              Very truly yours,

                              CMB INFRASTRUCTURE INVESTMENT GROUP X,
                              L.P., an Illinois limited partnership

                              By:   CMB Summit, LLC, an Ohio limited
                                    liability company, Managing Co-General Partner

                              By:   _____
                                    Patrick F. Hogan, Manager

cc:     Via Federal Express and Facsimile          Via Federal Express and Facsimile
        Fainsbert Mase Brown and Sussman LLP        Fainsbert Mase Brown & Sussman, LLP
        11835 West Olympic Boulevard, Suite 1100    11100 Santa Monica Boulevard, Suite 870
        Los Angeles, CA  90064                      Los Angeles, CA 90025
        Attn:   Dean Sussman, Esq.                  Attn: Jerry A. Brown, Jr.
                Jerry Brown, Esq.                    Facsimile: 310-473-8702
        Facsimile: 310-473-8702



PLAINTIFF'S
EXHIBIT
H

4813-0482-3864.2

# GUARANTY

This GUARANTY (this "Guaranty") is dated as of October $\underline{16}$, 2013 and is made by Stuart Lichter, an individual ("Guarantor"), in favor of CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("Lender").

## RECITALS

A. Guarantor owns a fifty percent (50%) membership interest in Maple Street Investors LLC, an Ohio limited liability company ("Borrower").

B. Borrower and Lender have entered into that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "Loan Agreement"), pursuant to which Lender is making a loan (the "Loan") to Borrower in the total principal amount of up to $36,000,000.00.

C. Guarantor will derive a material and substantial benefit from the making of the Loan to Borrower, and has therefore agreed to provide this Guaranty on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees, and is hereby bound for the benefit of Lender, as follows:

## SECTION 1
## DEFINITIONS

1.1     Loan Agreement Defined Terms.  Unless the context hereof shall otherwise require, capitalized terms used in this Guaranty, including those in the recitals, and not otherwise defined herein shall have the respective meanings specified in the Loan Agreement (including those set forth in Section 1.1 of the Loan Agreement). The general interpretive provisions of Section 1.3 to the Loan Agreement shall apply to terms used in this Guaranty.

1.2     Definitions.  "Guarantor Material Adverse Effect" shall mean an event that has a material adverse effect on the ability of Guarantor to perform his obligations under this Guaranty; provided, however, that notwithstanding the foregoing, in no event shall any of the following, alone or in combination, be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or shall be a Guarantor Material Adverse Effect: (i) any effect that results from events, circumstances or situations affecting general economic, business or regulatory conditions worldwide, or in North America or any national or global financial or capital market; (ii) any effect of any proposed or actual institution of any new interpretation of any existing applicable laws affecting the business of Guarantor or his affiliates; or (iii) acts of war (whether or not declared), the commencement, continuation or escalation of a war, acts of armed hostility, sabotage or terrorism or other international or national calamity or any material worsening of any such conditions threatened or existing as of the date hereof.

1


PLAINTIFF'S
EXHIBIT
I
tabbies

## SECTION 2
## GUARANTY PROVISIONS

2.1    Guaranty.  Subject to the limitations set forth in Section 2.7, Guarantor hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitations set forth in Section 2.7, the "Guaranteed Obligations").  Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligor, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

2.2    Termination.  This Guaranty shall be released and terminated (a) automatically, without further action by any Person, if and when Borrower acquires the remaining 10% of the MSC LLC Membership Interest (i.e. above the 90% of the MSC LLC Membership Interest currently owned by Borrower), and furnishes Lender with reasonably satisfactory evidence of such acquisition, (b) automatically, on the date on which the Guaranteed Obligations are paid in full or extinguished, (c) if Borrower or Guarantor furnishes substitute collateral or security for the Loan, which substitute collateral or security is acceptable to Lender in its sole and reasonable discretion, or (d) when otherwise released or terminated by Lender in writing (the date of such release and termination being the "Termination Date").  Guarantor hereby acknowledges and agrees that this Guaranty constitutes a continuing guaranty and shall remain in full force until the Termination Date; provided, however, that with respect to any claim resulting from the acts of Guarantor or Borrower which occurred prior to the Termination Date:

(a)    if such claim is made upon Lender at any time for repayment or recovery of any amounts or any property received by Lender from any source on account of any of the Guaranteed Obligations, and Lender is required to repay or return any amounts or property so received (including interest thereon to the extent Lender is required to repay the same), or

(b)    if Lender becomes liable for any part of such claim (beyond any possible appeal) by reason of (1) any judgment or order of any court or administrative authority having competent jurisdiction, or (2) any settlement or compromise of any such claim, which settlement or compromise has been approved in writing by Guarantor,

then, subject to the limitations set forth in Section 2.7, Guarantor shall remain liable under this Guaranty for the amounts so repaid or property so returned or the amounts for which Lender becomes liable (such amounts being deemed part of the Guaranteed Obligations) to the same extent as if such amounts or property had never been received by Lender, notwithstanding any termination hereof or the cancellation of any instrument or agreement evidencing any of the Guaranteed Obligations.  Not later than ten (10) days after receipt of notice from Lender, Guarantor shall pay to Lender an amount equal to the amount which Lender has repaid or returned as provided in this Section 2.2, subject to the limitations set forth in Section 2.7.

2

2.3    Guaranty Absolute.

(a)    The obligations of Guarantor contained herein (i) are direct, independent and primary obligations of Guarantor, (ii) are absolute, unconditional and continuing obligations and are not conditioned in any way upon the institution of suit or the taking of any other action or any attempt to enforce performance of or compliance with the Obligations of Borrower (other than providing notice to Borrower as set forth in the Loan Documents), (iii) shall remain in full force and effect and irrevocable without regard to the authority of Borrower to enter into any of the Loan Documents or any substitution, release or exchange of any other guaranty or any other security for any of the Guaranteed Obligations or any other circumstance whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents) that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, and (iv) except as set forth herein, are in no way conditioned or contingent upon any attempt to collect from Borrower or any other entity or to perfect or enforce any security or upon any other condition or contingency or upon any other action, occurrence or circumstance whatsoever.

(b)    Without limiting the generality of the foregoing, Guarantor shall have no right to terminate this Guaranty, or, except as expressly set forth herein, to be released, relieved or discharged from its obligations hereunder, and such obligations shall be neither affected nor diminished for any reason whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents), including (i) any amendment or supplement to or modification of any Loan Document, any extension or renewal of Borrower's obligations under any Loan Document, or any assignment or transfer of Borrower's interest in any Loan Document, (ii) any bankruptcy, insolvency, readjustment, composition, liquidation or similar proceeding with respect to Borrower, (iii) any furnishing or acceptance of additional security or any exchange, substitution, surrender or release of any security, (iv) any waiver, consent or other action or inaction or any exercise or non-exercise of any right, remedy or power with respect to the Guaranteed Obligations or any Loan Document, (v) any merger or consolidation of Borrower into or with any other Person, any change in the structure of Borrower, or any sale, lease or transfer of any or all of the assets of Borrower to any other Person, or (vi) any default, misrepresentation, negligence, misconduct or other action or inaction of any kind by Lender under or in connection with any Loan Document or any other agreement relating to this Guaranty, except to the extent that any such default, misrepresentation, negligence, misconduct or other action or inaction would constitute a defense to or limit Borrower's payment or performance of the Guaranteed Obligations.

(c)    Except as otherwise expressly set forth herein, Guarantor hereby unconditionally waives to the extent permitted by law promptness, diligence and notice as to the Guaranteed Obligations and acceptance of this Guaranty, and agrees that, except as otherwise provided herein and in the Loan Documents, Guarantor shall not be required to consent to or receive any notice of any amendment or modification of, or waiver, consent or extension with respect to, any Loan Document. The rights, powers and remedies herein provided are cumulative. No failure or delay on the part of Lender in

3

exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise of any other right, remedy, power or privilege.

2.4   Guarantor's Waivers.   Except as expressly required by the Loan Documents, Guarantor waives, to the fullest extent permitted by the provisions of applicable law, all of the following (including all defenses, counterclaims and other rights of any nature based upon any of the following):

(a)   presentment, demand for payment and protest of nonpayment of any of the Guaranteed Obligations, and notice of protest, dishonor or nonperformance;

(b)   notice of acceptance of this Guaranty and notice that credit has been extended in reliance on Guarantor's guaranty of the Guaranteed Obligations;

(c)   notice of any default or of any inability to enforce performance of the obligations of Borrower with respect to any Loan Document or notice of any acceleration of maturity of any Guaranteed Obligations;

(d)   demand for performance or observance of, and any enforcement of, any provision of any Loan Document or the Guaranteed Obligations, or any pursuit or exhaustion of rights or remedies against Borrower in respect of the Guaranteed Obligations or any requirement of diligence or promptness on the part of Lender in connection with any of the foregoing;

(e)   any "single action" or "anti-deficiency" law which would otherwise prevent Lender from bringing any action, including any claim for a deficiency, against Guarantor before or after Lender's commencement or completion of any foreclosure action, whether judicially, by exercise of power of sale or otherwise, or any other law which would otherwise require any election of remedies by Lender;

(f)   all demands and notices of every kind with respect to the foregoing;

(g)   any defense based upon any legal disability or other defense of Borrower;

(h)   any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower; and

(i)   any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender.

Without limiting the generality of the foregoing or any other provision hereof, Guarantor further expressly subordinates to the Guaranteed Obligations, to the extent permitted by law, any and all rights and defenses, including without limitation any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to Guarantor under the law. Guarantor represents that he has obtained the advice of counsel as to

4

the extent to which suretyship and other defenses may be available to him with respect to his obligations hereunder in the absence of the waivers contained in this Section 2.4.

2.5    Loan Documents.  Guarantor does hereby acknowledge that it has received and reviewed a copy of the Loan Agreement.

2.6    Payment.  All payments to be made by Guarantor hereunder shall be made (a) within twenty (20) business days after receipt by Guarantor of written notice from Lender that reasonably identifies Borrower's breach of its obligations that constitute Guaranteed Obligations as provided herein, or (b) if later, when due and payable under the terms of the Loan Documents (subject to any applicable notice and grace periods under the Loan Documents). Such notice shall also include the amount of the Guaranteed Obligations for which Lender is seeking recourse against Guarantor which has not been paid as and when due and payable by Borrower (subject to any applicable notice and grace periods under the Loan Documents). All payments to be made by Guarantor hereunder shall be made in immediately available funds and in U.S. dollars to Lender as Lender may direct to Guarantor in writing.

2.7    Limitation of Liability.  Notwithstanding anything to the contrary contained herein, (a) the total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amounts paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder and the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap").  Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants to Lender as of the date hereof that:

3.1    Organization; Requisite Power and Authority; Qualification.  Guarantor is an individual with all requisite power and authority to own and operate his assets and has not had, and does not reasonably expect to have, a Guarantor Material Adverse Effect.

3.2    Due Authorization.  Guarantor has obtained any and all necessary consents, including, if applicable, spousal consents as are necessary to enter into this Guaranty.

3.3    No Conflict.  The execution, delivery and performance by Guarantor of this Guaranty and the transactions contemplated hereby do not and will not (i) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Requirement of Law or Court Order binding upon Guarantor, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation of Guarantor, the breach of which could reasonably be expected to have a Guarantor Material Adverse Effect, or (iii) result in or require the creation or imposition of any Lien whatsoever upon any assets of Guarantor (other than any Liens created under or permitted by any of the Loan Documents).

5

## SECTION 4
## REMEDIES; SUBROGATION

4.1     Remedies.  In the event Guarantor shall fail to pay when due any amounts due under this Guaranty, or to comply with any other term of this Guaranty, Lender shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7.

4.2     Subrogation.  Guarantor will not exercise any rights that he may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, until all of the Guaranteed Obligations shall have been paid in full. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, in accordance with the terms of the Loan Documents, when such Guaranteed Obligations are due and payable.

4.3     Survival of Remedies and Subrogation Rights.  The provisions of this Section 4 shall survive the termination of this Guaranty and the payment in full of the Guaranteed Obligations and the termination of the Loan Agreement.

4.4     Subordination.  Guarantor covenants and agrees that, after the occurrence and during the continuance of an Event of Default, all indebtedness, claims and liabilities then or thereafter owing by Borrower to Guarantor, whether arising under any Loan Document or otherwise, are subordinated to the prior payment in full of the Guaranteed Obligations and are so subordinated as a claim against Borrower or any of its assets, whether such claim be in the ordinary course of business or in the event of voluntary or involuntary liquidation, dissolution, insolvency or bankruptcy, so that no payment with respect to any such indebtedness, claim or liability will be made or received while any Event of Default exists.  Notwithstanding the foregoing, to the extent Guarantor receives any such payment, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender upon written request from Lender to be credited and applied against the Guaranteed Obligations then due and payable and reasonable expenses of collection, whether matured or unmatured, in accordance with the terms of the Loan Documents.

## SECTION 5
## MISCELLANEOUS

5.1     Defenses.  Without limiting Guarantor's own defenses and rights hereunder, but subject to the conditions herein, Guarantor reserves to himself all rights, counterclaims and other defenses which Borrower is or may be entitled to arising from or out of any Loan Document, except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Borrower, the power or authority of Borrower to enter into the Loan Documents and to perform its Guaranteed Obligations thereunder, and the lack of enforceability of Borrower's Obligations under any Loan Document or any transaction thereunder; provided that, for the avoidance of doubt, Guarantor hereby waives, with respect to any claims asserted by Lender, any defenses he

6

may have against Borrower under the Loan Documents with respect to the Guaranteed Obligations.

5.2     Expenses.  Guarantor agrees that in the event that Lender retains or engages an attorney or attorneys to enforce this Guaranty by reason of the failure of Guarantor to fulfill his obligations hereunder, then upon the successful enforcement of any such claim (beyond any applicable notice and cure period), promptly after request therefor, Guarantor will reimburse Lender for all reasonable out-of-pocket expenses incurred, including reasonable attorneys' fees, costs and disbursements.

5.3     Amendments and Waivers.  No term, covenant, agreement or condition of this Guaranty may be terminated, amended or compliance therewith waived (either generally or in a particular instance, retroactively or prospectively) except by an instrument or instruments in writing executed by Guarantor and Lender.

5.4     Possession.  Guarantor agrees and acknowledges that possession of this Guaranty by Lender shall be conclusive evidence of due execution and delivery of this Guaranty by Guarantor.

5.5     Notices.  All notices, requests, consents and other communications required or permitted under this Guaranty shall be in writing and shall be (as elected by the Person giving such notice) (a) hand delivered by messenger or courier service, (b) delivered by express courier service (e.g., Federal Express), (c) telefaxed, or (d) mailed by registered or certified mail (postage prepaid), return receipt requested, addressed as follows:

If to Guarantor:

Stuart Lichter                          with a required copy to:
c/o Industrial Realty Group
12214 Lakewood Boulevard                Fainsbert Mase Brown & Sussman, LLP
Downey, California 90242                11835 West Olympic Blvd., Suite 1100
Attn: Stuart Lichter                    Los Angeles, California 90064
Tel: (562) 803-4761                     Attn: Dean Sussman, Esq.
Fax: (562) 803-4796                     Tel: (310) 473-6400
                                        Fax: (310) 473-8702

If to Lender:

CMB Export Infrastructure Investment Group X, LP
c/o CMB Export LLC
7819 42nd Street West
Rock Island, Illinois 61201
Attn: Patrick F. Hogan, General Partner
Tel: (309) 797-1550
Fax: (855) 852-5733

or to such other address as any party may designate by notice complying with the terms of this Section 5.5. Each such notice shall be deemed delivered (i) on the date actually delivered if by messenger or courier service or express courier service; (ii) on the date of confirmed answerback if by telefax so long as a duplicate copy is sent immediately by methods (a), (b), or (d) above; and (iii) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

5.6  Assignment and Assumption.  Except as permitted in the Loan Agreement, this Guaranty may not be assigned by Guarantor to, or assumed by, any successor to or assign of Guarantor without the prior written consent of Lender, which consent shall not be unreasonably withheld.

5.7  Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with the laws of the State of Illinois.

5.8  Waiver of Trial by Jury.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER IRREVOCABLY WAIVE (A) TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT, AND (B) ANY OBJECTION (INCLUDING, WITHOUT LIMITATION, ANY OBJECTION OF THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS) WHICH ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT IN ANY JURISDICTION.

5.9  Severability.  If any provision of this Guaranty is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible. If any provision of this Guaranty may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

5.10  Headings.  The headings contained in this Guaranty are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect in any way the meaning or interpretation of this Guaranty.

5.11  Further Assurances.  Guarantor will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by Lender, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Guaranty; provided, however, that Guarantor shall not be required to execute or enter into any such further assurance that increases Guarantor's obligations or decreases Guarantor's rights under this Guaranty.

5.12  Effectiveness of Guaranty.  This Guaranty shall be effective as of the date hereof.

5.13  Successors and Assigns.  This Guaranty shall be binding upon Guarantor and Lender (by acceptance hereof) and their respective successors and permitted assigns and shall

inure to the benefit of, and shall be enforceable by Lender and Guarantor and their respective successors and permitted assigns.

    5.14   Unsecured Obligation. The obligations of Guarantor under this Guaranty are unsecured obligations of Guarantor. Without limiting the generality of the immediately preceding sentence, the obligations of Guarantor under this Guaranty are not secured by, and Guarantor shall not be deemed to have granted or otherwise conveyed to Lender, any security interest in, lien on or pledge of any properties or assets (or interests therein) of Guarantor.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____
STUART LICHTER

Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,
an Illinois limited partnership

By: _____
    Name:  Patrick F. Hogan
    Title:  General Partner

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____

STUART LICHTER

Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,
an Illinois limited partnership

By: _____
     Name:  Patrick F. Hogan
     Title:  General Partner

**CMB INFRASTRUCTURE INVESTMENT GROUP X, L.P.**
7819 42nd Street West
Rock Island, IL 61201

September 30, 2016

Via Federal Express and Facsimile

Maple Street Investors, LLC
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, CA 90242
Attn:  Stuart Lichter
Facsimile: 562-803-4796

Re:    Guaranty (the "Guaranty") dated October 16, 2013 made by Stuart Lichter, an
       individual ("Guarantor") in favor CMB Infrastructure Investment Group X, L.P., an
       Illinois Limited Partnership ("Lender").  Capitalized terms used in this letter without
       definition, have the meaning provided in the Guaranty.

Dear Mr. Lichter:

        Enclosed, please find copy of correspondence of even date herewith from Lender to Borrower, as
well as correspondence dated March 7, 2016 from Lender's counsel to Borrower.  Be advised that Lender
hereby invokes the Guaranty and demands your prompt payment of $3.6 Million Dollars thereunder.

                                            Very truly yours,

                                            CMB INFRASTRUCTURE INVESTMENT
                                            GROUP X, L.P., an Illinois limited partnership

                                            By:   CMB Summit, LLC, an Ohio limited
                                                  liability company, Managing Co-General Partner

                                            By: _____
                                                  Patrick F. Hogan, Manager

cc:
Via Federal Express and Facsimile
Fainsbert Mase Brown and Sussman LLP
11835 West Olympic Boulevard, Suite 1100
Los Angeles, CA 90064
Attn:   Dean Sussman, Esq.
        Jerry Brown, Esq.
Facsimile: 310-473-8702

4831-9132-5753.1

PLAINTIFF'S
EXHIBIT
J

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
ATTORNEYS AT LAW

1375 East 9th Street, Suite 1600
Cleveland, OH 44114
Telephone: (216) 344-9422
Fax: (216) 344-9421
www.lewisbrisbois.com

JEFFREY D. WEINSTOCK
DIRECT DIAL: 216.344.9422
JEFF.WEINSTOCK@LEWISBRISBOIS.COM

March 7, 2016

Via Federal Express

Maple Street Investors LLC
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, CA 90242
Attention: Stuart Lichter

Re:  Loan Agreement dated May 7, 2012 by and between Maple Street Investors LLC, an Ohio Limited Liability Company, as Borrower, and CMB Investment Group X, LP, an Illinois limited partnership, as Lender, as amended by that certain First Amendment to Loan Agreement dated as of October 16, 2013 between said Borrower and Lender (collectively, the "Loan Agreement")

THIS LETTER CONSTITUTES A DEMAND FOR BORROWER TO CURE FAILURES TO COMPLY WITH VARIOUS COVENANTS UNDER THE LOAN AGREEMENT AND SETS FORTH PERIODS FOR SUCH CURE AS PERMITTED OR REQUIRED THEREUNDER.

Gentlemen:

This Law Firm represents CMB Investment Group X LP, an Illinois limited partnership ("Lender"). Lender has requested that we contact you regarding certain actions taken, and representations made to Lender, by Maple Street Investors LLC ("Borrower") and its representatives and Borrower's repeated failure to comply with various covenants and obligations under the Loan Agreement. Please note that this letter arises primarily out of your diversion of $25,000,000.00 of Loan proceeds within barely three (3) days after the closing of the Loan Agreement funding, followed by your repeated failure to comply with the terms of the Loan Agreement requiring financial statement reporting and direct responses to questions as Lender has attempted to determine the true intentions and results of Borrower having taken this action.

Words or phrases used in this letter with their initial letters capitalized and not otherwise defined in this letter, shall have the meanings ascribed to those words or phrases in the Loan Agreement.

ALBUQUERQUE • ATLANTA • BOSTON • CHARLESTON • CHICAGO • CLEVELAND • DALLAS • DENVER • FORT LAUDERDALE • FT. WRIGHT • HOUSTON • INDIAN WELLS
LAFAYETTE • LAWRENCEBURG • LAS VEGAS • LOS ANGELES • MADISON COUNTY • NEW ORLEANS • NEW YORK • NEWARK • ORANGE COUNTY • PHILADELPHIA • PHOENIX • PITTSBURGH
PORTLAND • PROVIDENCE • RALEIGH • SACRAMENTO • SAN BERNARDINO • SAN DIEGO • SAN FRANCISCO • SEATTLE • TAMPA • TEMECULA • TUCSON • WEIRTON • WICHITA
4814-3348-4718.8

March 7, 2016
Page 2 of 10

## I.    Items of Borrower Default

This letter constitutes Lender's demand that Borrower within 30 days from the date of your receipt of this letter, and in the manner hereinafter specified, cure Borrower's current failure to comply with certain covenants and obligations under Loan Agreement Sections 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management Letters"); 5.1(c) ("Annual Budget for the Property"); 5.1(d) ("Knowledge of Event of Default"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); 5.1(h) ("EB-5 Documentation"); 6.1(f) ("Use of Funds"); and 6.1(g) ("Single Purpose Entity").  Failure to do so will give rise to Events of Default.

It appears that Borrower has failed to comply with:

• **Section 5.1(a) ("Operating Statements and Operating Results")** by its failure to provide Lender with Operating Statements for December 2015 and January 2016 (an Operating Statement for February 2016, is due no later than March 25, 2016).  See further discussion at II(A) below.

• **Section 5.1(b) ("Annual Financial Statements; Accountant's Reports and Management Letters")** by its failure to provide any Annual Financial Statements, to wit:  Annual Financial Statements for 2013 and 2014 (the Annual Financial Statement for 2015 is due on or before April 30, 2016).  See further discussion at II(B) below.

• **Section 5.1(c) ("Annual Budget for the Property")** by its failure to deliver the Operating Budget for Fiscal Year 2016.  See further discussion at II(C) below.

• **Section 5.1(d) ("Knowledge of Event of Default")** by: (i) its failure to disclose to Lender until late 2015 (and then only after repeated requests by Lender for information regarding Borrower's use of Loan proceeds and repeated delays and lack of candor by Borrower and its representatives) Borrower's diversion in October 2013 of $25,000,000 of Loan proceeds to third parties; (ii) its ongoing refusal to comply with Lender's various requests for information regarding Borrower's use of Loan proceeds; (iii) its failure to provide Lender with notice as to the steps Borrower has taken, is taking and proposes to take with respect to effecting return and the expenditure of those funds to and for the costs of the Project.  See further discussion at II(D) below.

• **Section 5.1(f) ("Other Information")** by its failure to: (i) respond directly in good faith to repeated requests by Lender for information regarding Borrower's use of Loan proceeds; (ii) provide comprehensive and coherent reconciliations of all expenditures on the various phases and components of the Project; and (iii) since December 2015 provide any meaningful responses to Lender's requests for information regarding status of the Project and use of Loan proceeds.  See further discussion at II(E) below.

March 7, 2016
Page 3 of 10

●    *Section 5.1(g) ("Accountant Reports")* by failing to deliver to Lender any reports prepared by the Accountants in connection with the Audited Financial Statements or any reports prepared by the Accountants in connection with any other annual, interim or special audits or review over the financial statements or practices of Borrower.  See further discussion at II(F) below.


●    Borrower has failed to comply with *Section 5.1(h) ("EB-5 Documentation")* by its failure to provide Lender with all requested EB-5 Documentation regarding the Project, including without limitation, all spending records for incurred development and construction costs of the Project and draw requests submitted relating to the expenditure of funds (including without limitation expenditure of Loan proceeds) on the Project, notwithstanding repeated requests by Lender to Borrower for the EB-5 Documentation, including, (but not limited to) written requests made by correspondence dated September 14, 2015 and December 2, 2015, respectively, from Lender to Borrower.  See further discussion at II(G) below.


●    *Section 6.1(d) ("Inspection of Property; Books and Records; Discussions")* by its refusal to allow Lender or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Borrower's offices at the Property or otherwise.  See further discussion at II(H) below.


●    *Section 6.1(f) ("Use of Funds")* by diversion of $25,000,000 of the proceeds of the Loan.  See further discussion at II(I) and III below.


●    *Section 6.1(g) ("Single Purpose Entity")* by engaging in impermissible transactions with Affiliates in connection with Borrower's diversion of Loan proceeds, which call into question its status as a Single Purpose Entity.  See further discussion at II(J) below.


II.    **Requirements for Cure**

(A)    Borrower must within 30 days from the date Borrower receives this letter, deliver to Lender the Operating Statements for December 2015 and January 2016 respectively, and must on or before March 25, 2016 deliver to Lender the Operating Statement for February 2016. The form of the Operating Statements must be organized so as to clearly and consistently identify each building comprising the Project and the corresponding rent rolls for each such building, as well as the operating income net cash flow results, and comparisons to prior calendar year, and variance to budget reporting, cash flow projections, lease status reports and occupancy summaries for each of the buildings comprising of the Project, in each case broken out by each respective building and using the same designations for the respective buildings consistently applied so as to facilitate tracking across all Operating Statements.

(B)    Borrower is obligated within 120 days after the close of each calendar year (but to date has failed) to provide Lender with annual audited financial statements of Borrower, prepared on a consolidated basis and consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, all in accordance with GAAP, together with

March 7, 2016
Page 4 of 10

related schedules and supporting reports. The financial statements must be accompanied by a certificate executed by Borrower or a CPA acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects (collectively referred to in the Loan Agreement as the "Annual Financial Statements"). Borrower is further obligated to deliver to Lender, together with the Annual Financial Statements, a copy of the accountant's reports and management letters with respect to the calendar year in question.

Borrower must within 30 days from the date it receives this letter, deliver to Lender the Annual Financial Statements for each of the respective years ended December 31, 2013 and December 31, 2014. With respect to the Annual Financial Statements for year ended December 31, 2015 Borrower must deliver that Annual Financial Statement to Lender no later than 120 days from December 31, 2015 as required under Section 5.5(b) of the Loan Agreement.

(C)    Borrower must within 30 days from the date it receives this letter, deliver to Lender the Operating Budget for Fiscal Year 2016.

(D)    Borrower representative, Stuart Lichter must within 30 days from the date Borrower receives this letter, meet with Lender's representatives at Borrower's offices at the Project and engage in good faith and candid discussions with Lender and its representatives regarding the circumstances surrounding, and questions presented by the Diversion Notes and Borrower's diversion of Loan proceeds, the ramification thereof, delays in completion of the Project and such other relevant matters as may be presented by Lender.

(E)    Borrower must within 30 days from the date Borrower receives this letter deliver to Lender the information and documents and take the actions listed, and fully answer the questions set forth, in the attached Schedule A;

(F)    Borrower must within 30 days of the date of its receipt of this letter, provide Lender with copies of all audited Annual Financial Statements for 2013 and 2014, together with all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection therewith, including all comment letters submitted by the Accountants in connection with such audits, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower. All such materials for and with respect to 2015 must be provided to Lender within the periods specified in Sections 5.1(b) and 5.1(g) of the Loan Agreement.

To date Lender and its representatives have repeatedly made requests of Borrower and its representatives for EB-5 Documentation and on the few occasions when Borrower has responded, Borrower has provided incomplete, inconsistent and confusing responses and documentation.

Borrower must within 30 days of the date of its receipt to the letter, deliver full, complete and comprehensive EB-5 Documentation to Lender and fully comply with its obligations under Section 5.1(h) of the Loan Agreement.

(G)    Article VI of the Loan Agreement (titled "Affirmative Covenants") provides, inter alia, that Borrower must (under Section 6.1(d)) permit any authorized representative or representatives designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom,

March 7, 2016
Page 5 of 10

all at such times during normal business hours and as often as Lender may reasonably request. Borrower is obligated to keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by the Loan Agreement and applicable Requirements of Law, of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

Borrower must within 30 days of the date of its receipt of this letter, allow Lender's representatives to inspect the financial and accounting records and leases of and with regard to the Property and the Project, and to make copies and take extract therefrom during regular business hours at either Borrower's offices at the Property and Borrower's representatives must in connection therewith cooperate in good faith with Lender and its representatives with respect to the scheduling, facilitation and conduct of such inspections.

(H)     Section 6.1(f) of the Loan Agreement (titled "Use of Funds"), requires that the proceeds of the Loan be utilized solely for the purpose of funding costs of the Projects, and in part also requires that the Borrower within the later of (i) 2 years following the funding date of any Tranche or (ii) thirty days following Borrower's receipt of written request of such information from Lender, provide documentation and supporting accounting records and contract documentation demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project. More than 2 years has passed since funding of the Loan, and Borrower has failed to deliver to Lender documentation and supporting accounting records and contract documents demonstrating that all Loan proceeds have been spent directly or indirectly on the Project.

Borrower must within 30 days of the date of its receipt of this letter: (i) deliver to Lender copies of all bank statements, wire transfer instructions, wire transfer confirmations and all other correspondence and emails relating to Borrower's transfer or lending of any Loan proceeds to any of its affiliates or other third parties, including without limitation to S.L. Properties Inc., a Delaware corporation, Industrial Commerce, Ltd., an Ohio limited liability company, and IRG RC Market Buildings LLC; and (ii) effect return of all such Loan proceeds to Borrower for the purposes of expending those funds solely for the uses permitted under the Loan Agreement, and Borrower must provide such proof thereof as Lender may reasonably require.

(I)     Borrower must within 30 days of the date of its receipt of this letter provide Lender with copies of all limited liability company agreements and/or operating agreements of Borrower as well as Borrower's subsidiary, Maple Street Commerce LLC, together with all amendments, schedules and exhibits thereto, including but not limited to all schedules of members, interest holders and their respective membership interests or other interest in and to or with respect of such entities.

III.     **Diversion of Loan Proceeds.**

As you know, on or about May 7, 2012, Borrower and Lender executed the Loan Agreement. Thereafter, pursuant to the Loan Agreement, on or about October 16, 2013, Borrower executed and delivered the $36,000,000 Note and Lender funded the $36,000,000 Loan.

In addition to the explanation of the purposes of the Loan set forth in the Recitals of the Loan Agreement, the Loan Agreement at Sections 2.1(d) ("Requirements of EB-5 Program for Borrower") and Section 6.1(f) ("Use of Funds") are clear as to the purposes of the Loan and the permitted uses of the Loan proceeds by Borrower.  Section 2.1(d) provides that "Borrower shall use the proceeds of the

March 7, 2016
Page 6 of 10

Loan solely for the purpose of funding the construction and cost of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h). Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure period set forth in Section 9.1)."

Section 6.1(f) ("Use of Funds") sets forth Borrower's affirmative covenants that "the proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Loan Agreement for the purpose of funding costs for the Project. Within the later of (i) two (2) years following the funding date of any Tranche or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche where spent directly or indirectly on the Project".

After weeks of repeated and, for the most part, unsuccessful requests by Lender's representatives for information from Borrower regarding its use of the Loan proceeds and status of the Project, Lender was, in November 2015, advised by Messrs. Lichter and Richard Klein, (purportedly the Chief Financial Officer of Borrower's parent entity, Industrial Realty Group), that within the first 2 days following Lender's funding of the $36,000,000 Loan to Borrower, and unbeknownst to Lender and without Lender's permission or consent, Borrower diverted $25,000,000 of the Loan proceeds (which, by the terms of the Loan Agreement were to have been deployed exclusively on the Project), indirectly to two third party entities controlled by Messrs. Lichter and Semarjian and then purportedly loaned by those third parties to IRG RC Market Buildings, LLC, an Ohio limited liability company ("IRG"), another Lichter affiliated entity and the borrower under a separate loan agreement dated May 7, 2012 by and between Lender and IRG (the "Group X/IRG Loan"). The Group X/IRG Loan was made by Lender for an entirely different development project.

The diversion of Loan proceeds from the Project to IRG was according to Messrs. Lichter and Klein evidenced by a series of promissory notes dated as of October 18, 2013, copies of which were after numerous requests by Lender, finally provided by Borrower via email to Lender in December, 2015 (said notes collectively, the "Diversion Notes"). The Diversion Notes purportedly show a flow of $25,000,000 of Loan proceeds from Borrower ultimately to IRG. No supporting or corroborating materials, such as bank statements, financial records or wire transfer instructions or confirmations showing actual transfer of funds have to date been provided to Lender.

Notwithstanding statements previously made by Borrower's representatives regarding the Diversion Notes and use by IRG of the as yet unaccounted for $25,000,000, the balance sheet for IRG for the period ending December 31, 2013 does not reflect the $25,000,000 in question (whether as "assets" or otherwise), nor does it reflect any of the Diversion Notes or any note payable to anyone, other than to Lender under the "EB-5 Note" for $35,000,000 which IRG executed and delivered to Lender in connection with the Group X/IRG Loan.

Similarly, the comparative balance sheets of Borrower as of December 31, 2012 and 2013 do not reflect a reduction of cash as of December 31, 2013 of $25,000,000, nor does it reflect any note receivable of $25,000,000 or otherwise. This raises serious questions concerning whether the copies of the Diversion Notes delivered by Messrs. Lichter and Klein purporting to evidence a loan from Borrower to third party intermediaries and ultimately to IRG, truly reflect the actual disposition of the

March 7, 2016
Page 7 of 10

$25,000,000 of Loan proceeds in question, and requires further accounting as to the disposition of those funds.

Diversion of Loan proceeds by Borrower for use for any purpose other than those permitted under the Loan Agreement undeniably violates Borrower's covenants under the Loan Agreement, including but not limited to Borrower's affirmative covenants at Section 6.1(f).

Upon learning of the apparent diversion of Loan proceeds, representatives of Lender repeatedly attempted to schedule meetings with Mr. Lichter and other Borrower representatives for the purposes of reviewing records and having further discussions to understand what exactly has happened to the Loan proceeds. Lender's requests have to date been met with what can only be described as dissembling, if not outright stonewalling. This is not a matter that can be allowed to remain unresolved, and thus this letter.

**IV.  Litigation Hold/Warning against Spoliation of Evidence**

It is difficult for Lender to believe that Borrower or Mr. Lichter and his affiliates would actually misappropriate $25,000,000 of Loan proceeds. Lender wants to give Borrower and Messrs. Lichter, Semarjian and their affiliates the benefit of the doubt as to their intentions, and the opportunity to explain their actions and rectify the current situation, in the hope that declaration of Events of Default and subsequent resort to Lender's various remedies can be avoided. However, the apparent refusal by Borrower, Mr. Lichter and their respective affiliates to engage in forthright discussions with Lender regarding the issues at hand only serves to aggravate matters.

We hope these issues can be resolved amicably, however, Borrower needs to fully comply with the various requests set forth above, in good faith and in a timely manner. We invite a call, or face to face meeting with all concerned parties within 10 days of your receipt of this letter to discuss these issues and various potential paths forward. Borrower's failure to respond in a satisfactory manner, and to in good faith and in a timely fashion comply with Lender's requests as set forth above, may leave Lender with little choice but to pursue appropriate legal action.

Regardless of whether litigation is in state or federal court, similar rules require that Borrower and its attorneys preserve information that may be relevant to any such lawsuit, and such lawsuit would obligate Borrower and its attorneys to impose a "litigation hold" to preserve all of Borrower's documents and electronically stored information (ESI) which may be relevant in this matter. ESI includes data on all computers, networks, storage devices including back up tapes and USB drives, voicemail, and even cell phones and pdas.

"ESI" also includes but is not necessarily limited to, all text files (including word processing documents), Microsoft excel files and all other spreadsheets and charts, emails files and information concerning emails (including logs of email history and usage, header information and "deleted" files), Microsoft outlook and/or other similar files, internet history files and preferences, graphically image files, including but not limited to files with .gif, .tiff, .bmp and .jpg extensions, Portable Document Format (pdf) files and all other read only and/or limited access files, data bases, calendar and scheduling information, computer system activity logs, telephone logs, voicemails and all files fragments and backup files. This list is illustrative, not exhaustive.

March 7, 2016
Page 8 of 10

    We believe that discoverable evidence in the form of "hard copy" documents and ESI may exist in your computer systems, including computers used by your employees and agents, and third parties acting on behalf of or in concert with Borrower and/or its affiliates. Accordingly, this letter shall also serve as notice and demand that such evidence, and all such hard copy, and other discoverable documents, be immediately preserved and retained. Additionally, the continued operation of your computer systems will likely result in the destruction of potentially discoverable evidence due to the fact that electronic evidence can be easily altered, deleted or otherwise modified. The failure to preserve and retain ESI constitutes spoliation of evidence and may subject you and your affiliates to significant adverse consequences, including legal claims for damages and/or evidentiary and monetary sanctions. Please advise all appropriate third parties to preserve and retain all ESI generated or received, including but not limited to the ESI, relating to the issues that are subject to the matters described above.

    You and any third parties acting on your behalf must refrain from removing or altering internal or external drives and media attached thereto from any stand alone personal computers, network workstations, notebook and/or laptop, computers, and all wireless devices, including but not limited to personal digital assistance, blackberry, mobile telephones and paging devices. This includes emails sent or received by any employees or other "active information stored" on your services or those of persons acting for or on your behalf. You and your affiliates are obligated to take affirmative steps to prevent anyone with access to its data, systems and archives from seeking to modify, destroy, delete, overwrite or hide electronic evidence on network or local drives, including backup tapes or other storage media, whether online or offline, even if the information was deleted at some prior time.

    Please govern yourselves accordingly.

Very truly yours,

Jeffrey D. Weinstock of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc:  Via Federal Express
    Fainsbert Mase & Snyder, LLP
    11835 West Olympic Boulevard, Suite 1100
    Los Angeles, CA 90064
    Attention: John A. Mase, Esq.

    Via Federal Express
    Fainsbert Mase Brown & Sussman, LLP
    1110 Santa Monica Boulevard, Suite 870
    Los Angeles, CA 90025
    Attention: Dean Sussman

    Via Federal Express
    Christopher S. Semarjian
    c/o Alan R. Daus & Associates
    3401 Enterprise Park Place, Suite 105
    Cleveland, OH 44142

Via Email:
CMB Infrastructure Investment
  Group X, L.P.
Attn: CMB Summit, LLC00
    Patrick F. Hogan,
    Managing Member

March 7, 2016
Page 9 of 10

Schedule A

1.     Identify, and provide the address, telephone number, email address and other contact information of and with respect to the Accountants (including all contact persons within any accounting firm so identified and with whom Lender may communicate with regard to and who has knowledge of the matters referred to in Section 5.1(f) of the Loan Agreement;

2.     Deliver to the Accountants the letter called for under Section 5.1(f), instructing the Accountants to disclose the aforesaid information to Lender in compliance with Section 5.1(f); and simultaneously therewith furnish Lender with an executed copy of that letter.

3.     Deliver to Lender:

(a)     cash flow projections for the Project, broken out by each building comprising, and each phase of, the Project; budgets, operating statements (for year to date 2016 and for 2015), complete rent rolls identifying each building comprising the Project (using consistent nomenclature and designations for the respective buildings and phases of the Project) and for each suite, office or other premises within or comprising the Project; lease expiration reports and leasing status reports;

(b)     comprehensive and detailed general ledgers of all expenditures to date for and with respect to each component of the Project, together with all invoices for same, organized in accordance with the order in which they are presented in the aforesaid general ledger;

(c)     general ledgers and/or detailed spending records for and with respect to any other related costs, expenses or expenditures for or with respect to the Project - (whether in connection with municipal county, state, federal or other governmental authorities, tenants or otherwise) together with all corresponding invoices; and

(d)     all reports of, and all correspondence from or to environmental consultants with respect to the Property, the Project or any part thereof, and copies of all correspondence to or from any government agency or authority regarding any environmental condition, environmental law or regulation, or any environmental remediation effected or required to be effected on, below or with respect to the Property, Project or any part thereof, including without limitation all reports prepared by Hull and Associates for or in connection with the Property or Project.

4.     Advise with specificity, as to each element of environmental remediation of or with respect to the Property or Project or any part thereof, which as of the date of this letter: (i) has been completed; (ii) has been identified as being required but has not been completed (with respect to each such item, provide description of the progress made towards completion of such item and all expenditures in connection therewith, all actions remaining together with estimated cost of completion);

5.     Provide true and complete copies of all studies, reports and analyses, including Phase 1 and Phase 2 environmental audits, prepared by or for Borrower or any of its subsidiaries or affiliates with regard to the Property or Project, together with all correspondence between Borrower or any of its subsidiaries, affiliates or their respective representatives, on the one hand, and any state or federal government, official, agency or authority on the other, regarding environmental condition, or remediation of the Property or Project or any part thereof, or any actual or potential requirement for

March 7, 2016
Page 10 of 10

environmental remediation of or with respect to the Property or Project or any part thereof, together with budgets for all such remaining remediation.

      6.    Identify all outstanding mortgages, liens and other encumbrances filed of record against, or otherwise encumbering, the Property or any part thereof, including without limitation all liens filed by any persons or entities for or with respect to labor, services or materials provided to or for the benefit of the Property or Project and with respect to each such mortgage, lien or encumbrance, the principal amount thereof, and interest accruing thereon.

      7.    With respect to each part of the Project (e.g. demolition/renovation, site preparation, permitting, architectural/engineering, environmental, remediation, residential, commercial office, retail, industrial, warehouse, public facilities and common areas, etc.), provide percentage completion to date and projected costs of completion and completion dates.

      8.    With respect to each part of the Project, provide a table of expenditures to date, together with status and/or completion date for each item listed and indicating with respect to each such expenditure, the amount or percentage allocated to direct investment by Borrower, financing from Lender, and financing provided by third parties.

      9.    Provide the following information with regard to all distributions received by Borrower from Maple Street Commerce LLC – amount and nature of distribution, (whether cash or other property and if other than cash, provide description of property distributed); and the dates thereof.

      10.    List and describe (and identify all parties and claimants under or with respect to) all currently pending and threatened claims or litigation against Borrower or its subsidiary, Maple Street Commerce LLC or any of their respective parents, subsidiaries or affiliates, which in any respect relates to the Property or Project or any labor, services or materials provided by any person or entity for or in connection with the Property or Project.

      11.    Please advise whether Borrower or its subsidiary, Maple Street Commerce LLC engages the services of an architect, engineer, Project manager or any other person charged with primary responsibility for overseeing progress of the Project and/or or facilitating payment of invoices for labor, services or materials relating to the Property or Project; identify and provide contact information for each such person.