# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **CMB Infrastructure Investment Group X, L.P.,** ) | **CASE NO.:** 2016 CV 02717 |
| an Illinois Limited Partnership ) | |
| 7819 42nd Street, West ) | |
| Rock Island, Illinois 61201 ) | |
| ) | JUDGE: |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| v. ) | |
| ) | |
| **Maple Street Investors LLC**, an Ohio Limited ) | |
| Liability Company, ) | |
| c/o Hurtuk & Daroff Co., LLP ) | |
| 6120 Parkland Boulevard, #100 ) | |
| Cleveland, Ohio 44124 ) | |
| ) | |
| And ) | |
| ) | |
| **Stuart Lichter**, individually, ) | |
| c/o Industrial Realty Group, LLC ) | |
| 12214 Lakewood Boulevard ) | |
| Downey, CA 90242 ) | |
| ) | |
| Defendants. ) | |

Plaintiff, CMB Infrastructure Investment Group X, L.P., by and through undersigned counsel hereby sues Defendants, Maple Street Investors LLC, and Stuart Lichter, seeking money damages, equitable, and other relief, and alleges as follows:

### Nature of the Case

1.     This is an action for breach of contract, specific performance, and injunctive relief, arising from a borrower's misrepresentations and deliberate concealment of its failure to comply with the terms of a loan agreement and a guarantor's failure to honor a guaranty.

2.      On May 7, 2012, Plaintiff as "Lender" and Defendant, Maple Street Investors LLC, ("MSI") as "Borrower" entered into a loan agreement (the "Loan Agreement"),[1] a copy of which is attached hereto as Exhibit "A".  Pursuant to the Loan Agreement, MSI borrowed $36,000,000 from Plaintiff (the "Loan") for development of a construction project consisting of the renovation, repurposing and improvement of the former Hoover Vacuum Company campus located on real property in North Canton, Ohio ("Hoover Project").  The Hoover Project is being constructed on real property owned by Maple Street Commerce LLC, an entity owned by MSI.

3.      The principal amount of the Loan bears interest at a fixed rate of six percent (6%). Interest is payable quarterly and by its terms, the Loan was to mature seventy-two (72) months from the initial funding date.  The initial funding date was <u>October 16, 2013.</u>

4.      Under the Loan Agreement, Plaintiff agreed to lend MSI $36,000,000 in authorized EB-5 investment funds to facilitate the development of the Hoover Project pursuant to the provisions of the EB-5 foreign investor program as authorized by the United States Citizenship and Immigration Services (defined in ¶ 28, *infra*).[2]

5.      In the Loan Agreement, MSI delivered covenants to Plaintiff promising to use the Loan proceeds solely for the purpose of funding the construction costs of the Hoover Project. However, Plaintiff has since learned that, in direct contravention of the Loan Agreement, and a mere two (2) days after MSI received the Loan proceeds from Plaintiff, MSI diverted at least

---

[1] The Loan Agreement, Ex. "A", incorrectly names "CMB Investment Group X, L.P." as "Lender" (instead of Plaintiff/Lender's correct name, CMB Infrastructure Investment Group X, L.P.).  In the First Amendment to Loan Agreement dated October 16, 2013 (*see* Ex. "C", *infra*, at para. 6), the parties acknowledged the scrivener's error and agreed that all references to the incorrect name or to "Lender" in the Loan Agreement and in any other Loan Document shall mean and refer to CMB Infrastructure Investment Group X, L.P.

[2] The EB-5 investment program provides foreign investors the opportunity to earn permanent residence in the United States through investing in U.S. projects that create a certain number of jobs. *See, infra.*

2

$25,000,000 of the Loan proceeds. The transfer of Loan funds was made without Plaintiff's knowledge or consent and in violation of the Loan Agreement. Since first learning of the diverted funds, Plaintiff has been attempting to determine the use of the funds and scope of MSI's misreporting.

6.      MSI deliberately concealed from Plaintiff the unauthorized transfer of Loan proceeds by intentional omissions in financial reports and documentation it prepared and delivered to Plaintiff, and in meetings and discussions between MSI's officers and agents and Plaintiff's representatives.

7.      In accordance with the terms of the Loan Agreement, Plaintiff has undertaken repeated and continuing efforts to obtain information and documentation from MSI to ensure that the $36,000,000 loaned to MSI is being used solely for construction of the Hoover Project. In violation of the Loan Agreement, MSI continues to refuse to supply necessary records and reports required by the Loan Agreement, prohibited CMB's access to MSI's offices at the Hoover Project and denied Plaintiff's attempts to inspect MSI's books and records.

8.      Prior to funding the Loan, to induce Plaintiff to commence the raising of funds from foreign investors under the EB-5 Program, MSI delivered to Plaintiff in March 2012 an authorization letter. The authorization letter projected that the Hoover Project construction would be completed by the fourth quarter of 2015 and anticipated the expenditure by MSI of approximately $70,000,000, including private and public funds from sources other than the Plaintiff.

9.      Despite MSI's representations, the Hoover Project is still not complete and $25,000,000 of the projected $70,000,000 of funds required for completion of the Hoover Project have been diverted without authorization, for unknown purposes and uses.

3

10.     As a result of MSI's repeated failure to fully and properly address Plaintiff's requests for information regarding the status of the Hoover Project and the Loan proceeds, Plaintiff, through its counsel, provided notice to MSI of numerous Events of Default under the Loan Agreement. The notice requested that MSI cure those Events of Default as required pursuant to the Loan Agreement.  To date, MSI has failed to cure the Events of Default.

11.     By virtue of the unauthorized transfer of the Loan proceeds, inaccurate and incomplete financial information provided by the MSI and MSI's refusal to meet its reporting requirements, Plaintiff's collateral is compromised and it has incurred damages, including costs associated with attempts to obtain MSI's compliance with its obligations under the Loan Agreement.

12.     Plaintiff seeks damages for the repeated and continuing breach of the Loan Agreement by MSI as well as the accelerated return of all unpaid principal and accrued interest on the Loan.  Plaintiff further demands specific performance of certain provisions of the Loan Agreement which require the production of audited financial statements, operating budgets, records reflecting MSI's financial and operational condition and a forensic examination of the MSI's records.  Plaintiff further seeks injunctive relief enjoining MSI from continuing to violate the terms of the Loan Agreement.

13.     Plaintiff also seeks damages from Defendant, Stuart Lichter ("Lichter"), a fifty-percent (50%) owner of MSI, pursuant to a written Guaranty for his failure to fulfill his obligations under the Guaranty of MSI's obligations of the Loan Agreement.

4

**Parties**

14.     Plaintiff, CMB Infrastructure Investment Group X, L.P. ("CMB") is an Illinois Limited Partnership, with its principal place of business in Rock Island, Illinois. CMB's Co-General Partners are CMB Summit, LLC ("CMB Summit"), a Texas limited liability company, and NK Immigration Services, LLC, a Texas limited liability company.

15.     CMB, at the request of Defendant, originated the Loan and raised capital through EB-5 investors to invest in the Hoover Project. *See* Ex. "A", p. 1.

16.     Defendant, Maple Street Investors LLC ("MSI"), is an Ohio Limited Liability Company with its principal place of business in Summit County, Ohio. The members of MSI are Stuart Lichter, a resident of California, and Christopher S. Semarjian, a resident of Ohio.

17.     Defendant, Stuart Lichter ("Lichter"), a California resident, is the 50% owner of MSI.

**Jurisdiction and Venue**

18.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interest and costs and arises between citizens of different states.

19.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2202 (Injunctions). CMB seeks specific performance and an injunction enjoining MSI from continuing to violate the terms of the Loan Agreement, as further set out below.

20.     This Court has personal jurisdiction over MSI because MSI is an Ohio limited liability company and regularly conducts business in the State of Ohio and has sufficient contacts with the State of Ohio such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. Specifically, the Hoover Project is located in Summit

County, Ohio.  The Parties further consented to jurisdiction in this Court. *See* Loan Agreement, Ex. "A", at § 10.14; and Guaranty (Exhibit B to Exhibit "C"), at § 5.8.

21.  Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this district because the parties consented to such venue in the Loan Agreement and a substantial part of the events or omissions giving rise to the claim occurred in this District.

### Non-Party Affiliates of Defendants

22.  MSI was formed on April 30, 2012, as a "Single Purpose Entity" organized solely for the purpose of acquiring and holding membership interest in Maple Street Commerce LLC ("MSC"), an Ohio limited liability company with its principal place of business in Summit County, Ohio. *See* Ex. "A", pp. 5-6.  Non-Party, MSC holds fee title to the real property and improvements comprising the Hoover Project.

23.  MSI entered into the Loan Agreement with CMB on May 7, 2012, for the funding of the redevelopment of real property and improvements at the Hoover Project.

24.  Non-Party, IRG RC Market Buildings, LLC ("IRG"), is an Ohio limited liability company with its principal place of business in Akron, Ohio.  IRG was formed on June 10, 2011. IRG entered into a loan agreement with CMB on May 7, 2012, for the funding of the redevelopment of certain property located in Akron, Ohio and which property was formerly owned and operated by Goodyear Tire & Rubber Company in Akron, Ohio (the "Goodyear Project").

25.  Non-Party, IRG Rubber City, LLC ("IRG RC"), is a Delaware limited liability company.  IRG RC is the sole Member of IRG RC Market Buildings, LLC.

26.  Non-Party, S.L. Properties, Inc. is a Delaware corporation and is a Manager of MSI, IRG, and IRG RC. The President of S.L. Properties, Inc. is Lichter.

6

27.     Non-Party, Industrial Realty Group, LLC is a Nevada limited liability company with its principal place of business in Henderson, Nevada, and is the parent company of MSI and IRG. The President and Manager of Industrial Realty Group LLC is Lichter. MSI and IRG are affiliates by virtue of their common ownership.

## The EB-5 Program

28.     In 1990, Congress created the EB-5 Visa Program to provide prospective immigrants with the opportunity to become lawful U.S. permanent residents by investing in the U.S. economy. The EB-5 Visa Program is overseen by the U.S. Citizenship and Immigration Services ("USCIS"). *See* USCIS Policy Memorandum PM-602-0083, dated May 30, 2013, available at www.uscis.gov/laws/policy-memoranda.

29.     To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (see *infra*) in a commercial enterprise approved by the USCIS ("EB-5 Investor"). Once the investment is effected, the EB-5 Investor may apply for a 2-year conditional green card. If the investment creates or preserves at least ten (10) U.S. jobs during those two years, the EB-5 Investor may apply to have the conditions removed from the green card. Once the conditions are removed, the EB-5 Investor is allowed to live and work in the U.S. permanently.

30.     In 1992, a program was launched that set aside a certain number of EB-5 visas for investments that were affiliated with an economic unit known as a "Regional Center."

31.     A Regional Center is defined as any economic entity, public or private, which is involved with the promotion of economic growth, improved regional productivity, job creation, and increased domestic capital investment. EB-5 Regional Centers are designated by the USCIS to administer EB-5 investment projects based on proposals for promoting economic growth.

## CMB's Regional Centers

32.     CMB is an affiliated entity of CMB Summit, a federally-designated Regional Center with a geographic scope that encompasses Ohio.  CMB, through CMB Summit, is authorized to raise capital under the EB-5 Program.  Funds raised by CMB through CMB Summit from EB-5 Investors may be combined with additional public and private funds to finance the construction of a specific project or projects within the geographic region covered by the Regional Center.

33.     Through its Regional Center partnerships, CMB Summit seeks to assist needy U.S. communities by channeling foreign national investment capital into larger infrastructure construction projects such as roads, sewers, water, electricity generation, transportation, communication upgrades, and public and private building structures.

34.     As an approved Regional Center, CMB Summit is governed by the rules and regulations promulgated under the EB-5 Program.  CMB must comply with USCIS rules in order to protect CMB Summit's designation as a Regional Center as well as the immigration pursuits of the various limited partners in its Regional Center sponsored EB-5 limited partnerships.

## Factual Background

## CMB and MSI Loan Agreement

35.     On March 7, 2012, Lichter, on behalf of MSI, delivered a letter to Patrick F. Hogan ("Hogan"), the then President of CMB Summit ("MSI Authorization Letter"), authorizing CMB Summit to raise $36,000,000 in loan financing (referred to in the MSI Authorization Letter as the "CMB Maple Street Loan") for the Hoover Project.  *See* MSI Authorization Letter, attached hereto as Exhibit "B".

36.    In the MSI Authorization Letter, Lichter expressly represented that "[t]he CMB Maple Street Loan will be used by MSC to fund a portion of the needed equity commitment to the former Hoover Company projects and shall provide significant assistance to the further development of the former Hoover Company properties listed in the table above." *Id.*

37.    Lichter further represented to CMB that the total capital expenditures on the Hoover Project "are expected to exceed $70 million", of which $36,000,000 would be funded through the CMB Maple Street Loan and an additional $34,800,000 would be raised from a combination of public and private funds.  The Hoover Project was projected to be completed by the fourth quarter of 2015. *Id.*

38.    In reliance on the MSI Authorization Letter and the terms, conditions, and covenants of the Loan Agreement, on May 7, 2012, CMB entered into the Loan Agreement with MSI, agreeing to loan $36,000,000 to MSI "solely for the purpose of funding the construction costs of the [Hoover] Project." *See* Ex. "A", at § 2.1(d).

39.    MSI violated Section 2.1(d) (as well as Section 6.1(f)) of the Loan Agreement when it misappropriated Loan proceeds.  Instead of using the Loan proceeds as specifically required in the Loan Agreement, MSI claims that, within days of the funding of the Loan, and without notice to or consent of CMB, it transferred $25,000,000 of the Loan proceeds to intermediaries which then loaned those funds to an affiliate, IRG, for use in the Goodyear Project.  CMB has been unable to verify the true use of the Loan proceeds.

40.    The Loan Agreement also requires MSI to provide CMB with audited financial statements and accounting reports as well as EB-5 documentation and other information within specified time periods, including Sections: 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management

9

Letters"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); and 5.1(h) ("EB-5 Documentation").

41.    Section 5.1(a) of the Loan Agreement (titled "Operating Statements and Operating Results") requires MSI, as Borrower, to deliver or cause to be delivered to CMB, as Lender:

> As soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, (i) monthly operating statements, which operating statements shall include actual monthly and year-to-date net operating income and net cash flow results and comparison to the prior calendar year, and variance to budget reporting, detailed rent rolls, cash flow projections, lease status reports and occupancy summaries in the form customarily generated by Borrower for the Property, dated as of the last day of such calendar month, in form and substance satisfactory to Lender, certified to Borrower as being true, correct, and complete in all material respects (each, an **"Operating Statement"**).

42.    Section 5.1(b) of the Loan Agreement (titled "Annual Financial Statements; Accountant's Report and Management Letters") requires Borrower, to deliver or cause to be delivered to Lender:

> Within one hundred twenty (120) days after the close of each calendar year, annual audited financial statements of Borrower, prepared on a consolidated basis, consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, together with related schedules and supporting reports, when applicable. Such financial statements shall be prepared on the basis of GAAP or another accounting method approved by Lender and shall be accompanied by a certificate executed by Borrower or a certified public accountant acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects. Such financial statements are collectively referred to herein as the **"Annual Financial Statements"**. Together with the delivery of such Annual Financial Statements pursuant to this Section 5.1(b), Borrower shall deliver to Lender a copy of the accountant's reports and management letters with respect to such calendar year.

43.    Section 5.1(f) of the Loan Agreement (titled "Other Information") requires Borrower to deliver or cause to be delivered to Lender:

> Such other information, reports, contracts, schedules, lists, documents, agreements and instruments in the possession or under the control of Borrower

with respect to (i) the Property[3], (ii) any material change in Borrower's investment, finance or operating policies, or (iii) Borrower's business, condition (financial or otherwise), operations, performance, properties or prospects as Lender may from time to time reasonably request, including, without limitation, annual information with respect to cash flow projections, budgets, operating statements (current year and immediately preceding year), rent rolls, lease expiration reports and leasing status reports...

44.     Section 5.1(g) of the Loan Agreement (titled "Accountant Reports") requires

Borrower to deliver or cause to be delivered to Lender:

(i) In connection with the audited Annual Financial Statements described in Section 5.1(b) and if at any other time Borrower causes audited financial statements to be prepared with respect to any Fiscal Year, then, within ten (10) Business Days after receipt thereof from the Accountants: copies of such audited financial statements, together with all reports prepared by the Accountants and submitted to Borrower in connection therewith, including the comment letter submitted by the Accountants in connection with such audit, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower.

45.     Section 5.1(h) of the Loan Agreement (titled "EB-5 Documentation") requires

Borrower to deliver or cause to be delivered to Lender:

At any time during the term of this [Loan] Agreement, upon thirty (30) days written request therefor by Lender, EB-5 documentation reports in form and content acceptable to Lender relating to the construction expenditures made by or on behalf of Borrower with respect to the [Hoover] Project, including a description of each such construction expenditure and the date of each such construction expenditure in such detail as reasonably requested by Lender (the "**EB-5 Documentation**"). Borrower shall state in the EB-5 Documentation that total expenditures on the [Hoover] Project at the time of the delivery of the EB-5 Documentation to Lender, which [Hoover] Project expenditures, including the use of additional private and public funds, are estimated as of the date of this [Loan]

---

[3] The Loan Agreement defines the term "Property" as "the project known as the former Hoover Plant located in North Canton, Ohio" which "generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan" and "together with related site improvements, appurtenances, fixtures and tenant improvements, if any, now or hereafter on the Real Property". *See* Ex. "A", p. 1.

Agreement to be approximately $70,000,000.00. Borrower agrees to produce the EB-5 Documentation at its sole cost and expense.

46.     In addition to regular reporting requirements, the Loan Agreement affords CMB the right to visit and inspect the Property, and to inspect and make copies of financial and accounting records and leases "as often as Lender may reasonably request." *See* Ex. "A", Section 6.1(d) of the Loan Agreement, which states:

> 6.1(d) Inspection of Property; Books and Records; Discussions.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request.  Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

47.     As more fully stated below, MSI failed to comply with its aforesaid reporting requirements under the Loan Agreement and has repeatedly disregarded and denied CMB's repeated requests to inspect MSI's books and records.

48.     On October 16, 2013, CMB and MSI entered into a First Amendment to Loan Agreement ("First Amendment") which included additional terms requiring MSI to execute a Pledge Agreement and a Guaranty. *See* First Amendment, attached hereto as Exhibit "C".

49.     Pursuant to the terms of the First Amendment, MSI, on October 16, 2013, executed and delivered a promissory note evidencing CMB's funding of the Loan to MSI under the Loan Agreement, in the original principal amount of $36,000,000.  A copy of the Maple Street Investors LLC Promissory Note is attached hereto as Exhibit "D", (the "Note").  The Note states "[t]his Note shall not be assigned by either party without the written permission of the other party, which permission shall not be unreasonably withheld." *Id.*

12

50.     Although projected to be completed in the fourth quarter of 2015, to date, the Hoover Project remains unfinished and the Loan proceeds are not accounted for.

**MSI Deliberately Conceals the Unauthorized Diversion of Loan Proceeds**

51.     On March 7, 2012, Lichter sent a separate Authorization Letter on behalf of IRG ("IRG Authorization Letter"), to Hogan authorizing CMB Summit to raise an additional $35,000,000 in loan financing for funding improvements to properties formerly owned and operated by Goodyear Tire & Rubber Company and located in Akron, Ohio ("CMB Goodyear Project Loan"). See IRG Authorization Letter, attached hereto as Exhibit "E".

52.     In the IRG Authorization Letter, Lichter represented that the Goodyear Project would exceed $252 million in total funding, including the $35,000,000 to be funded by CMB. *Id.*

53.     As was the case in the MSI Authorization Letter, the IRG Authorization Letter identified the use of loan proceeds, specifically for use in development of the Goodyear Project: "to fund a portion of the needed equity commitment to the existing Goodyear Headquarters Buildings projects and shall provide significant assistance to the further development of IRG RC properties." *Id.*

54.     Contemporaneous with the execution of the Loan Agreement, on May 7, 2012, CMB also entered into a loan agreement with IRG for a loan for the financing of the Goodyear Project in the amount of $35,000,000 ("IRG Loan Agreement").

55.     On August 7, 2013, IRG executed and delivered to CMB a $35,000,000 promissory note in accordance with the IRG Loan Agreement.

56.     Pursuant to the loan documents, both MSI and IRG, respectively, were obligated to provide regular reporting to CMB regarding their finances and the status of their respective projects.

57.     In the summer of 2015, CMB was attempting to gather from MSI missing information regarding operations and expenditures on the Hoover Project, including Operating Statements required under Section 5.1(a) of the Loan Agreement.  MSI's failure to adequately respond to CMB's requests for information raised more questions regarding where and how the Loan proceeds were spent.

58.     After CMB's repeated requests for an explanation and for details regarding the vague and inconsistent financial information provided to CMB, MSI discontinued any meaningful communication with CMB.

59.     In September 2015, representatives of CMB sent a written request to MSI for the production of documents pursuant to Section 5.1(h) of the Loan Agreement. CMB's requests were ignored by MSI.

60.     On October 21, 2015, CMB's representatives sent another written request to MSI notifying MSI that CMB's representatives would be traveling to the Property for inspection and to make copies of financial and accounting records and leases, pursuant to Section 6.1(d) of the Loan Agreement.

61.     On October 26, 2015, CMB's representatives visited the Property in North Canton, Ohio.  Upon their arrival, they were intercepted by Tracy Green, President of IRG Realty Advisors, who denied the CMB's representatives access to MSI's offices and records. Green stated to the CMB's representatives that he was under direction from MSI not to provide them access to the documentation.

62.     In November 2015, after weeks of unsuccessful attempts by CMB's representatives to elicit responses to various requests for information from MSI regarding its use of the Loan proceeds and status of the Hoover Project, CMB was advised by MSI that days

14

following the October 16, 2013 funding of the $36,000,000 Loan, MSI diverted $25,000,000 of the Loan proceeds to intermediaries who allegedly then loaned those funds to IRG for use in the Goodyear Project.

63.     According to Richard Klein (purportedly the Chief Financial Officer of MSI's parent entity, Industrial Realty Group), and unbeknownst to CMB, on October 18, 2013 (a day after the $36 million Loan from Plaintiff cleared Defendant's bank account), MSI loaned $14,300,000 to S.L. Properties, Inc., the Manager of IRG. On the same date, S.L. Properties, Inc. loaned the entire $14,300,000 to IRG. An additional $10,700,000 was loaned from MSI to Industrial Commerce, Ltd, which in turn then supposedly loaned the $10,700,000 to IRG. To substantiate the alleged loans, MSI produced copies of four (4) purported promissory notes. *See* Promissory Notes, attached hereto as Composite Exhibit "F". MSI has refused to provide any records by which the funds can be traced. Due to MSI's failure to comply with regular reporting requirements or provide any meaningful information, CMB has been unable to verify the unauthorized loans or track the funds. To date, CMB does not know where the diverted Loan proceeds were sent.

64.     MSI - without the knowledge, permission, or consent of CMB and in direct contravention of the representations in the MSI Authorization Letter, the Loan Agreement, and the CMB-MSI Promissory Note - diverted $25,000,000 in Loan proceeds intended for the Hoover Project.

65.     Not only did MSI misappropriate the Loan proceeds but it knowingly and deliberately concealed the transfer of the $25,000,000 in financial statements and other reports and failed to disclose the transfer to CMB until December 2015 and then only after CMB had discovered discrepancies in MSI's and IRG's financial reporting.

66.     MSI's actions are in breach of Sections 2.1(d) and 6.1(f) of the Loan Agreement,

which provides:

> 2.1(d) <u>Requirements of EB-5 Program for Borrower</u>. Borrower shall use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h).  Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure periods set forth in Section 9.1).  Borrower further represents that that the total funds anticipated to be expended on the Project, including the use of additional private and public funds, are approximately $70,000,000.00.

> 6.1(f) <u>Use of Funds</u>. The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Agreement for the purpose of funding costs for the Project.  Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project.

67.     MSI had knowledge that it was in breach of the Loan Agreement, yet failed to

provide any notice to CMB in violation of Section 5.1(d) of the Loan Agreement, which provides

as follows:

> 5.1(d) <u>Knowledge of Event of Default.</u>  Promptly after Borrower (i) obtains knowledge of any condition or event which constitutes an Event of Default or Unmatured Event of Default, or becomes aware that Lender has given notice or taken any action with respect to a claimed Event of Default or Unmatured Event of Default or (ii) obtains knowledge of any condition or event which has a Material Adverse Effect, a notice specifying the nature and period of existence of such condition or event, or specifying the notice given or action taken by Lender and the nature of such claimed Event of Default, Unmatured Event of Default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto.

68.     Moreover, IRG – the purported ultimate beneficiary of the $25,000,000

unauthorized transfers – never reported the aggregate $25,000,000 in loans it supposedly

received from S.L. Properties, Inc. and Industrial Commerce, Ltd in any financial statements or reports provided to CMB, nor did it disclose the alleged $25,000,000 in unauthorized transfers until December 2015.

69.     Additionally, MSI has failed to deliver to CMB the EB-5 Documentation for the Hoover Project, in direct violation of Section 5.1(h) of the Loan Agreement.

70.     CMB remains in doubt as to what happened to the Loan proceeds, where the proceeds are now, whether sufficient funds are available to complete the Hoover Project, and the true condition of MSI and the Hoover Project.

## COUNT I

### Breach of Loan Agreement and Acceleration of Repayment Against MSI

71.     CMB re-alleges and incorporates herein paragraphs 1 through 70, herein.

72.     CMB and MSI are parties to a May 27, 2012 written Loan Agreement.

73.     CMB performed its contractual obligations under the Loan Agreement by, *inter alia*, disbursing to MSI the amount of $36,000,000.  CMB provided proper notice to MSI pursuant to Section 9.1(b) (Event(s) of Default) and 9.2(a) (acceleration of the loan) of the Loan Agreement.

74.     MSI has breached the Loan Agreement by failing to comply with its obligations under the Loan Agreement.  Specifically:

> a.  Section 2.1(d) – Failing to use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project;
>
> b.  Section 5.1(a) – Failing to provide CMB with monthly Operating Statements;
>
> c.  Section 5.1(b) – Failing to provide CMB with "Annual Financial Statements" (as defined in Section 5.1(b), *see supra,* p. 9, for 2013, 2014, and 2015;

d. Section 5.1(d) – Failing to disclose to CMB until December 2015 (and then only after repeated requests by CMB for information regarding Defendant's use of Loan proceeds) MSI's diversion in October 2013 of $25,000,000 of Loan proceeds to third parties;

e. Section 5.1(f) – Failing to properly account for, and respond directly and in good faith to repeated requests by CMB for information regarding MSI's use of Loan proceeds;

f. Section 5.1(g) – Failing to deliver to CMB any annual audited financial statements or any reports prepared by MSI's accountants in connection with the Audited Financial Statements or any accountant reports in connection with any other annual, interim, or special audits or review over the financial statements or practices of MSI;

g. Section 5.1(h) – Failing to provide CMB with all requested EB-5 Documentation regarding the Hoover Project;

h. Section 6.1(d) – Refusing to allow CMB or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Defendant's offices at the Property or otherwise;

i. Section 6.1(f) – Diverting and failing to account for $25,000,000 of the proceeds of the loan; and

j. Section 6.1(g) – Engaging in impermissible transactions with S.L. Properties, Inc., and Industrial Commerce, Ltd, in connection with Defendant's diversion of loan proceeds.

18

75.     MSI's breaches of the aforementioned Sections are material and have resulted in Events of Defaults under Section 9.1 of the Loan Agreement, which states, in part:

> 9.1 EVENTS OF DEFAULT: Each of the following occurrences shall constitute an "**Event of Default**" under this [Loan] Agreement:
>
> (b) <u>Other Defaults</u>. Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this Agreement which could lead to a Material Adverse Effect[4] (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law)[5].
>
> (h) <u>Transfer of Assets</u>. The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this Agreement, or as otherwise permitted by the Loan Documents."

76.     The diversion of $25,000,000 in Loan proceeds is a Material Adverse Effect.

77.     Upon the occurrence of an Event[s] of Default by MSI, the Loan Agreement expressly authorizes CMB to "institute any proceeding at law or in equity to enforce the obligations of Borrower under this Agreement and/or any covenants and obligations of Lender contained in this Agreement." *See* Ex. "A", at § 9.2(d).

78.     Further, upon the occurrence of an Event of Default, Section 9.2(a) of the Loan Agreement provides:

> 9.2(a) Acceleration, Etc. Upon the occurrence and during the continuance of any Event of Default, at the option of Lender, the unpaid principal amount of and any and all accrued interest on the Loan shall become immediately due and payable,

---

[4] The Loan Agreement defines "Material Adverse Effect" to mean, with respect to Borrower, a material adverse effect upon the condition (financial or otherwise) of Borrower. *See* Ex. "A", p. 4.

[5] *See* Letter dated March 7, 2016, from CMB to MSI, demanding compliance with the Loan Agreement, attached hereto as Exhibit "G". *See also* para. 80, *infra*.

with all additional interest from time to time accrued thereon and without presentment, demand or protest or other requirements of any kind (including, without limitation, valuation and appraisement, diligence, presentment, notice of intent to demand or accelerate or notice of acceleration), all of which are hereby expressly waived by Borrower, and the obligations of Lender to make any further disbursement under the Loan shall thereupon terminate.  On or after the Maturity Date, subject to the provisions of this Agreement and the other Loan Documents, Lender may exercise any or all rights and remedies under the Loan Documents or applicable law.

79.     As a result of MSI's breaches, CMB has suffered damages and has opted to accelerate the repayment of the loan pursuant to Section 9.2(a).

80.     By letter dated March 7, 2016, CMB, through counsel, notified MSI of its failures to comply with the Loan Agreement and demanding cure. *See* Exhibit "G".  MSI has failed to cure the defaults.

81.     By letter dated September 30, 2016, CMB provided MSI with a demand for the acceleration of the repayment of the unpaid principal on the loan and including any and all unpaid interest. *See* Exhibit "H", attached hereto.

82.     CMB is entitled to recover from MSI all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

WHEREFORE, CMB demands judgment against MSI for the following:

   a.   The immediate repayment of the unpaid principal amount of the Loan of $36,000,000 plus all accrued interest;

   b.   Monetary damages;

   c.   Interest;

   d.   All reasonable out-of-pocket costs and expenses, including attorney fees.

   e.   Injunctive relief enjoining MSI from further violations of the Loan Agreement; and

20

f.   All such other and further relief as the Court deems just and proper.

## COUNT II

### Specific Performance Against MSI

83.   CMB re-alleges and incorporates herein paragraphs 1 through 70 and 74, herein.

84.   MSI is in default for failure to comply with its obligations under the Loan Agreement.

85.   CMB seeks relief from the Court in the form of an judgment requiring MSI to specifically perform its obligations under the Loan Agreement as provided in the following sections:

6.1(d) Inspection of Property; Books and Records; Discussions. Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request. Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this [Loan] Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

86.   Section 6.1(f) of the Loan Agreement provides:

6.1(f) Use of Funds. The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this [Loan] Agreement for the purpose of funding costs for the [Hoover] Project. Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, [MSI] shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the [Hoover] Project.

87.   An "Event of Default" is defined in Section 9.1 of the Loan Agreement, and includes, in part:

9.1 EVENTS OF DEFAULT:  Each of the following occurrences shall constitute an "Event of Default" under this [Loan] Agreement:

(b) <u>Other Defaults</u>. Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this [Loan] Agreement which could lead to a Material Adverse Effect (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law).

(h) <u>Transfer of Assets</u>. The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this [Loan] Agreement, or as otherwise permitted by the Loan Documents.

An Event of Default shall be deemed "continuing" until cured or waived in writing in accordance with Section 9.3 or 10.3.

88.     Upon the occurrence of an Event of Default, Section 9.2(b) of the Loan Agreement provides:

9.2(b) <u>Access to Information</u>. If an Event of Default then exists, Lender shall have, in addition to and not by way of a limitation of any other rights and remedies contained in this [Loan] Agreement or in the other Loan Documents[6], the right within forty-eight (48) hours after notice to Borrower to obtain access to Borrower's records (including computerized information, files and supporting software) and its accounting information, and to use all of the foregoing and the information contained therein in any manner Lender deems appropriate. Borrower hereby authorizes any accountant or manager employed by Borrower to deliver such items and information to Lender. Notwithstanding anything to the contrary contained in the Loan Documents, upon the occurrence of and during the continuance of an Event of Default, Lender shall be entitled to request and receive, by or through [MSI] or appropriate legal process, any and all information concerning Borrower or any of its property which is reasonably available to or obtainable by Lender.

---

[6] The Loan Agreement defines "Loan Documents" as "those agreements, instruments and documents (together with any amendments and supplements thereto and replacements thereof, and in recordable form, if necessary) listed on <u>Exhibit C</u> [of the Loan Agreement] as Loan Documents and any other agreements, instruments or documents previously or hereafter executed by Borrower which evidence or secure the Obligations. *See* Ex "A", p. 4.

89.     In an Event of Default, Section 9.2(d) of the Loan Agreement affords CMB the right to institute any proceeding at law or in equity to enforce the obligations of MSI under this Agreement and/or any covenants and Obligations of MSI contained in this Agreement.

90.     By letter dated March 7, 2016, CMB, through counsel, requested pursuant to above-referenced Sections of the Loan Agreement, that MSI, *inter alia*, deliver to CMB certain information and documents regarding the accounting, finances, and EB-5 Documentation of the Property and the Project within thirty (30) days. *See* Ex. "G".

91.     In that same letter, CMB requested, pursuant to Section 6.1(d) of the Loan Agreement, that MSI allow CMB's representatives to inspect and make copies of the financial and accounting records and leases of the Property and the Project within 30 days.

92.     MSI should further be required to provide all of the information and documents demanded by CMB and to which CMB is entitled under Sections 5.1(a), 5.1(b), 5.1(g), and 5.1(h) of the Loan Agreement, including audited financial statements.

93.     Given MSI's pattern of misrepresentation and concealing the $25 million unauthorized transfer of funds, Plaintiff has reasonable justification to question the true use of the loaned funds, MSI'S compliance with the Loan Agreement, as well as the terms of the Promissory Note, and whether MSI has the financial wherewithal and ability to complete the Hoover Project and repay the Loan. CMB must be able to review and verify information associated with the EB-5 Program.

94.     Specific performance is appropriate and necessary to determine MSI's compliance with its covenants under the Loan Agreement. Only through inspection of the records and reports can CMB determine the nature and extent of the use of Loan proceeds,

violations of compliance with the covenants contained in the Loan Agreement, or the extent to which the pledged collateral is compromised.

95.     Moreover, CMB lacks an adequate remedy at law if MSI continues to violate the Loan Agreement by failing to provide required documents and information and permit an inspection of the records. MSI's continued disregard of its obligations under the Loan Agreement jeopardizes CMB's own compliance with USCIS requirements.

96.     CMB has complied with all of its obligations under the Loan Agreement by providing proper written notice pursuant to Section 9.1(b) in the form of the March 7, 2016 letter. *See* Ex. "G".

97.     CMB is entitled to recover from Defendant all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

WHEREFORE, CMB requests that the Court enter judgment in its favor, ordering MSI to provide all records and reports required under the Loan Agreement including Sections 5.1(a), 5.1(b), including audited financial statements, 5.1(g), and 5.1(h), and permit CMB to inspect all of MSI's records including its computerized information, files and supporting software and its accounting information pursuant to Section 9.2(b) through a forensic examination, all reasonable costs and expenses, including attorney fees incurred, together with such all such other relief as it deems just and proper.

## COUNT III

### Breach of Guaranty Against Lichter

98.     CMB re-alleges and incorporates herein paragraphs 1 through 70 and 74 through 81, herein.

24

99.     On October 16, 2013, Lichter, as holder of a 50% membership interest in MSI, entered into a Guaranty of the terms of the Loan Agreement and the $36,000,000 promissory note executed by MSI for the benefit of CMB (referred to in the Guaranty as the "Guaranty Obligations", *see* Section 2.1, *infra*). *See* Guaranty, attached as Exhibit I (the Guaranty is also attached to the First Amendment to Loan Agreement, Ex. "C").

100.    Section 2.1 of the Guaranty provides that Lichter, as Guarantor:

hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitation set forth in Section 2.7, the "Guaranteed Obligations"). Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligator, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

101.    Section 2.7 of the Guaranty provides that Lichter's obligations as Guarantor are limited to 10% of the $36,000,000 funded under the Loan Agreement:

(a) The total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amount paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap"). Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

102.    On September 30, 2016, CMB provided written notice to Lichter detailing MSI's breaches of its obligations that constitute Guaranteed Obligations as provided in Section 2.1 and 2.6 of the Guaranty. CMB invoked the Guaranty and demanded prompt payment of the

$3,600,000 owed thereunder. *See* Sept. 30, 2016 Correspondence to Lichter, attached hereto as Exhibit "J".

103.    Pursuant to Section 2.6 of the Guaranty, Lichter has failed to provide payment to CMB within twenty (20) business days after receipt of the September 30, 2016 letter.

104.    Lichter has breached his obligations under the Guaranty.

105.    CMB has been damaged by Lichter's breach of the Guaranty.

106.    Pursuant to Section 4.1 of the Guaranty, in the event of a failure by Lichter to pay any amounts due, CMB , as Lender "shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7."

107.    CMB is entitled to recover from Lichter all reasonable costs and expenses including attorney fees incurred by Plaintiff pursuant to the Guaranty at Section 5.2. WHEREFORE, CMB demands judgment against MSI for the following:

        a.  The immediate payment of the Guaranteed amount of $3,600,000 plus all accrued interest;

        b.  Monetary damages;

        c.  Interest;

        d.  All reasonable out-of-pocket costs and expenses, including attorney fees; and

        e.  All such other and further relief as the Court deems just and proper.

LEWIS BRISBOIS BISGAARD & SMITH, LLP
*Attorneys for Plaintiff*

BY:

JOHN R. CHRISTIE (0067570)
TODD GRAY (0071568)
1375 East 9th Street, Suite 1600
Cleveland, Ohio 44114
Phone: 216.344.9422
Fax: 216.344.9421
John.christie@lewisbrisbois.com
Todd.gray@lewisbrisbois.com

Kenneth J. Joyce, (Florida Bar #986488)
Stacy M. Schwartz, (Florida Bar #:520411)
Andrew B. Zelmanowitz, (Florida Bar #74202)
Michael Platner (Florida Bar # 366331)
Jeffrey Weinstock (Ohio Bar # 0066784)
110 S.E. 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Phone: 954.728.1280
Fax: 954.728.1282
Kenneth.Joyce@lewisbrisbois.com
Stacy.Schwartz@lewisbrisbois.com
Andrew.Zelman@lewisbrisbois.com
Michael.Platner@lewisbrisbois.com
Jeffrey.Weinstock@lewisbrisbois.com