# FIRST AMENDMENT TO LOAN AGREEMENT

This First Amendment to Loan Agreement (this "**Amendment**") is made effective as of October  16 , 2013 by and between Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**") and CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("**Lender**").

A.       Borrower and Lender entered into a certain Loan Agreement dated as of May 7, 2012 (the "**Loan Agreement**"), providing for a loan of up to $36,000,000 from Lender to Borrower for the Project, subject to the terms contained therein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.       Borrower and Lender wish to make certain amendments to the Loan Agreement and to correct a scriveners' error in the Loan Agreement, as set forth in this Amendment.

NOW, THEREFORE, in reliance on the foregoing facts and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender agree to amend the Loan Agreement, as follows:

1.       Ownership Structure of Borrower.  Recital C of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"C.       Borrower is currently the holder of a 90% membership interest (the "**MSC LLC Membership Interest**") in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**").  MSC LLC is governed by that certain Operating Agreement of Maple Street Commerce LLC, dated as of November 16, 2007 (as amended from time to time, the "**MSC LLC Operating Agreement**")."

2.       Pledge Agreement.  It shall be a condition precedent to the first disbursement by Lender of the initial Tranche of the Loan on the Initial Funding Date for all of the Members of Borrower to have executed and delivered to Lender the Pledge Agreement.  The form of Pledge Agreement attached to the Loan Agreement as Exhibit A is hereby deleted in its entirety and replaced with Exhibit A attached to this Amendment (and the definition of "**Pledge Agreement**" in Recital B of the Loan Agreement is hereby revised to reflect such substitution).

3.       Guaranty.  It shall be a condition precedent to the first disbursement by Lender of the initial Tranche of the Loan on the Initial Funding Date for Stuart Lichter to have executed and delivered to Lender a Guaranty (the "**Guaranty**"), guarantying a portion of the obligations of Borrower as incurred pursuant to the Loan Agreement.  The form of the Guaranty is attached to this Amendment as Exhibit B.  The Guaranty shall be released and terminated (a) automatically, without further action by any Person, if and when Borrower acquires the remaining 10% of the MSC LLC Membership Interest (i.e. above the 90% of the MSC LLC Membership Interest currently owned by Borrower), and furnishes Lender with reasonably satisfactory evidence of such acquisition, (b) automatically, on the date on which the Guaranteed Obligations (as defined in the Guaranty) are paid in full or extinguished, (c) if Borrower or Guarantor furnishes substitute collateral or security for the Loan, which substitute collateral or security is acceptable to Lender in its sole and reasonable discretion, or (d) when otherwise released or terminated by Lender in writing.

4.       Promissory Note.  The form of Promissory Note attached to the Loan Agreement as Exhibit D is hereby deleted in its entirety and replaced with Exhibit D attached to this Amendment (and

1



PLAINTIFF'S EXHIBIT

tabbies

C

the definition of "Note" in Section 1.1 of the Loan Agreement is hereby revised to reflect such substitution).

5.   Certain Definitions. The following defined terms in the Loan Agreement are hereby deleted in their entirety and replaced with the following:

(a)   In the introductory paragraph of the Loan Agreement and in Section 1.1 of the Loan Agreement: "**Lender**" means CMB Infrastructure Investment Group X, LP, an Illinois limited partnership, organized in accordance with the requirements for regional centers as set forth under the Immigration Act of 1990, as amended, and for the purpose of promoting economic growth through, among other things, increased export sales, improved regional productivity, job creation and increased domestic capital investment, and to generate jobs through the immigrant investor visa program of the USCIS.

(b)   In Recital A of the Loan Agreement: "**Borrower Operating Agreement**" means that certain Operating Agreement of Maple Street Investors LLC, dated as of October ___, 2013, as amended from time to time.

6.   Correction of Scriveners' Error. Due to a scriveners' error, the Loan Agreement and certain other Loan Documents incorrectly referred to Lender as "CMB Investment Group X, LP, an Illinois limited partnership" (instead of its correct name, CMB Infrastructure Investment Group X, LP, an Illinois limited partnership). The parties acknowledge and agree that all references to "Lender" or to "CMB Investment Group X, LP" in the Loan Agreement and in any other Loan Document shall mean and refer to CMB Infrastructure Investment Group X, LP, an Illinois limited partnership. The parties further acknowledge and agree that all references in the Loan Agreement and in any other Loan Document to the "$36,000,000 CMB Investment Group X Loan" shall mean and refer to the "$36,000,000 CMB Infrastructure Investment Group X Loan."

7.   Notice Address for Borrower's Counsel. The notice address for Borrower counsel on the signature page of the Loan Agreement (and in any other Loan Document) is hereby amended to read as follows:

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

8.   Ratification; Conflict. Except as amended hereby, the Loan Agreement remains in full force and effect. In the event of any conflict between the terms and provisions of the Loan Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, this Amendment has been duly executed on the date set forth above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:     **S.L. Properties, Inc.,**
        a Delaware corporation,
        its Manager

        By:     _____
                Stuart Lichter, President


**Lender:**

**CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,**
an Illinois limited partnership

By:     _____
        Name:  Patrick F. Hogan
        Title:  General Partner

IN WITNESS WHEREOF, this Amendment has been duly executed on the date set forth above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:     **S.L. Properties, Inc.,**
        a Delaware corporation,
        its Manager

        By: _____
            Stuart Lichter, President


**Lender:**

**CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,**
an Illinois limited partnership

By: _____
    Name: Patrick F. Hogan
    Title: General Partner

3

## MEMBERSHIP PLEDGE AND SECURITY AGREEMENT

This Membership Pledge and Security Agreement (this "**Agreement**") is made as of October 16, 2013 by the undersigned members (each a "**Pledgor**" and collectively, the "**Pledgor Group**") of Maple Street Investors LLC, an Ohio limited liability company ("**Borrower**"), in favor of CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("**Lender**").

### RECITALS

A.    In accordance with the terms and conditions of that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of October 16, 2013 (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "**Loan Agreement**"), between Lender and Borrower, Lender is making a loan to Borrower in the total principal amount of up to $36,000,000.00 (the "**Loan**"). The Loan is evidenced by the Promissory Note, dated as of the date hereof (the "**Note**"), executed in accordance with the Loan Agreement.

B.    As consideration for Lender's agreement to make the Loan, and as security therefor, each Pledgor has agreed to pledge a portion of the Collateral (as defined below). All capitalized terms used (and not defined) herein shall have the meanings given to them in the Loan Agreement.

NOW, THEREFORE, in consideration for the Loan, and for other good and valuable consideration, each Pledgor agrees as follows:

1.    Definitions.

    1.1.    Certain Defined Terms.    The following additional terms shall have the following meanings:

    "**Collateral**" has the meaning given to it in Section 2.

    "**Controlling Management Interest**" means the management and control over any and all decisions and elections of Borrower, which includes, but is not limited to, all organizational, operational and business affairs of Borrower as set forth in the LLC Agreement, subject to the covenants of Borrower set forth in the Loan Agreement.

    "**Default**" shall have the meaning given to it in Section 17.

    "**Economic Interest**" means all of the economic benefit accrued or accruing, including, without limitation, all proceeds from sale or assignment, rights to dividends and distributions of any type (regular or special, and whether pertaining to profits, return of capital or otherwise) with respect to the Pledged Interest of each Pledgor.

    "**LLC Agreement**" means the Operating Agreement of Borrower, dated as of October 1, 2013, as it may be amended, supplemented or restated from time to time.

    "**Membership Interest**" means each Pledgor's membership interest in Borrower (see Attachment 10.10), and includes any and all benefits to which the holder of such a membership interest may be entitled as provided in the LLC Agreement, including, but not limited to, all profits, distributions and payments now or hereafter due or paid to a Pledgor by or from Borrower on account of such membership interest, all rights of a Pledgor to receive net proceeds of any sale or financing (or refinancing) of the assets of

1

Borrower on account of such membership interest, and all rights to receive cash or any other distributions of property on account of such membership interest, together with all obligations of a Pledgor to comply with the terms and provisions of the LLC Agreement, and all rights with respect to the management of Borrower's activities, subject to the provisions of this Agreement.

"**Person**" means any natural person, corporation, limited partnership, general partnership, joint stock company, limited liability company, limited liability partnership, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, or any other nongovernmental or governmental entity.

"**Pledged Interest**" means one hundred percent (100%) of each Pledgor's individual Membership Interest in Borrower (see Attachment 10.10). The Pledged Interest(s) shall be partially released (and shall therefore decrease) in connection with any Prepayment of Principal by Borrower, as set forth in Section 2.2(b)(iv) of the Loan Agreement.

"**Secured Obligations**" has the meaning given to it in Section 3.

1.2.   Construction. Unless the context otherwise requires: (i) references in this Agreement to any other agreement shall mean such agreement as from time to time amended, supplemented or restated; (ii) references in this Agreement to a particular section of the LLC Agreement or any other document shall include any successor provision; and (iii) references to the plural include the singular and to the singular include the plural. The terms "include" and "including" are not limiting. Except where otherwise indicated, the term "or" has the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby" and "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision. Except where otherwise indicated, references to paragraphs, subparagraphs, sections, subsections, clauses, exhibits and schedules are to this Agreement.

2.   Grant of Security Interest. As security for the full and prompt performance of all of the Secured Obligations, each Pledgor hereby assigns, transfers to, grants a security interest in and pledges to Lender (i) such Pledgor's Pledged Interest, together with all rights (whether now owned or hereafter acquired) in, to and under whatever is receivable or received when such Pledged Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions on such Pledgor's Pledged Interest, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Pledged Interest, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise; and all proceeds, products, additions, accessions, rents, issues, royalties of or to any of the foregoing, in whatever form; and (ii) without limiting the foregoing clause (i), such Pledgor's Economic Interest, together with all rights of such Pledgor, whether now owned or hereafter acquired, in, to and under whatever is receivable or received when such Economic Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary

2

or involuntary; all dividends and distributions thereon, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to or upon conversion of or in exchange for all or any portion of such Economic Interest or other property subject to this Agreement, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise (all of the foregoing, the "**Collateral**").

3.    Secured Obligations. The pledge of the Collateral is made by each Pledgor to secure repayment or performance, as the case may be, of each of the following described obligations to Lender (the "**Secured Obligations**"): (i) the Loan and all other indebtedness, obligations, liabilities, conditions and covenants of Borrower, now existing or hereafter arising, under or in respect of the Note, the Loan Agreement or the other Loan Documents to which Borrower is a party, including all principal, interest (including interest accruing, or that would accrue but for the provisions of applicable law, after the commencement of any bankruptcy or other debtor-relief proceeding in respect of Borrower), premiums, fees, charges, expenses, penalties and other amounts arising under or relating to any of the foregoing, and the performance of each and every condition, covenant and obligation of Borrower thereunder; and (ii) the payment and performance by each Pledgor of each and every obligation, liability, condition, covenant and obligation of such Pledgor created hereby or otherwise arising hereunder.

4.    Rights with Respect to Distributions. At Lender's election, following the occurrence and during the continuance of a Default, all rights of the Pledgor Group to receive dividends, cash, securities, instruments, withdrawals or other distributions or transfers of property in respect of their respective Pledged Interests or other Collateral (collectively, "**Distributions**") shall be vested in Lender, and unless Lender elects otherwise, Lender have the sole right to receive such Distributions and apply them to the Secured Obligations in such order as it may elect in its sole discretion. In all other circumstances, each Pledgor shall have the right to receive Distributions and may apply such Distributions in any manner that it may elect. Without limiting the foregoing, any Distributions received by a Pledgor following the occurrence and during the continuance of a Default shall be received by such Pledgor in trust for the benefit of Lender, shall be segregated from other property or funds of such Pledgor and shall be forthwith delivered to Lender in the same form as so received (with any necessary endorsement).

5.    Voting and Other Rights. Subject to the limitations contained in Sections 11.3 and 19, so long as no Default shall have occurred and be continuing and subject to any other applicable provisions of this Agreement, each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not prohibited by the terms of this Agreement or the Loan Agreement. Lender shall execute and deliver (or cause to be executed and delivered) to each Pledgor such proxies and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and other rights that such Pledgor is entitled to exercise pursuant to the foregoing authorization. At Lender's election, upon the occurrence and during the continuance of any Default, and subject to the limitations set forth in Section 19, all rights of the Pledgor Group to exercise the voting and other consensual rights that the Pledgor Group would otherwise be entitled to exercise hereunder shall cease, and (unless otherwise agreed by Lender) all such rights (and any other rights the Pledgor Group may have in respect of the Pledged Interests) shall thereupon become vested in Lender, which shall thereupon have the sole right to exercise such rights.

3

6.     Obligations Under Other Agreements. The obligations of each Pledgor hereunder shall be in addition to any obligations of such Pledgor or any other Person under any other pledges of security or guaranties or indemnities for the Secured Obligations heretofore, now or hereafter given to Lender.

7.     Separate Actions; Waiver of Statute of Limitations; Reinstatement of Liability. The obligations of each Pledgor under this Agreement are independent of the Secured Obligations, and a separate action or actions may be brought and prosecuted against each Pledgor, whether or not action is brought against any other Person or whether any other Person is joined in any such action or actions. Each Pledgor acknowledges that there are no conditions precedent to the effectiveness of this Agreement and that this Agreement is in full force and effect and is binding on such Pledgor as of the date hereof, regardless of whether Lender obtains additional collateral or guaranties from others or takes any other action contemplated by the Loan Documents. To the extent permitted under applicable law, each Pledgor waives the benefit of any statute of limitations affecting such Pledgor's liability hereunder or the enforcement thereof, and agrees that any payment made on account of the Secured Obligations or other act that tolls any statute of limitations applicable thereto shall also operate to toll such statute of limitations applicable to such Pledgor with respect to its obligations hereunder. The liability of a Pledgor hereunder shall be reinstated and revived, and the rights of Lender shall continue, with respect to any amount paid on account of the Secured Obligations that is required thereafter to be restored or returned by Lender upon the bankruptcy, insolvency or reorganization of Borrower or any other Person or for any other reason, all as though such amount had not been paid.

8.     Financing Statement; Further Assurances; Power of Attorney. Each Pledgor hereby consents to Lender filing a financing statement describing the Collateral being provided by the Pledgor Group, and such financing statement, when filed of record (a) for any Pledgor who is an individual, with the Secretary of State of the State in which such Pledgor has his principal residence, or (b) for any Pledgor that is an entity, with the Secretary of State of the State in which such Pledgor is organized or incorporated, will perfect the security interest in all of the Collateral in which such Pledgor currently has rights. The form of such financing statement (the "UCC-1") is attached hereto as Attachment 8. Each Pledgor agrees that at any time and from time to time, at the expense of such Pledgor, such Pledgor shall promptly execute and deliver all further instruments and documents, and take all further action, that Lender may reasonably request to perfect and protect the security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Each Pledgor hereby irrevocably makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as such Pledgor's true and lawful attorney-in-fact to sign the name of such Pledgor on any financing statement or other writing necessary or reasonably requested by Lender to perfect and maintain a perfected lien on, and security interest in, any Collateral. Without limiting the generality of the foregoing, if at any time after the date hereof all or any portion of the Collateral shall be represented or evidenced by certificates or instruments, all such certificates or instruments representing or evidencing the Collateral shall be delivered to and held by Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Lender. In the event that certificates or instruments evidencing the Collateral are delivered to Lender pursuant to this paragraph, Lender shall have the right, at any time in its discretion and without notice to any Pledgor, to transfer to or to register in the name of Lender or any of its nominees any or all of the Pledgor Group's interest in the Collateral (without affecting the nature of such property as Collateral), subject only to the revocable rights specified in Section 5. In addition, Lender shall have the right at any time to

4

exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

9.  Release of Pledge. Upon repayment in full of all of the Secured Obligations, the obligations of Pledgors under this Agreement shall terminate. The parties acknowledge that, pursuant to Section 2.2(b)(iv) of the Loan Agreement, partial releases of Lender's security interest in the Collateral are permitted and, upon the satisfaction of the criteria for such partial releases pursuant to Section 2.2(b)(iv) of the Loan Agreement, Lender shall execute all documents necessary or reasonably requested by any Pledgor to release the applicable Released Collateral. Any such Released Collateral shall thereafter not be subject to the terms and conditions of this Agreement.

10. Representations and Warranties. Each Pledgor, as to itself only, represents and warrants to Lender as follows:

    10.1. Due Formation and Existence. With respect to any Pledgor that is an entity, such Pledgor is duly organized or incorporated, validly existing and in good standing under the laws of the State of its organization or incorporation, is duly qualified to conduct its business as now conducted and proposed to be conducted, and is in good standing in all jurisdictions where the failure to do so would have a material adverse effect on its business or financial condition.

    10.2. Requisite Power. Such Pledgor has all requisite limited liability company, corporate, or other power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its properties (including owning such Pledgor's Membership Interest) and to carry on its business as now conducted and proposed to be conducted. Such Pledgor has all requisite limited liability company, corporate, or other power to execute, deliver and perform this Agreement and each other agreement, document or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby. With respect to any Pledgor that is an entity, the execution, delivery and performance of this Agreement have been duly authorized by all necessary action by the members, managers, directors, and/or shareholders (as applicable) of such Pledgor.

    10.3. Governmental Consents. No authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the grant by such Pledgor of the security interest created hereunder or the exercise by Lender of the voting or other rights, remedies or powers provided for in this Agreement.

    10.4. Enforceability. This Agreement has been duly and validly executed and delivered by such Pledgor and constitutes the valid and legally binding obligation of such Pledgor, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by principles of equity.

    10.5. No Conflicts. Subject to Borrower's delivery to Lender of the Authorization Notice, neither the execution and delivery by such Pledgor of this Agreement or of any other document or instrument to be executed and delivered by such Pledgor in connection with the transactions contemplated hereby, the consummation of the transactions contemplated hereby, nor compliance by such Pledgor or Borrower with the provisions hereof or thereof (i) requires the consent of any third party or (ii) will conflict with or result in a breach of any of the terms, conditions or provisions of any indenture, agreement, lease or

instrument to which such Pledgor or Borrower is a party or by which such Pledgor or Borrower is bound or to which such Pledgor or Borrower, or any material part of the property of such Pledgor or Borrower, may be subject (including the LLC Agreement), or constitute a breach thereof or a default thereunder, or permit the acceleration of any obligation thereunder, or result in the creation or imposition of any lien of any nature whatsoever (other than the lien created hereby and the other liens permitted by the Loan Documents) upon any of the property of such Pledgor.

10.6. Governing Documents. A true and complete copy of the LLC Agreement, including all amendments and supplements thereto, has been previously delivered to Lender. The LLC Agreement remains in full force and effect as of the date of this Agreement, and is the valid and legally binding obligation of each party thereto, enforceable in accordance with its terms. Borrower has all requisite legal power and all governmental licenses, authorizations, consents and approvals necessary to own and operate its property and any other assets of Borrower and to carry on its business as now conducted and proposed to be conducted. The execution, delivery and performance of such agreements, documents and instruments has been duly authorized by all necessary action by such Pledgor and by Borrower.

10.7. No Other Agreements. Except for the LLC Agreement (as provided to and approved by Lender) and as otherwise previously disclosed to Lender, there are no other agreements or commitments between or among Pledgors relating to the management, voting rights, operations or ownership of Borrower or relating to such Pledgor's Membership Interest or any of Borrower's or such Pledgor's obligations with respect thereto.

10.8. Absence of Liens; Absence of Certificates. Such Pledgor's Membership Interest is owned by such Pledgor free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character, other than the security interest created hereunder. Except as contemplated by or permitted by the Loan Agreement or related to the issuance of the Authorization Notice, the property owned by Borrower is free and clear of all liens, adverse claims, defenses, rights of setoff and counterclaims of any kind or character. The Collateral is not, and will not be, evidenced by any certificate.

10.9. Address. Such Pledgor's address for notices is set forth on the signature page hereof.

10.10. Membership Interests in Borrower. Attachment 10.10 accurately reflects the ownership structure of Borrower, including each Pledgor's percentage ownership interest in Borrower.

11. Certain Covenants of Pledgor. Until all Secured Obligations are paid or performed in full, each Pledgor covenants and agrees as follows:

11.1. No Liens or Transfers. Without Lender's consent, such Pledgor shall not grant, permit or suffer to exist any lien on all or any portion of the Collateral, or agree to do so, except in favor of Lender, nor shall such Pledgor sell or otherwise dispose or transfer of all or any portion of its Pledged Interest.

11.2. Name and Organization. Such Pledgor shall not change its name, the place or structure of its organization (for any Pledgor that is an entity), or the place of his principal residence (for any Pledgor who is an individual), without first giving Lender at least thirty (30) days' written notice of such change and executing such additional

6

documentation as Lender may reasonably require pursuant to Section 8 of this Agreement.

11.3.    Exercise of Voting Rights; Other Changes to Documents. Without Lender's consent (not to be unreasonably withheld), such Pledgor shall not vote or give consent (i) to amend in any material respect the LLC Agreement, (ii) to sell or otherwise dispose of or transfer, or grant any lien on, all or any portion of the assets of Borrower in violation of this Agreement or the other Loan Documents, (iii) to terminate or dissolve Borrower, (iv) except as permitted by the LLC Agreement, to permit any change in the ownership of Borrower, or (v) except as permitted by the LLC Agreement, to admit any additional member to Borrower.

11.4.    Copies of Notices. Such Pledgor shall promptly deliver to Lender copies of all material reports and financial statements, and all other material notices, issued by or delivered to such Pledgor under the LLC Agreement, and such Pledgor shall provide to Lender:

(a)    a copy of each amendment to or restatement of Borrower's articles of organization filed by Borrower promptly (but in any event within ten (10) Business Days) after effecting such filing;

(b)    a copy of each amendment to or restatement of the LLC Agreement promptly after effecting such amendment or restatement; and

(c)    within ten (10) Business Days after its receipt of the written request of Lender therefor, copies of any or all of the business records of Borrower to which such Pledgor is entitled access under the LLC Agreement or applicable law.

12.    Powers of Lender. Each Pledgor appoints Lender (and any Persons designated by Lender for such purpose) as such Pledgor's true and lawful attorney-in-fact to take any action and to execute any instrument that Lender may reasonably deem necessary or desirable to accomplish the purposes of this Agreement. Such power is coupled with an interest, is irrevocable until termination of this Agreement and may be exercised from time to time by Lender's officers and employees, or any of them, in their discretion.

13.    Waivers.

13.1.    Waivers of Rights. Each Pledgor waives any right to require Lender:

(a)    to proceed against any Person, including Borrower or any other pledgor of security for, or guarantor of, the Secured Obligations or any part thereof;

(b)    to proceed against or exhaust any Collateral;

(c)    to proceed against or exhaust any collateral held from any other Person;

(d)    to give notice of the terms, time and place of any public or private sale of personal property security held from such Pledgor or any other Person, except as expressly required under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities);

(e)    to pursue any other remedy in Lender's power; or

(f)    to make any presentment, demands for performance, or give any notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any obligations or evidences of the Secured Obligations, or in connection with the creation of new or additional obligations, whether or not constituting Secured Obligations.

Further, each Pledgor waives all rights and benefits of such Pledgor under California Civil Code Sections 2787 to 2855 inclusive, under California Civil Code Sections 2899 and 3433, and under Chapter 1341 of the Ohio Revised Code (as applicable), each as amended and superseded from time to time.

13.2.    Waivers of Defenses. Each Pledgor waives any defense arising by reason of:

(a)    any disability or other defense to the Secured Obligations of Borrower or any other Person;

(b)    the cessation, from any cause whatsoever (other than payment in full of all Secured Obligations), of any obligation of Borrower or any other Person;

(c)    the application by Borrower or any other Person of the proceeds of any Secured Obligation for purposes other than the purposes represented by Borrower or any other Person to Lender or intended or understood by Lender or such Pledgor;

(d)    any act or omission by Lender which directly or indirectly results in or aids the discharge of Borrower or any other Person or any of the Secured Obligations, or which provides a defense to Borrower or any other Person, by operation of law or otherwise;

(e)    any modification of the Secured Obligations, in any form whatsoever and including the renewal, extension, acceleration or other change in time for payment of the Secured Obligations, or other change in the terms of the Secured Obligations, or any part thereof, including any increase or decrease of the rate of interest thereon;

(f)    any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(g)    Lender's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the United States Bankruptcy Code or any successor statute;

(h)    any borrowing or any grant of a security interest under Section 364 of the United States Bankruptcy Code;

(i)    any statute of limitations affecting the liability of such Pledgor hereunder or the enforcement hereof, and each Pledgor agrees that the payment of all sums payable under the Note or other act which tolls any statute of limitations

applicable to the Note shall similarly operate to toll the statute of limitations applicable to such Pledgor's liability hereunder;

(j) any defense based upon an election of remedies by Lender, including any election to proceed by judicial or nonjudicial foreclosure of any security, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies (including remedies relating to real property or personal property security) which destroys or otherwise impairs the subrogation rights of such Pledgor or the rights of such Pledgor to proceed against Borrower, any other Pledgor or any guarantor for reimbursement, or both (including, if applicable, California Code of Civil Procedure Sections 580a, 580b, 580d, and 726 or Ohio Revised Code Sections 2329.08 and 5721.192); or

(k) any defense or right of subrogation, reimbursement, exoneration, contribution or indemnity, or any right to enforce any remedy which Lender now has or may hereafter have against Borrower, any other Pledgor, or any other Person or any benefit of, or any right to participate in, any security now or hereafter held by Lender pursuant to the Note, the Loan Agreement, the other Loan Documents and/or this Agreement.

13.3    Waiver of Subrogation and Related Rights. Each Pledgor hereby waives, until all Secured Obligations have been paid in full, any right of subrogation, any right of contribution, any right of reimbursement and any right to enforce any remedy that Lender may have against Borrower or any other Person and any right to participate in, or benefit from, any security for the Note or the other Loan Documents now or hereafter held by Lender. Each Pledgor waives any defense it may have based upon an election of remedies by Lender that destroys such Pledgor's subrogation rights or its rights to proceed against Borrower or any other Person for reimbursement or contribution, including any loss of rights such Pledgor may suffer by reason of any rights, powers or remedies of Borrower or any other Person in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging all or any part of the Secured Obligations (including, if applicable, Sections 726, 580b and 580d of the California Code of Civil Procedure or Sections 2329.08 and 5721.92 of the Ohio Revised Code, each as from time to time amended). Without limiting the generality of the foregoing or any other provision hereof (but subject to the first sentence of this Section 13.3), each Pledgor expressly waives any and all benefits which might otherwise be available to such Pledgor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899 and 3433, under California Code of Civil Procedure Sections 580a, 580b, 580d and 726, and under Chapter 1341 and Sections 2329.08 and 5721.192 of the Ohio Revised Code (as applicable). Furthermore, each Pledgor waives as a defense to its obligations hereunder the application of any "one action" or "anti-deficiency" statute or law or other similar statute or law, now or hereafter in effect, in any state in which all or any real property security for either Borrower's, or any other Person's, obligations under the Loan Documents (if any) may be located.

14.    Authorizations to Lender. Each Pledgor authorizes Lender, without notice or demand and without affecting such Pledgor's other liability hereunder, from time to time and at any time:

14.1.    Alterations of Secured Obligations. To alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Secured Obligations or any part thereof, including any increase or decrease of the rate of interest thereon.

14.2. Dealings with Security. To take and hold security other than the Collateral for payment of the Secured Obligations or any part thereof, or for all or any portion of the obligations of any guarantor of the Secured Obligations, and to exchange, enforce, waive, release or perfect or fail to perfect its security interests in the Collateral or any part thereof or any such other security.

14.3. Application of Collateral. During the existence of a Default, to apply the Collateral or any other security and direct the order or manner of sale thereof, including a non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine.

14.4. Dealings with Pledgor, Guarantors and other Persons. To release or substitute any other pledgor of security for the Secured Obligations or any part thereof, or any other Person.

15. Payment of Taxes, Charges, Liens and Assessments. Each Pledgor agrees to pay, prior to delinquency, all taxes, charges, liens and assessments against such Pledgor's interest in the Collateral. Upon the failure of any Pledgor to do so, Lender at its option may pay any of such taxes, charges, liens or assessments and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge them. Any such payments made by Lender shall be obligations of such Pledgor to Lender, due and payable immediately without demand, together with interest at a rate determined in accordance with the provisions of Section 22, and shall be secured by the Collateral, subject to all of the terms and conditions of this Agreement.

16. Continuing Obligations of Pledgor. Lender shall not, by reason of this Agreement, the creation of the security interest in the Collateral provided for herein, the exercise of any remedies as provided hereunder or for any other reason, be responsible or liable in any manner or to any extent for the obligations and liabilities of Borrower or of any Pledgor with respect thereto, whether now existing or hereafter incurred, and all such obligations and liabilities shall at all times and in all events be the responsibilities and liabilities of Borrower and the Pledgor Group only. Without limiting the generality of the foregoing, each Pledgor shall remain liable to observe and perform and shall observe and perform all the conditions and obligations to be observed and performed by it under each agreement, document, or other instrument relating to the Collateral granted hereunder, all in accordance with the terms and conditions thereof.

17. Default. The occurrence of any of the following shall constitute a "Default" under this Agreement:

17.1. Default under Loan Agreement. Any "Event of Default" as defined in the Loan Agreement.

17.2. LLC Agreement. Any material breach by any Pledgor of any of its obligations under the LLC Agreement or any agreements, instruments or documents related to the LLC Agreement beyond any applicable notice and cure periods thereunder.

17.3. Default under this Agreement. Any material breach by any Pledgor of, or failure by any Pledgor to comply with or perform, any provision hereof, or any failure by any Pledgor to pay any amount due hereunder when due; provided, however, that, except for any Pledgor's failure to comply with the provisions of Sections 11.1, 11.2, and 11.3 (which shall be immediate Defaults, with no required notice or cure period), any such breach or failure shall constitute a "Default" only if such failure is not cured within thirty (30) days

after Lender delivers written notice to each Pledgor advising each Pledgor of such breach or failure and demanding that such breach or failure be cured.

17.4. **Insolvency Events.**

    (a)    The institution of a proceeding in a court having jurisdiction seeking a decree or order for relief in respect of Borrower, Stuart Lichter, or Christopher S. Semarjian under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of any such Person for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs, if such proceeding remains undismissed or unstayed and in effect for a period of sixty (60) consecutive days, or such court enters a decree or order granting the relief sought in such proceeding.

    (b)    The institution by Borrower, Stuart Lichter, or Christopher S. Semarjian of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; the consent by Borrower, Stuart Lichter, or Christopher S. Semarjian to the entry of an order for relief in any involuntary proceeding described in Section 17.4(a) or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official for any substantial part of its/his property or for the winding-up or liquidation of its/his affairs; the making by Borrower, Stuart Lichter, or Christopher S. Semarjian of a general assignment for the benefit of creditors; or the general failure by Borrower, Stuart Lichter, or Christopher S. Semarjian to pay its/his debts as they become due.

18.    **Remedies.** Upon the occurrence of a Default, subject to the limitations set forth in Section 19, Lender shall thereupon and thereafter during the continuance thereof have any or all of the rights, remedies and powers to which a secured party is entitled after a default under the provisions of the Uniform Commercial Code as in effect (a) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (b) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), including, without limitation, the right to foreclose on the Collateral, or any portion thereof (including, without limitation, the Pledged Interest or any portion thereof or the Economic Interest or any portion thereof, or both), or any combination of the foregoing; provided that Lender's election to foreclose on less than all of the Collateral shall not limit Lender's right to foreclose on any other portion of the Collateral at any time in the future (and such future foreclosure shall in no event require the consent from any other party). In addition to those rights, remedies and powers and in addition to any and all other rights, remedies and powers that Lender may have under any other agreement, document or instrument or under applicable law, and subject to the limitations set forth in Section 19, each Pledgor agrees that Lender may in its sole discretion do or cause to be done any one of more of the following:

18.1.    **Realize Upon Collateral.** Sell, assign and deliver, or otherwise realize upon, all or any part of the Collateral in any manner permitted by law, at any time and from time to time, at public or private sale, with or without demand and with or without notice or advertisement, for cash, upon credit or for future delivery, as Lender shall deem appropriate. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay or appraisal that such Pledgor

now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. In addition:

(a) If notice of sale is required to be given to any Pledgor under the Uniform Commercial Code as in effect (i) in the State in which such Pledgor has his principal residence (for Pledgors who are individuals), or (ii) in the State in which such Pledgor is organized or incorporated (for Pledgors who are entities), written notice to such Pledgor ten (10) days prior to the date of any public sale or private sale of the Collateral shall be the notice required to be given under the applicable provision of the Uniform Commercial Code.

(b) In connection with any private sale or other disposition of any part of the Collateral (if the Collateral or relative portion thereof is of a type customarily sold on a recognized market), and upon each public sale of any of the Collateral, Lender may purchase all or any part of the Collateral being sold and may credit bid any portion or all of the Secured Obligations. Lender shall hold any such Collateral in its own right, free from any claims of Pledgor or rights of redemption.

(c) Lender shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. If sale of all or any part of the Collateral is made on credit or for future delivery: (i) the Collateral so sold may be retained by Lender until the sale price is paid by the purchaser or purchasers thereof, (ii) the Secured Obligations shall be reduced only to the extent that payment is actually received by Lender in respect of such sale, and (iii) Lender shall not incur any liability in the event that any purchaser or purchasers for future delivery shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.

(d) As an alternative to exercising the power of sale herein conferred upon it, Lender may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts of competent jurisdiction.

Any proceeds of any disposition of the Collateral or any part thereof may be applied by Lender to the payment of reasonable expenses incurred by Lender in connection with the foregoing, including reasonable attorneys' fees and expenses, and the balance of such proceeds may be applied by Lender toward the payment of the Secured Obligations, in such order of application as Lender may from time to time elect.

18.2. Pledgor's Acknowledgments. Each Pledgor recognizes that Lender may be unable to effect a public sale of all or part of the Collateral by reason of certain prohibitions contained in the Securities Act of 1933, in applicable securities laws of the State of California or the State of Ohio, or in applicable securities laws of another jurisdiction, but may instead resort to one or more private sales to a single purchaser or a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Pledged Interests for their own account, for investment and not with a view to the distribution or

12

resale thereof. Each Pledgor understands that Lender's exercise of its election to hold private sales may be at prices and other terms less favorable to such Pledgor than if such Collateral were sold at public sale and that Lender has no obligation to delay the sale of any portion of the Collateral for the period of time necessary to permit any Person to register any portion of the Collateral constituting securities, even if such Person is required to, or would, agree to register such securities for public sale under applicable securities laws. Each Pledgor agrees that private sales made under the foregoing circumstances shall each be deemed to have been actions taken or transactions made in a "commercially reasonable" manner.

18.3. No Liability. Without limiting in any manner any other limitation on Lender's liability to any Pledgor set forth herein or in any other agreement, document or instrument executed in connection herewith or otherwise available to Lender under applicable law, Lender shall not have any liability whatsoever to any Pledgor under any circumstances as a result of any income tax liability incurred by such Pledgor as a result of any action (or inaction) by Lender pursuant to its rights, remedies and powers under this Agreement.

18.4. Rights Cumulative. The rights, remedies and powers of Lender shall be cumulative, and no single or partial exercise of any of them shall preclude the further or other exercise of any of them, in any sequence or combination, and in one or more iterations. Any waiver, permit, consent or approval of any kind by Lender in respect of any Default, or any waiver of any provision or condition hereof, must be in writing and shall be effective only to the extent set forth in such writing.

19. Controlling Management Interest. Notwithstanding any other provision of this Agreement to the contrary, with the exception of (i) a Default under Sections 17.1, 17.2 or 17.3 resulting from a final determination of fraud or intentional misrepresentation by Borrower, any Pledgor or any officer, director, partner, member or employee of Borrower in connection with the application for or creation of the Loan or any request for any action or consent of Lender, or (ii) a Default under Section 17.4, the Pledgor Group shall retain the Controlling Management Interest in accordance with the LLC Agreement, and Lender, upon gaining control of the Collateral in accordance with Section 18, shall be limited to ownership of the Economic Interest; provided, however, if Lender, upon gaining control of the Collateral in accordance with Section 18, holds more than forty percent (40.00%) of the Membership Interests in Borrower, thereafter any Major Decision (as defined below) shall require the prior written approval of Lender (not to be unreasonably withheld). The failure of Lender to disapprove in writing of any proposed Major Decision within thirty (30) days following Lender's receipt of written notice describing the Major Decision in question shall be deemed Lender's approval of such Major Decision. Upon Lender's transfer, sale or other conveyance of the Collateral to any third party, Lender shall notify such third party of the reservation of the Controlling Management Interest set forth in this Section 19. A "Major Decision" shall mean (i) approval of the annual business and operations plan for MSC LLC (the "MSC LLC Annual Business Plan") in accordance with the provisions of the MSC LLC Operating Agreement, (ii) an election to sell, dispose or transfer fee title to any material portion of the Real Property below the values established in or not contemplated by the MSC LLC Annual Business Plan, or (iii) an action not contemplated in the MSC LLC Annual Business Plan which could result in a Material Adverse Effect with respect to Borrower.

20. Disposition of Collateral and Proceeds. Upon the transfer of all or any part of the Secured Obligations, Lender may transfer all or any part of the Collateral, and thereafter Lender shall be fully discharged from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all the rights, remedies and powers and assume

all the obligations of Lender hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral not so transferred, Lender shall retain all rights, remedies and powers herein given.

21. Notices. Unless otherwise specifically provided herein, any consent, notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied or sent by courier service or United States mail, and shall be deemed to have been given (a) when delivered in person or by courier service, (b) upon receipt of a telecopy (or on the next Business Day if such telecopy is received on a non-Business Day or after 5:00 p.m. (at the office of the recipient) on a Business Day), or (c) four (4) Business Days after deposit in the United States mail (registered or certified, with postage prepaid and properly addressed). Any party delivering a communication by telecopy shall also send a copy thereof by one of the other means provided in this Section 21. Notices to Lender shall not be effective until received by Lender. For the purposes hereof (i) the address of each Pledgor shall be its address set forth on the signature pages hereof and (ii) the address of Lender shall be its address set forth in the Loan Agreement (until notice of a change of address is delivered as provided in this Section 21), or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

22. Costs, Expenses and Attorneys' Fees. All reasonable out-of-pocket payments, advances, charges, costs and expenses, including reasonable attorneys' fees and expenses and fees and expenses of expert witnesses, made or incurred by Lender in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof (including those arising in connection with (i) the custody of, the registration of, the sale of, or other redemption upon, any of the Collateral, or (ii) the failure by any Pledgor to perform or observe any of the provisions hereof), shall be paid to Lender by the Pledgor Group immediately and without demand, together with interest at a rate per annum equal to the rate of interest specified in the Note for amounts remaining unpaid thereunder after the due date thereof (or, if less, the maximum rate permitted by law).

23. Governing Law; Successors, Assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, and shall be binding on and inure to the benefit of the legal representatives, successors and assigns of each Pledgor and Lender.

24. Severability. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

25. WAIVER OF RIGHT TO TRIAL BY JURY. TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND, TO THE EXTENT NOW OR HEREAFTER ENFORCEABLE, EACH PARTY HEREBY

AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

26. Choice of Forum Venue. Except with respect to foreclosure proceedings against any Collateral which by requirement of law must be brought in the jurisdiction where such Collateral is located, all judicial proceedings brought against any Pledgor with respect to this Agreement may be, and all judicial proceedings brought by any Pledgor with respect to this Agreement shall be, brought in any state or federal court of competent jurisdiction having situs in Summit County, Ohio, and by execution and delivery of this Agreement, each Pledgor accepts, for itself and in connection with the Collateral, generally and unconditionally, the jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby from which no appeal has been taken or is available. Each Pledgor irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its notice address specified on the signature page hereof.

27. Miscellaneous. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute a single instrument.

*[Signature Pages Follow]*

15

IN WITNESS WHEREOF, each Pledgor has executed this Agreement as of the day and year first written above.

**Pledgor Group:**

**STUART LICHTER**

Address:

631 Paseo de la Playa
Redondo Beach, California 90277
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

**CHRISTOPHER S. SEMARJIAN**

Address:

c/o Industrial Commerce Ltd.
360 East Highland Road
Macedonia, Ohio 44056
Tel: (216) 570-5584
Fax: _____

IN WITNESS WHEREOF, each Pledgor has executed this Agreement as of the day and year first written above.

Pledgor Group:

_____
STUART LICHTER

Address:

631 Paseo de la Playa
Redondo Beach, California 90277
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

_____
CHRISTOPHER S. SEMARJIAN

Address:

c/o Industrial Commerce Ltd.
360 East Highland Road
Macedonia, Ohio 44056
Tel: (216) 570-5584
Fax: (440) 605-2222

**Attachment 8**

**UCC-1**

[See attached]

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

CMB Export LLC
Attn: Patrick Hogan
7819 42nd Street West
Rock Island, IL 61201

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - Do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| Lichter | Stuart | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 631 Paseo de la Playa | Redondo Beach | CA  90277 | USA |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE  1e. TYPE OF ORGANIZATION / ORGANIZATION DEBTOR | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE  2e. TYPE OF ORGANIZATION / ORGANIZATION DEBTOR | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CMB Infrastructure Investment Group X, LP | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 7819 42nd Street West | Rock Island | IL  61201 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's 50.00% membership interest in Maple Street Investors LLC, an Ohio limited liability company, pursuant to that certain Membership Pledge and Security Agreement executed by Debtor in favor of Secured Party, in connection with the transactions contemplated by that certain Loan Agreement, dated as of May 7, 2012 (as amended from time to time), by and between Maple Street Investors LLC and Secured Party.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  [if applicable]  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)  [ADDITIONAL FEE]  [optional]  ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

⌐ CMB Export LLC
   Attn: Patrick Hogan
   7819 42nd Street West
   Rock Island, IL 61201 ⌐

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| Semarjian | Christopher | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 360 East Highland Road | Macedonia | OH | 44056 | USA |
| ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CMB Infrastructure Investment Group X, LP | | | | |
| **OR** 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7819 42nd Street West | Rock Island | IL | 61201 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's 50.00% membership interest in Maple Street Investors LLC, an Ohio limited liability company, pursuant to that certain Membership Pledge and Security Agreement executed by Debtor in favor of Secured Party, in connection with the transactions contemplated by that certain Loan Agreement, dated as of May 7, 2012 (as amended from time to time), by and between Maple Street Investors LLC and Secured Party.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

## Attachment 10.10

## PLEDGED MEMBERSHIP INTERESTS IN BORROWER

| Member | Percentage Membership Interest in Borrower | Percentage Interest Being Pledged Pursuant to this Agreement ("Pledged Interest") |
|---|---|---|
| Stuart Lichter | 50.00%[1] | 50.00% |
| Christopher S. Semarjian | 50.00%[1] | 50.00% |

[1] Subject to increase or decrease as set forth in the LLC Agreement.

## GUARANTY

This GUARANTY (this "Guaranty") is dated as of October $\underline{16}$, 2013 and is made by Stuart Lichter, an individual ("Guarantor"), in favor of CMB Infrastructure Investment Group X, LP, an Illinois limited partnership ("Lender").

## RECITALS

A.     Guarantor owns a fifty percent (50%) membership interest in Maple Street Investors LLC, an Ohio limited liability company ("Borrower").

B.     Borrower and Lender have entered into that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "Loan Agreement"), pursuant to which Lender is making a loan (the "Loan") to Borrower in the total principal amount of up to $36,000,000.00.

C.     Guarantor will derive a material and substantial benefit from the making of the Loan to Borrower, and has therefore agreed to provide this Guaranty on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees, and is hereby bound for the benefit of Lender, as follows:

## SECTION 1
## DEFINITIONS

1.1     Loan Agreement Defined Terms.  Unless the context hereof shall otherwise require, capitalized terms used in this Guaranty, including those in the recitals, and not otherwise defined herein shall have the respective meanings specified in the Loan Agreement (including those set forth in Section 1.1 of the Loan Agreement). The general interpretive provisions of Section 1.3 to the Loan Agreement shall apply to terms used in this Guaranty.

1.2     Definitions. "Guarantor Material Adverse Effect" shall mean an event that has a material adverse effect on the ability of Guarantor to perform his obligations under this Guaranty; provided, however, that notwithstanding the foregoing, in no event shall any of the following, alone or in combination, be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or shall be a Guarantor Material Adverse Effect: (i) any effect that results from events, circumstances or situations affecting general economic, business or regulatory conditions worldwide, or in North America or any national or global financial or capital market; (ii) any effect of any proposed or actual institution of any new interpretation of any existing applicable laws affecting the business of Guarantor or his affiliates; or (iii) acts of war (whether or not declared), the commencement, continuation or escalation of a war, acts of armed hostility, sabotage or terrorism or other international or national calamity or any material worsening of any such conditions threatened or existing as of the date hereof.

1

## SECTION 2
## GUARANTY PROVISIONS

2.1     Guaranty.  Subject to the limitations set forth in Section 2.7, Guarantor hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitations set forth in Section 2.7, the "Guaranteed Obligations").  Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligor, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

2.2     Termination.  This Guaranty shall be released and terminated (a) automatically, without further action by any Person, if and when Borrower acquires the remaining 10% of the MSC LLC Membership Interest (i.e. above the 90% of the MSC LLC Membership Interest currently owned by Borrower), and furnishes Lender with reasonably satisfactory evidence of such acquisition, (b) automatically, on the date on which the Guaranteed Obligations are paid in full or extinguished, (c) if Borrower or Guarantor furnishes substitute collateral or security for the Loan, which substitute collateral or security is acceptable to Lender in its sole and reasonable discretion, or (d) when otherwise released or terminated by Lender in writing (the date of such release and termination being the "Termination Date").  Guarantor hereby acknowledges and agrees that this Guaranty constitutes a continuing guaranty and shall remain in full force until the Termination Date; provided, however, that with respect to any claim resulting from the acts of Guarantor or Borrower which occurred prior to the Termination Date:

(a)     if such claim is made upon Lender at any time for repayment or recovery of any amounts or any property received by Lender from any source on account of any of the Guaranteed Obligations, and Lender is required to repay or return any amounts or property so received (including interest thereon to the extent Lender is required to repay the same), or

(b)     if Lender becomes liable for any part of such claim (beyond any possible appeal) by reason of (1) any judgment or order of any court or administrative authority having competent jurisdiction, or (2) any settlement or compromise of any such claim, which settlement or compromise has been approved in writing by Guarantor,

then, subject to the limitations set forth in Section 2.7, Guarantor shall remain liable under this Guaranty for the amounts so repaid or property so returned or the amounts for which Lender becomes liable (such amounts being deemed part of the Guaranteed Obligations) to the same extent as if such amounts or property had never been received by Lender, notwithstanding any termination hereof or the cancellation of any instrument or agreement evidencing any of the Guaranteed Obligations.  Not later than ten (10) days after receipt of notice from Lender, Guarantor shall pay to Lender an amount equal to the amount which Lender has repaid or returned as provided in this Section 2.2, subject to the limitations set forth in Section 2.7.

2.3     Guaranty Absolute.

(a)     The obligations of Guarantor contained herein (i) are direct, independent and primary obligations of Guarantor, (ii) are absolute, unconditional and continuing obligations and are not conditioned in any way upon the institution of suit or the taking of any other action or any attempt to enforce performance of, or compliance with the Obligations of Borrower (other than providing notice to Borrower as set forth in the Loan Documents), (iii) shall remain in full force and effect and irrevocable without regard to the authority of Borrower to enter into any of the Loan Documents or any substitution, release or exchange of any other guaranty or any other security for any of the Guaranteed Obligations or any other circumstance whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents) that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, and (iv) except as set forth herein, are in no way conditioned or contingent upon any attempt to collect from Borrower or any other entity or to perfect or enforce any security or upon any other condition or contingency or upon any other action, occurrence or circumstance whatsoever.

(b)     Without limiting the generality of the foregoing, Guarantor shall have no right to terminate this Guaranty, or, except as expressly set forth herein, to be released, relieved or discharged from its obligations hereunder, and such obligations shall be neither affected nor diminished for any reason whatsoever (other than upon the occurrence of the Termination Date or other termination of this Guaranty in accordance with the Loan Documents), including (i) any amendment or supplement to or modification of any Loan Document, any extension or renewal of Borrower's obligations under any Loan Document, or any assignment or transfer of Borrower's interest in any Loan Document, (ii) any bankruptcy, insolvency, readjustment, composition, liquidation or similar proceeding with respect to Borrower, (iii) any furnishing or acceptance of additional security or any exchange, substitution, surrender or release of any security, (iv) any waiver, consent or other action or inaction or any exercise or non-exercise of any right, remedy or power with respect to the Guaranteed Obligations or any Loan Document, (v) any merger or consolidation of Borrower into or with any other Person, any change in the structure of Borrower, or any sale, lease or transfer of any or all of the assets of Borrower to any other Person, or (vi) any default, misrepresentation, negligence, misconduct or other action or inaction of any kind by Lender under or in connection with any Loan Document or any other agreement relating to this Guaranty, except to the extent that any such default, misrepresentation, negligence, misconduct or other action or inaction would constitute a defense to or limit Borrower's payment or performance of the Guaranteed Obligations.

(c)     Except as otherwise expressly set forth herein, Guarantor hereby unconditionally waives to the extent permitted by law promptness, diligence and notice as to the Guaranteed Obligations and acceptance of this Guaranty, and agrees that, except as otherwise provided herein and in the Loan Documents, Guarantor shall not be required to consent to or receive any notice of any amendment or modification of, or waiver, consent or extension with respect to, any Loan Document. The rights, powers and remedies herein provided are cumulative. No failure or delay on the part of Lender in

exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise of any other right, remedy, power or privilege.

     2.4    Guarantor's Waivers. Except as expressly required by the Loan Documents, Guarantor waives, to the fullest extent permitted by the provisions of applicable law, all of the following (including all defenses, counterclaims and other rights of any nature based upon any of the following):

     (a)    presentment, demand for payment and protest of nonpayment of any of the Guaranteed Obligations, and notice of protest, dishonor or nonperformance;

     (b)    notice of acceptance of this Guaranty and notice that credit has been extended in reliance on Guarantor's guaranty of the Guaranteed Obligations;

     (c)    notice of any default or of any inability to enforce performance of the obligations of Borrower with respect to any Loan Document or notice of any acceleration of maturity of any Guaranteed Obligations;

     (d)    demand for performance or observance of, and any enforcement of, any provision of any Loan Document or the Guaranteed Obligations, or any pursuit or exhaustion of rights or remedies against Borrower in respect of the Guaranteed Obligations or any requirement of diligence or promptness on the part of Lender in connection with any of the foregoing;

     (e)    any "single action" or "anti-deficiency" law which would otherwise prevent Lender from bringing any action, including any claim for a deficiency, against Guarantor before or after Lender's commencement or completion of any foreclosure action, whether judicially, by exercise of power of sale or otherwise, or any other law which would otherwise require any election of remedies by Lender;

     (f)    all demands and notices of every kind with respect to the foregoing;

     (g)    any defense based upon any legal disability or other defense of Borrower;

     (h)    any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower; and

     (i)    any defense based upon the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender.

     Without limiting the generality of the foregoing or any other provision hereof, Guarantor further expressly subordinates to the Guaranteed Obligations, to the extent permitted by law, any and all rights and defenses, including without limitation any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to Guarantor under the law. Guarantor represents that he has obtained the advice of counsel as to

the extent to which suretyship and other defenses may be available to him with respect to his obligations hereunder in the absence of the waivers contained in this Section 2.4.

    2.5    Loan Documents. Guarantor does hereby acknowledge that it has received and reviewed a copy of the Loan Agreement.

    2.6    Payment. All payments to be made by Guarantor hereunder shall be made (a) within twenty (20) business days after receipt by Guarantor of written notice from Lender that reasonably identifies Borrower's breach of its obligations that constitute Guaranteed Obligations as provided herein, or (b) if later, when due and payable under the terms of the Loan Documents (subject to any applicable notice and grace periods under the Loan Documents). Such notice shall also include the amount of the Guaranteed Obligations for which Lender is seeking recourse against Guarantor which has not been paid as and when due and payable by Borrower (subject to any applicable notice and grace periods under the Loan Documents). All payments to be made by Guarantor hereunder shall be made in immediately available funds and in U.S. dollars to Lender as Lender may direct to Guarantor in writing.

    2.7    Limitation of Liability. Notwithstanding anything to the contrary contained herein, (a) the total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amounts paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder and the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap"). Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants to Lender as of the date hereof that:

    3.1    Organization; Requisite Power and Authority; Qualification. Guarantor is an individual with all requisite power and authority to own and operate his assets and has not had, and does not reasonably expect to have, a Guarantor Material Adverse Effect.

    3.2    Due Authorization. Guarantor has obtained any and all necessary consents, including, if applicable, spousal consents as are necessary to enter into this Guaranty.

    3.3    No Conflict. The execution, delivery and performance by Guarantor of this Guaranty and the transactions contemplated hereby do not and will not (i) conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Requirement of Law or Court Order binding upon Guarantor, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation of Guarantor, the breach of which could reasonably be expected to have a Guarantor Material Adverse Effect, or (iii) result in or require the creation or imposition of any Lien whatsoever upon any assets of Guarantor (other than any Liens created under or permitted by any of the Loan Documents).

## SECTION 4
## REMEDIES; SUBROGATION

4.1    Remedies. In the event Guarantor shall fail to pay when due any amounts due under this Guaranty, or to comply with any other term of this Guaranty, Lender shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7.

4.2    Subrogation. Guarantor will not exercise any rights that he may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, until all of the Guaranteed Obligations shall have been paid in full. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, in accordance with the terms of the Loan Documents, when such Guaranteed Obligations are due and payable.

4.3    Survival of Remedies and Subrogation Rights. The provisions of this Section 4 shall survive the termination of this Guaranty and the payment in full of the Guaranteed Obligations and the termination of the Loan Agreement.

4.4    Subordination. Guarantor covenants and agrees that, after the occurrence and during the continuance of an Event of Default, all indebtedness, claims and liabilities then or thereafter owing by Borrower to Guarantor, whether arising under any Loan Document or otherwise, are subordinated to the prior payment in full of the Guaranteed Obligations and are so subordinated as a claim against Borrower or any of its assets, whether such claim be in the ordinary course of business or in the event of voluntary or involuntary liquidation, dissolution, insolvency or bankruptcy, so that no payment with respect to any such indebtedness, claim or liability will be made or received while any Event of Default exists. Notwithstanding the foregoing, to the extent Guarantor receives any such payment, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender upon written request from Lender to be credited and applied against the Guaranteed Obligations then due and payable and reasonable expenses of collection, whether matured or unmatured, in accordance with the terms of the Loan Documents.

## SECTION 5
## MISCELLANEOUS

5.1    Defenses. Without limiting Guarantor's own defenses and rights hereunder, but subject to the conditions herein, Guarantor reserves to himself all rights, counterclaims and other defenses which Borrower is or may be entitled to arising from or out of any Loan Document, except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Borrower, the power or authority of Borrower to enter into the Loan Documents and to perform its Guaranteed Obligations thereunder, and the lack of enforceability of Borrower's Obligations under any Loan Document or any transaction thereunder; provided that, for the avoidance of doubt, Guarantor hereby waives, with respect to any claims asserted by Lender, any defenses he

6

may have against Borrower under the Loan Documents with respect to the Guaranteed Obligations.

    5.2    Expenses. Guarantor agrees that in the event that Lender retains or engages an attorney or attorneys to enforce this Guaranty by reason of the failure of Guarantor to fulfill his obligations hereunder, then upon the successful enforcement of any such claim (beyond any applicable notice and cure period), promptly after request therefor, Guarantor will reimburse Lender for all reasonable out-of-pocket expenses incurred, including reasonable attorneys' fees, costs and disbursements.

    5.3    Amendments and Waivers. No term, covenant, agreement or condition of this Guaranty may be terminated, amended or compliance therewith waived (either generally or in a particular instance, retroactively or prospectively) except by an instrument or instruments in writing executed by Guarantor and Lender.

    5.4    Possession. Guarantor agrees and acknowledges that possession of this Guaranty by Lender shall be conclusive evidence of due execution and delivery of this Guaranty by Guarantor.

    5.5    Notices. All notices, requests, consents and other communications required or permitted under this Guaranty shall be in writing and shall be (as elected by the Person giving such notice) (a) hand delivered by messenger or courier service, (b) delivered by express courier service (e.g., Federal Express), (c) telefaxed, or (d) mailed by registered or certified mail (postage prepaid), return receipt requested, addressed as follows:

If to Guarantor:

Stuart Lichter
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

If to Lender:

CMB Export Infrastructure Investment Group X, LP
c/o CMB Export LLC
7819 42nd Street West
Rock Island, Illinois 61201
Attn: Patrick F. Hogan, General Partner
Tel: (309) 797-1550
Fax: (855) 852-5733

or to such other address as any party may designate by notice complying with the terms of this Section 5.5. Each such notice shall be deemed delivered (i) on the date actually delivered if by messenger or courier service or express courier service; (ii) on the date of confirmed answerback if by telefax so long as a duplicate copy is sent immediately by methods (a), (b), or (d) above; and (iii) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

5.6     Assignment and Assumption. Except as permitted in the Loan Agreement, this Guaranty may not be assigned by Guarantor to, or assumed by, any successor to or assign of Guarantor without the prior written consent of Lender, which consent shall not be unreasonably withheld.

5.7     Governing Law. This Guaranty shall be governed by, and construed and enforced in accordance with the laws of the State of Illinois.

5.8     Waiver of Trial by Jury. TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER IRREVOCABLY WAIVE (A) TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT, AND (B) ANY OBJECTION (INCLUDING, WITHOUT LIMITATION, ANY OBJECTION OF THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS) WHICH ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY LOAN DOCUMENT IN ANY JURISDICTION.

5.9     Severability. If any provision of this Guaranty is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible. If any provision of this Guaranty may be construed in two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable and another of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

5.10    Headings. The headings contained in this Guaranty are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect in any way the meaning or interpretation of this Guaranty.

5.11    Further Assurances. Guarantor will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by Lender, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Guaranty; provided, however, that Guarantor shall not be required to execute or enter into any such further assurance that increases Guarantor's obligations or decreases Guarantor's rights under this Guaranty.

5.12    Effectiveness of Guaranty. This Guaranty shall be effective as of the date hereof.

5.13    Successors and Assigns. This Guaranty shall be binding upon Guarantor and Lender (by acceptance hereof) and their respective successors and permitted assigns and shall

inure to the benefit of, and shall be enforceable by Lender and Guarantor and their respective successors and permitted assigns.

5.14    Unsecured Obligation.  The obligations of Guarantor under this Guaranty are unsecured obligations of Guarantor.  Without limiting the generality of the immediately preceding sentence, the obligations of Guarantor under this Guaranty are not secured by, and Guarantor shall not be deemed to have granted or otherwise conveyed to Lender, any security interest in, lien on or pledge of any properties or assets (or interests therein) of Guarantor.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____

STUART LICHTER


Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP,
an Illinois limited partnership


By:     _____
        Name:  Patrick F. Hogan
        Title:  General Partner

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date first written above.

Guarantor:

_____

STUART LICHTER

Acknowledged and Accepted by Lender:

CMB INFRASTRUCTURE INVESTMENT GROUP X, LP, an Illinois limited partnership

By: _____
Name: Patrick F. Hogan
Title: General Partner

## MAPLE STREET INVESTORS LLC
## PROMISSORY NOTE
### (CMB Infrastructure Investment Group X, LP)

| RATE OF INTEREST: | TERM: | DATE: |
|---|---|---|
| 6.0% | 6 Years | October ⬛, 2013 |

**REGISTERED OWNER: CMB Infrastructure Investment Group X, LP**

**PRINCIPAL AMOUNT: $36,000,000.00**

All capitalized terms used, but not otherwise defined in this Promissory Note (this "**Note**") shall have the meanings ascribed to such terms in that certain Loan Agreement, dated as of May 7, 2012, as amended by that certain First Amendment to Loan Agreement, dated as of the date hereof (as so amended and as it may in the future be amended, supplemented or restated from time to time, the "**Loan Agreement**"), between MAPLE STREET INVESTORS LLC, an Ohio limited liability company ("**Borrower**") and CMB INFRASTRUCTURE INVESTMENT GROUP X, LP, an Illinois limited partnership ("**Lender**")).

Borrower is an Ohio limited liability company, formed on April 30, 2012, as a Single Purpose Entity. Borrower is the holder of 90% of the membership interests in Maple Street Commerce LLC, an Ohio limited liability company ("**MSC LLC**"). Certain members of Borrower have executed and delivered a certain Membership Pledge and Security Agreement, dated as of the date hereof (the "**Pledge Agreement**"), granting to Lender a security interest in their respective membership interests in Borrower (the "**Collateral**") as security for the obligations of Borrower as incurred pursuant to the Loan Agreement. In addition, Stuart Lichter (who is one of the members of Borrower) has executed and delivered a certain Guaranty, dated as of the date hereof (the "**Guaranty**"), guarantying a portion of the obligations of Borrower as incurred pursuant to the Loan Agreement.

MSC LLC holds fee title in certain real property (the "**Real Property**," see Exhibit B to the Loan Agreement), which consists of the project known as the former Hoover Plant located in North Canton, Ohio. The Real Property generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan (as hereinafter defined).

Borrower hereby promises to pay to Lender the principal sum of Thirty-Six Million Dollars ($36,000,000.00) (the "**Loan**"), or so much thereof as has been advanced by Lender to Borrower pursuant to the Loan Agreement, plus interest as set forth in Section 1(b) of this Note, in accordance with and subject to the terms and provisions of the Loan Agreement. Reference is hereby made to the Loan Agreement for a more complete statement of the terms and conditions under which the Loan evidenced by this Note is made and is to be repaid. Subject to the terms of the Loan Agreement, this Note shall be paid in full on the Maturity Date, which is six (6) years after the Initial Funding Date, unless payment in full is made sooner pursuant to Section 2.2(b) of the Loan Agreement.

1

Borrower agrees to pay the aforesaid principal plus interest in accordance with the terms hereinafter set forth:

1. This Note shall be payable as follows:

(a) On the Maturity Date, Borrower shall pay, in lawful money of the United States of America, the outstanding principal balance of this Note to Lender at 7819 42nd Street West, Rock Island, IL 61201 or to such other address or to such account and in such manner as Lender shall direct. Except as provided in Section 2.2(b) of the Loan Agreement, Borrower may not prepay any of the outstanding principal balance of this Note at any time prior to the expiration of forty-two (42) months following the Initial Funding Date. Any prepayment of the outstanding principal balance of this Note shall be subject to the provisions of Section 2.2(b) of the Loan Agreement. Upon any prepayment of a portion of the outstanding principal balance of this Note, Lender shall concurrently release a portion of its interest in the Collateral in accordance with the process and formula set forth in Section 2.2(b)(iv) of the Loan Agreement.

(b) The outstanding principal balance of the Loan shall bear interest at the rate of six percent (6.0%) per annum (the "**Fixed Rate**"), calculated from the date of disbursement of the applicable Tranche (as defined in the Loan Agreement) by Lender to Borrower, until repaid as set forth in this Agreement and the other Loan Documents (as defined in the Loan Agreement).

(c) Interest on the Loan shall be computed on an actual-day basis of a year equal to 365/366 days, and shall be payable, in arrears, quarterly on each January 1, April 1, July 1, and October 1 following the Initial Funding Date (each such date, an "**Interest Payment Date**"), with the final interest payment being due and payable on the Maturity Date. Lender shall provide invoices for all payments as set forth in the Loan Agreement.

2. In lieu of the imposition of any late charges for payments not made by Borrower to Lender as of any Interest Payment Date ("**Delinquent Interest**") or the Maturity Date ("**Delinquent Principal**"), as applicable, a three percent (3%) per annum interest charge shall be added to the Fixed Rate (the "**Default Interest Rate**") and shall be applied for the number of days any payment remains unpaid as to (i) any interest payment not made on or before the ninth (9th) calendar day subsequent to each Interest Payment Date (i.e. January 10, April 10, July 10 and October 10), and (ii) as of the Maturity Date for the payment in whole of the outstanding principal balance of the Loan and the accrued and unpaid interest due and payable as of the Maturity Date. Each amount of Delinquent Interest and Delinquent Principal (collectively, a "**Delinquent Payment**") shall bear interest at the Default Interest Rate until such payment is made in full to Lender. Borrower and Lender agree that this Default Interest Rate represents a reasonable sum considering all of the circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower and Lender further agree that proof of actual damages would be costly and inconvenient. Acceptance of any payments of the Default Interest Rate shall not constitute a waiver of a default with respect to an overdue installment, and shall not prevent Lender from exercising any of the other rights available hereunder or under any other Loan Document. Such Default Interest Rate shall be paid without prejudice to any rights of Lender.

3. In the event Borrower fails to make two (2) consecutive interest payments to Lender or two (2) interest payments in any twelve-month period, Lender may accelerate payment of the amount of interest coming due on the next two (2) succeeding Interest Payment Dates after notice from Lender to Borrower, so that all such interest for the next two (2) Interest Payment Dates, together with all Delinquent Payments, shall be due and payable on (i) the tenth (10th) calendar day of the month following the month in which the second (2nd) interest payment was not made. Such amounts of interest that are

subject to acceleration shall only be payable on invoice from Lender delivered to Borrower at least ten (10) days prior to the due date thereof. Thereafter, Borrower shall continue to remit quarterly interest payments in accordance with this Note and the Loan Agreement.

4.       This Note is secured by the Pledge Agreement, and the security interests created by the Pledge Agreement are perfected by one or more Uniform Commercial Code filings against the Collateral, providing a public record of lien. In addition, a portion of Borrower's obligations under this Note is guarantied by Stuart Lichter pursuant to the Guaranty.

5.       This Note shall not be assigned by either party without the written permission of the other party, which permission shall not be unreasonably withheld.

6.       Borrower covenants and warrants that the execution, delivery and performance of this Note have been duly authorized by all necessary actions of Borrower, do not require the consent or approval of any other person, regulatory authority or governmental body, and do not conflict with, result in a violation of, or constitute a default of: (a) any provision of any agreement or other instrument binding upon Borrower, or (b) any law, regulation, court decree or order applicable to Borrower.

7.       This Note, when delivered, shall constitute a legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and general principles of equity.

8.       It is hereby recited, certified and declared that any and all acts, conditions and things required to exist, to happen and to be performed precedent to and in the issuance of this Note exist, have happened and have been performed in due time, form and manner as required by the Ohio Constitution and the laws of the State of Ohio.

9.       This Note, the Loan Agreement, the Pledge Agreement, and the Guaranty constitute the entire understanding and agreement of the parties as to the matters set forth herein and therein. No alteration of or amendment to this Note shall be effective unless given in writing and signed by Lender and Borrower.

10.       Payment of the principal amount of this Note may not be accelerated by Lender, unless otherwise provided herein or in the Loan Agreement.

11.       This Note has been delivered to Lender and accepted by Lender in the State of Ohio. In the event of a lawsuit, Lender and Borrower agree to submit to the jurisdiction of the courts of Summit County, Ohio. This Note shall be governed by the laws of the State of Ohio as to the interpretation of any matter contained herein.

12.       If a court of competent jurisdiction finds any provision of this Note invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; provided, however, in the event the offending provision cannot be so modified, it shall be stricken and all other provisions of this Note in all respects shall remain valid and enforceable.

13.       Time shall be of the essence in the performance of this Note.

*[Remainder of page intentionally left blank]*

3

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date first written above.

**Borrower:**

**MAPLE STREET INVESTORS LLC,**
an Ohio limited liability company

By:     **S.L. Properties, Inc.,**
        a Delaware corporation,
        its Manager

        By:     _____
                Stuart Lichter, President

ADDRESS FOR NOTICE AND DELIVERY TO BORROWER:

c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, California 90242
Attn: Stuart Lichter
Tel: (562) 803-4761
Fax: (562) 803-4796

with a required copy to:

Fainsbert Mase Brown & Sussman, LLP
11835 West Olympic Blvd., Suite 1100
Los Angeles, California 90064
Attn: Dean Sussman, Esq.
Tel: (310) 473-6400
Fax: (310) 473-8702

4