**LEWIS BRISBOIS BISGAARD & SMITH LLP**
ATTORNEYS AT LAW

1375 East 9th Street, Suite 1600
Cleveland, OH 44114
Telephone: (216) 344-9422
Fax: (216) 344-9421
www.lewisbrisbois.com

JEFFREY D. WEINSTOCK
DIRECT DIAL: 216.344.9422
JEFF.WEINSTOCK@LEWISBRISBOIS.COM

March 7, 2016

Via Federal Express

Maple Street Investors LLC
c/o Industrial Realty Group
12214 Lakewood Boulevard
Downey, CA 90242
Attention: Stuart Lichter

Re: Loan Agreement dated May 7, 2012 by and between Maple Street Investors LLC, an Ohio Limited Liability Company, as Borrower, and CMB Investment Group X, LP, an Illinois limited partnership, as Lender, as amended by that certain First Amendment to Loan Agreement dated as of October 16, 2013 between said Borrower and Lender (collectively, the "Loan Agreement")

**THIS LETTER CONSTITUTES A DEMAND FOR BORROWER TO CURE FAILURES TO COMPLY WITH VARIOUS COVENANTS UNDER THE LOAN AGREEMENT AND SETS FORTH PERIODS FOR SUCH CURE AS PERMITTED OR REQUIRED THEREUNDER.**

Gentlemen:

This Law Firm represents CMB Investment Group X LP, an Illinois limited partnership ("Lender"). Lender has requested that we contact you regarding certain actions taken, and representations made to Lender, by Maple Street Investors LLC ("Borrower") and its representatives and Borrower's repeated failure to comply with various covenants and obligations under the Loan Agreement. Please note that this letter arises primarily out of your diversion of $25,000,000.00 of Loan proceeds within barely three (3) days after the closing of the Loan Agreement funding, followed by your repeated failure to comply with the terms of the Loan Agreement requiring financial statement reporting and direct responses to questions as Lender has attempted to determine the true intentions and results of Borrower having taken this action.

Words or phrases used in this letter with their initial letters capitalized and not otherwise defined in this letter, shall have the meanings ascribed to those words or phrases in the Loan Agreement.

ALBUQUERQUE • ATLANTA • BOSTON • CHARLESTON • CHICAGO • CLEVELAND • DALLAS • DENVER • FORT LAUDERDALE • FT. WRIGHT • HOUSTON • INDIAN WELLS
LAFAYETTE • LAWRENCEBURG • LAS VEGAS • LOS ANGELES • MADISON COUNTY • NEW ORLEANS • NEW YORK • NEWARK • PHOENIX • PITTSBURGH
PORTLAND • PROVIDENCE • RALEIGH • SACRAMENTO • SAN BERNARDINO • SAN DIEGO • SAN FRANCISCO • TEMECULA • TAMPA • WICHITA
4814-3548-4718.8


PLAINTIFF'S EXHIBIT G

## I. Items of Borrower Default

This letter constitutes Lender's demand that Borrower within 30 days from the date of your receipt of this letter, and in the manner hereinafter specified, cure Borrower's current failure to comply with certain covenants and obligations under Loan Agreement Sections 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management Letters"); 5.1(c) ("Annual Budget for the Property"); 5.1(d) ("Knowledge of Event of Default"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); 5.1(h) ("EB-5 Documentation"); 6.1(f) ("Use of Funds"); and 6.1(g) ("Single Purpose Entity"). Failure to do so will give rise to Events of Default.

It appears that Borrower has failed to comply with:

- *Section 5.1(a) ("Operating Statements and Operating Results")* by its failure to provide Lender with Operating Statements for December 2015 and January 2016 (an Operating Statement for February 2016, is due no later than March 25, 2016). See further discussion at II(A) below.

- *Section 5.1(b) ("Annual Financial Statements; Accountant's Reports and Management Letters")* by its failure to provide any Annual Financial Statements, to wit: Annual Financial Statements for 2013 and 2014 (the Annual Financial Statement for 2015 is due on or before April 30, 2016). See further discussion at II(B) below.

- *Section 5.1(c) ("Annual Budget for the Property")* by its failure to deliver the Operating Budget for Fiscal Year 2016. See further discussion at II(C) below.

- *Section 5.1(d) ("Knowledge of Event of Default")* by: (i) its failure to disclose to Lender until late 2015 (and then only after repeated requests by Lender for information regarding Borrower's use of Loan proceeds and repeated delays and lack of candor by Borrower and its representatives) Borrower's diversion in October 2013 of $25,000,000 of Loan proceeds to third parties; (ii) its ongoing refusal to comply with Lender's various requests for information regarding Borrower's use of Loan proceeds; (iii) its failure to provide Lender with notice as to the steps Borrower has taken, is taking and proposes to take with respect to effecting return and the expenditure of those funds to and for the costs of the Project. See further discussion at II(D) below.

- *Section 5.1(f) ("Other Information")* by its failure to: (i) respond directly in good faith to repeated requests by Lender for information regarding Borrower's use of Loan proceeds; (ii) provide comprehensive and coherent reconciliations of all expenditures on the various phases and components of the Project; and (iii) since December 2015 provide any meaningful responses to Lender's requests for information regarding status of the Project and use of Loan proceeds. See further discussion at II(E) below.

- *Section 5.1(g) ("Accountant Reports")* by failing to deliver to Lender any reports prepared by the Accountants in connection with the Audited Financial Statements or any reports prepared by the Accountants in connection with any other annual, interim or special audits or review over the financial statements or practices of Borrower. See further discussion at II(F) below.

- Borrower has failed to comply with *Section 5.1(h) ("EB-5 Documentation")* by its failure to provide Lender with all requested EB-5 Documentation regarding the Project, including without limitation, all spending records for incurred development and construction costs of the Project and draw requests submitted relating to the expenditure of funds (including without limitation expenditure of Loan proceeds) on the Project, notwithstanding repeated requests by Lender to Borrower for the EB-5 Documentation, including, (but not limited to) written requests made by correspondence dated September 14, 2015 and December 2, 2015, respectively, from Lender to Borrower. See further discussion at II(G) below.

- *Section 6.1(d) ("Inspection of Property; Books and Records; Discussions")* by its refusal to allow Lender or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Borrower's offices at the Property or otherwise. See further discussion at II(H) below.

- *Section 6.1(f) ("Use of Funds")* by diversion of $25,000,000 of the proceeds of the Loan. See further discussion at II(I) and III below.

- *Section 6.1(g) ("Single Purpose Entity")* by engaging in impermissible transactions with Affiliates in connection with Borrower's diversion of Loan proceeds, which call into question its status as a Single Purpose Entity. See further discussion at II(J) below.

II. **Requirements for Cure**

(A) Borrower must within 30 days from the date Borrower receives this letter, deliver to Lender the Operating Statements for December 2015 and January 2016 respectively, and must on or before March 25, 2016 deliver to Lender the Operating Statement for February 2016. The form of the Operating Statements must be organized so as to clearly and consistently identify each building comprising the Project and the corresponding rent rolls for each such building, as well as the operating income net cash flow results, and comparisons to prior calendar year, and variance to budget reporting, cash flow projections, lease status reports and occupancy summaries for each of the buildings comprising of the Project, in each case broken out by each respective building and using the same designations for the respective buildings consistently applied so as to facilitate tracking across all Operating Statements.

(B) Borrower is obligated within 120 days after the close of each calendar year (but to date has failed) to provide Lender with annual audited financial statements of Borrower, prepared on a consolidated basis and consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, all in accordance with GAAP, together with

related schedules and supporting reports. The financial statements must be accompanied by a certificate executed by Borrower or a CPA acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects (collectively referred to in the Loan Agreement as the "Annual Financial Statements"). Borrower is further obligated to deliver to Lender, together with the Annual Financial Statements, a copy of the accountant's reports and management letters with respect to the calendar year in question.

Borrower must within 30 days from the date it receives this letter, deliver to Lender the Annual Financial Statements for each of the respective years ended December 31, 2013 and December 31, 2014. With respect to the Annual Financial Statements for year ended December 31, 2015 Borrower must deliver that Annual Financial Statement to Lender no later than 120 days from December 31, 2015 as required under Section 5.5(b) of the Loan Agreement.

(C) Borrower must within 30 days from the date it receives this letter, deliver to Lender the Operating Budget for Fiscal Year 2016.

(D) Borrower representative, Stuart Lichter must within 30 days from the date Borrower receives this letter, meet with Lender's representatives at Borrower's offices at the Project and engage in good faith and candid discussions with Lender and its representatives regarding the circumstances surrounding, and questions presented by the Diversion Notes and Borrower's diversion of Loan proceeds, the ramification thereof, delays in completion of the Project and such other relevant matters as may be presented by Lender.

(E) Borrower must within 30 days from the date Borrower receives this letter deliver to Lender the information and documents and take the actions listed, and fully answer the questions set forth, in the attached Schedule A;

(F) Borrower must within 30 days of the date of its receipt of this letter, provide Lender with copies of all audited Annual Financial Statements for 2013 and 2014, together with all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection therewith, including all comment letters submitted by the Accountants in connection with such audits, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower or its affiliates in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower. All such materials for and with respect to 2015 must be provided to Lender within the periods specified in Sections 5.1(b) and 5.1(g) of the Loan Agreement.

To date Lender and its representatives have repeatedly made requests of Borrower and its representatives for EB-5 Documentation and on the few occasions when Borrower has responded, Borrower has provided incomplete, inconsistent and confusing responses and documentation.

Borrower must within 30 days of the date of its receipt to the letter, deliver full, complete and comprehensive EB-5 Documentation to Lender and fully comply with its obligations under Section 5.1(h) of the Loan Agreement.

(G) Article VI of the Loan Agreement (titled "Affirmative Covenants") provides, inter alia, that Borrower must (under Section 6.1(d)) permit any authorized representative or representatives designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom,

all at such times during normal business hours and as often as Lender may reasonably request. Borrower is obligated to keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by the Loan Agreement and applicable Requirements of Law, of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

Borrower must within 30 days of the date of its receipt of this letter, allow Lender's representatives to inspect the financial and accounting records and leases of and with regard to the Property and the Project, and to make copies and take extract therefrom during regular business hours at either Borrower's offices at the Property and Borrower's representatives must in connection therewith cooperate in good faith with Lender and its representatives with respect to the scheduling, facilitation and conduct of such inspections.

(H) Section 6.1(f) of the Loan Agreement (titled "Use of Funds"), requires that the proceeds of the Loan be utilized solely for the purpose of funding costs of the Projects, and in part also requires that the Borrower within the later of (i) 2 years following the funding date of any Tranche or (ii) thirty days following Borrower's receipt of written request of such information from Lender, provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project. More than 2 years has passed since funding of the Loan, and Borrower has failed to deliver to Lender documentation and supporting accounting records and contract documents demonstrating that all Loan proceeds have been spent directly or indirectly on the Project.

Borrower must within 30 days of the date of its receipt of this letter: (i) deliver to Lender copies of all bank statements, wire transfer instructions, wire transfer confirmations and all other correspondence and emails relating to Borrower's transfer or lending of any Loan proceeds to any of its affiliates or other third parties, including without limitation to S.L. Properties Inc., a Delaware corporation, Industrial Commerce, Ltd., an Ohio limited liability company, and IRG RC Market Buildings LLC; and (ii) effect return of all such Loan proceeds to Borrower for the purposes of expending those funds solely for the uses permitted under the Loan Agreement, and Borrower must provide such proof thereof as Lender may reasonably require.

(I) Borrower must within 30 days of the date of its receipt of this letter provide Lender with copies of all limited liability company agreements and/or operating agreements of Borrower as well as Borrower's subsidiary, Maple Street Commerce LLC, together with all amendments, schedules and exhibits thereto, including but not limited to all schedules of members, interest holders and their respective membership interests or other interest in and to or with respect of such entities.

### III. Diversion of Loan Proceeds.

As you know, on or about May 7, 2012, Borrower and Lender executed the Loan Agreement. Thereafter, pursuant to the Loan Agreement, on or about October 16, 2013, Borrower executed and delivered the $36,000,000 Note and Lender funded the $36,000,000 Loan.

In addition to the explanation of the purposes of the Loan set forth in the Recitals of the Loan Agreement, the Loan Agreement at Sections 2.1(d) ("Requirements of EB-5 Program for Borrower") and Section 6.1(f) ("Use of Funds") are clear as to the purposes of the Loan and the permitted uses of the Loan proceeds by Borrower. Section 2.1(d) provides that "Borrower shall use the proceeds of the

Loan solely for the purpose of funding the construction and cost of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement. Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h). Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure period set forth in Section 9.1)."

Section 6.1(f) ("Use of Funds") sets forth Borrower's affirmative covenants that "the proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Loan Agreement for the purpose of funding costs for the Project. Within the later of (i) two (2) years following the funding date of any Tranche or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche where spent directly or indirectly on the Project".

After weeks of repeated and, for the most part, unsuccessful requests by Lender's representatives for information from Borrower regarding its use of the Loan proceeds and status of the Project, Lender was, in November 2015, advised by Messrs. Lichter and Richard Klein, (purportedly the Chief Financial Officer of Borrower's parent entity, Industrial Realty Group), that within the first 2 days following Lender's funding of the $36,000,000 Loan to Borrower, and unbeknownst to Lender and without Lender's permission or consent, Borrower diverted $25,000,000 of the Loan proceeds (which by the terms of the Loan Agreement were to have been deployed exclusively on the Project), indirectly to two third party entities controlled by Messrs. Lichter and Semarjian and then purportedly loaned by those third parties to IRG RC Market Buildings, LLC, an Ohio limited liability company ("IRG"), another Lichter affiliated entity and the borrower under a separate loan agreement dated May 7, 2012 by and between Lender and IRG (the "Group X/IRG Loan"). The Group X/IRG Loan was made by Lender for an entirely different development project.

The diversion of Loan proceeds from the Project to IRG was according to Messrs. Lichter and Klein evidenced by a series of promissory notes dated as of October 18, 2013, copies of which were after numerous requests by Lender, finally provided by Borrower via email to Lender in December, 2015 (said notes collectively, the "Diversion Notes"). The Diversion Notes purportedly show a flow of $25,000,000 of Loan proceeds from Borrower ultimately to IRG. No supporting or corroborating materials, such as bank statements, financial records or wire transfer instructions or confirmations showing actual transfer of funds have to date been provided to Lender.

Notwithstanding statements previously made by Borrower's representatives regarding the Diversion Notes and use by IRG of the as yet unaccounted for $25,000,000, the balance sheet for IRG for the period ending December 31, 2013 does not reflect the $25,000,000 in question (whether as "assets" or otherwise), nor does it reflect any of the Diversion Notes or any note payable to anyone, other than to Lender under the "EB-5 Note" for $35,000,000 which IRG executed and delivered to Lender in connection with the Group X/IRG Loan.

Similarly, the comparative balance sheets of Borrower as of December 31, 2012 and 2013 do not reflect a reduction of cash as of December 31, 2013 of $25,000,000, nor does it reflect any note receivable of $25,000,000 or otherwise. This raises serious questions concerning whether the copies of the Diversion Notes delivered by Messrs. Lichter and Klein purporting to evidence a loan from Borrower to third party intermediaries and ultimately to IRG, truly reflect the actual disposition of the

$25,000,000 of Loan proceeds in question, and requires further accounting as to the disposition of those funds.

Diversion of Loan proceeds by Borrower for use for any purpose other than those permitted under the Loan Agreement undeniably violates Borrower's covenants under the Loan Agreement, including but not limited to Borrower's affirmative covenants at Section 6.1(f).

Upon learning of the apparent diversion of Loan proceeds, representatives of Lender repeatedly attempted to schedule meetings with Mr. Lichter and other Borrower representatives for the purposes of reviewing records and having further discussions to understand what exactly has happened to the Loan proceeds. Lender's requests have to date been met with what can only be described as dissembling, if not outright stonewalling. This is not a matter that can be allowed to remain unresolved, and thus this letter.

### IV. Litigation Hold/Warning against Spoliation of Evidence

It is difficult for Lender to believe that Borrower or Mr. Lichter and his affiliates would actually misappropriate $25,000,000 of Loan proceeds. Lender wants to give Borrower and Messrs. Lichter, Semarjian and their affiliates the benefit of the doubt as to their intentions, and the opportunity to explain their actions and rectify the current situation, in the hope that declaration of Events of Default and subsequent resort to Lender's various remedies can be avoided. However, the apparent refusal by Borrower, Mr. Lichter and their respective affiliates to engage in forthright discussions with Lender regarding the issues at hand only serves to aggravate matters.

We hope these issues can be resolved amicably, however, Borrower needs to fully comply with the various requests set forth above, in good faith and in a timely manner. We invite a call, or face to face meeting with all concerned parties within 10 days of your receipt of this letter to discuss these issues and various potential paths forward. Borrower's failure to respond in a satisfactory manner, and to in good faith and in a timely fashion comply with Lender's requests as set forth above, may leave Lender with little choice but to pursue appropriate legal action.

Regardless of whether litigation is in state or federal court, similar rules require that Borrower and its attorneys preserve information that may be relevant to any such lawsuit, and such lawsuit would obligate Borrower and its attorneys to impose a "litigation hold" to preserve all of Borrower's documents and electronically stored information (ESI) which may be relevant in this matter. ESI includes data on all computers, networks, storage devices including back up tapes and USB drives, voicemail, and even cell phones and pdas.

"ESI" also includes but is not necessarily limited to, all text files (including word processing documents), Microsoft excel files and all other spreadsheets and charts, emails files and information concerning emails (including logs of email history and usage, header information and "deleted" files), Microsoft outlook and/or other similar files, internet history files and preferences, graphically image files, including but not limited to files with .gif, .tiff, .bmp and .jpg extensions, Portable Document Format (pdf) files and all other read only and/or limited access files, data bases, calendar and scheduling information, computer system activity logs, telephone logs, voicemails and all files fragments and backup files. This list is illustrative, not exhaustive.

We believe that discoverable evidence in the form of "hard copy" documents and ESI may exist in your computer systems, including computers used by your employees and agents, and third parties acting on behalf of or in concert with Borrower and/or its affiliates. Accordingly, this letter shall also serve as notice and demand that such evidence, and all such hard copy, and other discoverable documents, be immediately preserved and retained. Additionally, the continued operation of your computer systems will likely result in the destruction of potentially discoverable evidence due to the fact that electronic evidence can be easily altered, deleted or otherwise modified. The failure to preserve and retain ESI constitutes spoliation of evidence and may subject you and your affiliates to significant adverse consequences, including legal claims for damages and/or evidentiary and monetary sanctions. Please advise all appropriate third parties to preserve and retain all ESI generated or received, including but not limited to the ESI, relating to the issues that are subject to the matters described above.

You and any third parties acting on your behalf must refrain from removing or altering internal or external drives and media attached thereto from any stand alone personal computers, network workstations, notebook and/or laptop, computers, and all wireless devices, including but not limited to personal digital assistance, blackberry, mobile telephones and paging devices. This includes emails sent or received by any employees or other "active information stored" on your services or those of persons acting for or on your behalf. You and your affiliates are obligated to take affirmative steps to prevent anyone with access to its data, systems and archives from seeking to modify, destroy, delete, overwrite or hide electronic evidence on network or local drives, including backup tapes or other storage media, whether online or offline, even if the information was deleted at some prior time.

Please govern yourselves accordingly.

Very truly yours,

Jeffrey D. Weinstock of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc: Via Federal Express
Fainsbert Mase & Snyder, LLP
11835 West Olympic Boulevard, Suite 1100
Los Angeles, CA 90064
Attention: John A. Mase, Esq.

Via Federal Express
Fainsbert Mase Brown & Sussman, LLP
1110 Santa Monica Boulevard, Suite 870
Los Angeles, CA 90025
Attention: Dean Sussman

Via Federal Express
Christopher S. Semarjian
c/o Alan R. Daus & Associates
3401 Enterprise Park Place, Suite 105
Cleveland, OH 44142

Via Email:
CMB Infrastructure Investment
 Group X, L.P.
Attn: CMB Summit, LLC /
 Patrick F. Hogan,
 Managing Member

### Schedule A

1. Identify, and provide the address, telephone number, email address and other contact information of and with respect to the Accountants (including all contact persons within any accounting firm so identified and with whom Lender may communicate with regard to and who has knowledge of the matters referred to in Section 5.1(f) of the Loan Agreement;

2. Deliver to the Accountants the letter called for under Section 5.1(f), instructing the Accountants to disclose the aforesaid information to Lender in compliance with Section 5.1(f); and simultaneously therewith furnish Lender with an executed copy of that letter.

3. Deliver to Lender:

    (a) cash flow projections for the Project, broken out by each building comprising, and each phase of, the Project; budgets, operating statements (for year to date 2016 and for 2015), complete rent rolls identifying each building comprising the Project (using consistent nomenclature and designations for the respective buildings and phases of the Project) and for each suite, office or other premises within or comprising the Project; lease expiration reports and leasing status reports;

    (b) comprehensive and detailed general ledgers of all expenditures to date for and with respect to each component of the Project, together with all invoices for same, organized in accordance with the order in which they are presented in the aforesaid general ledger;

    (c) general ledgers and/or detailed spending records for and with respect to any other related costs, expenses or expenditures for or with respect to the Project - (whether in connection with municipal county, state, federal or other governmental authorities, tenants or otherwise) together with all corresponding invoices; and

    (d) all reports of, and all correspondence from or to environmental consultants with respect to the Property, the Project or any part thereof, and copies of all correspondence to or from any government agency or authority regarding any environmental condition, environmental law or regulation, or any environmental remediation effected or required to be effected on, below or with respect to the Property, Project or any part thereof, including without limitation all reports prepared by Hull and Associates for or in connection with the Property or Project.

4. Advise with specificity, as to each element of environmental remediation of or with respect to the Property or Project or any part thereof, which as of the date of this letter: (i) has been completed; (ii) has been identified as being required but has not been completed (with respect to each such item, provide description of the progress made towards completion of such item and all expenditures in connection therewith, all actions remaining together with estimated cost of completion);

5. Provide true and complete copies of all studies, reports and analyses, including Phase 1 and Phase 2 environmental audits, prepared by or for Borrower or any of its subsidiaries or affiliates with regard to the Property or Project, together with all correspondence between Borrower or any of its subsidiaries, affiliates or their respective representatives, on the one hand, and any state or federal government, official, agency or authority on the other, regarding environmental condition, or remediation of the Property or Project or any part thereof, or any actual or potential requirement for

environmental remediation of or with respect to the Property or Project or any part thereof, together with budgets for all such remaining remediation.

6. Identify all outstanding mortgages, liens and other encumbrances filed of record against, or otherwise encumbering, the Property or any part thereof, including without limitation all liens filed by any persons or entities for or with respect to labor, services or materials provided to or for the benefit of the Property or Project and with respect to each such mortgage, lien or encumbrance, the principal amount thereof, and interest accruing thereon.

7. With respect to each part of the Project (e.g. demolition/renovation, site preparation, permitting, architectural/engineering, environmental, remediation, residential, commercial office, retail, industrial, warehouse, public facilities and common areas, etc.), provide percentage completion to date and projected costs of completion and completion dates.

8. With respect to each part of the Project, provide a table of expenditures to date, together with status and/or completion date for each item listed and indicating with respect to each such expenditure, the amount or percentage allocated to direct investment by Borrower, financing from Lender, and financing provided by third parties.

9. Provide the following information with regard to all distributions received by Borrower from Maple Street Commerce LLC – amount and nature of distribution, (whether cash or other property and if other than cash, provide description of property distributed); and the dates thereof.

10. List and describe (and identify all parties and claimants under or with respect to) all currently pending and threatened claims or litigation against Borrower or its subsidiary, Maple Street Commerce LLC or any of their respective parents, subsidiaries or affiliates, which in any respect relates to the Property or Project or any labor, services or materials provided by any person or entity for or in connection with the Property or Project.

11. Please advise whether Borrower or its subsidiary, Maple Street Commerce LLC engages the services of an architect, engineer, Project manager or any other person charged with primary responsibility for overseeing progress of the Project and/or or facilitating payment of invoices for labor, services or materials relating to the Property or Project; identify and provide contact information for each such person.