# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CMB Infrastructure Investment Group X, L.P., an Illinois Limited Partnership,    ) | CASE NO.: 2016-CV-02717-SL |
|   ) | |
| Plaintiff,   ) | JUDGE SARA LIOI |
|   ) | |
| vs.   ) | MAGISTRATE JUDGE LIMBERT |

CMB Infrastructure Investment Group X, L.P., an Illinois Limited Partnership,

        Plaintiff,

vs.

Maple Street Investors LLC, Stuart Lichter, Mary Claire Lichter, Christopher Semarjian, Maple Street Commerce LLC, IRG Realty Advisors, LLC, Ohio Realty Advisors, LLC, Industrial Realty Group, LLC, Industrial Commerce, Ltd., IRG Master Holdings, LLC, S.L. Properties, Inc., IRG RC Market Buildings LLC, Kaplan Family Trust, Eric Kaplan, as Trustee of the Kaplan Family Trust, Tracy Kaplan, as Trustee of the Kaplan Family Trust, Haas Family Trust, Bruce Haas, Individually, and as Trustee of the Haas Family Trust, Cynthia A. Woelfel, as Trustee of the Haas Family Trust, and Fainsbert Mase Brown & Sussman, LLP,

        Defendants.

CASE NO.: 2016-CV-02717-SL

JUDGE SARA LIOI

MAGISTRATE JUDGE LIMBERT

## AMENDED COMPLAINT

Plaintiff, CMB Infrastructure Investment Group X, L.P. ("CMB"), by and through undersigned counsel hereby sues Defendants, Maple Street Investors LLC, Stuart Lichter, Mary Claire Lichter, Christopher Semarjian, Maple Street Commerce LLC, IRG Realty Advisors, LLC, Ohio Realty Advisors, LLC, Industrial Realty Group, LLC, IRG Master Holdings, LLC, S.L. Properties, Inc., Industrial Commerce, Ltd., IRG RC Market Buildings, LLC, Kaplan Family Trust, Eric Kaplan, as Trustee of the Kaplan Family Trust, Tracy Kaplan, as Trustee of the Kaplan Family Trust, Haas Family Trust, Bruce Haas, Individually and as Trustee of the Haas Family Trust, Cynthia A. Woelfel, as Trustee of the Haas Family Trust, and Fainsbert Mase

Brown & Sussman, LLP, seeking money damages, equitable and other relief, including the appointment of a receiver, and alleges as follows:

## Nature of the Case

1.     Plaintiff brings this lawsuit against the Defendants to address unlawful and intentional acts stemming from a $36,000,000 Loan made by Plaintiff pursuant to a Loan Agreement dated May 7, 2012.  Prior to funding, the borrower and its principals perpetrated a scheme whereby all of the money loaned would be taken and diverted to numerous complicit parties who have been named as Defendants.  The borrower never received, possessed or controlled the Loan Proceeds.  The borrower, Maple Street Investors, LLC ("MSI") along with its affiliates and principals, then engaged in prolonged deceptive efforts to conceal the diversion of the Loan Proceeds from Plaintiff.  When MSI refused to disclose information called for in the Loan Agreement causing this lawsuit to be filed, the scope and extent of the subterfuge was finally revealed.  What was initially an action for breach of contract against MSI, is now also an action in fraud.  Defendants' actions necessitate relief in the form of injunction and receivership. The evidence demands this Court intervene to protect and preserve the assets of the borrower and seek to recover its transferred property.

2.     On May 7, 2012, Plaintiff as "Lender" and Defendant, MSI, as "Borrower", an entity owned by Defendant, Stuart Lichter ("Lichter") and Christopher Semarjian ("Semarjian"), entered into a loan agreement (the "Loan Agreement"),[1] a copy of which is attached hereto as

---

[1] The Loan Agreement, Ex. "A", incorrectly names "CMB Investment Group X, L.P." as "Lender" (instead of Plaintiff/Lender's correct name, CMB Infrastructure Investment Group X, L.P.).  In the First Amendment to Loan Agreement dated October 16, 2013 (*see* Ex. "C"), the parties acknowledged the scrivener's error and agreed that all references to the incorrect name or to "Lender" in the Loan Agreement and in any other Loan Document shall mean and refer to CMB Infrastructure Investment Group X, L.P.

**Exhibit "A"**.  Pursuant to the Loan Agreement, MSI borrowed $36,000,000 from Plaintiff (the "Loan") as part of the capital needed for development of a construction project consisting of the renovation, repurposing and improvement of the former Hoover Vacuum Company campus located on real property in North Canton, Ohio ("Hoover Project").  The Hoover Project is being constructed on real property owned by Maple Street Commerce LLC, an entity that is 90% owned by MSI.

3.      The principal amount of the Loan bears interest at a fixed rate of six percent (6%) per annum.  Interest is payable quarterly and by its terms, the Loan was to mature seventy-two (72) months from the initial funding date.[2]  The funding date was October 16, 2013.

4.      Pursuant to the terms of the Loan Agreement, Plaintiff agreed to lend MSI $36,000,000 in authorized EB-5 investment funds (the "Loan Proceeds") to facilitate the development of the Hoover Project pursuant to the provisions of the EB-5 foreign investor program as authorized by the United States Citizenship and Immigration Services (defined in ¶ 46, *infra*).[3]

5.      In the Loan Agreement, MSI delivered covenants to Plaintiff promising it would use the Loan Proceeds solely for the purpose of funding the construction costs of the Hoover Project.  Notwithstanding the covenants and promises made, Plaintiff has since learned that, MSI, through its co-Defendant affiliates and attorneys, conspired to and engaged in a fraudulent scheme to divert the $36,000,000 in Loan Proceeds which was expressly intended solely for use on the Hoover Project.  In fact, pursuant to a pre-conceived plan, the Loan Proceeds never

---

[2] The 72 months is purposeful pre-negotiated time frame to allow for a typical development for EB-5 funding which will encompass development, leasing and refinance or sale.

[3] The EB-5 investment program provides foreign investors the opportunity to earn permanent residence in the United States by investing capital in U.S. projects that create a certain number of jobs. *See, infra.*

reached an MSI bank account and were never possessed by MSI. Defendants brazenly pocketed the $36,000,000 in Loan Proceeds in direct contravention of MSI's representations to use the funds solely on the Hoover Project.

6. Acting in concert, and over a substantial period of more than three years, Defendants deliberately concealed from Plaintiff the unauthorized diversion of Loan Proceeds. Defendants transmitted false financial reports, created phony paper trails, made intentional omissions, denied Plaintiff records and misrepresented the use of the Loan Proceeds. All of these acts and omissions were designed to obstruct Plaintiff from uncovering the truth.

7. The immediate unauthorized taking of the Loan Proceeds - which commenced days after the Loan was funded - manifests that there was no intention that MSI would receive and use the Loan Proceeds for their intended purpose. Rather, Defendants' intent was to defraud CMB and convert the funds for other uses by the Defendants.

8. In accordance with the terms of the Loan Agreement, prior to commencing suit, Plaintiff undertook repeated and continuous efforts to obtain information and documentation to ensure that the $36,000,000 loaned to MSI was being used solely for construction of the Hoover Project. Yet, in an effort to conceal the fraud and in violation of the Loan Agreement, MSI, through its co-Defendant affiliates, including IRG Realty Advisors, LLC ("IRG RA") and Industrial Realty Group, LLC ("IRG"), failed to supply necessary records and reports required by the Loan Agreement, prohibited CMB's access to MSI's records, and denied Plaintiff's attempts to inspect MSI's books and records at IRG RA's offices in Richfield, Ohio.

9. Prior to funding the Loan, to induce Plaintiff to commence the raising of funds from foreign investors under the EB-5 Program, Lichter on behalf of MSI delivered to Plaintiff in March 2012 an authorization letter. The authorization letter projected that the Hoover Project

construction would be completed by the fourth quarter of 2015 and represented the total capital expenditure by MSI at $70,000,000, including private and public funds from sources other than the Plaintiff.

10.     Today, as of filing, the Hoover Project is still not complete, the diverted $36,000,000 in Loan Proceeds has not been returned to MSI and is unaccounted for, and MSI failed to raise the represented additional funds required for completion of the Hoover Project.

11.     After the misappropriation and while this case has been pending, Defendants sought to cover up the fraudulent transfer of the Loan Proceeds by creating "loan accounts" representing that the Loan Proceeds were loaned to Defendants, S.L. Properties, Inc. and Industrial Commerce, Ltd.  These representations were accompanied by a series of promissory notes ("Diversion Notes") purporting to show a flow of the Loan Proceeds.  The notes first appeared in early December 2015.  The loans purported to be evidenced by the notes have no contemporaneous supporting or corroborating bank statements, financial records or wire transfers to demonstrate the actual transfer of monies to the providers of the notes.

12.     As a result of MSI's repeated failure to fully and properly address Plaintiff's requests for information regarding the status of the Hoover Project and the Loan Proceeds, Plaintiff, through its counsel, provided notice to MSI of numerous Events of Default under the Loan Agreement.  The notice requested that MSI cure those Events of Default as required pursuant to the Loan Agreement.  MSI failed to cure the Events of Default and Plaintiff accelerated the Loan which remains unpaid.

13.     In addition to seeking avoidance and damages for the fraud perpetrated by Defendants, Plaintiff seeks specific performance to obtain records, damages for the repeated and continuing breach of the Loan Agreement by MSI as well as the accelerated return of all unpaid

loan principal, accrued interest, attorneys' fees, cost and expenses.  Plaintiff seeks the appointment of a receiver to recover the $36,000,000 in Loan Proceeds fraudulently transferred; to protect and preserve the assets of MSI; to take full possession and control over and manage the remaining construction of the Hoover Project; to collect rents and other fees due, receive and manage the revenue, interest payments and/or profits of the Hoover Project; to pay operating expenses, including taxes, insurance, utilities, general maintenance, and debt secured by the Hoover Project; to borrow funds as needed to pay for operating and other related expenses; to enter into contracts and employ/terminate contractors and/or staff as necessary to operate the business; and to pursue all claims and take whatever actions are necessary for the protection of Plaintiff and the other EB-5 investors.

14.    Plaintiff also seeks damages from Defendant, Lichter, individually and as the trustee of the Stuart Lichter Trust, which is a member and fifty-percent (50%) owner of MSI, pursuant to a written Guaranty for Lichter's failure to fulfill his obligations under the Guaranty of MSI's obligations of the Loan Agreement.

### Parties

15.    Plaintiff, CMB is an Illinois Limited Partnership, with its principal place of business in Rock Island, Illinois.  CMB's Co-General Partners are CMB Summit, LLC ("CMB Summit"), a Texas limited liability company, and NK Immigration Services, LLC, a Texas limited liability company.

16.    CMB, at the request of Defendant, MSI, originated the Loan and raised capital through EB-5 investors to invest in the Hoover Project.  *See* Ex. "A", p. 1.

17.     Defendant, MSI, is an Ohio Limited Liability Company with its principal place of business in Summit County, Ohio.  The current members of MSI are the Stuart Lichter Trust[4], domiciled in California, and Christopher S. Semarjian, a resident of Ohio.

18.     MSI was formed on April 30, 2012, as a "Single Purpose Entity" organized solely for the purpose of acquiring and holding membership interest in Maple Street Commerce LLC ("MSC").  *See* Ex. "A", pp. 5-6.  MSC holds fee title to the real property and improvements comprising the Hoover Project.

19.     MSC is an Ohio limited liability Company with its principal place of business located in Summit County, Ohio.  The members of MSC are MSI, holding a 90% membership interest in MSC, and DeHoff Development Company, which holds a 10% membership interest.

20.     MSI entered into the Loan Agreement with CMB on May 7, 2012, for the partial funding of the redevelopment of real property and improvements at the Hoover Project.  At the time of the signing the Loan Agreement, MSI's members included Defendants Lichter, Semarjian, Kaplan Family Trust, Haas Family Trust, and non-Party, DeHoff Development Company.  *See* Ex. "A", Attachment 10.10.

21.     In August 2013 – prior to the Loan funding - Defendants Kaplan Trust and Haas Trust sold their member interests (4.02% and 5.62%, respectively) in MSC to Defendants Lichter and Semarjian in exchange for unauthorized payments to be made from the Loan Proceeds.  *See, infra*.  In September 2013, Lichter and Semarjian caused their member interests in MSC to be transferred to MSI.

---

[4] Lichter, individually, held 50% of the member interests in MSI at the time of the Loan funding on October 16, 2013.  Without notice or consent from CMB, pursuant to documents served in this action, he may have transferred his interest to the Stuart Lichter Trust shortly after the Loan was funded.  Such transfer would be in violation of Section 7.3 of the Loan Agreement.  Plaintiff reserves its right to amend on this issue.

22.     Defendant, Lichter, a California resident, and is the 50% owner of MSI.  Lichter also holds membership interests in Defendants, IRG Master Holdings, LLC, IRG Realty Advisors, LLC (via member interests in its sole member, IRG Master Holdings, LLC), Industrial Realty Group, LLC, S.L. Properties, Inc., and IRG RC Market Buildings LLC (via member interests in its sole member, IRG Rubber City, LLC). Lichter and his wife, Claire Lichter received $15,653,146.00 of fraudulently transferred Loan Proceeds.

23.     Defendant, Mary Claire Lichter ("Claire Lichter"), a California resident, is named as a Defendant, individually, and is the wife of Stuart Lichter.  Pursuant to wire records, Lichter and Claire Lichter received $15,653,146.00 of fraudulently transferred Loan Proceeds.

24.     Defendant, IRG RA, is a Delaware Limited Liability Company, with its principal place of business located in Richfield, Ohio.  Defendant, IRG Master Holdings, LLC, a Delaware Limited Liability Company, is the sole Member of IRG RA.

25.     Defendant, Ohio Realty Advisors, LLC ("Ohio Realty"), is an Ohio Limited Liability Company with its principal place of business located in Columbus, Ohio.  The sole member of Ohio Realty is non-Party, ORA Management, LLC, which is owned by IRG RA.

26.     IRG RA, which was formed on November 1, 2013, is the property and project manager for MSC and was primarily responsible for preparing the financial reports, tracking revenue and paying the bills for MSI and MSC on the Hoover Project.  Prior to IRG RA's formation, Ohio Realty was responsible for the property and project management, finances and reporting on the Hoover Project.  As explained in more detail below, Ohio Realty and then IRG RA, acting at the direction of Lichter, Semarjian and their attorneys, concealed the misappropriation of Loan Proceeds through falsified reporting provided to CMB and denial of access to requested records, in contravention of the Loan Agreement.

8

27.     Defendant, IRG Master Holdings, LLC ("IRG Master"), is a Delaware Limited Liability Company with its principal place of business in Downey, California.  Stuart Lichter, as Trustee of the Stuart Lichter Trust, is the 55% owner of IRG Master.  IRG Master was the recipient of $3,600,000 of fraudulently transferred Loan proceeds.

28.     Defendant, S.L. Properties, Inc. ("SLP") is a Delaware corporation with its principal place of business in New Castle, Delaware.  Lichter is the sole shareholder and President of SLP. SLP is the Manager of MSI, IRG and IRG Market.  SLP signed the Loan Agreement on behalf of MSI as the Borrower.

29.     Defendant, IRG RC Market Buildings, LLC ("IRG Market"), is an Ohio limited liability company with its principal place of business in Akron, Ohio.  The sole member of IRG Market is IRG Rubber City, LLC, a Delaware limited liability company, whose members include Lichter and Semarjian.  IRG Market entered into a loan agreement with CMB on May 7, 2012, for the funding of the redevelopment of certain property located in Akron, Ohio and which property was formerly owned and operated by Goodyear Tire & Rubber Company in Akron, Ohio (the "Goodyear Project").  The Loan Agreement between IRG Market and CMB is hereafter referred to as the "Goodyear Loan Agreement."

30.     Defendant, IRG is a Nevada limited liability company with its principal place of business in Henderson, Nevada.  Lichter is the President and sole member of IRG. IRG conspired to further the fraudulent concealment of the misappropriated Loan Proceeds through delivery of the Diversion Notes and subsequently concocted "loan accounts."

31.     MSI, IRG, IRG RA, Ohio Realty, MSC, SLP, IRG Master, and IRG Market are affiliates by virtue of their common ownership.

32.     Defendant Industrial Commerce Ltd. ("ICL"), is an Ohio Limited Liability Company with its principal place of business in Cuyahoga County, Ohio.  The sole member of ICL is Semarjian.  Pursuant to wire records, ICL was a recipient of $15,653,146 of the fraudulently transferred Loan Proceeds.

33.     Defendant, Semarjian is a resident of Ohio, and holds 50% of the membership interests in Defendant, MSI.  Semarjian is the sole member of Defendant, ICL, and also holds member interests in IRG Rubber City, LLC, which is the sole member of IRG Market.

34.     Defendant, Haas Family Trust ("Haas Trust") is a California trust.  Upon information and belief, the trustees of the Haas Trust are Bruce Haas and Cynthia A. Woelfel, residents of California.  Pursuant to wire records, Haas Trust received $537,618.00 in fraudulently transferred Loan Proceeds.

35.     Defendant, Bruce Haas ("Haas"), a California resident, was formerly an Executive Vice President at IRG, and is a Trustee of the Haas Trust.  Pursuant to wire records, Bruce Haas, as co-Trustee of the Haas Trust, received $537,618 in fraudulently transferred Loan Proceeds.  Haas, individually, received an additional $100,000 in fraudulently transferred Loan Proceeds.

36.     Defendant, Cynthia A. Woelfel ("Woelfel"), a California resident, is a Trustee of the Haas Trust.  Pursuant to wire records, Woelfel, as co-Trustee of the Haas Trust, received $537,618 in fraudulently transferred Loan Proceeds.

37.     Defendant, Kaplan Family Trust dated July 23, 2002 ("Kaplan Trust") is a California trust.  Upon information and belief, the trustees of the Kaplan Trust are Eric and Tracy Kaplan, residents of California.  Pursuant to wire records, Kaplan Trust received $456,090.00 in fraudulently transferred Loan Proceeds.

38.     Defendant, Eric Kaplan, a California resident, is a Trustee of the Kaplan Trust. Pursuant to wire records, Eric Kaplan, as co-Trustee of the Kaplan Trust, received $456,090 in fraudulently transferred Loan Proceeds.

39.     Defendant, Tracy Kaplan, a California resident, is a Trustee of the Kaplan Trust. Pursuant to wire records, Tracy Kaplan, as co-Trustee of the Kaplan Trust, received $456,090 in fraudulently transferred Loan Proceeds.

40.     Defendant, Fainsbert Mase Brown & Sussman, LLP ("FMS Law") is a law firm operating in California with its principal place of business in Los Angeles, California.  FMS Law represented MSI in the negotiation of the Loan Agreement, the closing of the Loan, and the assignment of MSI member interests.  FMS Law also represented Lichter in his Guaranty.  FMS Law held the Loan Proceeds in its Special Client Trust Account and the fraudulent wires were initiated from its account.

41.     Non-party, John Mase, is the Chief Executive Officer of IRG and an attorney purporting to represent IRG and MSI.  It is unknown if John Mase is still a practicing attorney with FMS Law, the firm that he co-founded and which continues to bear his name.  IRG and FMS Law are located in the same building and with adjacent offices on the 8th floor of 11100 Santa Monica Boulevard, in Los Angeles, California.

## Jurisdiction and Venue

42.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interest and costs and arises between citizens of different states.

43.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2202 (Injunctions).  CMB seeks specific performance and an injunction enjoining

Defendants, MSI from continuing to violate the terms of the Loan Agreement, as further set out below.

44.    This Court has personal jurisdiction over Defendants because each Defendant either resides or transacts business within this judicial district and has sufficient contacts with the State of Ohio and/or has caused tortious injury in Ohio.  The Hoover Project is located in Summit County, Ohio, and the Goodyear Project is located in Akron, Ohio.  Further, the Loan Agreement and the Goodyear Loan Agreement confer jurisdiction on this Court.  *See* Loan Agreement, Ex. "A", at § 10.14; and Guaranty (Exhibit B to Ex. "C"), at § 5.8.  This Court also has personal jurisdiction over Defendants pursuant to Ohio R.C. § 2307.382.  Specifically, and at all times material hereto:

a.    MSI resides, maintains its principal operations and transacts business in Ohio, and is bound by the terms of the Loan Agreement that confer jurisdiction in this Court.

b.    MSC resides, maintains its principal operations and transacts business in Ohio, has an interest in and possesses real property in the Hoover Project, located in Summit County, Ohio.

c.    Lichter transacts business in Ohio and is bound by the terms of the Guaranty which confers jurisdiction on this Court.

d.    IRG RA resides, maintains its principal operations, transacts business, and contracts to supply services in Ohio, including the property management of MSI/MSC.

e.  At all times material hereto, Ohio Realty resides, maintains its principal operations, transacts business, and contracts to supply services in Ohio, including the property management of MSI/MSC.

f.  IRG, directly and through agents, transacts business and contracts to supply services in Ohio.

g.  IRG Master, directly and through agents, including IRG RA, transacts business in Ohio.  IRG Master is the sole member and parent company of IRG RA.

h.  SLP, directly or through an agent, transacts business and contracts to supply services in Ohio.  SLP, as Manager and agent for MSI, signed the Loan Agreement, which confers jurisdiction in Ohio.

i.  ICL resides, maintains its principal operations, transacts business, and contracts to supply services in Ohio.

j.  Semarjian resides, transacts business, and operates several entities including ICL, MSI, MSC in Ohio.

k.  IRG Market resides and transacts business in Ohio, possesses real property in the Goodyear Project located in Akron, Ohio, and is bound by the terms of the Goodyear Loan Agreement that confer jurisdiction on this Court.

l.  FMS Law transacts business and contracts to supply legal services in Ohio to MSI, MSC, IRG RA, IRG, and IRG Master.

m.  By facilitating the unlawful transfer of and receiving fraudulent transfers of the Loan Proceeds, Defendants, FMS Law, Stuart Lichter, Claire Lichter, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, Woelfel, IRG Master, ICL, and Semarjian caused tortious injury by perpetrating fraud in Ohio by acts

13

committed both inside and outside Ohio with the purpose of injuring CMB, when Defendants might reasonably have expected that CMB would be injured by their conduct.

45.    Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this district because Defendants either reside or transact business in this district or, alternatively, this district is where a substantial part of the events or omissions giving rise to the claims occurred.  Further, the Loan Agreement and Goodyear Loan Agreement confer venue in this district.

### The EB-5 Program

46.    In 1990, Congress created the EB-5 Visa Program to provide prospective immigrants with the opportunity to become lawful U.S. permanent residents by investing in the U.S. economy.  The EB-5 Visa Program is overseen by the U.S. Citizenship and Immigration Services ("USCIS").  *See* USCIS Policy Memorandum PM-602-0083, dated May 30, 2013, available at www.uscis.gov/laws/policy-memoranda.

47.    All times material hereto, to qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million in a commercial enterprise approved by the USCIS ("EB-5 Investor").  Once the investment is effected, the EB-5 Investor may apply for a 2-year conditional green card.  If the investment creates or preserves at least ten (10) U.S. jobs during those two years, the EB-5 Investor may apply to have the conditions removed from the green card.  Once the conditions are removed, the EB-5 Investor is allowed to live and work in the U.S. permanently.

48.    In 1992, a program was launched that set aside a certain number of EB-5 visas for investments that were affiliated with an economic unit known as a "Regional Center."

49.     A Regional Center is defined as any economic entity, public or private, which is involved with the promotion of economic growth, improved regional productivity, job creation, and increased domestic capital investment.  EB-5 Regional Centers are designated by the USCIS to administer EB-5 investment projects based on proposals for promoting economic growth.

## CMB's Regional Centers

50.     CMB Summit is a federally-designated Regional Center with a geographic scope that encompasses Ohio.  CMB, through CMB Summit, is authorized to raise capital under the EB-5 Program.  Funds raised by CMB through CMB Summit from EB-5 Investors may be combined with additional public and private funds to finance the construction of a specific project or projects within the geographic region covered by the Regional Center.

51.     Through its Regional Center partnerships, CMB Summit seeks to assist needy U.S. communities by channeling foreign national investment capital into larger infrastructure construction projects such as roads, sewers, water, electricity generation, transportation, communication upgrades, and public and private building structures.

52.     As an approved Regional Center, CMB Summit is governed by the rules and regulations promulgated under the EB-5 Program.  CMB must comply with USCIS rules in order to protect CMB Summit's designation as a Regional Center as well as the immigration pursuits of its limited partners.

## FACTUAL BACKGROUND

## CMB and MSI Loan Agreement

53.     On March 7, 2012, Lichter, on behalf of MSI, delivered a letter to CMB Summit ("MSI Authorization Letter"), authorizing CMB Summit to raise $36,000,000 in loan financing

(referred to in the MSI Authorization Letter as the "CMB Maple Street Loan") for the Hoover Project.  *See* MSI Authorization Letter, attached hereto as **Exhibit "B"**.

54.     In the MSI Authorization Letter, Lichter expressly represented that "[t]he CMB Maple Street Loan will be used by MSC to fund a portion of the needed equity commitment to the former Hoover Company projects and shall provide significant assistance to the further development of the former Hoover Company properties listed in the table above." *Id.*

55.     Lichter further represented to CMB that the total capital expenditures on the Hoover Project "are expected to exceed $70 million", of which $36,000,000 would be funded through the CMB Maple Street Loan and an additional $34,800,000 would be raised from a combination of public and private funds.  *See* Ex. "A", at § 2.1(d).  The Hoover Project was projected to be completed by the fourth quarter of 2015.  *Id*.  MSI never raised these additional funds and the project remains incomplete.  Had Plaintiff known that MSI would not or could not raise these additional funds, Plaintiff would not have entered into the Loan Agreement.

56.     In reliance on the MSI Authorization Letter and the terms, conditions, and covenants of the Loan Agreement, on May 7, 2012, CMB entered into the Loan Agreement with MSI, agreeing to loan $36,000,000 to MSI "**solely for the purpose of funding the construction costs of the [Hoover] Project.**" *See* Ex. "A", at § 2.1(d) (emphasis added).

57.     On behalf of MSI, the Loan Agreement was signed by Lichter as President of SLP, the Manager of MSI.

58.     FMS Law represented MSI in the negotiation of the Loan Agreement and the closing of the Loan, as well as Lichter in connection with his Guaranty.

59.     On October 16, 2013, CMB and MSI entered into a First Amendment to Loan Agreement ("First Amendment") which included additional terms requiring the members of MSI

16

to execute a Pledge Agreement and for Lichter to execute a Guaranty.  *See* First Amendment, attached hereto as **Exhibit "C"**.

60.     On the same date, the members of MSI, as "Pledgors" entered into a Membership Pledge and Security Agreement ("Membership Pledge") for the benefit of CMB.  *See* Membership Pledge and Security Agreement, attached hereto as **Exhibit "D"**.  Pursuant to the Membership Pledge, as consideration for CMB's agreement, and as security, the members of MSI (Lichter and Semarjian) pledged 100% of their interest in MSI – the owner of 90% of MSC, which held fee title to the Hoover Project.

61.     Pursuant to the terms of the First Amendment, MSI, on October 16, 2013, executed and delivered a promissory note evidencing CMB's funding of the Loan to MSI under the Loan Agreement, in the original principal amount of $36,000,000.  A copy of the Maple Street Investors LLC Promissory Note is attached hereto as **Exhibit "E"** (the "Note").

62.     Upon receipt of the Note signed by Lichter as President of SLP on behalf of MSI, and in reliance on the wiring instructions provided by FMS Law, as MSI's counsel and agent, on October 16, 2013, CMB wired $36,000,000 to FMS Law Special Client Trust Account for the benefit of MSI.

### Misappropriation of MSI Loan Proceeds

63.     Within days of receiving the Loan Proceeds - which were received via wire from CMB and held in FMS Law's Special Client Trust Account - Lichter and Semarjian, without notice or authorization from CMB, caused ***all*** of the $36,000,000 to be disbursed - except not to the rightful borrower, MSI.  Such action was knowingly made in direct violation of Sections 2.1(d) and 6.1(f) of the Loan Agreement.

64.     FMS Law, knowing the Loan Proceeds were expressly restricted to use by MSI solely to fund development of the Hoover Project, failed to wire the Loan Proceeds to MSI. Instead, FMS Law transferred all of the Loan Proceeds via bank wire from its trust account at Comerica Bank (Account No. ending in 3346) to the following recipients and accounts (hereinafter collectively referred to as the "Transferees"):

a.     $15,653,146 to a Wells Fargo account (Account No. ending in 8249) held by **Stuart and Claire Lichter** on October 18, 2013;

b.     $3,600,000 to a Comerica Bank account (Account No. ending in 9843) held by **IRG Master** on October 22, 2013;

c.     $537,618 to a JPMorgan Chase Bank account (Account No. ending in 2274) held by **Bruce Haas and Cynthia A. Woelfel** as Trustees for the **Haas Trust** on October 28, 2013;

d.     $100,000 to a JPMorgan Chase Bank account (Account No. ending in 4885) held by **Bruce Haas** on October 28, 2013;

e.     $456,090 to a Bank of America account (Account No. ending in 9031) held by **Eric and Tracy Kaplan** as Trustees for the **Kaplan Trust** on October 28, 2013; and

f.     $15,653,146 to a PNC Bank account (Account No. ending in 5594) held by **ICL** on November 12, 2013.

65.     Thus, Lichter and Semarjian, with the complicity of FMS Law and the Transferees, orchestrated the unlawful taking of Loan Proceeds intended expressly for MSI and solely for use on the Hoover Project.

66.    The $36,000,000 in EB-5 Loan Proceeds were earmarked by law and by contract solely for use on the Hoover Project pursuant to the Loan Agreement, First Amendment, and the Note, yet **none** of it ever reached an   MSI bank account.   Nor is there **any** evidence to corroborate that the Loan Proceeds were used on the Hoover Project.   These facts were never disclosed to CMB until May 15, 2017, when Defendants MSI and Lichter produced bank wire confirmations in response to discovery– over three and one-half years after the transfers were made.  To date, CMB has been unable to verify (and MSI, Lichter, Semarjian and their agents have failed to account for) the actual use of the Loan Proceeds, where the proceeds went or what value the Transferees provided.

67.    MSI and Lichter now acknowledge in discovery that the Transferees have commingled the Loan Proceeds with other funds and cannot know where the Loan Proceeds are located.

68.    These actions are in breach of Sections 2.1(d) and 6.1(f) of the Loan Agreement, which provides:

> 2.1(d) <u>Requirements of EB-5 Program for Borrower</u>.  Borrower shall use the proceeds of the Loan solely for the purpose of funding the construction costs of the Project, including expenses paid or incurred prior to the Initial Funding Date, and otherwise in accordance with the terms and conditions of this Agreement.   Borrower shall submit to Lender the EB-5 Documentation as provided in Section 5.1(h).  Failure of Borrower to use the proceeds of the Loan in accordance with the terms and conditions of this Agreement or to provide the EB-5 Documentation shall be an Event of Default pursuant to Section 9.1 (subject to any applicable notice and cure periods set forth in Section 9.1).  Borrower further represents that that the total funds anticipated to be expended on the Project, including the use of additional private and public funds, are approximately $70,000,000.00.

> 6.1(f) <u>Use of Funds</u>.  The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this Agreement for the purpose of funding costs for the Project.  Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, Borrower shall provide documentation and supporting accounting

records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the Project.

69.     MSI had actual knowledge that it was in breach of the Loan Agreement, yet failed to provide any notice to CMB in violation of Section 5.1(d) of the Loan Agreement, which provides as follows:

> 5.1(d) Knowledge of Event of Default.   Promptly after Borrower (i) obtains knowledge of any condition or event which constitutes an Event of Default or Unmatured Event of Default, or becomes aware that Lender has given notice or taken any action with respect to a claimed Event of Default or Unmatured Event of Default or (ii) obtains knowledge of any condition or event which has a Material Adverse Effect, a notice specifying the nature and period of existence of such condition or event, or specifying the notice given or action taken by Lender and the nature of such claimed Event of Default, Unmatured Event of Default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto.

**Unauthorized Transfers to Kaplan Trust, Haas Trust, and Haas**

70.     At the date the Loan Agreement was executed, May 7, 2012, Defendant Kaplan Trust held membership interests in MSC totaling 4.02%.

71.     At the date the Loan Agreement was executed, May 7, 2012, Defendant Haas Trust held membership interests in MSC totaling 5.62%.

72.     On August 31, 2013, Kaplan Trust (signed by Eric Kaplan, as Trustee) and Haas Trust (signed by Haas as Trustee) executed separate Assignments of their member interest in MSC, conveying their entire interest to Lichter and Semarjian, the majority owners of MSI and MSC - for the purchase price of $456,090 and $637,618, respectively.  *See* Assignments of Membership Interest, attached hereto as **Exhibit "F"**.  FMS Law representing Lichter and Semarjian, prepared the Assignments and communicated with the assignors and closed the transaction of the Assignments.

73.    The Assignments erroneously stated they are delivered for "cash in hand"; however, the consideration was not funded at execution.   Rather, Defendants used the misappropriated Loan Proceeds as consideration for the purchase of the member interests.

74.    The Loan Proceeds used to pay Kaplan Trust, Haas Trust, and Haas were to facilitate Lichter and Semarjian's buy-out of the remaining MSC member interests in a likely attempt to eliminate the Guaranty.

75.    The terms of the Assignments reveal that the funds used to purchase the membership interests of Kaplan Trust and Haas Trust were to be diverted from the Loan Proceeds:



*See* Ex. "F", pp. 3, 6.[5]

76.    FMS Law, representing the "Buyers", i.e. Lichter and Semarjian, in the assignment of the Kaplan Trust and Haas Trust membership interests in MSC, drafted a Closing Statement memorializing the purchase.  *See* Closing Statement, attached hereto as **Exhibit "G"**. Notably, the Closing Statements are dated 45 days prior to CMB funding the Loan Proceeds. FMS Law facilitated these unlawful transactions knowing they directly violated representations made by MSI as to the use of the Loan Proceeds and concealed the deception by holding the assignments in escrow pending the receipt of the Loan Proceeds from CMB.

---

[5] This text is quoted from a document that is subject to a pending Motion to Seal.

77.     Then, subsequent to funding of the Loan Proceeds, on October 28, 2013, FMS Law wired $456,090 to Kaplan Trust.  On the same day, FMS Law sent wires to Haas Trust in the amount of $537,618 and a second wire for $100,000, to Bruce Haas, individually, for a total of $637,618.  The wire confirmations indicate that these payments were made from the Loan Proceeds intended for Hoover.

78.     As indicated above, Kaplan Trust and Haas Trust were members of MSI at the time of the execution of the Loan Agreement. *See* Ex. "A" at attachment 10.10.  Thus, Kaplan Trust, Haas Trust, in addition to MSI, Lichter, Semarjian and FMS Law had knowledge of Sections 2.1(d) and 6.1(f) which mandate that the Loan Proceeds were to be used on the Hoover Project.  Eric Kaplan even demanded consideration for the Assignment within 3 days of the EB-5 Loan Proceeds closing.

79.     By orchestrating this scheme and facilitating the subterfuge to purchase the minority investors' interests in MSC with the Loan Proceeds prior to the closing of the Loan, Defendants Kaplan Trust, Haas Trust, Haas, and FMS Law in cooperation with MSI, Lichter and Semarjian intended to defraud CMB by misappropriating the Loan Proceeds.

**Defendants Deliberately Conceal the Unauthorized Diversion of Loan Proceeds**

80.     Not only were MSI's Loan Proceeds misappropriated, but Lichter and Semarjian, MSI, IRG RA, Ohio Realty, IRG and FMS Law knowingly and deliberately concealed from CMB the transfer of the $36,000,000 through false financial statements, intentional omissions, obstructionary tactics to preclude access to records and the creation of bogus "loan accounts."

81.     Pursuant to the Loan Agreement, MSI was obligated to provide regular reporting to CMB regarding their finances and the status of the Hoover Project.  IRG RA as property manager, undertook reporting obligations for MSI and MSC.

22

82.     Section 5.1(a) of the Loan Agreement (titled "<u>Operating Statements and Operating Results</u>") requires MSI, as Borrower, to deliver or cause to be delivered to CMB, as Lender:

> As soon as practicable, and in any event within twenty-five (25) days after the end of each calendar month, (i) monthly operating statements, which operating statements shall include actual monthly and year-to-date net operating income and net cash flow results and comparison to the prior calendar year, and variance to budget reporting, detailed rent rolls, cash flow projections, lease status reports and occupancy summaries in the form customarily generated by Borrower for the Property, dated as of the last day of such calendar month, in form and substance satisfactory to Lender, certified to Borrower as being true, correct, and complete in all material respects (each, an "**Operating Statement**").

83.     Section 5.1(b) of the Loan Agreement (titled "<u>Annual Financial Statements; Accountant's Report and Management Letters</u>") requires Borrower, to deliver or cause to be delivered to Lender:

> Within one hundred twenty (120) days after the close of each calendar year, annual audited financial statements of Borrower, prepared on a consolidated basis, consisting of balance sheets, income statements, statements of operations and statements of cash flow and sources and use of funds, together with related schedules and supporting reports, when applicable.  Such financial statements shall be prepared on the basis of GAAP or another accounting method approved by Lender and shall be accompanied by a certificate executed by Borrower or a certified public accountant acceptable to Lender, certifying that such financial statements are true, correct, and complete in all material respects.  Such financial statements are collectively referred to herein as the "**Annual Financial Statements**".  Together with the delivery of such Annual Financial Statements pursuant to this Section 5.1(b), Borrower shall deliver to Lender a copy of the accountant's reports and management letters with respect to such calendar year.

84.     Section 5.1(f) of the Loan Agreement (titled "<u>Other Information</u>") requires Borrower to deliver or cause to be delivered to Lender:

> Such other information, reports, contracts, schedules, lists, documents, agreements and instruments in the possession or under the control of

Borrower with respect to (i) the Property[6], (ii) any material change in Borrower's investment, finance or operating policies, or (iii) Borrower's business, condition (financial or otherwise), operations, performance, properties or prospects as Lender may from time to time reasonably request, including, without limitation, annual information with respect to cash flow projections, budgets, operating statements (current year and immediately preceding year), rent rolls, lease expiration reports and leasing status reports.    Borrower hereby authorizes Lender to communicate with the Accountants and authorizes the Accountants to disclose to Lender any and all financial statements and other information of any kind, including copies of any management letter or the substance of any oral information, that such Accountants may have with respect to Borrower's condition (financial or otherwise), operations, properties, performance and prospects.  Concurrently therewith, Lender will notify Borrower of any such communication.  At Lender's request, Borrower shall deliver a letter addressed to the Accountants instructing them to disclose such information in compliance with this Section 5.1(f).

85.    Section 5.1(g) of the Loan Agreement (titled "<u>Accountant Reports</u>") requires

Borrower to deliver or cause to be delivered to Lender:

> (i) In connection with the audited Annual Financial Statements described in Section 5.1(b) and if at any other time Borrower causes audited financial statements to be prepared with respect to any Fiscal Year, then, within ten (10) Business Days after receipt thereof from the Accountants: copies of such audited financial statements, together with all reports prepared by the Accountants and submitted to Borrower in connection therewith, including the comment letter submitted by the Accountants in connection with such audit, and (ii) copies of all reports prepared by the Accountants and submitted to Borrower in connection with any other annual, interim or special audit or review of the financial statements or practices of Borrower.

86.    Section 5.1(h) of the Loan Agreement (titled "<u>EB-5 Documentation</u>") requires

Borrower to deliver or cause to be delivered to Lender:

---

[6] The Loan Agreement defines the term "Property" as  "the project known as the former Hoover Plant located in North Canton, Ohio" which "generally includes buildings formerly owned by the Hoover Company, comprising approximately 1,100,000 square feet of rentable improvements (including industrial, warehouse and office buildings, and residential and recreational improvements), portions of which shall be rehabilitated with the proceeds of the Loan" and "together with related site improvements, appurtenances, fixtures and tenant improvements, if any, now or hereafter on the Real Property". *See* Ex. "A", p. 1.

At any time during the term of this [Loan] Agreement, upon thirty (30) days written request therefor by Lender, EB-5 documentation reports in form and content acceptable to Lender relating to the construction expenditures made by or on behalf of Borrower with respect to the [Hoover] Project, including a description of each such construction expenditure and the date of each such construction expenditure in such detail as reasonably requested by Lender (the "**EB-5 Documentation**"). Borrower shall state in the EB-5 Documentation that total expenditures on the [Hoover] Project at the time of the delivery of the EB-5 Documentation to Lender, which [Hoover] Project expenditures, including the use of additional private and public funds, are estimated as of the date of this [Loan] Agreement to be approximately $70,000,000.00.  Borrower agrees to produce the EB-5 Documentation at its sole cost and expense.

87.     In addition to regular reporting requirements, the Loan Agreement affords CMB the right to visit and inspect the Property, and to inspect and make copies of financial and accounting records and leases "as often as Lender may reasonably request." *See* Ex. "A", Section 6.1(d) of the Loan Agreement, which states:

6.1(d) <u>Inspection of Property; Books and Records; Discussions</u>.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request.  Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

88.     As will be further explained below, Defendants, IRG RA and Ohio Realty, the entity undertaking responsibility for the financial reporting for the Hoover Project, and IRG, concealed the missing Loan Proceeds from CMB through falsified financial reports and other documentation and obstructing CMB's access to records.

**<u>IRG RA and Ohio Realty Concealed the Misappropriation of Loan Proceeds</u>**

89.     IRG RA is a company that supports its commercial real estate clients through property management, project management, transaction services, and facility management.

Notably, approximately 80% of IRG RA's clientele is comprised of businesses owned by Lichter, including IRG Master, IRG RA's wholly owned parent company.

90.     IRG RA was responsible for the property and project management on the Hoover Project beginning in November 2013.  Prior to November 2013, Ohio Realty held property management responsibilities for the Hoover Project.

91.     As part of that management function, IRG RA and Ohio Realty performed accounting, administrative, and financial services and undertook for MSI reporting and compliance with the reporting requirements under the Loan Agreement.  IRG RA and Ohio Realty had access to all of MSI's financial and banking information including MSI's checking account.

92.     IRG RA and Ohio Realty both had knowledge of the misappropriated Loan Proceeds, and were aware that MSI never held any of the $36,000,000 in its bank account or had access to any of the funds. Yet, despite having knowledge of the misappropriated Loan Proceeds, IRG RA and Ohio Realty provided falsified financial reports to CMB in order to conceal the missing funds.

93.     IRG RA, including its President and Controller (the former President and Controller of Ohio Realty), willfully and recklessly contributed to the concealment.  In or about February 2014, IRG RA, on behalf of MSI, delivered a consolidated December 31, 2013 balance sheet of MSI and MSC to CMB, pursuant to Section 5.1(b) of the Loan Agreement.  The December 31, 2013 balance sheet falsely reported that MSI held $34,264,187 in cash assets. IRG RA knew MSI had virtually no cash in its account.

94.     Similarly, the December 31, 2014 balance sheet provided by IRG RA falsely reports that MSI held $28,284,286 in cash assets.  In fact, MSI had *de minimus* cash assets.

95.     In reality, MSI had little or no cash and was only meeting its intentionally suppressed expenses through what IRG RA was characterizing as "cash calls" or "capital calls". In a scheme orchestrated between Lichter, Semarjian, and IRG RA, IRG RA would contact Lichter and Semarjian to transfer money from other sources including personal bank accounts to MSI.  The "cash calls" were used to satisfy payment obligations to CMB including quarterly interest payments, the payment of "developer fees"[7], and other expenses.  *See* First Amendment to Operating Agreement, attached hereto as **Exhibit "H"**.

96.     The "cash calls" or "capital calls" were well below the threshold represented as needed to keep the Hoover Project on its projected completion schedule.

97.     Lichter and Semarjian even went further to take distributions from MSI as "Distributions of Available Cash Flow"[8] in violation of Section 6.1(h) of the Loan Agreement.

98.     IRG RA's false reporting was intended to conceal from CMB the fact that the Loan Proceeds were misappropriated and never reached the intended borrower, MSI.

99.     In the summer of 2015, in anticipation of EB-5 Program reporting deadlines, CMB was attempting to gather from MSI and IRG RA missing information regarding operations and expenditures on the Hoover Project, including Operating Statements required under Section 5.1(a) of the Loan Agreement.  Defendants' failure to adequately respond to CMB's requests for information raised more questions regarding where and how the Loan Proceeds were put to use.

---

[7] Payments classified as "Developer Fees" were payments made by Lichter and Semarjian to themselves.

[8] *See* Ex. "A", Section 6.1(h), Distributions of Available Cash Flow are defined as "the amount of cash which the management of Borrower deems available for distributions to the Members, taking into account, among other facts, (i) all of Borrower's obligations then due and payable, including, but not limited to, required payments under loan documents, (ii) anticipated Borrower expenditures, and (iii) those amounts which the management of Borrower deems reasonably necessary to place into reserves to satisfy customary and usual claims with respect to Borrower's business."

100.     After CMB's repeated requests for an explanation and for details regarding the vague and inconsistent financial information provided to CMB, Defendants discontinued any meaningful communication with CMB and stopped all reporting in violation of the Loan Agreement.

101.     In September 2015, representatives of CMB sent a written request to MSI and IRG RA for the production of documents pursuant to Section 5.1(h) of the Loan Agreement. CMB's requests were ignored by Defendants.

102.     On October 21, 2015, CMB's representatives sent another written request to MSI notifying them that CMB's representatives would be traveling to Richfield, Ohio, for inspection and to make copies of financial and accounting records and leases, pursuant to Section 6.1(d) of the Loan Agreement.

103.     On October 26, 2015, CMB's representatives visited IRG RA's offices in Richfield, Ohio. Upon their arrival, they were intercepted by Tracy Green, President of IRG RA, who denied CMB's representatives access to the offices and records pertaining to the Hoover Project. Green stated to the CMB representatives that he was under direction from Lichter and Semarjian not to provide them access to the documentation.

### Industrial Realty Group, LLC Concealed the Misappropriation

104.     After CMB was denied access to the Hoover Project records by IRG RA, at the direction of Lichter and Semarjian, Richard Klein ("Klein"), the Chief Financial Officer of IRG was recruited to aid in the cover-up and further the fraudulent concealment.

105.     In November 2015, after weeks of unsuccessful attempts by CMB's representatives to elicit responses to various requests for information regarding the use of the Loan Proceeds and status of the Hoover Project, CMB was advised by Defendant, IRG, the entity

wholly-owned by Lichter, that days after the October 16, 2013 funding of the $36,000,000 Loan, MSI "loaned" $25,000,000 of the Loan Proceeds to SLP and ICL who allegedly then loaned those funds to IRG Market for use in the Goodyear Project.[9]

106.    In further attempts to conceal the fraud, Klein relayed the story that on October 18, 2013, two days after the Loan funding, MSI loaned $14,300,000 to SLP, the Manager of IRG Market, which in turn loaned  the entire $14,300,000 to IRG Market  on the same date.  Klein further represented an additional $10,700,000 was loaned from MSI to ICL, which in turn then loaned the entire $10,700,000 also to IRG Market.  After CMB pressed Klein for documentation of said "loans", Klein eventually, in December 2015, delivered copies of four (4) purported promissory notes dated October 18, 2013, which make up four of the eight total Diversion Notes:

     a.     $14,300,000 from SLP for the benefit of MSI;

     b.     $14,300,000 from IRG Market for the benefit of SLP;

     c.     $10,700,000 from ICL for the benefit of MSI; and

     d.     $10,700,000 from IRG Market for the benefit of ICL.

*See* Promissory Notes, attached hereto as Composite **Exhibit "I"** (pp. 1-8).

107.    CMB later learned that these promissory notes were false and has reason to believe that they were conceived and backdated to try and placate CMB and end its persistent inquiries as to the use of the Loan Proceeds.

108.    The information relayed and documents provided through Klein were false and intentionally provided to continue the concealment of the fact that the Loan Proceeds were never with MSI, but were taken and distributed unlawfully.

---

[9] This representation was also discovered to be untrue, as CMB later learned in the discovery process that all of the $36,000,000 in Loan Proceeds were diverted.  *See* ¶¶ 63 – 66, *supra*.

109.    IRG Market – the purported ultimate beneficiary of the $25,000,000 unauthorized transfers according to the representations made by IRG – never reported having received the $25,000,000 in loans from SLP and ICL in any financial statements or reports provided to CMB as part of the Goodyear Project.

110.    IRG had knowledge of the actual wire transfers of the Loan Proceeds to the six Transferees which occurred in October and November 2013 and had knowledge that the four Diversion Notes were false in that they did not represent actual cash transfers from SL, ICL, or MSI.  Yet IRG chose to intentionally misrepresent the truth and instead, presented the notes to conceal the fraud.

111.    The fraud continued despite the filing of this lawsuit in November 2016.  After the lawsuit was filed, an additional four Diversion Notes dated December 31, 2016, were produced to Plaintiff in April 2017.

112.    The December 31, 2016 notes are titled "Amended and Restated Promissory Notes" and consist of the following additional four Diversion Notes:

a.    $9,139,725 from SLP for the benefit of MSI;

b.    $8,743,959.35 from SLP for the benefit of MSI;

c.    $6,997,722.57 from ICL for the benefit of MSI; and

d.    $6,601,944.76 from ICL for the benefit of MSI.

*See* Composite Ex. "I" (pp. 9-16).

113.    The terms of the Amended and Restated Notes purportedly created after the commencement of this lawsuit include interest-only payments, payable at the rate 0.5% per year with a maturity date of October 1, 2019.  *See Id.*

30

114.    Obviously, such interest rate would not generate enough income to pay the 6% quarterly interest payments to CMB.

115.    CMB has now received multiple sets of dubious "promissory notes" purporting to evidence loans from MSI.  The promissory notes are nothing more than an artifice created after the fact to re-characterize the loss of capital from an unlawful taking to a "loan".  The bank records establish that MSI never had the money to make the loans reflected in the Diversion Notes.  There is no dispute that the Loan Proceeds were misappropriated and commingled with other funds of the Transferees and there remains substantial doubt whether sufficient funds are available to complete the Hoover Project, and the true condition of the Hoover Project is unknown.

116.    The bungling of eight Diversion Notes, all for different amounts and involving different entities, demonstrate  the difficulty in attempting to create, after the fact, manufactured loan transactions.  The steps taken also demonstrate a well-conceived plan to conceal and obfuscate the actual taking of the Loan Proceeds.

### The Goodyear Project and IRG Market's Fraudulent Conduct

117.    On March 7, 2012, Lichter sent a separate Authorization Letter on behalf of IRG Market ("Goodyear Authorization Letter"), to  CMB Summit to raise an additional $35,000,000 in loan financing for funding improvements to properties formerly owned and operated by Goodyear Tire & Rubber Company and located in Akron, Ohio ("CMB Goodyear Project Loan").  *See* IRG Market Authorization Letter, attached hereto as **Exhibit "J"**.

118.    In the IRG Market Authorization Letter, Lichter represented that the Goodyear Project would exceed $252 million in total funding, including the $35,000,000 to be funded by CMB.  *Id.*

119.    As was the case in the MSI Authorization Letter, the IRG Market Authorization Letter identified the use of Loan Proceeds, specifically for use in development of the Goodyear Project: "to fund a portion of the needed equity commitment to the existing Goodyear Headquarters Buildings projects and shall provide significant assistance to the further development of IRG RC properties." *Id.*

120.    Contemporaneous with the execution of the Loan Agreement, on May 7, 2012, CMB also entered into a loan agreement with IRG for a loan for the financing of the Goodyear Project in the amount of $35,000,000 ("Goodyear Loan Agreement").

121.    On August 7, 2013, IRG executed and delivered to CMB a $35,000,000 promissory note in accordance with the Goodyear Loan Agreement.

122.    Similar to the MSI Loan Agreement, the Goodyear Loan Agreement requires IRG Market to provide CMB with audited financial statements and accounting reports as well as EB-5 documentation and other information within specified time periods, including Sections: 5.1(a) ("Operating Statements and Operating Results"); 5.1(b) ("Annual Financial Statements; Accountants Reports and Management Letters"); 5.1(f) ("Other Information"); 5.1(g) ("Accountant Reports"); and 5.1(h) ("EB-5 Documentation").

123.    Like MSI, IRG Market has failed to comply with the Goodyear Loan Agreement in providing the required reporting.

124.    IRG Market, owned by Defendants Lichter and Semarjian through IRG Rubber City, LLC[10], ceased reporting in furtherance of the conspiracy to conceal the misappropriation of the Loan Proceeds.  Because IRG was initially advising CMB that $25,000,000 of the Loan Proceeds were loaned to IRG Market (*see* ¶¶ 105 - 106, *supra*), if IRG Market were to accurately

---

[10] Haas Trust and Kaplan Trust are minority members of IRG Rubber City, LLC.

report that it did not receive $25,000,000 in the form of a loan, the scheme would have been revealed to CMB earlier.

125.     Accordingly, IRG Market actively engaged in the fraud.

## COUNT I

### Breach of Loan Agreement and Acceleration of Repayment of Note against MSI

126.     CMB re-alleges and incorporates herein paragraphs 1 through 69, 81 through 88, 97, and 99 through 103, herein.

127.     CMB and MSI are parties to a May 7, 2012 written Loan Agreement.

128.     On October 16, 2013, MSI executed and delivered to CMB the Note.

129.     CMB performed its contractual obligations under the Loan Agreement by, *inter alia*, disbursing to MSI the amount of $36,000,000.   CMB provided proper notice to MSI pursuant to Sections 9.1 (Event(s) of Default) and 9.2(a) (acceleration of the loan) of the Loan Agreement.

130.     MSI breached the Loan Agreement by failing to comply with its obligations under the Loan Agreement.  Specifically:

a.     Section 2.1(d) – Failing to use the proceeds of the Loan solely for the purpose of funding the construction costs of the Hoover Project;

b.     Section 5.1(a) – Failing to provide CMB with monthly Operating Statements;

c.     Section 5.1(b) – Failing to provide CMB with "Annual Financial Statements" (as defined in Section 5.1(b), *see* ¶ 23, *supra*, for 2013, 2014, and 2015);

d.     Section 5.1(d) – Failing to disclose to CMB until December 2015 (and then only after repeated requests by CMB for information regarding Defendant's use of

Loan Proceeds) MSI's diversion in October 2013 of all $36,000,000 of Loan Proceeds to third parties;

e.    Section 5.1(f) – Failing to properly account for, and respond directly and in good faith to repeated requests by CMB for information regarding MSI's use of Loan Proceeds;

f.    Section 5.1(g) – Failing to deliver to CMB any annual audited financial statements or any reports prepared by MSI's accountants in connection with the Audited Financial Statements or any accountant reports in connection with any other annual, interim, or special audits or review over the financial statements or practices of MSI;

g.    Section 5.1(h) – Failing to provide CMB with all requested EB-5 Documentation regarding the Hoover Project;

h.    Section 6.1(d) – Refusing to allow CMB or its representatives to inspect financial records and leases and to make copies and to take extracts therefrom at Defendant's offices at the Property or otherwise;

i.    Section 6.1(f) – Diverting and failing to account for the Loan Proceeds;

j.    Section 6.1(g) – Engaging in impermissible transactions with Defendants, Lichter, Claire Lichter, IRG Master, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, Woelfel, and ICL, in connection with the diversion and fraudulent transfers of the Loan Proceeds;

k.    Section 6.1(h) – Making impermissible distributions to members without meeting the standards as stated in Section 6.1(h) and defined in "Distributions of Available

Cash Flow" and failing to retain 50% of all distributions made to members be paid to CMB as a prepayment of the principal of the Loan.

l.      MSI's commission of fraud in connection with the diversion of the Loan Proceeds.

131.    MSI's breaches of the aforementioned Sections are material and have resulted in Events of Defaults under Section 9.1 of the Loan Agreement, which states, in part:

> 9.1 EVENTS OF DEFAULT:  Each of the following occurrences shall constitute an "**Event of Default**" under this [Loan] Agreement:
>
> (a) <u>Failure to Make Payments When Due</u>.  Borrower's failure to pay (i) any amount due on the Maturity Date, (ii) any other principal payment within ten (10) days after the date upon which it first became due, (iii) any interest on the Loan (or any Tranche thereof) within ten (10) days after the applicable Interest Payment Date, or (iv) any fee or other amount payable under any Loan Document within ten (10) days after the date upon which it first became due.
>
> (b) <u>Other Defaults</u>.  Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this  Agreement which could lead to a Material Adverse Effect[11] (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law)[12].
>
> (h) <u>Transfer of Assets</u>.  The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this Agreement, or as otherwise permitted by the Loan Documents.

---

[11] The Loan Agreement defines "Material Adverse Effect" to mean, with respect to Borrower, a material adverse effect upon the condition (financial or otherwise) of Borrower. *See* Ex. "A", p. 4.

[12] *See* Letter dated March 7, 2016, from CMB to MSI, demanding compliance with the Loan Agreement, attached hereto as **Exhibit. "K."**

> An Event of Default shall be deemed "continuing" until cured or waived in writing in accordance with Section 9.3 or 10.3.

132.    The diversion of $36,000,000 in Loan Proceeds is a Material Adverse Effect.

133.    Upon the occurrence of an Event[s] of Default by MSI, the Loan Agreement expressly authorizes CMB to "institute any proceeding at law or in equity to enforce the obligations of Borrower under this Agreement and/or any covenants and obligations of Lender contained in this Agreement." *See* Ex. "A", at § 9.2(d).

134.    Further, upon the occurrence of an Event of Default, Section 9.2(a) of the Loan Agreement provides:

> 9.2(a) Acceleration, Etc.  Upon the occurrence and during the continuance of any Event of Default, at the option of Lender, the unpaid principal amount of and any and all accrued interest on the Loan shall become immediately due and payable, with all additional interest from time to time accrued thereon and without presentment, demand or protest or other requirements of any kind (including, without limitation, valuation and appraisement, diligence, presentment, notice of intent to demand or accelerate or notice of acceleration), all of which are hereby expressly waived by Borrower, and the obligations of Lender to make any further disbursement under the Loan shall thereupon terminate.  On or after the Maturity Date, subject to the provisions of this Agreement and the other Loan Documents, Lender may exercise any or all rights and remedies under the Loan Documents or applicable law.

135.    As a result of MSI's breaches, CMB has suffered damages and has opted to accelerate the repayment of the loan pursuant to Section 9.2(a).

136.    By letter dated March 7, 2016, CMB, through counsel, notified MSI of its failures to comply with the Loan Agreement and demanding cure.  *See* Ex. "K".  MSI has failed to cure the defaults.

137.    By letter dated September 30, 2016, CMB provided MSI with a demand for the acceleration of the repayment of the unpaid principal on the Loan and including any and all unpaid interest.  *See* **Exhibit "L",** attached hereto.

138.    CMB owns and holds the Note.

139.    The entire principal sum of $36,000,000 and accrued interest is now due and owing on the Note and remains unpaid.

140.    CMB is entitled to recover from MSI all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

WHEREFORE, CMB demands judgment against MSI for the following:

a.      The immediate repayment of the unpaid principal amount of the Loan of $36,000,000 plus all accrued interest;

b.      Monetary damages;

c.      Interest;

d.      All reasonable out-of-pocket costs and expenses, including attorney fees;

e.      Injunctive relief enjoining MSI from further violations of the Loan Agreement; and

f.      All such other and further relief as the Court deems just and proper.

## COUNT II

## Specific Performance against MSI

141.    CMB re-alleges and incorporates herein paragraphs 1 through 69, 81 through 88, 97, 99 through 103, and 126 through 140.

142.    MSI is in default for failure to comply with its obligations under the Loan Agreement.

143.    CMB seeks relief from the Court in the form of an judgment requiring MSI to specifically perform its obligations under the Loan Agreement as provided in the following sections:

6.1(d) Inspection of Property; Books and Records; Discussions.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect the Property (subject to the rights of tenants of the Property), to inspect financial and accounting records and leases, and to make copies and take extracts therefrom, all at such times during normal business hours and as often as Lender may reasonably request.  Lender will keep proper books of record and account in which entries, in conformity with GAAP and as otherwise required by this [Loan] Agreement and applicable Requirements of Law, shall be made of all dealings and transactions in relation to its businesses and activities and as otherwise required under Section 5.1.

144.    Section 6.1(f) of the Loan Agreement provides:

6.1(f) Use of Funds.  The proceeds of the Loan shall be used solely in accordance with the terms and conditions of this [Loan] Agreement for the purpose of funding costs for the [Hoover] Project.  Within the later of (i) two years following the funding date of any Tranche, or (ii) thirty (30) days following Borrower's receipt of written request of such information from Lender, [MSI] shall provide documentation and supporting accounting records and contract documents demonstrating that Loan proceeds from such Tranche were spent directly or indirectly on the [Hoover] Project.

145.    An "Event of Default" is defined in Section 9.1 of the Loan Agreement, and

includes, in part:

9.1 EVENTS OF DEFAULT:  Each of the following occurrences shall constitute an "**Event of Default**" under this [Loan] Agreement:

(a) Failure to Make Payments When Due.  Borrower's failure to pay (i) any amount due on the Maturity Date, (ii) any other principal payment within ten (10) days after the date upon which it first became due, (iii) any interest on the Loan (or any Tranche thereof) within ten (10) days after the applicable Interest Payment Date, or (iv) any fee or other amount payable under any Loan Document within ten (10) days after the date upon which it first became due.

(b) Other Defaults.  Should Borrower fail duly and punctually to perform or observe any agreement, covenant or obligation binding on Borrower under this [Loan] Agreement which could lead to a Material Adverse Effect (including (i) Borrower's failure to deliver the Loan Documents required by Section 3.1(e), or (ii) Borrower's failure to deliver the EB-5 Documentation in accordance with Section 5.1(h)), and such failure shall continue for thirty (30) days after the date on which Lender gives

Borrower notice of such failure (or such lesser period of times as is mandated by applicable Requirements of Law).

(h) <u>Transfer of Assets</u>.  The sale, assignment, pledge, hypothecation, mortgage or transfer of all or a substantial portion of assets of Borrower, other than in the ordinary course of business of Borrower, as disclosed to Lender by Borrower prior to the date of this [Loan] Agreement, or as otherwise permitted by the Loan Documents.

An Event of Default shall be deemed "continuing" until cured or waived in writing in accordance with Section 9.3 or 10.3.

146.    Upon the occurrence of an Event of Default, Section 9.2(b) of the Loan

Agreement provides:

9.2(b) <u>Access to Information</u>.  If an Event of Default then exists, Lender shall have, in addition to and not by way of a limitation of any other rights and remedies contained in this [Loan] Agreement or in the other Loan Documents[13], the right within forty-eight (48) hours after notice to Borrower to obtain access to Borrower's records (including computerized information, files and supporting software) and its accounting information, and to use all of the foregoing and the information contained therein in any manner Lender deems appropriate.  Borrower hereby authorizes any accountant or manager employed by Borrower to deliver such items and information to Lender.  Notwithstanding anything to the contrary contained in the Loan Documents, upon the occurrence of and during the continuance of an Event of Default, Lender shall be entitled to request and receive, by or through [MSI] or appropriate legal process, any and all information concerning Borrower or any of its property which is reasonably available to or obtainable by Lender.

147.    In an Event of Default, Section 9.2(d) of the Loan Agreement affords CMB the

right to institute any proceeding at law or in equity to enforce the obligations of MSI under this

Agreement and/or any covenants and Obligations of MSI contained in this Agreement.

---

[13] The Loan Agreement defines "Loan Documents" as "those agreements, instruments and documents (together with any amendments and supplements thereto and replacements thereof, and in recordable form, if necessary) listed on <u>Exhibit C</u> [of the Loan Agreement] as Loan Documents and any other agreements, instruments or documents previously or hereafter executed by Borrower which evidence or secure the Obligations. *See* Ex "A", p. 4.

148.    By letter dated March 7, 2016, CMB, through counsel, requested pursuant to above-referenced Sections  of the Loan Agreement, that MSI, *inter alia*, deliver to CMB certain information and documents regarding the accounting, finances, and EB-5 Documentation of the Property and the Hoover Project within thirty (30) days.  *See* Ex. "K".

149.    In that same letter, CMB requested, pursuant to Section 6.1(d) of the Loan Agreement, that MSI allow CMB's representatives to inspect and make copies of the financial and accounting records and leases of the Property and the Hoover Project within 30 days.

150.    MSI should further be required to provide all of the information and documents demanded by CMB and to which CMB is entitled under  Sections 5.1(a), 5.1(b), 5.1(f), 5.1(g) and 5.1(h) of the Loan Agreement, including audited financial statements and disclosure of all information provided to and developed by the Auditors.

151.    Given MSI's misrepresentations and active concealment of the $36 million unauthorized transfer of funds, Plaintiff has reasonable justification to discover the use of the loaned funds, MSI's compliance with other aspects of the Loan Agreement, as well as the terms of the Promissory Note, and whether MSI has the financial wherewithal and ability to complete the Hoover Project and repay the Loan.  CMB must be able to review and verify information associated with the EB-5 Program.

152.    Specific performance is appropriate and necessary to determine MSI's compliance with its covenants under the Loan Agreement.  Only through inspection of the records and reports can CMB determine the nature and extent of the use of Loan Proceeds, violations of compliance with  the covenants contained in the Loan Agreement, or the extent to which the pledged collateral is compromised.

153.    Moreover, CMB lacks an adequate remedy at law if MSI continues to violate the Loan Agreement by failing to provide required documents and information and permit an inspection of the records.   MSI's continued disregard of its obligations under the Loan Agreement jeopardizes CMB's own compliance with USCIS requirements.

154.    CMB has complied with all of its obligations under the Loan Agreement by providing proper written notice pursuant to Section 9.1(b) in the form of the March 7, 2016 letter. *See* Ex. "K".

155.    CMB is entitled to recover from Defendant all reasonable costs and expenses including attorney fees incurred by CMB pursuant to the Loan Agreement at Section 10.1.

WHEREFORE, CMB requests that the Court enter judgment in its favor, ordering  MSI to provide all records and reports required under the Loan Agreement including Sections 5.1(a), 5.1(b), including audited financial statements, and sources and uses of capital funding, 5.1(g), and  5.1(h), and permit CMB to inspect all of MSI's records including its computerized information, files and supporting software and its accounting information pursuant to Section 5.1(f) and 9.2(b) and records to trace disbursements of funds through a forensic examination, all reasonable costs and expenses, including attorney fees incurred, together with such all such other relief as it deems just and proper.

## COUNT III

### Breach of Guaranty against Lichter

156.    CMB re-alleges and incorporates herein paragraphs 1 through 69, 81 through 88, 97, 99 through 103, 126 through 140, herein.

157.    On October 16, 2013, Lichter, as holder of a 50% membership interest in MSI, entered into a Guaranty of the terms of the Loan Agreement and the $36,000,000 promissory

note executed by MSI for the benefit of CMB (referred to in the Guaranty as the "Guaranty Obligations", *see* Section 2.1, *infra*). *See* Guaranty, attached as **Exhibit "M"** (the Guaranty is also attached to the First Amendment to Loan Agreement, Ex. "C").

158. Section 2.1 of the Guaranty provides that Lichter, as Guarantor:

> hereby unconditionally, absolutely and irrevocably guarantees, as primary obligor and not merely as a surety, the due, punctual and full payment (when and as the same may become due and payable) of the Obligations evidenced by the Note in accordance with, and subject to, the terms of the Loan Agreement (collectively, subject to the limitation set forth in Section 2.7, the "Guaranteed Obligations"). Guarantor acknowledges and agrees that this Guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be had by Lender against any other obligator, to any other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other Person, or against any other guarantor under any other guaranty covering the Guaranteed Obligations.

159. Section 2.7 of the Guaranty provides that Lichter's obligations as Guarantor are limited to 10% of the $36,000,000 funded under the Loan Agreement:

> (a) The total amount of the Guaranteed Obligations shall be limited to an amount equal to ten percent (10%) of the amount funded under the Loan, less amount paid to Lender to reduce the amount due under the Note, and (b) Guarantor's liability hereunder the Guaranteed Obligations shall not exceed Three Million Six Hundred Thousand and No/100 Dollars ($3,600,000.00) (the "Cap"). Nothing contained herein shall expand the obligations of Guarantor beyond those of Borrower as incurred under the Loan Documents, and in all events Guarantor's obligations hereunder shall be subject to the Cap.

160. On September 30, 2016, CMB provided written notice to Lichter detailing MSI's breaches of its obligations that constitute Guaranteed Obligations as provided in Section 2.1 and 2.6 of the Guaranty. CMB invoked the Guaranty and demanded prompt payment of the $3,600,000 owed thereunder. *See* Sept. 30, 2016 Correspondence to Lichter, attached hereto as **Exhibit "N".**

161.    Pursuant to Section 2.6 of the Guaranty, Lichter has failed to provide payment to CMB within twenty (20) business days after receipt of the September 30, 2016 letter.

162.    Lichter has breached his obligations under the Guaranty.

163.    CMB has been damaged by Lichter's breach of the Guaranty.

164.    Pursuant to Section 4.1 of the Guaranty, in the event of a failure by Lichter to pay any amounts due, CMB , as Lender "shall be entitled to all rights and remedies to which it may be entitled hereunder or at law, in equity or by statute, subject to the limitations set forth in Section 2.7."

165.    CMB is entitled to recover from Lichter all reasonable costs and expenses including attorney fees incurred by Plaintiff pursuant to the Guaranty at Section 5.2.

WHEREFORE, CMB demands judgment against MSI for the following:

a.      The immediate payment of the Guaranteed amount of $3,600,000 plus all accrued interest;

b.      Monetary damages;

c.      Interest;

d.      All reasonable out-of-pocket costs and expenses, including attorney fees; and

e.      All such other and further relief as the Court deems just and proper.

## COUNT IV

### Foreclosure of Membership Interests in MSI against Semarjian

166.    CMB re-alleges and incorporates herein paragraphs 1 through 125, and 126 through 140, herein.

167.    On October 16, 2013, Defendant Semarjian, as the holder of a 50% membership interest in MSI, executed a Membership Pledge and Security Agreement for the benefit of CMB. *See* Membership Pledge, Ex. "D".

168.    Pursuant to the Membership Pledge, in consideration for the Loan, Semarjian, as "Pledgor" has agreed to pledge a portion of the Collateral.

169.    Section 2 of the Membership Pledge defines "Collateral" as:

> Grant of Security Interest.  As security for the full and prompt performance of all of the Secured Obligations, each Pledgor hereby assigns, transfers to, grants a security interest in and pledges to Lender (i) such Pledgor's Pledged Interest[14], together with all right (whether now owned or hereafter acquired) in, to and under whatever is receivable or received when such Pledged Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions on such Pledgor's Pledged Interest, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or other change declared or made in the capital structure of Borrower or otherwise and all proceeds, products, additions, accessions, rents, issues, royalties of or to any of the foregoing, in whatever form; and (ii) without limiting the foregoing clause (i), such Pledgor's Economic Interest[15], together with all rights of such Pledgor, whether now owned or hereafter acquired, in, to and under whatever is receivable or received when such Economic Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions thereon, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to our

---

[14] Defined as one hundred percent (100%) of each Pledgor's individual Membership Interest in Borrower. *See* Ex. "D", at p. 2.

[15] Defined as all of the economic benefit accrued or accruing, including, without limitation, all proceeds from sale or assignment, rights to dividends and distributions of any type (regular or special, and whether pertaining to profits, return of capital or otherwise) with respect the Pledged Interest of each Pledgor. *See* Ex. " D", at p. 1.

upon conversion of or in exchange for all or any portion of such Economic Interest or other property subject to this Agreement, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise.

170.    Section 17.1 of the Membership Pledge defines a "Default" as "[a]ny 'Event of Default' as defined in the Loan Agreement."

171.    MSI has breached the Loan Agreement by failing to comply with its obligations under the Loan Agreement and defaulted in payment on the Note (*See* ¶ 124), constituting Events of Default under Section 9.1 of the Loan Agreement.

172.    Semarjian, Lichter, and MSI were all active participants in an organized scheme to defraud CMB, divert the Loan Proceeds and conceal such diversion.

173.    A UCC Financing Statement was filed with the Ohio Secretary of State.  A copy of the UCC financing statement is attached hereto as **Exhibit "O"**.  The financing statement names Semarjian as the Debtor and discloses the Collateral.

174.    CMB's Security interest has attached and was perfected.

175.    CMB, by virtue of the Membership Pledge, is entitled to possession of the Collateral and all benefits and rights commensurate therewith.

WHEREFORE, CMB demands judgment against Defendant, Semarjian for the following:

a.    Declaring CMB is entitled to immediate possession of the Collateral and all rights and benefits commensurate therewith;

b.    Directing Semarjian to take all necessary action to transfer and deliver the Collateral; and

c.    All such other and further relief as the Court deems just and proper.

## COUNT V

### Foreclosure of Membership Interests in MSI against Lichter

176.     CMB re-alleges and incorporates herein paragraphs 1 through 125, and 126 through 140, herein.

177.     On October 16, 2013, Defendant Lichter, as holder of a 50% membership interest in MSI, executed a Membership Pledge and Security Agreement for the benefit of CMB.  *See* Membership Pledge, Ex. "D".

178.     Pursuant to the Membership Pledge, in consideration for the Loan, Lichter as a "Pledgor" has agreed to pledge a portion of the Collateral.

179.     Section 2 of the Membership Pledge defines "Collateral" as:

> Grant of Security Interest. As security for the full and prompt performance of all of the Secured Obligations, each Pledgor hereby assigns, transfers to, grants a security interest in and pledges to Lender (i) such Pledgor's Pledged Interest[16], together with all right (whether now owned or hereafter acquired) in, to and under whatever is receivable or received when such Pledged Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions on such Pledgor's Pledged Interest, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or other change declared or made in the capital structure of Borrower or otherwise and all proceeds, products, additions, accessions, rents, issues, royalties of or to any of the foregoing, in whatever form; and (ii) without limiting the foregoing clause (i), such Pledgor's Economic Interest[17], together with all rights of such Pledgor, whether now owned or hereafter acquired, in, to and under

---

[16] Defined as one hundred percent (100%) of each Pledgor's individual Membership Interest in Borrower. *See* Ex. "D", at p. 2.

[17] Defined as all of the economic benefit accrued or accruing, including, without limitation, all proceeds from sale or assignment, rights to dividends and distributions of any type (regular or special, and whether pertaining to profits, return of capital or otherwise) with respect the Pledged Interest of each Pledgor. *See* Ex. "D", at p. 1.

46

whatever is receivable or received when such Economic Interest, or any proceeds thereof, are sold, collected, exchanged or otherwise disposed of (whether constituting accounts, goods, money, documents, instruments, chattel paper, investment property or general intangibles), whether such disposition is voluntary or involuntary; all dividends and distributions thereon, additions thereto and substitutions therefor, including any and all new or substituted or additional cash, securities, instruments or other properties distributed with respect to our upon conversion of or in exchange for all or any portion of such Economic Interest or other property subject to this Agreement, whether as a result of merger, consolidation, dissolution, reorganization, recapitalization, interest payment, split, dividend, withdrawal or other distribution, reclassification, redemption or any other change declared or made in the capital structure of Borrower or otherwise.

180.    Section 17.1 of the Membership Pledge defines a "Default" as "[a]ny 'Event of Default' as defined in the Loan Agreement." MSI has breached the Loan Agreement by failing to comply with its obligations under the Loan Agreement and defaulted in payment on the Note (*See* ¶ 124), constituting Events of Default under Section 9.1 of the Loan Agreement.

181.    Semarjian, Lichter, and MSI were all active participants in an organized scheme to defraud CMB, divert the Loan Proceeds and conceal such diversion.

182.    A UCC Financing Statement was filed with the California Secretary of State.  A copy of the Financing Statement is attached hereto as **Exhibit "P"**.  The financing statement discloses Lichter as the Debtor and describes the Collateral.

183.    CMB's Security interest has attached and was perfected.

184.    CMB, by virtue of the Membership Pledge, is entitled to possession of the Collateral and all rights and benefits commensurate therewith.

WHEREFORE, CMB demands judgment against Defendant, Lichter, for the following:

a.    Declaring CMB is entitled to immediate possession of the Collateral and all rights and commensurate benefits therewith;

47

b.       Directing Lichter to take all necessary action to transfer and deliver the Collateral; and

c.       All such other and further relief as the Court deems just and proper.

## COUNT VI

### Fraud in the Inducement against MSI, MSC, SLP, Lichter, Semarjian

185.    CMB re-alleges and incorporates herein paragraphs 1 through 125, herein.

186.    In the MSI Loan Agreement and First Amendment, MSI and its representatives knowingly misrepresented to CMB that the Loan Proceeds would be used solely for the construction and renovation of the Hoover Project.

187.    Through the false and fraudulent representations and omissions of material fact detailed herein, Defendants, MSI, MSC, SLP, Lichter, and Semarjian knowingly, intentionally, and maliciously induced CMB to enter into the Loan Agreement, the First Amendment, and to transfer $36,000,000 in Loan Proceeds under false pretenses.

188.    Defendants made the false and fraudulent misrepresentations of fact and omissions of material fact for the purpose of inducing CMB to enter into the Loan Agreement and First Amendment and transfer the $36,000,000 in Loan Proceeds.

189.    Defendants had knowledge of the falsity of their representations and/or such reckless or utter disregard for the truthfulness of their representations that knowledge may be inferred.  In particular, Defendants:

a.       fraudulently induced MSI to enter into the Loan Agreement knowing that the Loan Proceeds would not be held or used by MSI;

b.  fraudulently misrepresented to CMB that the Loan Proceeds were to be used solely on the Hoover Project in accordance with the Loan Agreement and the First Amendment;

c.  fraudulently misrepresented that the Loan Proceeds were to be used towards the construction and renovation of the Hoover Project;

d.  fraudulently concealed their intention to divert the Loan Proceeds; and

e.  fraudulently misrepresented that the Hoover Project would acquire $34,600,000 of additional capital; and

f.  fraudulently misrepresented that the Hoover Project would be completed by the end of 2015.

190.  Defendants knew these representations were false, but made the misrepresentations for the purpose of inducing CMB into loaning $36,000,000 to MSI.

191.  In reasonable reliance on Defendants' material misrepresentations, CMB raised funds from EB-5 Investors and loaned $36,000,000 to MSI.

192.  CMB's reliance on Defendants' representations was justifiable.

193.  CMB was harmed as a direct and proximate result of the purposeful and malicious acts of Defendants described herein.

194.  CMB is entitled to recover damages from Defendants, MSI, SLP, Lichter, and Semarjian.

WHEREFORE, CMB demands judgment against Defendants for the following:

a.  Monetary damages;

b.  Punitive damages;

c.  Interest;

d.     All reasonable out-of-pocket costs and expenses, including attorney fees; and

e.     All such other and further relief as the Court deems just and proper.

## COUNT VII

### Fraud in the Concealment Against MSI, MSC, SLP, Lichter, Semarjian, IRG RA, Ohio Realty, IRG, FMS Law, and IRG Market

195.    CMB re-alleges and incorporates herein paragraphs 1 through 125, herein.

196.    Defendants MSI, MSC, SLP, Lichter, Semarjian, IRG RA, Ohio Realty, IRG, FMS Law, and IRG Market, individually and collectively, knowingly concealed from CMB the diversion and misappropriation of the Loan Proceeds through the falsification of financial records and the unlawful restriction of access to records.

197.    Defendants had knowledge of the material fact that the Loan mandates that the Loan Proceeds were to be used solely on the Hoover Project.  CMB would not have entered into the Loan Agreement, First Amendment, or loaned the $36,000,000, if it was aware that Defendants had intended to use the Loan Proceeds for other purposes.

198.    Defendants intentionally falsified and transmitted financial records and restricted access to conceal MSI's records on the Hoover Project and the Goodyear Project records. Defendants knowingly concealed the truth and acted in utter and reckless disregard in perpetrating fraud against CMB.

199.    Defendants knew these representations were false, but made the misrepresentations for the purpose of concealing the misappropriation of the $36,000,000 and misleading CMB.

200.    CMB's reliance on Defendants' representations was justifiable.

201.    CMB was harmed as a direct and proximate result of the purposeful and malicious acts of Defendants described herein.

202.    CMB is entitled to recover damages from Defendants, MSI, MSC, SLP, Lichter, Semarjian, IRG RA, Ohio Realty, IRG, FMS Law, and IRG Market.

WHEREFORE, CMB demands judgment against Defendants for the following:

a.    Monetary damages;

b.    Punitive damages;

c.    Interest;

d.    All reasonable out-of-pocket costs and expenses, including attorney fees; and

e.    All such other and further relief as the Court deems just and proper.

## COUNT VIII

### Fraud Against MSI, MSC, FMS Law, SLP, ICL, Stuart Lichter, Claire Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, IRG Market, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel

203.    CMB re-alleges and incorporates herein paragraphs 1 through 125, herein.

204.    Defendants MSI, MSC, FMS Law, SLP, ICL, Lichter, Claire Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, IRG Market, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel, individually and collectively, knowingly concealed from CMB the diversion and misappropriation of the Loan Proceeds.

205.    As described more fully above, MSI was operating a fraudulent scheme with the assistance of Defendants.

206.    In furtherance of the scheme, and as alleged throughout this Complaint, Defendants knowingly made material false statements, representations, and omissions, including but not limited to ("Falsities"):

a.      fraudulently misrepresenting to CMB that the Loan Proceeds were to be used solely on the Hoover Project in accordance with the Loan Agreement and the First Amendment;

b.      creating and delivering false MSI financial statements;

c.      fraudulently misrepresenting that the Loan Proceeds were in MSI's possession as reported on financial reports;

d.      fabricating fictitious notes (Diversion Notes);

e.      fraudulently misrepresenting that the Loan Proceeds were being used towards the construction and renovation of the Hoover Project;

f.      fraudulently misrepresenting the solvency of MSI;

g.      fraudulently diverting the Loan Proceeds through fraudulent transfers;

h.      the fraudulent transfer of the Loan Proceeds;

i.      fraudulently concealing and misrepresenting the transfer of the Loan Proceeds to the Transferees; and

j.      fraudulently concealing the diversion of the Loan Proceeds by purposefully ceasing its obligations to report financial information and reports to CMB on the Goodyear Project

207.    The Defendants intended for CMB to act on their knowingly false representations and omissions.

208.    CMB justifiably relied on Defendants' Falsities.

209.    As a direct and proximate cause of Defendants' Falsities, CMB has sustained damages.

210.    CMB is entitled to recover damages from Defendants, MSI, MSC, FMS Law, SLP, ICL, Lichter, Claire Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, IRG Market, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel.

WHEREFORE, CMB demands judgment against Defendants for the following:

a.    Monetary damages;

b.    Punitive damages;

c.    Interest;

d.    All reasonable out-of-pocket costs and expenses, including attorney fees; and

e.    All such other and further relief as the Court deems just and proper.

## COUNT IX

### Fraudulent Conveyance Pursuant to Ohio Rev. Code Ann. § 1336.04(A)
### Ohio's Uniform Fraudulent Transfer Act Against  MSI, FMS Law, SLP, ICL,
### Stuart Lichter, Claire Lichter, IRG Master, Kaplan Trust, Eric Kaplan, Tracy Kaplan,
### Haas Trust, Haas, and Woelfel

211.    CMB re-alleges and incorporates herein paragraphs 1 through 125, herein.

212.    Pursuant to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code Ann. § 1336.08(B)(1), judgment may be entered against either: (a) the first transferee of an asset or the person whose benefit the transfer was made; (b) any subsequent transferee other than a good faith transferee who took for value or from a subsequent transferee.

213.    The transfers of the Loan Proceeds from the FMS Law Special Client Trust Account, and at the direction of Lichter and Semarjian, MSI, FMS Law, and SLP to the Transferees: (i) Stuart and Claire Lichter; (ii) IRG Master; (iii) Kaplan Trust; (iv) Haas Trust; (v) Haas; and (vi) ICL, were fraudulent transfers under R.C. § 1336.04(A) because the transfers were made with the actual intent to hinder, delay, or defraud CMB, including but not limited to:

a.    The transfers were made to "Insiders" pursuant to R.C. § 1336.01:

i.      Lichter is the sole shareholder and President of SLP.  SLP is the Manager of MSI and IRG Market;

ii.     Lichter holds 55% in membership interests in IRG Master;

iii.    At all times material, Lichter held 50% of membership in MSI and jointly controls MSI with Semarjian;

iv.    Claire Lichter is the wife of Lichter;

v.     Semarjian holds 50% membership in MSI and jointly controls MSI with Lichter;

vi.    Semarjian is the sole member of ICL;

vii.   Kaplan Trust was formerly a member of MSI and MSC and conveyed its 4.02% membership interests in MSC in exchange for payment of the Loan Proceeds.  Eric Kaplan and Tracy Kaplan are Trustees of the Kaplan Trust;

viii.  Haas Trust was formerly a member of MSI and MSC and conveyed its 5.62% membership interests in MSC in exchange for payment of the Loan Proceeds.  Haas and Woelfel are Trustees of the Haas Trust;

ix.    FMS Law is a law firm representing MSI, Lichter, IRG RA, and IRG. FMS Law held the Loan Proceeds in its Special Client Trust; and

x.     John Mase is CEO of IRG.  John Mase is either currently or formerly associated with FMS Law which still bears his name.  Mase is also the CEO of IRG Holdings Manager, LLC, the Manager for IRG Master;

b.    MSI, FMS Law, SLP, IRG RA, Ohio Realty, IRG, Lichter, Semarjian, FMS Law, SLP and ICL concealed from CMB the transfer of the Loan Proceeds to the

above-mentioned recipients.  CMB reasonably believed – based on the terms of the Loan Agreement, First Amendment, and the Note - that the Loan Proceeds would have been held by MSI for use on the Hoover Project.

c. The fraudulent transfers of the $36,000,000 represented substantially all of the assets of MSI, rendering MSI insolvent.

d. The Transferees received Loan Proceeds without paying any consideration that was reasonably equivalent to the asset transferred.

214. As a result of the fraudulent transfers of the Loan Proceeds, CMB is entitled to the following remedies:

a. Avoidance of the transfers to satisfy CMB's claims;

b. Attachments or garnishments against the assets transferred or other property of the Transferees in accordance with Chapters 2715 and 2716 of the Ohio Revised Code;

c. An injunction against further disposition by MSI, FMS Law, SLP, ICL, and the Transferees, of the assets transferred or of other property;

d. Appointment of a receiver to take charge of the assets transferred or of other property of the Transferees pursuant to Ohio R.C. § 1336.07(A)(3)(b);

e. Punitive damages pursuant to Ohio R.C. § 1336.10;

f. Attorney's fees pursuant to Ohio R.C. § 1336.10; and

g. Any other relief that circumstances may require.

## COUNT X

### Civil Conspiracy Against MSI, MSC, FMS Law, SLP, ICL, Stuart Lichter, Claire Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, IRG Market, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel

215.    CMB re-alleges and incorporates herein paragraphs 1 through 125, and 185 through 214, herein.

216.    Defendants, MSI, MSC, FMS Law, SLP, ICL, Lichter, Claire Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel, acted in concert with each in order to commit a fraudulent scheme against CMB.  Defendants actively participated in a civil conspiracy among themselves, the purpose of which was to fraudulently divert the Loan Proceeds.

217.    Defendants had a preconceived plan, unity of purpose and common design to defraud CMB. Defendants all had knowledge that the Loan Proceeds were to be used for the Hoover Project and intentionally and purposefully misrepresented or failed to disclose to CMB that the Loan Proceeds were diverted.

218.    CMB further states that during the course of the conspiracy, the conspirators/Defendants, acting in concert, engaged in numerous acts to further the conspiracy, including but not limited to:

    a.    MSI, MSC, SLP, Lichter, and Semarjian fraudulently induced MSI to enter into the Loan Agreement knowing that the Loan Proceeds would not be held or used by MSI;

    b.    MSI, MSC, SLP, Lichter, and Semarjian fraudulently misrepresented to CMB that the Loan Proceeds were to be used solely on the Hoover Project in accordance with the Loan Agreement and the First Amendment;

c.     MSI, MSC, SLP, FMS Law, Lichter, and Semarjian fraudulently misrepresented that the Loan Proceeds were to be used towards the construction and renovation of the Hoover Project;

d.     MSI, MSC, SLP, Lichter, and Semarjian fraudulently misrepresented that the Hoover Project would acquire $34,600,000 of additional capital;

e.     MSI, MSC, SLP, Lichter, and Semarjian fraudulently misrepresented that the Hoover Project would be completed by the end of 2015;

f.     MSI, Lichter, Semarjian, IRG RA, Ohio Realty, and IRG created and delivered false MSI financial statements to CMB;

g.     MSI, Lichter, Semarjian, IRG RA, Ohio Realty, and IRG fraudulently misrepresented that the Loan Proceeds were in MSI's possession as reported on financial reports;

h.     MSI, Lichter, Semarjian, IRG RA, and IRG fabricated fictitious notes (Diversion Notes);

i.     MSI, Lichter, Semarjian, IRG RA, and IRG fraudulently misrepresented the solvency of MSI;

j.     MSI, MSC, FMS Law, SLP, ICL, Lichter, Claire Lichter, IRG Master, Semarjian, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel for the fraudulent transfer of the Loan Proceeds;

k.     MSI, Lichter, Semarjian, IRG RA, and IRG fraudulently concealed and misrepresented the transfer of the Loan Proceeds to the Transferees; and

l.　　IRG Market concealed the diversion of the Loan Proceeds by purposefully ceasing its obligations to report financial information and reports to CMB on the Goodyear Project.

219.　As a result of the conspiracy described herewith, CMB is entitled to recover damages from Defendants, MSI, MSC, FMS Law, SLP, ICL, Lichter, IRG Master, IRG RA, Ohio Realty, IRG, Semarjian, Kaplan Trust, Eric Kaplan, Tracy Kaplan, Haas Trust, Haas, and Woelfel

WHEREFORE, CMB demands judgment against Defendants for the following:

a.　　Monetary damages;

b.　　Punitive damages;

c.　　Interest;

d.　　All reasonable out-of-pocket costs and expenses, including attorney fees; and

e.　　All such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
*Counsel for Plaintiff, CMB Infrastructure Investment Group X, L.P.*
1375 East 9th Street, Suite 2250
Cleveland, Ohio 44144
Telephone: 216.344.9422
Facsimile: 216.344.9421
E-Mail: todd.gray@lewisbrisbois.com
E-Mail: john.christie@lewisbrisbois.com


By: /s/ John R. Christie
　　　John R. Christie, Ohio Bar No. 0067570
　　　Todd A. Gray, Ohio Bar No. 0071568

— AND

Kenneth J. Joyce, *Pro Hac Vice*
Stacy M. Schwartz, *Pro Hac Vice*
Andrew Zelman, *Pro Hac Vice*
Michael Platner, Florida Bar No. 366331
Jeffrey Weinstock, Ohio Bar No. 0066784
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
*Counsel for Plaintiff, CMB Infrastructure Investment Group X, L.P.*
110 SE 6th Street, Suite 2600
Fort Lauderdale, Florida 33301
Telephone:  954.728.1280
Facsimile:  954.728.1282
E-Mail:  Ken.Joyce@lewisbrisbois.com
E-Mail:  Stacy.Schwartz@lewisbrisbois.com
E-Mail:  Andrew.Zelman@lewisbrisbois.com
E-Mail:  Michael.Platner@lewisbrisbois.com
E-Mail:  Jeffrey.Weinstock@lewisbrisbois.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served electronically to all Parties on this 1st day of August, 2017.

By:  /s/ John R. Christie
John R. Christie, Ohio Bar No. 0067570
Todd A. Gray, Ohio Bar No. 0071568